**No. 22-15288**

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

PRESTON LEE,

Plaintiff-Appellant

v.

L3HARRIS TECHNOLOGIES, INC.

Defendant-Appellee

On Appeal from the United States District Court
District of Hawaii Civil No. 1:20-00489 (LEK/KJM)
(Honorable Leslie E. Kobayashi)

**APPELLANT'S EXCERPTS OF RECORD
VOLUME 2 of 3**

FUJIWARA AND ROSENBAUM, LLLC

JOSEPH T. ROSENBAUM          9205
ELIZABETH JUBIN FUJIWARA     3558
Topa Financial Center
745 Fort St, Ste 1501
Honolulu, Hawaii 96813
Telephone: (808) 203-5436

Attorney for Plaintiff-Appellant
PRESTON LEE

CADES SCHUTTE LLP
A Limited Liability Law Partnership

AMANDA M. JONES          8854
MICHAEL R. SOON FAH      11156
1000 Bishop Street, Suite 1200
Honolulu, HI 96813-4212
Telephone: (808) 521-9200
FAX: (808) 521-9210
Email:    ajones@cades.com
          msoonfah@cades.com

Attorneys for Defendant
L3HARRIS TECHNOLOGIES, INC.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAIʻI

| | |
|---|---|
| PRESTON LEE,<br><br>        Plaintiff,<br><br>    v.<br><br>L3HARRIS TECHNOLOGIES, INC.;<br>JOHN DOES 1-10; JANE DOES 1-10;<br>DOE CORPORATIONS 1-10; DOE<br>PARTNERSHIPS 1-10; DOE<br>UNICORPORATED<br>ORGANIZATIONS 1-10; and DOE<br>GOVERNMNENTAL AGENCIES 1-10.<br><br>        Defendants. | CIVIL NO. 1:20-CV-00489 LEK-KJM<br>(Other Civil Action)<br><br>**DEFENDANT L3HARRIS<br>TECHNOLOGIES, INC.'S REPLY<br>MEMORANDUM IN SUPPORT OF<br>ITS MOTION FOR SUMMARY<br>JUDGMENT ON ALL CLAIMS;**<br><br>**CERTIFICATE OF COMPLIANCE<br>WITH WORD LIMIT;**<br><br>**CERTIFICATE OF SERVICE** |

**DEFENDANT L3HARRIS TECHNOLOGIES, INC.'S
REPLY MEMORANDUM IN SUPPORT OF ITS MOTION
FOR SUMMARY JUDGMENT ON ALL CLAIMS**

# TABLE OF CONTENTS

**Page**

A.    The Opp. Did Not Address Fatal Deficiencies With the Discrimination Claims Based on Pre-Termination Events. ................1

B.    Plaintiff's Claims of Discrimination Based on His Termination Fail Because He Has Not Established a Prima Facie Case or Demonstrated L3Harris's Reasons Were Pretextual...........................4

    1.    Plaintiff cannot establish he is a "qualified individual." ...........4

    2.    Plaintiff should be estopped from arguing he is a "qualified individual."................................................................8

    3.    Plaintiff cannot establish L3Harris terminated him because of PTSD.......................................................10

    4.    L3Harris's reasons for terminating Plaintiff were not pretextual..................................................................12

C.    Plaintiff's Retaliation Claim Fails Because He Cannot Establish Causation or Pretext. .......................................................13

D.    Plaintiff's HWPA Claim Has Similar Fatal Defects. ........................14

ER 047

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alamillo v. BNSF Ry. Co.*,
    869 F.3d 916 (9th Cir. 2017) ........................................................7

*Alvarez v. Sch. Bd. of Broward Cty.*,
    208 F.Supp.3d 1281 (S.D. Fla. 2016) ..........................................8

*Casumpang v. Hawaiian Com. & Sugar Co.*,
    Civ.12-00694, 2014 WL 4322168 (D. Haw. Aug. 29, 2014) ............12

*Cleveland v. Pol'y Mgmt. Sys. Corp.*,
    526 U.S. 795 (1999) .............................................................4, 8, 9

*Curley v. City of N. Las Vegas*,
    772 F.3d 629 (9th Cir. 2014) .......................................................5

*Dark v. Curry County*,
    451 F.3d 1078 (9th Cir. 2006) .....................................................7

*Feldman v. Am. Mem'l Life Ins. Co.*,
    196 F.3d 783 (7th Cir. 1999) .......................................................9

*Gambini v. Total Renal Care*,
    486 F.3d 1087 (9th Cir. 2007) .....................................................7

*Humphrey v. Mem'l Hosps. Ass'n*,
    239 F.3d 1128 (9th Cir. 2001) .....................................................7

*Kimbro v. Atlantic Richfield Co.*,
    889 F.2d 869 (9th Cir. 1990) .......................................................7

*Kuhn v. Washtenaw Cnty.*,
    709 F.3d 612 (6th Cir. 2013) .....................................................15

*Lewis v. Ameron Int'l*,
    Civ.12-00453, 2014 WL 2968918 (D. Haw. July 1, 2014) ...............15

i

*Mayo v. PCC Structurals, Inc.*,
    795 F.3d 941 (9th Cir. 2015) .......................................................................5, 6, 9

*Pietro v. Walt Disney Co.*,
    SACV11-0819, 2012 WL 4755415 (C.D.Cal. Oct. 4, 2012) ..............................7

*Reed Elsevier, Inc. v. Muchnick*,
    559 U.S. 154 (2010)...........................................................................................9

*Sch. Dist. No.1J, Multnomah Cty., Or. v. ACandS, Inc.*,
    5 F.3d 1255 (9th Cir. 1993) ..............................................................................2

*Villiarimo v. Aloha Island Air, Inc.*,
    281 F.3d 1054 (9th Cir. 2002) .........................................................................12

*Westendorf v. W.Coast Contractors of Nevada, Inc.*,
    712 F.3d 417 (9th Cir. 2013) .............................................................................4

*Yonemoto v. Shulkin*,
    725 F.App'x 482 (9th Cir. 2018) .......................................................................6

**Statutes**

42 U.S.C. Section 2000e-5(e)(1)...........................................................................3

Haw. Rev. Stat. Section 368-11(c)(1) ...................................................................3

L3Harris Technologies, Inc. ("**L3Harris**") submits this reply in support of its Motion for Summary Judgment ("**Motion**") to address Plaintiff's Memorandum in Opposition to the Motion ("**Opp.**").

## A.   The Opp. Did Not Address Fatal Deficiencies With the Discrimination Claims Based on Pre-Termination Events.

Plaintiff's Opp. ignores some of the fatal deficiencies identified in the Motion concerning alleged events prior to the termination of Plaintiff's employment.  Plaintiff has tacitly conceded that these claims should be dismissed.

The Opp. did not dispute that Plaintiff did not file a timely charge of discrimination with respect to the alleged harassment by his co-workers.  The Opp. confirms the alleged harassment occurred in February and March 2019,[1] which is more than 180 and 300 days prior to the filing of Plaintiff's first charge, and thus, untimely. HRS §368-11(c)(1); 42 U.S.C. §2000e-5(e)(1).

The Opp. also failed to address that the alleged conduct was not actionable because the co-workers' comments were not severe or pervasive and there was no evidence of negligence by L3Harris, *i.e.*, that any harassment occurred after notice to L3Harris. Mem. in Supp. of Motion at 12.  In his declaration, Plaintiff claims he said during the November 18, 2019 disciplinary meeting that he felt he was being "singled out" due to his PTSD diagnosis. Lee Decl. ¶111. Even if Plaintiff could be

---

[1] *See* Opp. at 4; Plaintiff's Concise Statement ("**Lee CSF**") ¶¶14-15; Declaration of Preston Lee [Doc. 61-5] (**Lee Decl.**) ¶¶29-35.

1

found to have complained of discrimination during this meeting, contradicting his sworn statements[2], Plaintiff identifies no harassment occurring thereafter.  Plaintiff left work to see his doctor after the disciplinary meeting and never returned to the workplace. Lee CSF ¶22; Lee Decl. ¶¶111-12; Ex. B at 67:3-:21.

Similarly, the Opp. did not dispute that Plaintiff did not timely file a charge of discrimination with respect to the alleged improper questioning during a meeting that Plaintiff admits occurred in March 2019.  Lee Decl. ¶50. Thus, any claims based on this allegation or alleged co-worker harassment must be dismissed for failure to timely file a charge with respect to those alleged events.

Regarding the collection of Plaintiff's CAC badge during his extended absence, Plaintiff does not dispute that Manu Kai policy specified that employees "shall surrender" the badge when "beginning an extended leave of absence of 30-days or more," Ex. W ¶6.10. Plaintiff's absence undisputedly satisfied that period. Concise Statement ¶23.  Plaintiff argues other employees went on leave and were not asked to return their badges, Opp. at 11, but Plaintiff produced no information

---

[2] Plaintiff did not identify any such complaint in his sworn response to an interrogatory request wherein the only complaints he identified were those filed with the EEOC/HCRC. Ex. J to the Motion #14. Under the "Sham-Affidavit Rule," Plaintiff cannot create a question of fact by submitting a declaration which contradicts his prior deposition testimony or interrogatory responses. *See Sch. Dist. No.1J, Multnomah Cty., Or. v. ACandS, Inc.*, 5 F.3d 1255, 1264 (9th Cir. 1993) (explaining that "a party should not be able to substitute an affidavit alleging helpful facts for earlier deposition testimony harmful to its case in order to avoid summary judgment" and that this rule "applies to conflicts between affidavits and interrogatory responses as well as deposition testimony").

2

regarding the length of the absences.   Plaintiff proffered no evidence that the request to return the badge was based on a disability. Moreover, since Plaintiff was on leave from work, he had no need for the badge and thus suffered no harm from its retrieval.

Plaintiff's complaint that he was unfairly disciplined in November 2019 fails because he admits that he violated the Code of Conduct during the incident with Igne, Lee CSF ¶18. Plaintiff cannot establish he was disciplined not for that violation, but for his PTSD diagnosis, which L3Harris learned about at least eight months earlier, CSF ¶14.

Plaintiff erroneously contends his co-workers later refuted their statements about the incident.  To the contrary, Castro and Hesapene testified that they spoke honestly to their supervisor about what happened between Plaintiff and Igne, and signed statements describing Plaintiff's angry, profane verbal attack. Ex.BB (Castro Depo.) at 16:6-19:2 & Ex.2; Ex.CC (Hesapene Depo.) at 26:18-28:6 & Ex.3. Whether these individuals presently believe Plaintiff's conduct was threatening is irrelevant.  What matters is the information presented at the time the disciplinary decision was made, all of which, including Plaintiff's own statement about the incident (Ex. O) demonstrated that Plaintiff angrily yelled and swore at Igne "in a loud disruptive manner" (*id.*) because Igne had earlier directed Plaintiff to put on rain pants. Ex. N, P-R.  Plaintiff may disagree about who was at fault, but

3

based on the signed statements describing what occurred, Plaintiff cannot establish that L3Harris did not believe disciplinary action was warranted. *Westendorf v. W.Coast Contractors of Nevada, Inc.*, 712 F.3d 417, 425 (9th Cir. 2013) ("If the employee presents no evidence that the employer did not believe its proffered justification, summary judgment in favor of the employer is warranted.").

**B.    Plaintiff's Claims of Discrimination Based on His Termination Fail Because He Has Not Established a *Prima Facie* Case or Demonstrated L3Harris's Reasons Were Pretextual.**

Plaintiff's discrimination claim based on his termination fails because he cannot meet his burden to make a *prima facie* case. The Opp. misunderstands the requirements for demonstrating Plaintiff is a "qualified individual" and the law regarding estoppel.  Even if he could overcome those problems, Plaintiff cannot establish he was terminated "because of his disability" given that L3Harris was undisputedly aware of Plaintiff's PTSD diagnosis more than a year before Plaintiff's employment was terminated.   Finally, Plaintiff has not submitted evidence demonstrating the legitimate, non-discriminatory reasons for terminating Plaintiff were pretextual.

1.    <u>Plaintiff cannot establish he is a "qualified individual."</u>

Plaintiff bears the burden of proving he is a "qualified individual with a disability." *Cleveland v. Pol'y Mgmt. Sys. Corp.*, 526 U.S. 795, 806 (1999). The Opp. suggests Plaintiff satisfies the standard because he never had a physical

altercation at work and disputes having made threats on which he intended to act. Opp. at 14-17. These arguments miss the mark.

It is undisputed that Plaintiff's co-worker, David Hesapene, reported to L3Harris on November 7 that Plaintiff, still upset from having been told by Igne to put on rain pants the day before, said that he did not care if he lost his job, and that he was going to "punch Sean through his face." Ex. P (Hesapene Statement); Ex.CC (Hesapene Depo.) at 28:13-21 & Ex.3 (confirming same). Although Plaintiff now argues otherwise, at his deposition, Plaintiff testified, "I might have said I like punch him in his face but that's just speaking out loud." Ex. B at 49:22-:24.

The law does not require an employer to take the risk on whether an employee will act upon threats or wait for a violent incident before deciding to terminate, particularly where co-workers come forward with concerns about the threat-making employee returning to the workplace.[3] *Curley v. City of N. Las Vegas*, 772 F.3d 629, 632 (9th Cir. 2014) (holding an employer can terminate based on past threats, regardless of if that employee poses any actual danger); *Mayo v. PCC Structurals, Inc.*, 795 F.3d 941, 944 (9th Cir. 2015) (recognizing that the ADA does not require an employer to stand on a "razor's edge" by retaining an

---

[3] The fact that not all employees were fearful of Plaintiff does not excuse the threat that was made or Plaintiff's angry outburst, which did understandably cause concern for certain of his co-workers.

employee who has made violent threats against a co-worker).

The Opp. argues Plaintiff's conduct should be excused because "[c]onduct resulting from a disability is considered to be part of the disability, rather than a separate basis for termination." Opp. at 19 (citing *Humphrey, Gambini, Dark*, and *Kimbro*). This argument fails for several reasons.

First, in *Mayo*, the Ninth Circuit rejected that very argument because those cases did not address whether the plaintiff could make a *prima facie* case by demonstrating he was a "qualified individual," 795 F.3d at 946-47, which is the issue here. As *Mayo* recognized, an employee whose inability to control his stress leads to threats is not a "qualified individual," even if the stress was caused by a disability. *Id.*; *see also id.* at 944 ("[A]n essential function of almost every job is the ability to appropriately handle stress and interact with others."); *Yonemoto v. Shulkin*, 725 F.App'x 482, 484 (9th Cir. 2018) (holding that an employee cannot perform his essential job functions if he is "unable to complete substantive work independently, take constructive criticism, and avoid interpersonal issues").

Second, Plaintiff presented no evidence that his actions that led to his termination were caused by his PTSD. Instead, he blames Igne and others for conduct that he now argues was no big deal. Plaintiff still does not accept responsibility for his actions, much less proffer evidence that his conduct was caused by his disability. Courts have distinguished *Humphrey* in these

6

ER 055

circumstances. *Alamillo v. BNSF Ry. Co.*, 869 F.3d 916, 921 (9th Cir. 2017) (holding that "no reasonable jury could find the requisite causal link" between the plaintiff's disability and attendance violations where the plaintiff produced no evidence that his disability caused the violations); *Pietro v. Walt Disney Co.*, SACV11-0819, 2012 WL 4755415, at *9 (C.D.Cal. Oct. 4, 2012) ("Unlike in *Humphrey*, where plaintiff produced documents from both a doctor and a psychologist attesting to this causal link, here Plaintiff's doctor wrote that Plaintiff 'can return to full duties with no restrictions on 4/14/2008.'").

Third, a critical issue in each of the cited cases was that the employees requested accommodations that arguably could have prevented the disability-induced problems that led to their terminations. *See Humphrey v. Mem'l Hosps. Ass'n*, 239 F.3d 1128, 1140 (9th Cir. 2001); *Gambini v. Total Renal Care*, 486 F.3d 1087, 1094 (9th Cir. 2007); *Dark v. Curry County*, 451 F.3d 1078, 1089–90 (9th Cir. 2006); *Kimbro v. Atlantic Richfield Co.*, 889 F.2d 869, 879 (9th Cir. 1990). In contrast, Plaintiff admits he was asked and he ***denied the need for any accommodation***. Lee Decl. ¶59-60. Plaintiff does not contend he later requested any accommodation[4], or that one could have provided to prevent the conduct that

---

[4] The Opp. argues that L3Harris did not offer Plaintiff any accommodation when he was ready to return from his extended leave. Opp. at 21. But Plaintiff does not allege he asked for an accommodation at that time, and even if he had, it was too late. *Alamillo*, 869 F.3d at 922 ("Since reasonable accommodation is always prospective, an employer is not required to excuse past misconduct even if

led to his termination.

In this case, the record shows that Plaintiff yelled and swore at Igne because of an instruction to wear pants while pressure washing, and the next day, he told a co-worker he wanted to punch Igne. After being warned his actions were inappropriate and disruptive, Plaintiff claimed he was unable to work for months and during his absence, made statements to Dr. Bianchi that raised legitimate concerns about Plaintiff's ability to safely return and work with others. Based on this evidence, Plaintiff cannot establish that he is capable of taking constructive criticism and avoiding interpersonal issues as required for all jobs.

    2.    **Plaintiff should be estopped from arguing he is a "qualified individual."**

Plaintiff should also be estopped from arguing he is a "qualified individual" based on the records he submitted to the VA in support of his claim for 100% disability benefits. Plaintiff asks the court to disregard the estoppel argument because L3Harris did not have Plaintiff's statements to the VA when it made the termination decision. Opp. at 16; Lee Decl. ¶23. L3Harris has not suggested otherwise, nor does the estoppel doctrine articulated in the Supreme Court's *Cleveland* decision and its progeny require it. Rather, Plaintiff is estopped because

---

it is the result of the individual's disability.") (quoting EEOC Enforcement Guidance); *Alvarez v. Sch. Bd. of Broward Cty.*, 208 F.Supp.3d 1281, 1286 (S.D.Fla. 2016) ("An employer generally is not required to grant a request for reasonable accommodation after the occurrence of workplace misconduct that warrants demotion or termination.").

his statements about his ability to work with others in this action are contradicted by the statements made in documents that he admits he submitted to the VA in support of his successful disability benefits claim. Lee CSF ¶¶5-12; *Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154, 170 (2010) (explaining that estoppel focuses on the party's prior statements and applies when "a party has succeeded in persuading a [tribunal] to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second [tribunal] was misled") (internal quotations omitted).

Plaintiff has not attempted to reconcile his statements to the VA with his current assertion that he is a qualified individual because he cannot. Plaintiff's submissions to the VA are replete with statements establishing he cannot "appropriately handle stress and interact with others." *Mayo*, 795 F.3d at 944; Concise Statement ¶¶5-12. The problem is not that Plaintiff applied for disability benefits, but that the ***factual findings and statements*** in the documents that he submitted to obtain those benefits and a 100% disability rating contradict his contentions here that he is qualified. *Feldman v. Am. Mem'l Life Ins. Co.*, 196 F.3d 783, 791 (7th Cir. 1999) ("Although *Cleveland* clarified that an ADA claim is not estopped simply because an individual applied for or received SSDI benefits, a plaintiff cannot avoid summary judgment merely by asserting that she is a qualified individual if she made prior statements, in applying for SSDI, regarding

9

her disability that are squarely contradictory.").

Plaintiff argues his statements to the VA are not disqualifying because he is able to control his emotions at work and had no thoughts of hurting his co-workers. (Lee Decl. ¶¶ 37-38, 132, 150). But the records that Plaintiff submitted to the VA to obtain benefits say the opposite, reflecting Plaintiff's problems penetrated into the work environment, directly affected work relationships and his thoughts about his co-workers, and impeded his ability to control his actions without devolving to violence. Ex. H (Progress Notes at 7 and 13 of 16); Ex. I (pages 3, 5, and 9 of 10). The VA relied on those assertions in awarding Plaintiff taxpayer-funded benefits. Ex. D at 4. Plaintiff cannot come to this court with a contrary story about his ability to function effectively in the workplace. Because Plaintiff cannot demonstrate he is a "qualified individual," he cannot make a *prima facie* case of discrimination.

3.    <u>Plaintiff cannot establish L3Harris terminated him because of PTSD.</u>

Plaintiff also cannot demonstrate he was terminated because of PTSD. As temporal proximity is absent, Plaintiff tries to invoke the cat's paw theory, arguing that Igne influenced the decision to terminate Plaintiff's employment. Opp. at 22. This argument fails for several reasons.

First, even assuming the cat's paw theory could apply to a non-supervisory employee like Igne, there is no evidence that his complaint in November 2019 was

motivated by disability-based bias. Plaintiff contends he told Igne about his PTSD diagnosis in February 2019. Lee Decl. ¶26. Igne's complaint was nine months later concerning conduct occurring that day, and does not mention PTSD. Ex. N.

Second, L3Harris did not act based solely on Igne's complaint. Mr. Martin conducted an investigation, interviewing Plaintiff and his co-workers who witnessed the incident. Those statements (including Plaintiff's own statement) established that Plaintiff angrily yelled and swore at Igne for no good reason. Exs. O-R. Based upon these statements and Plaintiff's admission that his actions violated company policy, Plaintiff cannot establish that L3Harris simply adopted Igne's complaint, but rather, verified there was a legitimate basis for discipline.

Third, the conduct addressed in Igne's complaint was not the sole reason for Plaintiff's termination. As explained in the Motion, after Plaintiff was disciplined for his conduct towards Igne, Plaintiff's co-workers (through the union) submitted signed statements expressing concern for their safety if Plaintiff returned to the workplace. Stewart Decl. ¶7; Ex.BB (Castro Depo) at 40:1-42:10 & Ex.4. After that, Plaintiff made concerning statements to Dr. Bianchi, Ex. Z, and Keaki required a medical clearance guaranteeing that Plaintiff was not a danger, which L3Harris could not provide, Stewart Decl. ¶12. Igne was not involved with those events, which culminated in the termination of Plaintiff's employment. Thus, the cat's paw theory does not save Plaintiff from the fatal problem that he cannot

11

ER 060

establish he was terminated because of PTSD.

4.    L3Harris's reasons for terminating Plaintiff were not pretextual.

Even if Plaintiff could make a *prima facie* case, summary judgment should be granted because Plaintiff has not submitted evidence demonstrating that the reasons for termination described in the declarations of Ms. Stewart and Mr. Kreider were pretextual.[5]    Plaintiff disagrees on how the company should have handled the situation wherein Plaintiff had a profanity-laced outburst, made a threat to punch his co-worker, was unable to handle a disciplinary meeting to address that conduct, and made concerning statements to Dr. Bianchi, and where Plaintiff's co-workers expressed fear about his return to the workplace and Keaki required a guarantee of safety before it would allow Plaintiff to return.    Even assuming the assessment was wrong that these circumstances raised concerns about employee safety and workplace disruption warranting termination, the question is not whether the employer's decision was wise or correct.    "[C]ourts only require that an employer honestly believed its reason for its actions, even if its reason is foolish or trivial or even baseless." *Villiarimo v. Aloha Island Air, Inc.,*

---

[5] Plaintiff asks that the declarations be stricken as to "any events that Ms. Stewart and Mr. Kreider did not have personal, firsthand knowledge of, such as what occurred in the workplace and at meetings with HR on Kauai for L3." Opp. at 13. The purpose for these declarations was not to identify what happened in the workplace, but to establish the legitimate, non-discriminatory reasons for terminating Plaintiff's employment. They are admissible for that purpose. *See Casumpang v. Hawaiian Com. & Sugar Co.,* Civ.12-00694, 2014 WL 4322168, *16 (D.Haw. Aug. 29, 2014), aff'd, 712 F.App'x 709 (9th Cir. 2018).

281 F.3d 1054, 1063 (9th Cir. 2002). There is no evidence demonstrating that L3Harris did not honestly believe the articulated reasons for terminating Plaintiff's employment. For this additional reason, summary judgment should be entered on Plaintiff's discrimination claims.

## C.   Plaintiff's Retaliation Claim Fails Because He Cannot Establish Causation or Pretext.

The Opposition lumps together the discussion of Plaintiff's retaliation and whistleblower claims. Because the conduct protected by the disability discrimination and whistleblower statutes is different, the claims should be separately analyzed. Relevant to his retaliation claim based on the ADA and state law, the only complaints of discrimination Plaintiff identified in his sworn interrogatory responses were the EEOC/HCRC charges, the first of which was filed in late February 2020. Ex. J #14. Given the initial decision to terminate Plaintiff was made in January 2020 (before the charge was filed), and deferred because Plaintiff extended his leave, and there is no evidence showing that Plaintiff was terminated "because of" the filing of the charges, Plaintiff failed to establish a prima facie case of retaliation.

Plaintiff attempts to create a factual question by suggesting he referenced being "singled out" due to PTSD during the November 2019 disciplinary meeting. However, as discussed above, any suggestion that he made an earlier complaint is contradicted by his sworn interrogatory responses, which identify the

13

ER 062

EEOC/HCRC charges as the only discrimination complaints Plaintiff made. Ex. J #14.

The Opp. argues a "pattern of antagonism" can give rise to an inference of causation and argues such a pattern "culminated in **Mr. Ho's** termination." Opp. at 24 (emphasis added). This argument seems to have been copied from another brief with different facts. No such pattern existed here. It is undisputed that Plaintiff disclosed his PTSD diagnosis in February 2019, and L3Harris was aware of it no later than March 2019. Lee CSF ¶14. Following the meeting where Plaintiff was asked and he denied the need for any accommodation, *id.*, no action was taken against him until the disciplinary warning in November 2019, prompted by Plaintiff's angry outburst toward Igne.

Even if Plaintiff could make a *prima facie* case, for the reasons described above, Plaintiff has not demonstrated that L3Harris's legitimate reasons for terminating Plaintiff's employment were pretextual. Furthermore, Plaintiff should be estopped from arguing it was wrongful to terminate Plaintiff's employment given the statements in Plaintiff's documentation submitted to the VA. Plaintiff's retaliation claim should be dismissed.

**D.    Plaintiff's HWPA Claim Has Similar Fatal Defects.**

Apparently recognizing problems with his "gas theft" allegations he initially claimed supported his whistleblower claim, the Opp. argues this claim is also

premised on Plaintiff's alleged objection to the handling of his "CAC/secret clearance card." Opp. at 25. However, Plaintiff testified unequivocally at his deposition that he did <u>not</u> express his alleged concerns that the handling of his card was illegal when Ross West asked for the card because Plaintiff was not going to tell the project manager how to do his job. Ex. B at 100:19-101:20. As noted above, Plaintiff cannot create a factual question through a declaration contradicting his prior testimony.

Plaintiff's gas theft allegation fails because he cannot establish causation. Lacking any evidence that L3Harris would be motivated to fire Plaintiff based on that allegation, Plaintiff attempts to rely on temporal proximity. But temporal proximity is "not the sole measuring stick." *Lewis v. Ameron Int'l*, Civ.12-00453, 2014 WL 2968918, *7 (D.Haw. July 1, 2014); *see also Kuhn v. Washtenaw Cnty.*, 709 F.3d 612, 628 (6th Cir. 2013) ("[A]n intervening legitimate reason to take an adverse employment action dispels an inference of retaliation based on temporal proximity"). One cannot ignore the events that transpired after Plaintiff's allegation. Thereafter, (1) Keaki relayed concerns about Plaintiff's behavior based on Taylor's investigation, (2) L3Harris received statements from Plaintiff's union by co-workers expressing concern for their safety if Plaintiff returned to work; (3) Plaintiff made concerning statements to Dr. Bianchi; and (4) Keaki asked for a guarantee that Plaintiff could safely return, which L3Harris could not provide.

These events were specifically considered in the ultimate decision to terminate Plaintiff's employment. Stewart Decl. ¶14; Kreider Decl. ¶6. Plaintiff presents no evidence that L3Harris did not honestly believe these reasons. Furthermore, Plaintiff should be estopped from asserting it was wrongful to terminate him.

Based on the foregoing and reasons described in the Motion, summary judgment should be granted on all of Plaintiff's claims.

DATED: Honolulu, Hawai'i, October 29, 2021.

CADES SCHUTTE LLP
A Limited Liability Law Partnership

/s/ Michael R. Soon Fah
AMANDA M. JONES
MICHAEL R. SOON FAH
Attorneys for Defendant
L3HARRIS TECHNOLOGIES, INC.

16

ER 065

FUJIWARA AND ROSENBAUM, LLLC

ELIZABETH JUBIN FUJIWARA 3558
JOSEPH T. ROSENBAUM 9205
1100 Alakea St., 20th Fl., Ste B
Honolulu, Hawaii 96813
Telephone: 808-203-5436

Attorneys for Plaintiff
PRESTON LEE

### IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| PRESTON LEE,<br><br>        Plaintiff,<br><br>   vs.<br><br>L3HARRIS TECHNOLOGIES, INC.;<br>JOHN DOES 1-10; JANE DOES 1-10;<br>DOE CORPORATIONS 1-10; DOE<br>PARTNERSHIPS 1-10; DOE<br>UNINCORPORATED<br>ORGANIZATIONS<br>1-10; and DOE GOVERNMENTAL<br>AGENCIES 1-10,<br><br>        Defendants. | ) CIVIL NO. 20-00489 LEK-KJM<br>) (Other Civil Action)<br>)<br>) **PLAINTIFF'S MEMORANDUM**<br>) **IN OPPOSITION TO**<br>) **DEFENDANT L3HARRIS**<br>) **TECHNOLOGIES, INC.'S**<br>) **MOTION FOR SUMMARY**<br>) **JUDGMENT; CERTIFICATE OF**<br>) **SERVICE.**<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

### PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT L3HARRIS TECHNOLOGIES, INC.'S MOTION FOR SUMMARY JUDGMENT

1

Plaintiff PRESTON LEE ("Plaintiff and/or Mr. Lee) **opposes** and urges this

Honorable Court to reject Defendant L3HARRIS TECHNOLOGIES, INC.'s

Motion For Summary Judgment ("Defs.'s Motion").

## I. PERTINENT FACTS

Mr. Lee is a fifty-seven (57) year old a combat veteran who served our

country in the United States Navy from 1982-1992. *See* Declaration of Preston Lee

("Lee Decl.") at ¶ 4 attached to Mr. Lee's Concise Statement of Facts ("CSF"). Mr.

Lee served two tours in the Persian Gulf in the late 1980's/early 1990's and has

PTSD as a result since 1991. *Id.* at 5-11. Mr. Lee never knew what PTSD was until

he was informed of what it is by his doctor in or about 2016-2017 when he spoke

about his PTSD symptoms with his VA doctor. *Id.* at 12. Mr. Lee was formally

diagnosed with PTSD by at least one of his doctor in or about 2017 or 2018. *Id.* at

13.

Mr. Lee was hired on or about March 20, 1994 to work on the Flight Line at

the time ITT Industries ("ITT") was the main contractor for the United States Navy

at Barking Sands on Kaua'i. *Id.* at 14. Mr. Lee worked on the Flight Line as a

helicopter inspector. *Id.* at 15. Mr. Lee was promoted during the time he worked

for ITT. *Id.* at 16. Mr. Lee had PTSD the whole time he worked at Barking Sands

on the Flight Line for ITT and he never once got into any physical altercations in

the workplace and never made any threats against anyone in the workplace. *Id.* at

2

17. He never had any performance issues related to his ability to perform his job

duties. *Id.* at 18. In November 2006, Mr. Lee became a painter. *Id.* at 19.

L3 Harris Technologies, Inc. ("L3") took over the United States Navy

contract Mr. Lee worked under from ITT at Barking Sands in or about 2015. *Id.* at

20. Mr. Lee held the position of painter. *Id.* at 21. The entire time he worked for L3

Mr. Lee had PTSD, he just hadn't been officially diagnosed yet. *Id.* at 22.

Mr. Lee submitted documentation to the VA in 2017 and 2018 requesting

disability benefits related to his PTSD diagnosis that occurred around the same

time. Part of the documentation to the VA reflected Mr. Lee's private thoughts and

feelings related to his PTSD that he conveyed to his physicians. L3 did not have

any of this documentation prior to Mr. Lee's termination. *Id.* at 23.

In February 2019, Mr. Lee received 100% VA disability benefits due to his

PTSD. *Id.* at 24. At the time the VA approved his 100% disability benefits, the VA

knew he was employed at L3 and there is nothing that forbids a military veteran

from receiving 100% VA benefits for PTSD and/or other injuries to continue to

work in the private sector. *Id.* at 25. L3 became aware of Mr. Lee's PTSD

disability via L3 Lead Sean Igne in or about February 2019 after Mr. Lee informed

Mr. Igne Mr. Lee received 100% VA benefits based on his PTSD. *Id.* at 26. Mr.

Lee worked on a day-to-day basis side-by-side alongside Mr. Igne, Gilbert Castro

and David Hesapene at the paint shop for L3. *Id.* at 27. Mr. Lee did not work with

3

L3 employee Mark Vegas on a day-to-day basis as he was not in the paint shop. He was a rigger not a painter. *Id.* at 28.

Since disclosing his PTSD in the workplace, Mr. Lee was harassed and unfairly disciplined. *Id.* at 29. Sean Igne told L3's human resources that he was afraid to work with Mr. Lee because of Mr. Lee's PTSD. *Id.* at 30. In or about February 2019, Mr. Igne asked Mr. Lee why he didn't just retire because he got his 100% VA benefits for PTSD. *Id.* at 31. Mr. Lee told Mr. Igne it was none of his business. *Id.* at 32.

Mr. Igne wrote a letter to L3 to falsely portray Mr. Lee in a negative light as a violent person in the workplace that was a threat to him and Mr. Lee's coworkers. Mr. Igne knew this was false. Mr. Igne has been proven to be a liar and a thief of government gas and has falsified his timecards at work. He is simply a liar and a cheat. *Id.* at 35 and Ex A at pg. 37 lns 10-14, pg 39 ln 11-25, pg. 49 ln 5-25 to pg 50-51, pg 52 ln 19 to pg 54 ln 17.

Mr. Lee had PTSD since 1991 and worked at Barking Sands since 1994 and for L3 since 2015 and Mr. Lee never did anything violent in the workplace and he never threatened or physically harmed anyone. *Id.* at 36. Although PTSD does result in irritability and other negative emotions, part of having this disability is Mr. Lee learning to deal with it and maintain his mental wellbeing through learning coping mechanisms and to not let situations enflame his PTSD. *Id.* at 37.

Through his efforts to keep his PTSD in check, Mr. Lee has always kept it together at work and he has never been violent with anyone at the workplace and he would never. He told L3 the same. *Id.* at 38. Mr. Lee conveyed this to L3's human resources', Julie Broyles, when they asked him about it. Mr. Lee confirmed that he did not want to hurt his coworkers or in any way be violent in the workplace. *Id.* at 39. Mr. Lee has never once been in a physical altercation in the workplace and he has never physically threatened anyone in the workplace. *Id.* at 40.

Working at Barking Sands is and has always been a workplace for blue collar workers and many veterans. It is quite common for the employees to be cursing in the workplace and at each other. *Id.* at 41; Ex A pg 59 ln 5 to pg 60 ln 9. Every day that he worked at L3 Mr. Lee's coworkers were cursing in the workplace. Lee Decl. at 42. Mr. Lee's former manager/supervisor Rod Martin himself would curse in the workplace. Mr. Lee personally heard Mr. Martin curse more than five (5) times. *Id.* at 43. Mr. Igne himself would also curse in the workplace. Mr. Lee has heard Mr. Igne curse at least twice a day when he worked with Mr. Igne. Mr. Lee worked with Mr. Igne for fourteen (14) years. *Id.* at 44. Rod Martin likely heard Mr. Igne curse in the workplace as it was so common. *Id.* at 45. Mr. Lee tried to remain professional in the workplace. *Id.* at 46. Mr. Lee's professional conduct is reflected in that he never had a poor performance review and, in 2019, he received from L3 an award for 25 years of dedicated service. *Id.* at

47. Mr. Lee worked at Barking Sands for 26 years and never was he violent. he might have been loud and might have cursed, but this was commonplace in this blue collar and veteran-filled workplace. *Id.* at 49.

In or about March 2019, Mr. Lee was told by his supervisor, Rodney Martin, to go to the human resources ("HR") at 9:00 a.m. *Id.* at 50. Mr. Lee did as instructed and met with Julie Broyles head of L3 HR in Hawai'i and Jasmine Apo an L3 HR representative. *Id.* at 51. At the meeting, Ms. Broyles confirmed she was aware of Mr. lee's PTSD. *Id.* at 52. Ms. Boynes began to ask Mr. Lee a series of questions listed below related to his PTSD as Ms. Apo took notes. *Id.* at 53. Ms. Broyles stated because of Mr. Lee's PTSD they had to ask him some questions. *Id.* at 54. Ms. Broyles asked, amongst other questions: Do you want to hurt your coworkers? Mr. Lee answered, "No." Do you want to hurt yourself? Mr. Lee answered, "No." Do you want to kill your coworkers? Mr. Lee answered "No." Do you want to kill yourself? Mr. Lee answered, "No." Do you have an anger problem? Mr. Lee answered, "No." Do you want to kill people when you get angry? Mr. Lee answered, "No." Do you need anger management classes? Mr. Lee answered, "No." Do you need a psychiatrist? Mr. Lee answered, "No." Do you have a drug problem? Mr. Lee answered, "No." Do you have an alcohol problem? Mr. Lee answered, "No." *Id.* at 57. Mr. Lee asked them if they were trying to fire him and Ms. Broyles and Ms. Apo said they were there to help him. *Id.* at 58. Ms.

Broyles asked Mr. Lee if he needed any accommodation. *Id*. at 59. Mr. Lee

responded, "No" as he had been functioning in the workplace up to that point for

twenty-five (25) years without accommodation and without any violence or any

other threatening conduct. *Id*. at 60. Mr. Lee had been able to perform his job

duties as a painter for years without anyone calling his ability to do his job

functions into question. Mr. Lee saw no reason for an accommodation. Nothing

had changed. *Id*. at 61.

After he was called in and interviewed by HR, Mr. Lee spoke with L3's Bill

Nordmeier, the operator for grounds department, who informed Mr. Lee that Mr.

Nordmeier also had just received 100% VA disability for his back. *Id*. at 64.

Mr. Nordmeier was still working at L3s although he has 100% VA disability. *Id*. at

65. Due to the way Mr. Lee was questioned by HR after getting his 100% disability

from the federal government, Mr. Nordmeier told Mr. Lee he went to L3 HR to

inform them that he also got his 100% VA disability. *Id*. at 66. Mr. Nordmeier told

Mr. Lee he went to L3 HR and disclosed that he had received 100% disability from

the federal government and wanted to disclose it to L3. *Id*. at 67. Mr. Nordmeier

told Mr. Lee that HR at L3 told Mr. Nordmeier that he doesn't need to disclose it

and that he shouldn't talk about his disability at work as it was personal. *Id*. at 68.

On or about November 15, 2019, Mr. Lee's coworker Gilbert Castro was

verbally warned by the safety lady at Barking Sands for not wearing protective

gear. *Id.* at 70. After lunch on the same date, Mr. Igne yelled at Mr. Lee to put on

pants which he immediately complied with. *Id.* at 71. Mr. Lee was power washing

at that time and was wearing shorts because he was soaking wet. *Id.* at 72. Mr. Lee

was wearing steel toed rubber boots. *Id.* at 73. At that time, Mr. Igne was also

wearing shorts and tennis shoes. *Id.* at 74. Mr. Igne wore shorts and tennis shoes

every day at work. *Id.* at 75. On the same date, Mr. Lee told Mr. Igne, "Tomorrow

if I have to wear long pants, you have to wear long pants. If I have to wear steel toe

shoes you have to wear steel toe shoes. What is good for one is good for all. So

come tomorrow morning have your PPE or else." *Id.* at 78. Mr. Igne said, "Or else

what, you going turn me in?" *Id.* at 79. Mr. Lee respond, "Yeah" *Id.* at 80. Mr.

Igne: "Well, fuck you" *Id.* at 81. Mr. Lee responds: "Well, fuck you too." *Id.* at 82.

Mr. Igne and Mr. Lee exchanged a couple more "fuck yous" and Mr. Lee realized

it was wrong and walked away. *Id.* at 83. Mr. Lee never physically threatened Mr.

Igne. *Id.* at 84. Mr. Igne claims that when they spoke Mr. Lee's hands were "fisted

and his chest was popped out." This is completely false. Mr. Lee was in no way

physically threatening Mr. Igne. *Id.* at 85.

The following workday, Mr. Lee was called into Mr. Martin's office

regarding a letter/note that Mr. Igne wrote to human resources/management

regarding the previous day's confrontation with Mr. Lee. *Id.* at 86. Mr. Martin

asked Mr. Lee a series of questioned that indicated Mr. Igne had given Mr. Martin

false information. *Id.* at 87-95. Mr. Martin said he was going to investigate Mr. Lee

and this alleged incident. *Id.* at 97.

Previously in or about October 2017, Mr. Igne lied to Mr. Martin and stated

Mr. Lee walked up to Mr. Igne with clenched fists acted like he was going to

attack Mr. Igne and falsely alleged Mr. Lee said he was going to kick Mr. Igne's

ass after work. *Id.* at 98. This was proven to be a lie by the two witnesses present.

*Id.* at 99. In his November 2019 letter to L3 regarding him being afraid of Mr. Lee,

Mr. Igne cites to the incident on October 24, 2017. The truth of that incident is that

Mr. Igne falsely claimed that Mr. Lee had again clenched his fists and popped out

his chest like he wanted to fight. This incident was investigated by L3 and David

Hesapene, who was a direct witness told the truth. David Hesapene reported that

Mr. Lee never had clenched fist and a popped-out chest and never said he wanted

to fight Mr. Igne. Declaration of David Hesapene at ¶ 6. Mr. Igne was again lying.

*Id.* The investigation, done by Rodney Martin, came back that Mr. Lee did nothing

wrong. Lee Decl. at 100.

On November 18, 2019, Mr. Lee had a meeting with human recourses and

Mr. Martin regarding the confrontation with Mr. Igne. *Id.* at 102. Mr. Lee was told

he was being written up for breaking the code of conduct for telling Mr. Igne fuck

you. *Id.* at 102. During this meteing Mr. Lee reported that Mr. Igne had been

stealing gas from the government for his personal truck. The theft of the gasoline

was confirmed by Gilbert Castro. Ex A at pg. 37 lns 10-14, pg 39 ln 11-25, pg. 49

ln 5-25 to pg 50-51.  Mr. Lee then told them he had to immediately take stress

leave and that he could not work under these conditions as he felt he was being

single out now that he was officially diagnosed with PTSD and those at the

workplace knew about his diagnosis. *Id.* at 111.

Mr. Lee went to see his doctor that very day to be placed on stress leave

which was effective November 21, 2019. *Id.* at 112-113.

On December 5, 2019, Ross West, the L3 project manager called Mr. Lee

and requested Mr. Lee's CAC card and secret clearance card. The CAC and secret

clearance cards are national security sensitive. Mr. Lee received security clearance

training every year. L3 employees are supposed to give the CAC card and secret

clearance card to security not to Mr. West. *Id.* at 114. Mr. Lee was directed by Mr.

West to give his CAC card and secret clearance card to Mr. West and if he wasn't

there then give it to his secretary. *Id.* at 115. Mr. Lee objected and said that was not

proper as the CAC card and the secret clearance card were national security related

items that need to be secure at all times. *Id.* at 116. Following Mr. West's directive,

Mr. Lee brought the CAC card and secret clearance card on December 6, 2020 to

Mr. West's office, Mr. West was not there so the card was left with Mr. West's

secretary. *Id.* at 118-119. This was a clear national security violation as Mr. Lee

should have been directed to provide the CAC card and secret clearance card to the

L3 security to safeguard those security sensitive items. *Id.* at 120. There were other L3 employees including Melissa Castillo and William "Bill" Milke, who were on stress leave that did not have their CAC cards and clearance cards removed by L3. They did not have PTSD. *Id.* at 121.

On or about April 1, 2020, Mr. Lee's doctor, Dr. Williamson, released him to return to work. *Id.* at 122. Mr. Lee was told to stay home and he would be paid his full wages. *Id.* at 123. Mr. Lee was never notified by L3 that they felt he was a threat to return to the workplace or was he given a chance to provide his side of the story. Mr. Lee was never called by L3 to determine if he was a threat to return to the workplace. Mr. Lee was never interviewed, his psychologists/psychiatrist were not interviewed, he had no chance to refute any of L3's feelings that he was a threat to return to the workplace. L3 never did any investigation into whether Mr. Lee was a threat to the workplace in 2020 that included Mr. Lee or any doctor's or family on his behalf that would verify he was not a threat to the workplace. Mr. Lee's twenty-six (26) years working at Barking Sands, while he had PTSD, with no violence in the workplace is evidence that he was not a threat to the workplace or his coworkers. *Id.* at 124.

On June 22, 2020, Mr. Lee was issued his termination letter that does not indicate why he was terminated, and he was never told why he was terminated. *Id.* at 125-126.

11

## II. DEFENDANT'S MOTION DOES NOT MEET THE SUMMARY JUDGMENT STANDARD

The Ninth Circuit Court of Appeals is generally reluctant to approve summary judgment in a case in which the motivation or intent of a party is placed at issue, especially in employment rights cases. *See, e.g., Perez v.Curcio,* 841 F.2d 255, 258 (9th Cir. 1988)(emphasis added); *Yartzoff v. Thomas,* 809 F.2d 1371, 1377 (9th Cir. 1987). Consequently, as the requisite discriminatory intent is inherently a factual question, and is usually proven by inference and circumstantial evidence, it is rare to grant summary judgment in favor of a defendant in a discrimination case. *See Lam v. University of Hawaii*, 40 F.3d 1551 (9th Cir.1994) (emphasis added). In employment discrimination cases brought under the *McDonnell Douglas* framework, "[w]e require very little evidence to survive summary judgment precisely because the ultimate question is one that can only be resolved through a searching inquiry -- one that is most appropriately conducted by the factfinder, upon a full record." *Lam v. University of Hawaii*, 40 F.3d 1551, 1564 (9th Cir. 1994).

### III. ARGUMENT

#### A. All Plaintiff's Claims Meet the Legal Standard to Pass Summary Judgment

Discrimination claims under the Americans with Disabilities Act ("ADA") and Section 378-2 of the Hawaii Revised Statutes ("HRS") are analyzed under the

12

ER 077

McDonnell Douglas burden-shifting framework. *See Raytheon Co. v. Hernandez*, 540

U.S. 44, 49, n.3 (2003); *Schefte v. Reliable Collection Agency, Ltd.*, 96 Hawai'i 408,

425, 32 P.3d 52, 69 (2001).

Plaintiff establishes a prima facie case by showing that "(1) he is a disabled

person within the meaning of the statute; (2) he is a qualified individual with a

disability; and (3) he suffered an adverse employment action because of his

disability." *Hutton v. Elf Atochem N. Am., Inc.*, 273 F.3d 884, 891 (9th Cir. 2001);

*French v. Hawaii Pizza Hut, Inc.*, 105 Hawai'i 462, 467, 99 P.3d 1046, 1051

(2004).

Defs. Motion only argues Mr. Lee can't meet the second and third elements

of the prima facie case as to his termination. As a preliminary matter, Mr. Lee

objects to the foundation of the declaration of Danielle Stewart and John Kreider

and asks they be stricken as to any events that Ms. Stewart and Mr. Kreider did not

have personal, firsthand knowledge of, such as what occurred in the workplace and

at meetings with HR on Kauai for L3. Ms. Stewart and Mr. Kredier were not

present on Kaua'i and do not have personal, firsthand knowledge of what occurred

there. It is telling that none of the L3's key percipient witnesses as to what

occurred on Kaua'i have submitted declarations such as Mr. Igne, Mr. Lee's

coworkers and/or L3's local HR representatives on Kaua'i.

**i.**     **Plaintiff Is Without Doubt a Qualified Individual with a Disability**

13

ER 078

An individual is a "qualified individual with a disability" if he can perform the essential functions of the position that he holds or desires, with or without reasonable accommodation. 42 U.S.C. § 12111(8); *Kennedy v. Applause,* 90 F.3d 1477, 1481 (9th Cir.1996); *see also Cripe v. City of San Jose,* 261 F.3d 877, 884 (9th Cir.2001). For twenty-six (26) years Mr. Lee performed his job duties at Barking Sands from without any negative performance evaluations. Lee Decl at 18, 47, 60-61, 145. Mr. Lee's ability to perform his essential job functions was never called into question. *Id*. Moreover, Mr. Lee could also handle stress in the workplace even though he had PTSD. *Id*. at ¶¶ 17, 132, 148, 150. This is confirmed by Mr. Lee's coworkers. Ex. A pg. 62 ln 1 to pg. 63 ln 15, pg. 64 ln 5-15, pg. 67 ln 4-16, pg. 68 14-25 to pg. 69 ln 2 and ln 6-25; Ex. B pg. 37 ln 24 to pg. 38 ln 4, pg. 38 ln 14 to pg. 41 ln 20; David Shimogawa Decl. at ¶¶ 2-11; Michael Young Decl. at ¶¶ 3-11; Jimmy Costales Decl. at ¶¶ 12-13; Guy Fujita at ¶¶ 3-11; Josh Burton at ¶¶ 3-16.

L3 attempts to sway this Court that Mr. Lee could not perform his essential job functions due to his stress citing to the case *Mayo v. PCC Structurals, Inc.*, 795 F.3d 941 (9th Cir. 2015) (while an employee can *be qualified despite adverse reactions to stress*, he is not qualified when that stress leads him to threaten to kill his co-workers in chilling detail and on multiple occasions (here, at least five times)). (This vastly disproportionate reaction demonstrated that Mayo could not

14

ER 079

perform an "essential function" of his job, and was not a "qualified individual.").

*Mayo*, 795 F.3d at 944; see also id. at 945 ("Mayo's credible, detailed, and unwavering plan to kill his supervisors more than adequately demonstrated that he lacked the ability to appropriately handle stress and interact with others"). ... The *Mayo* court, addressing the narrowness of its holding, expressly wrote that "[w]e emphasize that we only address the extreme facts before us in this case: an employee who makes serious and credible threats of violence toward his co-workers." Id. at 945 n.4. Contrary to Defendant's assertion, absent a credible threat of violence to a coworker or supervisor, facts showing that an employee may have adverse reactions to stress are not enough to conclude, as a matter of law, that the employee cannot perform the essential functions of the job. *See Reaves v. Nexstar Broad., Inc.*, 327 F. Supp. 3d 1352, 1365-1368 (D. Or. 2018) Defs. argument overlooks *Mayo's* limited holding. While *Mayo* noted that an "essential function of almost every job is the ability to appropriately handle stress and interact with others," the court did not hold that every employee who has difficulty handling stress cannot, as a matter of law, establish a prima facie case of disability discrimination. *Id.* at 1368.

The facts of *Mayo* warranted a finding as a matter of law, but were much more extreme and starkly different than the facts in the Instant Matter. Mr. Lee never physically or verbally threatened anyone in the workplace and only got into a

shouting match after his co-worker Mr. Igne told Mr. Lee, "Fuck you", first. Lee

Decl. at ¶¶ 17, 48-49, 77, 85, 132, 148, 150; Ex. A pg. 62 ln 1 to pg. 63 ln 15, pg.

64 ln 5-15, pg. 67 ln 4-16, pg. 68 14-25 to pg. 69 ln 2 and ln 6-25; Ex. B pg. 37 ln

24 to pg. 38 ln 4, pg. 38 ln 14 to ln 41 ln 20; David Shimogawa Decl. at ¶¶ 2-11;

Michael Young Decl. at ¶¶ 3-11; Jimmy Costales Decl. at ¶¶ 12-13; Guy Fujita at

¶¶ 3-11; Josh Burton at ¶¶ 3-16; Ex A. pg 28 ln 22 to pg 30 ln 8; Lee Decl. at ¶¶

78-85.

L3 then erroneously argues that Mr. Lee is estopped from asserting that he is

qualified individual because he filed for VA benefits based on his PTSD symptoms

that have nothing to do with his ability to perform his essential job functions. The

cases law cited by L3 are easily distinguished and wholly inapplicable to the facts

of the Instant Matter. Each of the cases cited had to do with an employee

disclosing his/her physical/mental limitations in applying for government disability

benefits, or the like, that directly and clearly showed the employees could not

physically or mentally perform the essential job functions. There is nothing like

those facts in the Instant Matter.

As a preliminary matter, L3 did not have any of Mr. Lee's VA benefits filing

documents prior to Mr. Lee's termination and had no idea what was contained

therein until discovery. Lee Decl. at ¶ 23. Moreover, Mr. Lee's L3 coworker Mr.

Nordmeier also filed and received 100% VA benefits and he was still working at

16

ER 081

L3 at the time of Mr. Lee's termination even though L3 new Mr. Nordmeier received 100% VA benefits. *Id.* at ¶¶ 64-68. This comparison shows that a person receiving 100% VA benefits could still work at L3, apparently if they did not have PTSD.

All cases cited as to L3's estoppel argument are distinguished as in each of those cases the employee disclosed symptoms of their disability that directly showed they could not perform their essential job functions. That is not at all present in Mr. Lee's VA benefits filings. Mr. Lee has been able to perform his essential job functions for decades including acting professionally and civilly in the workplace. There is nothing in Mr. Lee's VA benefits filing that show he could not perform the essential job functions of a painter and L3 does not even argue what the essential job functions are for a painter other than acting civilly and professional, as would be true for any job. As part of their argument L3 cites to Mr. Lee's VA benefits documents statement that he gets in fights with his workers. It is undisputed that Mr. Lee never got into any physical altercations with anyone in the workplace and was clearly referencing "fights" such as disagreements/arguments. For these reasons, L3's estoppel argument fails.

L3 argues that Mr. Lee does not dispute that he said he was going to punch Mr Igne. This is untrue. *See* Lee Decl. 148 and the transcript of Mr. Lee's deposition (pgs 49-50) attached to Defs. Motion. L3 argues that Mr. Lee told Dr.

17

Bianchi that he wanted to instigate a fight or argument. This is inapplicable as it had nothing to do with the workplace. Lee Decl. at ¶¶ 127-132 and *see* Defs. Ex Z.

### ii.     Plaintiff Was Terminated Because of His PTSD and L3 Did Not Have Legitimate Reason to Terminate Mr. Lee

One month after L3 became aware Mr. Lee had PTSD they called him into the HR office in March 2019 and questioned him as to if he was threat of violence to his coworkers in the workplace. Lee Decl. at ¶¶ 50-61. This shows that L3 management already felt Mr. Lee was a threat due to his PTSD, within one month of Mr. Lee's disability disclosure, without any basis that Mr. Lee had been violent in the workplace. *See* Lee Decl. in total showing Mr. Lee was never physically or verbally threatening or violent in the workplace.

It is evident that Mr. Lee was terminated because of his disability as Mr. Igne was the one that started the cursing at Mr. Lee and Mr. Igne was not terminated. That is because Mr. Igne does not have PTSD and was not viewed as a threat even though his conduct was identical to Mr. Lee's and worse as Mr. Igne started the cursing before Mr. Lee returned cursing. Lee Decl. at ¶¶ 78-84, 146-147 Ex A. pg 29. Moreover, cursing was commonplace at L3 even from Mr. Igne and Mr. Lee's boss Mr. Rodney Martin. Lee Decl. at ¶¶ 41-45 Ex A at pg. 59 ln 6 to pg. 60 ln 9. Moreover, Mr. Lee was written up for the November 2019 incident with Mr. Igne and was only fired after a witchhunt to gather statements drafted by

18

the L3 management or the union to falsely claimed Mr. Lee was a threat of violence based on Mr. Igne's false letter to L3 management. These documents drafted by the union and employer were refuted at depositions of the same men that signed them: Gilbert Castro and David Hesapene. *See* Ex A at pgs. 62-64, Ex B pg 37-45. In sum, both these men stated Mr. Lee was never threatened anyone in the workplace, including Mr. Igne and did not create a hostile work environment. The lack of threat of violence by Mr. Lee is corroborated by 5 other coworkers of Mr. Lee. David Shimogawa Decl. at ¶¶ 2-11; Michael Young Decl. at ¶¶ 3-11; Jimmy Costales Decl. at ¶¶ 12-13; Guy Fujita at ¶¶ 3-11; Josh Burton at ¶¶ 3-16; Ex A. pg 28 ln 22 to pg 30 ln 8; Lee Decl. at ¶¶ 78-85. It is important to note that Mr. Lee's stress reaction due to PTSD cannot be separated from his disability itself. "Conduct resulting from a disability is considered to be part of the disability, rather than a separate basis for termination." *Mayo* at 946 citing *Humphrey v. Mem'l Hosps. Ass'n*, 239 F.3d 1128, 1139-40 (9th Cir. 2001); *see also Gambini v. Total Renal Care, Inc.*, 486 F.3d 1087, 1094-95 (9th Cir. 2007); *Dark v. Curry County*, 451 F.3d 1078, 1084 (9th Cir. 2006). In *Kimbro v. Atlantic Richfield Co.*, 889 F.2d 869 (9th Cir.), *cert. denied*, 498 U.S. 814, 112 L. Ed. 2d 28, 111 S. Ct. 53 (1990), for example, the 9th Circuit found that there was a sufficient causal connection between the employee's disability and termination where the employee was discharged for excessive absenteeism caused by migraine-related

19

absences. *See Kimbro*, 889 F.2d at 875. The *Gambini* court held that the employee's violent outburst was protected if it stemmed from her bipolar disorder after the employee had a temper tantrum when she received a negative review. *See Gambini v. Total Renal Care, Inc.*, 486 F.3d 1087 (9th Cir. 2007)). As L3 terminated Mr. Lee because of his stress reaction and irritability related to his PTSD, but Mr. Lee was no real threat of violence in the workplace, then L3 terminated Mr. Lee due to his PTSD without a legitimate justification. This is especially true since Mr. Igne was involved in the exact same conduct as Mr. Lee, yet Mr. Igne was not terminated. Mr. Lee never committing any violence in the workplace and these facts create a genuine issue of fact as to whether L3 was legally justified in terminating Mr. Lee based on his alleged conducted related to his PTSD.

In regards to L3 and Keaki's assertion that it could not allow Mr. Lee back in the workplace without an assurance Mr. Lee was not a threat to the workplace, Keaki is L3's partners in the joint venture Manu Kai, they are essentially the same entity trying to use one another to cover their bad acts. Keaki and L3 did nothing to confirm via Mr. Lee or his physician that Mr. Lee could safely return to the workplace. In fact, Dr. Bianchi advised L3 that only Mr. Lee's physician could confirm that Mr. Lee was not a threat to return to the workplace. L3 did not follow Keaki or their own hired physician's advice as to safely returning Mr. Lee to the

workplace. Ignoring what L3 was directed to do by Dr. Bianchi, to get assurances

from Mr. Lee's Dr. Williamson that Mr. Lee could return to the workplace. L3 did

not reach out to Mr. Lee's physician for confirmation that Mr. Lee could safely

return to the workplace. Lee Decl. at ¶¶ 124, 127-142. This is because L3 had no

interest in returning Mr. Lee to the workplace as they viewed him as threat because

of his PTSD disclosure. This is evidenced by Mr. Lee's March 2019 meeting with

HR, Mr. Igne's letter, Mr. John Kreider's Decl at ¶ 5, Ms. Danielle Stewart's Decl.

at ¶ 4, the taking of his CAC/secret security clearance card when others on leave

did not have it taken (Lee Decl. at ¶ 121), and the fact L3 didn't offer Mr. Lee any

accommodation to return to the workplace after his leave in 2020.

*Humphrey* recognized that a "link between the disability and termination is

particularly strong where it is the employer's failure to reasonably accommodate a

known disability" that results in a discharge for performance problems arising from

that disability. *Humphrey*, 239 F.3d at 1140. It is crucial to note in tying Mr. Lees'

PTSD into his termination that L3's corporate decisionmaker regarding Mr. Lee's

termination, John Kredier, was informed by Ross West on December 11, 2019 that

"due to the recent two active shooter events" and Mr. Lees' PTSD they had

concerns about Mr. Lee's stability. *See* Ex C. As based on the facts herein, these

concerns were untrue, baseless and unfounded. Regarding assertions from Mr.

Martin or Mr. Scott Taylor that Mr. Lee was a threat to the workplace, Mr. Lee

completely refutes those statements: Lee Decl. at ¶¶ 143-145, 150.

As applicable, Mr. Lee argues the cat's paw theory in that Mr. Igne, with clear animus against Mr. Lee as a person with PTSD, influenced the decision to terminate Mr. Lee based on Mr. Igne's false claims. *See Poland v. Chertoff*, 494 F.3d 1174, 1182 (9th Cir. 2007) ("[I]f a [biased] subordinate ... sets in motion a proceeding by an independent decisionmaker that leads to an adverse employment action, the subordinate's bias is imputed to the employer if the plaintiff can prove that the allegedly independent adverse employment decision was not actually independent because the biased subordinate influenced or was involved in the decision or decisionmaking process.")

B. **Plaintiff Clearly Makes Out His Prima Facie Case of Disability-Related Retaliation and Whistleblower Retaliation**

The ADA retaliation and Hawai'i Whistleblower Protection Act retaliation prima facie elements are essentially identical.

First, there must be a showing that the employee engaged in protected conduct as it is defined by the HWPA. Second, the employer is required to take some adverse action against the employee. Third, there must be a causal connection between the alleged retaliation and the whistleblowing. In other words, to meet the causal connection requirement, the employer's challenged action must have been taken because the employee engaged in protected conduct.

*You v. Longs Drugs Stores California, LLC,* 937 F. Supp. 2d 1237, 1258 (9th Cir. 2013) and compare to ADA retaliation test at Defs. Motion at pg 22-23. Mr. Lee has met every element of these tests.

### There is Causal Connection Between Mr. Lee's Protected Activity and the Retaliation

"Causation sufficient to establish the ... [causal link] element of the prima facie case may be inferred from circumstantial evidence, such as the employer's knowledge that the plaintiff engaged in protected activities and the proximity in time between the protected action and the allegedly retaliatory employment decision." *Yartzoff v. Thomas,* 809 F.2d 1371, 1376 (9th Cir.1987).

### There is a Clear Temporal Relation Between Mr. Lee's Reporting of Illegal Activity and His Termination

The 9th Circuit has held that proximity in time may support an inference of retaliation sufficient to survive summary judgment. *See Allen v. Iranon,* 283 F.3d 1070, 1077-78 (9th Cir.2002) ("This proximity in time constitutes circumstantial evidence of retaliatory motive."). *See Davis v. Team Elec. Co.,* 520 F.3d 1080, 1094 (9th Cir.2008) ("We have held that `causation can be inferred from timing alone where an adverse employment action follows on the heels of protected activity.'") Causation may be inferred when an adverse employment action occurred "fairly soon after the employee's protected expression." *Villiarimo v. Aloha Island Air, Inc.,* 281 F.3d 1054, 1065 (9th Cir.2002) ("[C]ausation can be inferred from timing alone where an adverse employment action follows on the heels of protected activity.");*see also Coszalter v. City of Salem,* 320 F3d 968, 977 (9th Cir 2003) ("Depending on the circumstances, three to eight months is easily

23

within a time range that can support an inference of retaliation."); *Allen v. Ironon,* 283 F3d 1070, 1078 (9th Cir 2002) ("*[A]n eleven-month gap in time is within the range that has been found to support an inference that an employment decision was retaliatory."*) (emphasis added)(citation omitted). *Nidds v. Schindler Elevator Corp.,* 113 F.3d 912, 919 (9th Cir.1996) (four-month period between protected activity and layoff was sufficiently close to satisfy the "causal link" prong), and *Yartzoff v. Thomas,* 809 F.2d 1371, 1376 (9th Cir.1987) (three-month period sufficient to infer causation). *See Passantino v. Johnson & Johnson Consumer Prods., Inc.,* 212 F.3d 493, 507 (9th Cir.2000) ("[W]e have held that evidence based on timing can be sufficient to let the issue go to the jury, even in the face of alternative reasons proffered by the defendant.").

"Although a lack of temporal proximity may make it more difficult to show causation, "circumstantial evidence of a 'pattern of antagonism' following the protected conduct can also give rise to the inference. *Kachmar v. SunGard Data Sys., Inc.,* 109 F.3d 173, 177 (3rd Cir. 1997). In the Instant Matter there clearly was a "pattern of antagonism" starting immediately after the reporting of the sexual assault/harassment that culminated in Mr. Ho's termination.

It is undisputed that Mr. Lee reported illegal activity (gas theft from government, disability discrimination) in the workplace to his supervisor in

24

November 2019 and went on stress leave the same day. Lee Decl. at ¶¶ 106-111.

On December 5, 2019, Mr. Lee objected to the violation of the law related to his

CAC/secret security clearance card. Id. at 114-121. This was while Mr. Lee was on

stress leave. Mr. Lee was terminated before he could return from leave, so the time

period of his leave should be disregarded as to the calculation of the time between

his reporting and the adverse action. Moreover, as is admitted by Defs, they had

allegedly decided to terminate Mr. Lee in January 2020, nearly immediately after

he reported the illegal activities in the workplace. This occurred one and two

months, respectively, after his reporting of discrimination and illegal activity in the

workplace creating a strong inference of retaliation. Moreover, Mr. Lee reasserts,

incorporates and argues that L3 did not have a valid basis for his termination, as

argued *supra,* which further shows a causal connection between his objection to

discrimination/illegal activity and his termination.

## III. CONCLUSION

For all of the reasons set forth herein and supported by the attached

declaration and exhibit, as well as all of the records and files herein, this Honorable

Court must deny Def.'s Motion.

DATED:   Honolulu, Hawaii; October 22, 2021.

/s/ Joseph T. Rosenbaum
JOSEPH T. ROSENBAUM
Attorney for Plaintiff Preston Lee

ELIZABETH JUBIN FUJIWARA 3558
JOSEPH T. ROSENBAUM 9205
1100 Alakea St., 20th Fl., Ste B
Honolulu, Hawaii 96813
Telephone: 808-203-5436

Attorneys for Plaintiff
PRESTON LEE

### IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| PRESTON LEE,<br><br>                    Plaintiff,<br><br>          vs.<br><br>L3HARRIS TECHNOLOGIES, INC.;<br>JOHN DOES 1-10; JANE DOES 1-10;<br>DOE CORPORATIONS 1-10; DOE<br>PARTNERSHIPS 1-10; DOE<br>UNINCORPORATED<br>ORGANIZATIONS<br>1-10; and DOE GOVERNMENTAL<br>AGENCIES 1-10,<br><br>                    Defendants. | ) CIVIL NO. 20-00489 LEK-KJM<br>) (Other Civil Action)<br>)<br>) **PLAINTIFF'S CONCISE**<br>) **STATEMENT OF FACTS;**<br>) **DECLARATION OF JOSEPH T.**<br>) **ROSENBAUM, EXHIBITS A-C;**<br>) **DECLARATION OF PRESTON**<br>) **LEE; DECLARATION OF JIMMY**<br>) **COSTALES; DECLARATION OF**<br>) **JOSH BURTON; DECLARATION**<br>) **OF GUY FUJITA;**<br>) **DECLARATION OF MICHAEL**<br>) **YOUNG; DECLARATION OF**<br>) **DAVID SHIMOGAWA;**<br>) **DECLARATION OF DAVID**<br>) **HESAPENE; CERTIFICATE OF**<br>) **COMPLIANCE PURSUANT TO**<br>) **L.R 7.5; CERTIFICATE OF**<br>)   **SERVICE.** |

---

## PLAINTIFF'S CONCISE STATEMENT OF FACTS

Plaintiff Preston Lee ("Plaintiff"), submits this Concise Statement of

Facts in opposition of summary judgment per L.R. 56.1.

Plaintiff's Response to Defendant's Concise Statement of Facts "Defs. CSF"

| 1. | Undisputed | *See* Defs. "CSF" |
|---|---|---|
| 2. | Undisputed | *Id.* |
| 3. | Undisputed | *Id.* |
| 4. | Undisputed | *Id.* |
| 5. | Undisputed | *Id.* |
| 6. | Undisputed | *Id.* |
| 7. | Undisputed | *Id.* |
| 8. | Undisputed | *Id.* |
| 9. | Disputed as to what exactly was said and also disputed as to Mr. Lee ever doing anything violent in the workplace. | *See* Defs. "CSF" and documents attached thereto as they read differently than asserted and Lee Decl at ¶¶ 17, 36-39, 47-49, 57, 77, 84, 98-100, 124, 131-132, 141, 143-145, 148, 150. |
| 10. | Undisputed | *See* Defs. "CSF" |

| 11 | Undisputed | *Id.* |
|---|---|---|
| 12 | Undisputed | *Id.* |
| 13 | Undisputed | *Id.* |
| 14 | Disputed as HR from L3 raised the issue of Mr. Lee's PTSD | Lee Decl. at ¶¶ 50-58. |
| 15 | Disputed – Mr. Lee was harassed and questioned about his disability without reason. | *Id.* |
| 16 | Undisputed | *See* Defs. "CSF" |
| 17 | Disputed as to how it is characterized | Lee Decl. at ¶¶ *78-85;* Ex A at pgs. 62-64, Ex B pg 37-45. |
| 18 | Undisputed | *See* Defs. "CSF" |
| 19 | Disputed that the coworkers truly felt Mr. Lee was aggressive, a threat, created a hostile work environment or that Mr. Lee said he was going to punch Mr. Igne in his face. | *See* Lee Decl. 148 and the transcript of Mr. Lee's deposition (pgs 49-50) attached to |

| | | |
|---|---|---|
| | | Defs. Motion; Ex A at pgs. 62-64; Ex B pg 37-45; David Shimogawa Decl. at ¶¶ 2-11; Michael Young Decl. at ¶¶ 3-11; Jimmy Costales Decl. at ¶¶ 12-13; Guy Fujita at ¶¶ 3-11; Josh Burton at ¶¶ 3-16; Ex A. pg 28 ln 22 to pg 30 ln 8; Lee Decl. at ¶¶ 78-85. |
| 20 | Undisputed | *See* Defs. "CSF" |
| 21 | Undisputed | *Id.* |
| 22 | Undisputed | *Id.* |
| 23 | Undisputed | *Id.* |
| 24 | Disputed as to following Manu Kai policy | Lee Decl at ¶ 121 |
| 25 | Undisputed | *See* Defs. "CSF" |
| 26 | Undisputed | *Id.* |
| 27 | Disputed that Mr. Lee caused an unsafe or unhealthy work environment as Mr. Lee never physically touched or threatened anyone in the workplace. | Lee Decl. in total and Lee Decl. 17, 36, 38, 40, 47-49, 84, 100, 124, 132, 142 and 148-149 and the transcript of Mr. Lee's deposition (pgs 49-50) attached to Defs. Motion; Ex A at pgs. 62-64; Ex B pg 37-45; David Shimogawa Decl. at ¶¶ 2-11; Michael Young Decl. at ¶¶ 3-11; Jimmy Costales Decl. at ¶¶ 12-13; Guy Fujita at ¶¶ 3-11; Josh Burton at ¶¶ 3-16; Ex A. pg 28 ln 22 to pg 30 ln 8; Lee Decl. at ¶¶ 78-85. |
| 28 | Undisputed | *See* Defs. "CSF" |

| 29 | Undisputed | *Id.* |
|----|------------|-------|
| 30 | Disputed in the false characterization that Mr. Lee thought about starting a fight at work. He definitely didn't start a physical fight at work. | Lee Decl ¶¶ 127-132; Defs. Ex Z attached to Defs. CSF. |
| 31 | Undisputed | *See* Defs. "CSF" |
| 32 | Undisputed | *Id.* |
| 33 | Disputed as to Dr. Bianchi stating or recommending Mr. Lee could not safely return to the workplace. | Lee Decl. at ¶¶ 124, 127-142. Defs Ex Z and AA |
| 34 | Disputed as to L3 or Keaki or Manu Kai's implication that it did anything to get a medical clearance or even looked into getting a medical clearance for Mr. Lee to safely return to work. | *Id.* |
| 35 | Disputed as to L3 having legitimate non-discriminatory/non-retaliatory reason for terminating Mr. Lee. | Lee Decl in total; Ex A at pgs. 62-64; Ex B pg 37-45; Ex. A pg 29, 59-60, pg. 62 ln 1 to pg. 63 ln 15, pg. 64 ln 5-15, pg. 67 ln 4-16, pg. 68 14-25 to pg. 69 ln 2 and ln 6-25; Ex. B pg. 37-45 generally and 37 ln 24 to pg. 38 ln 4, pg. 38 ln 14 to pg. 41 ln 20; Ex C; David Shimogawa Decl. at ¶¶ 2-11; Michael Young Decl. at ¶¶ 3-11; Jimmy Costales Decl. at ¶¶ 12-13; Guy Fujita at ¶¶ 3-11; Josh Burton at ¶¶ 3-16; Ex A. pg 28 ln 22 to pg 30 ln 8; Lee Decl. at ¶¶ ¶¶ 17, 23, 48-49, 50-61, 64-68, 77-85, 106-121, 124, 127-132, 143-148, 150. Mr. John Kreider's Decl at ¶ 5 attached to Defs CSF, Ms. |

4

|    |    | Danielle Stewart's Decl. at ¶ 4 attached to Defs CSF. |
|----|----|-----|
| 36 | Undisputed | *See* Defs. "CSF" |
| 37 | Disputed | Lee Decl 106-11 |

### Plaintiff's Statement of Facts in Opposition

|    |    |    |
|----|----|----|
| 38 | Mr. Lee was qualified individual with a disability who could perform his essential job functions. | *See* Lee Decl at 17, 18, 47, 60-61, 132, 145, 148, 150. Ex. A pg. 62 ln 1 to pg. 63 ln 15, pg. 64 ln 5-15, pg. 67 ln 4-16, pg. 68 14-25 to pg. 69 ln 2 and ln 6-25; Ex. B pg. 37 ln 24 to pg. 38 ln 4, pg. 38 ln 14 to pg. 41 ln 20; David Shimogawa Decl. at ¶¶ 2-11; Michael Young Decl. at ¶¶ 3-11; Jimmy Costales Decl. at ¶¶ 12-13; Guy Fujita at ¶¶ 3-11; Josh Burton at ¶¶ 3-16. |
| 39 | Mr. Lee was terminated due to his disability and in retaliation for objecting to discrimination and reporting illegal activity in the workplace. | Lee Decl in total; Ex A at pgs. 62-64; Ex B pg 37-45; Ex. A pg 29, 59-60, pg. 62 ln 1 to pg. 63 ln 15, pg. 64 ln 5-15, pg. 67 ln 4-16, pg. 68 14-25 to pg. 69 ln 2 and ln 6-25; Ex. B pg. 37-45 generally and 37 ln 24 to pg. 38 ln 4, pg. 38 ln 14 to pg. 41 ln 20; Ex C; David Shimogawa Decl. at ¶¶ 2-11; Michael Young Decl. at ¶¶ 3-11; Jimmy Costales Decl. |

5

| | | at ¶¶ 12-13; Guy Fujita at ¶¶ 3-11; Josh Burton at ¶¶ 3-16; Ex A. pg 28 ln 22 to pg 30 ln 8; Lee Decl. at ¶¶ ¶¶ 17, 23, 48-49, 50-61, 64-68, 77-85, 106-121, 124, 127-132, 143-148, 150. Mr. John Kreider's Decl at ¶ 5 attached to Defs CSF, Ms. Danielle Stewart's Decl. at ¶ 4 attached to Defs CSF. |
|---|---|---|

DATED:  Honolulu, Hawaii, October 22, 2021

/s/Joseph T. Rosenbaum
JOSEPH T. ROSENBAUM

Attorney for Plaintiff
PRESTON LEE

ER  096

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| PRESTON LEE, | ) CIVIL NO. 20-00489 LEK-KJM |
| | ) (Other Civil Action) |
| Plaintiff, | ) |
| | ) DECLARATION OF JOSEPH T. |
| vs. | ) ROSENBAUM |
| | ) |
| L3HARRIS TECHNOLOGIES, INC.; | ) |
| JOHN DOES 1-10; JANE DOES 1-10; | ) |
| DOE CORPORATIONS 1-10; DOE | ) |
| PARTNERSHIPS 1-10; DOE | ) |
| UNINCORPORATED | ) |
| ORGANIZATIONS | ) |
| 1-10; and DOE GOVERNMENTAL | ) |
| AGENCIES 1-10, | ) |
| | ) |
| | ) |
| Defendants. | ) |
| | ) |
| | ) |

## DECLARATION OF JOSEPH T. ROSENBAUM

| | |
|---|---|
| STATE OF HAWAI'I | ) |
| | ) SS. |
| COUNTY OF HONOLULU | ) |

I, JOSEPH T. ROSENBAUM, do hereby declare that:

1.    Unless otherwise indicated, I make this declaration based upon my personal firsthand knowledge. All of the statements in this declaration are true. I understand that if I make a false statement, I may be prosecuted for perjury.

2.     I am competent to testify to the matters set forth herein.

3.     That I am an attorney with the Fujiwara and Rosenbaum, LLLC and am licensed to practice law in the State of Hawaii. I am one of the attorneys representing Plaintiff Preston Lee in this action.

4.     Attached hereto as Exhibit "A" is a true and accurate copy of portions of the transcript of the deposition of Plaintiff's coworker, Gilbert Castro, taken on September 22, 2021.

5.     Attached hereto as Exhibit "B" is a true and accurate copy of portions of the transcript of the deposition of Plaintiff's coworker, David Hesapene, taken on September 22, 2021.

6.     Attached hereto as Exhibit "C" is a true and accurate copy of the December 11, 2019 email, received through discovery in this matter, from Ross West to L3's local HR representatives, Julie Broyles and Jasmine Apo, and L3 decisionmaker as to Mr. Lee's termination, Mr. John Kredier.

Further Declarant Sayeth Naught

Pursuant to 28 U.S.C. § 1746(2), I declare under penalty of perjury that the foregoing is true and correct.

Honolulu, Hawai'i, October 22, 2021.

/s/ Joseph T. Rosenbaum

JOSEPH T. ROSENBAUM

2

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

|  |  |
|---|---|
| PRESTON LEE, | Civil No. |
| Plaintiff, | 20-00489 LEK-KJM |
| | (Other Civil Action) |
| vs. | |
| L3HARRIS TECHNOLOGIES, INC.; | |
| JOHN DOES 1-10; JANE DOES | |
| 1-10; DOE CORPORATIONS 1-10; | |
| DOE PARTNERSHIPS 1-10; DOE | |
| UNINCORPORATED ORGANIZATIONS | |
| 1-10; and DOE GOVERNMENTAL | |
| AGENCIES 1-10, | (Pages 1 - 74) |
| Defendants. | |

DEPOSITION OF GILBERT CASTRO

taken on behalf of Defendants, commencing at

8:59 a.m., Wednesday, September 22, 2021, pursuant to

Notice.

Reported by:    JESSICA AKITA, RPR
                Certified Shorthand Reporter
                Hawaii License No. 461

EXHIBIT "A"

Page 26

1    A.  Over --
2    Q.  -- to put on pants?
3    A.  Yes.  Well, he wasn't yelling to put on
4  pants.  He was just getting his attention.
5    Q.  He was yelling his name?
6    A.  Yes.
7    Q.  And was he signaling to indicate what he was
8  trying to get his attention for like to -- motioning to
9  put on his pants?
10    A.  He was just yelling.
11    By the time Preston looked back, then he saw
12  him kind of waving his hands and telling -- kept telling
13  him to -- it's hard to talk when the machine is so loud,
14  yeah?  So turn off the machine, you know, so.  Yeah.  He
15  was -- he was yelling for his attention.
16    Q.  Okay.  And then at that point did you go to
17  the truck and get the rain pants?
18    A.  I -- I -- I knew already, so I had the rain
19  gear for -- when -- as Preston was walking up, then Sean
20  kind of explained to him, you know, you got to wear your
21  safety gear.  He's the lead man, yeah.  But you don't
22  have to yell at your team members when you -- you
23  yourself as the lead man can just shut the machine down
24  and talk to him, you know?  I knew already, so I just
25  walked over to the van and handed Mr. Lee his rain gear.

Page 27

1  "Hey, put this on.  Please put this on so we can keep
2  pressure washing."
3    But Sean was kind of upset, but I would get
4  upset too.  I would get upset because I would be yelling
5  -- he was yelling at me, yeah -- yelling at Mr. Lee, not
6  getting his attention so fast.
7    Q.  Did you think it was inappropriate for Sean
8  Igne to tell Mr. Lee to put on pants?
9    A.  It's not a -- it wasn't appropriate -- I
10  mean, it was appropriate to him to put on the pants, but
11  not kind of like making a big whole incident where
12  everybody's just walking around you.  He could have just
13  make -- turn off that machine and kind of cool
14  everything down and kind of -- how he pursues things is
15  differently, you know?
16    Q.  So, if I understand correctly, you think it
17  was appropriate for Sean Igne to tell Preston to wear
18  pants, but you didn't think that the way he went about
19  doing it was the best way; is that right?
20    A.  Yes.  Yes.  Yes.
21    Q.  Now, at the end of the workday, that same
22  workday --
23    A.  Uh-huh.
24    Q.  -- I understand there was a incident in the
25  office; is that correct, between Preston and Sean?

Page 28

1    A.  Yes.
2    Q.  And in Exhibit 2, in the last paragraph on
3  the first page, the third line says, "I heard Preston
4  yelling at Sean in an angry tone about why he had to
5  wear long pants while Sean was working in short pants.
6  And if he, Preston, was going to have to wear long
7  pants, then Sean better be wearing long pants the next
8  day."
9    You see that?
10    A.  Yes.
11    Q.  Does that sentence accurately reflect what
12  you heard in the office that day?
13    A.  Exactly.
14    Q.  Now, the statement also says that you heard
15  Preston swearing at Sean.
16    Is it correct that Preston was swearing at
17  Sean that afternoon?
18    A.  He said some words of swearing.  Yes.
19    Q.  Like what, the "F" word?
20    A.  "F" word and, you know, he was just very
21  upset.
22    Q.  Was -- did you think that Preston's conduct
23  towards Sean in the office was appropriate?,
24    A.  Well, two guys was going at it.  So if one
25  swear, the other one going swear.  So two guys was just

Page 29

1  going off at each other.
2    Q.  Okay.
3    A.  Had start with, you know, just the build up,
4  yeah, during the day of him coming to him that morning
5  kind of, you know, winding him up for the finale at the
6  end like this --
7    Q.  Okay.
8    A.  -- so.
9    Q.  So in your statement that's Exhibit 2, you
10  don't say anything about Sean swearing at Preston.  I
11  don't see that anywhere in this statement.
12    Do you see that anywhere?
13    A.  No.  But two guys was swearing at each other
14  in -- because I was on the other side listening because
15  I was doing my time card.  Yeah.  So two guys
16  automatically going -- was swearing at each other.
17    Q.  And why is it that you didn't say anything in
18  your statement about Sean swearing during this incident?
19    A.  They never ask me to put if Sean was
20  swearing.
21    Q.  Who never asked you?
22    A.  Rod Martin when they asked me to give a
23  statement.
24    Q.  Okay.  Why did you not put something in here
25  about that before you signed it if that was what

Page 30

1  happened?

2      A.  I just told you what I heard, you know, and I
3  cannot give all the details, you know?  I'm not one
4  police officer, so I don't know.  I just listened.  I
5  heard him swearing.  I heard Sean swearing and that's
6  it.  I mean, if I missed them, I missed them.  I didn't
7  -- I didn't put it in.  But they didn't ask me to ask if
8  Sean was swearing.  I just heard Preston.

9      Q.  Did -- did Mr. Martin ask you what happened
10  that afternoon?

11      A.  Yeah.

12      Q.  Okay.  And did you give him a full accounting
13  of what happened?

14      A.  Yeah.  A rough -- rough thing, what had
15  happened.

16      Q.  Did you ever amend this statement that you
17  gave to Mr. Martin?

18      A.  No.  I never amend anything.  I go back and
19  check it or rephrase things.

20      Q.  Did you ever tell him, oh, hey, I missed
21  something in my statement that wasn't included?

22      A.  I never really thought about telling in
23  detail what had happened because having one argument is
24  normal, you know?  We -- we get arguments all the time.
25  And he swore.  I swore.  What you expect?  Everybody's

Page 31

1  so -- so hyped up already, and I cannot catch every
2  detail what that person said, what that person said.  So
3  I'm -- I'm not -- I'm not perfect in telling who was
4  innocent in the whole thing, you know?

5      Q.  This incident on November 6, 2019, was that
6  the first time you heard Preston yell at somebody at
7  work?

8      A.  He yells at me.  I yell back, but it was just
9  to make the day as -- as comfortable as possible for me,
10  yeah?  But it's all work-related.  But for other people,
11  not really.  I don't -- if -- if he probably yells at
12  people, it's not around me, you know, just to, you know,
13  say "Hi, bye," you know, but that's it.  Not violently,
14  yeah, with anybody.

15      Q.  Okay.  Earlier, I think you said that
16  Exhibit 2 was not exactly what happened?

17      A.  Uh-huh.

18      Q.  When you first read Exhibit 2, you said,
19  "Some of this was correct and some of this is not what
20  happened"; is that -- is that correct?

21      A.  Yes.

22      Q.  Okay.  So what -- what is it that is not
23  correct about this statement?

24      A.  (Reading) That guy Jose Felix -- Felix Jose
25  wasn't in the picture over here.  Only -- only Kathleen

Page 32

1  Lambrix that was in the whole -- whole, you know, kind
2  of -- having one personal explanation for -- for what I
3  was getting in trouble for.  We didn't have Felix Jose
4  in -- in this paragraph, or just only Kathleen Lambrix.

5      Q.  Okay.  I'm sorry.  I don't see where it says
6  Felix Jose here.

7      A.  Yeah.  That's why when I -- I read it, you
8  know, they only had Kathleen's name.

9      MR. ROSENBAUM:  He's saying that that was
10  left out and --

11      THE DEPONENT:  Yeah.  They left out Felix
12  Jose, the safety -- one of our safety members in -- in
13  our supply.

14  BY MS. JONES:

15      Q.  Okay.  So you're saying in paragraph 2 --

16      A.  Uh-huh.

17      Q.  -- of Exhibit 2 --

18      A.  Yes.

19      Q.  -- you just didn't include that this guy
20  Felix Jose was also present during this discussion?

21      A.  Yes.

22      Q.  Is there anything else that is not accurate
23  about Exhibit 2?

24      A.  No.  Everything is pretty -- pretty updated.
25  Just wasn't right where I didn't see Felix's name inside

Page 33

1  that included the whole conversation.

2      Q.  Okay.  Now, I understand that you were later
3  interviewed by a man named Scott Taylor --

4      A.  Uh-huh.

5      Q.  -- for an investigation that he was doing to
6  an allegation that Sean Igne was stealing gasoline.

7      A.  Uh-huh.

8      Q.  Do you recall that interview?

9      A.  Yes.

10      Q.  Did you know Mr. Taylor prior to that
11  interview?

12      A.  Not really.  He's around, but I don't know
13  him personally.

14      Q.  Okay.  You knew who he was?

15      A.  Yes.

16      Q.  And did you respond truthfully to
17  Mr. Taylor's questions?

18      A.  Yes.

19      (Exhibit 3 was marked.)

20  BY MS. JONES:

21      Q.  The court reporter has handed you what's been
22  marked as Exhibit 3 to your deposition.  If you can take
23  a look at that document, two pages, and let me know when
24  you're ready.

25      A.  Yes.

9  (Pages 30 to 33)

**Page 34**

1   Q. You're ready?

2   A. Yeah. I'm ready.

3   Q. Okay. Do you recognize this document?

4   A. Yes.

5   Q. Is that your signature on the second page --

6   A. Yes.

7   Q. -- of this document?

8   A. Yes.

9   Q. Okay. So after Mr. Taylor interviewed you,

10 did he provide this document for you to review and sign?

11   A. He provided it to me and, yeah, I signed it.

12   Q. Okay. Did you review it before you signed

13 it?

14   A. I kind of looked at it and I had to say what

15 I had to say. Yeah.

16   Q. Did you make any corrections to the document?

17   A. No.

18   Q. So up at the top, the first two lines --

19   A. Right.

20   Q. -- it says, "I voluntarily provide this

21 statement to Scott Taylor who was conducting an inquiry

22 into an allegation that Sean Igne systematically stole

23 gas from the 'MOGAS,' all in caps, station for personal

24 use."

25       Do you see that?

**Page 35**

1   A. Yes.

2   Q. Do you know what the MOGAS station is?

3   A. Yes.

4   Q. What is that?

5   A. That's our gas station for refueling

6 equipment.

7   Q. And you understand -- you understood when

8 Mr. Taylor was interviewing you that he was

9 investigating an allegation that Sean had been stealing

10 gasoline?

11   A. Right.

12   Q. And Mr. Taylor told you that the purpose of

13 the interview was for his investigation of this gas

14 theft allegation?

15   A. Wasn't just that. Was more what's happening

16 around, you know, if I saw anything else --

17   Q. Okay.

18   A. -- you know?

19   Q. So you could have told him about other issues

20 if there were other things going on?

21   A. Yeah. But, I mean, our issues is for -- to

22 -- to do our eight hours and get home, yeah?

23   Q. So about halfway down on the first page, it

24 indicates that Mr. Taylor asked you if you had observed

25 Sean Igne pump gas at the MOGAS station since 2007; you

**Page 36**

1 see that?

2   A. Yes.

3   Q. And then it indicates that your response was,

4 quote, "Yes, many times over the years into the Manu Kai

5 vehicle and the Manu Kai 5-gallon gas cans, one for

6 straight gas (pressure washer) and one for mixed gas

7 (blower). The cans go into a locked locker once the job

8 is finished."

9       Do you see that?

10   A. Yes.

11   Q. So first of all, Manu Kai is an entity that

12 was providing services to the Navy; is that right?

13   A. Yes.

14   Q. So that's basically the company gas cans; is

15 that right?

16   A. Yes.

17   Q. And this answer that I just read, does that

18 accurately reflect what you told Mr. Taylor?

19   A. "Many times five gallons." Yes.

20   Q. It then says that he asked if you had ever,

21 "Observed Sean Igne pump gas into a personal 5-gallon

22 gas can."

23       You see that?

24   A. Where you at?

25   Q. It's the next question down from where we

**Page 37**

1 just looked at.

2   A. Okay. Okay.

3   Q. And it appears -- the response you gave was

4 "No. Just the red Manu Kai metal gas cans"; you see

5 that?

6   A. Yes.

7   Q. And does that accurately reflect what you

8 told Mr. Taylor?

9   A. Yes.

10   Q. Did you tell Mr. Taylor at any time during

11 this interview that Sean Igne had been stealing

12 gasoline?

13   A. I told Mr. Taylor, "If I would steal gas, I

14 wouldn't tell nobody."

15   Q. Okay.

16   A. So I didn't -- I didn't tell him exactly

17 that. But I would be -- I wouldn't tell anybody until

18 I've seen it, and I've seen it.

19   Q. Okay. Let me -- I want to be clear.

20   A. Right.

21   Q. Did you tell Mr. Taylor that Sean Igne was

22 stealing gasoline during this interview, yes or no?

23   A. No. No.

24   Q. Did you tell Mr. Taylor that -- at any other

25 time, did you tell Mr. Taylor at any time that Sean Igne

10 (Pages 34 to 37)

Page 38

1  was stealing gasoline from the base?
2      A.  No.
3      Q.  Did you tell Mr. Taylor at any point during
4  the interview that Sean Igne was engaged in any other
5  inappropriate conduct?
6      A.  No.
7      Q.  And did Rodney Martin also ask you about
8  whether -- about this gas theft allegation?
9      A.  No.
10     Q.  If you look here on Exhibit 3 --
11     A.  Uh-huh.
12     Q.  -- one of the questions right after what we
13  looked at, it says:
14         "Q.  Has anyone ever approached you about
15  this issue before today?"
16         And then it says:
17         "A.  Rod Martin, after his meeting with
18  Preston, and I told him the same thing."
19         Do you see that?
20     A.  Uh-huh.
21     Q.  Looking at that, does it refresh your
22  recollection that Rodney Martin asked you about the gas
23  theft allegation?
24     A.  He -- he asked me about it, but I told him
25  no.

Page 39

1      Q.  You told him that you had not --
2      A.  I -- I never seen anything at that time.  But
3  as I see all this gas incidents coming up and I go, "I
4  guess it's about time to open up and see," you know,
5  that I saw a lot of things that gas was missing and --
6  but in -- in the whole incident, I never exposed all
7  these incidents of taking gas.
8      Q.  Okay.  You never -- at any time, did you tell
9  Rodney Martin that Sean Igne was stealing gas?
10     A.  No.  I didn't say anything.
11     Q.  And is the first time that you said that in
12  2021?
13     A.  I was kind of -- I was kind of scared
14  exposing, you know, a lot, especially the gas -- this
15  gas incident because of having, you know, friends and
16  allegations to where, you know -- you know, I worked
17  with these guys hand in hand, and being as exposed with
18  the gas issue, you know, going -- going hurt everybody.
19  It's just -- it's time to open everything and tell the
20  truth before I get more in trouble in not telling
21  anything.
22     Q.  Okay.  So my question was:  Is the first time
23  that you ever said anything about Sean Igne stealing gas
24  in 2021?
25     A.  Yes.

Page 40

1         (Exhibit 4 was marked.)
2  BY MS. JONES:
3      Q.  The court reporter has just handed you what's
4  been marked as Exhibit 4 --
5      A.  Uh-huh.
6      Q.  -- to your deposition.  Please take a look at
7  this document and let me know when you're ready.
8      A.  Okay.  I'm ready.
9      Q.  Okay.  Do you recognize this document?
10     A.  This came from --
11     Q.  It's just a yes or no question --
12     A.  Yes.
13     Q.  -- do you recognize it?
14     A.  Yes.  I recognize it.
15     Q.  Okay.  And is that your signature at the
16  bottom?
17     A.  Yes.
18     Q.  Okay.  And is that your handwriting right
19  above it with the date?
20     A.  Yes.
21     Q.  And what about the handwriting up at the top
22  in paragraphs one, two, and three; is that yours?
23     A.  Yes.
24     Q.  And L3Harris received this document from the
25  union.

Page 41

1      A.  Okay.
2      Q.  And you've got a shirt on today that says,
3  "IBEW1260."
4      A.  Right.
5      Q.  Is that the union that you belong to?
6      A.  Yes.
7      Q.  Okay.  How long have you been a union member?
8      A.  Since '95.
9      Q.  Since you started out at the base?
10     A.  Yes.
11     Q.  And is this a document that the union typed
12  up for you?
13     A.  They typed it up.  Yes.
14     Q.  Yeah.  You didn't type this document; right?
15     A.  No.  I haven't -- yeah.  I wouldn't type this
16  thing out.
17     Q.  Yeah.  So who at the union typed this out, if
18  you know?
19     A.  I don't know anybody from the union that --
20  that actually typed this thing up.
21     Q.  You don't remember who -- who typed this up?
22     A.  No.
23     Q.  Do you -- do you remember who gave it to you?
24     A.  No.  No.
25     Q.  Did you review this document before you

Page 46

```
1        Do you see that?
2     A.  Uh-huh.
3     Q.  Okay.  Is that accurate?
4     A.  See, L3Harris and Ke'aki, that's -- that's
5  one company.  So I work for the two guys -- the two
6  companies, but it's split, yeah?  So no matter if
7  they -- they say L3Harris or Ke'aki, you just got to
8  know your -- your -- your side of the company.
9     Q.  Yeah.  So you were on the Ke'aki side; right?
10    A.  I'm on the Ke'aki side.
11    Q.  Then in paragraph 6 --
12    A.  Uh-huh.
13    Q.  -- it says, "On or about November 15, 2019";
14  do you see that?
15    A.  Yes.
16    Q.  Now, the document that we looked at earlier
17  today --
18    A.  Uh-huh.
19    Q.  -- which is Exhibit 2, you still have
20  Exhibit 2?
21    A.  Yes.  Uh-huh.
22    Q.  Now, Exhibit 2 reflects that this incident
23  between Sean and Preston occurred on November 6, 2019;
24  you see that?
25    A.  Okay.  Right.
```

Page 47

```
1     Q.  So your declaration says, "On or about
2  November 15, 2019"; you see that?
3     A.  Yeah.  I see that.
4     Q.  Okay.  So I guess my question is:  The date
5  that's in your declaration, November 15, 2019, where did
6  that date come from?
7        Is that something that you supply -- that you
8  told Mr. Lee's attorney, or did he just put that in the
9  document for you to sign?
10    A.  I -- yeah, I think Mr. Lee's attorney put
11  that in, but I kind of realized that we're there for one
12  certain time, yeah?  So -- I mean, the times that we are
13  working on one building, you cannot be accurate for what
14  this -- this actually was, yeah?  So we're there one
15  certain time, so I going be like couple days short or
16  what, but I don't know exactly what day it happened.
17    Q.  You're not sure what day it was?
18    A.  I don't know what day what was.
19    Q.  Okay.  I just want to be clear, though, there
20  was only one incident --
21    A.  Uh-huh.
22    Q.  -- where you're referring to the same
23  incident in paragraph 6 --
24    A.  Uh-huh.
25    Q.  -- as you're referring to in your statement
```

Page 48

```
1  that's Exhibit 2; is that right?
2     A.  Right.
3     Q.  It's the same thing?
4     A.  Same thing, just --
5     Q.  Right --
6     A.  -- the dates.  I don't know how accurate do
7  you want.  I got to go back to my time card and check it
8  out, but it's kind of way back.  I don't even remember
9  what I even -- you know, you cannot remember what you
10  ate that day, you know, what you drank.  I don't know.
11    Q.  Yeah.  No, I -- I understand.  I just want to
12  make sure that you're not talking about two separate
13  things.  It's the same --
14    A.  No.
15    Q.  -- thing.  You're just not --
16    A.  Yeah.
17    Q.  -- sure of the date --
18    A.  Just the dates --
19    Q.  -- is that right?
20    A.  -- might be little bit off, but -- yeah.
21  It's -- it's just dates, but the same incident.  Yes.
22    Q.  Okay.  And did Mr. Lee's attorney provide you
23  with a copy of your earlier statement, Exhibit 2, before
24  you signed your declaration?
25    A.  No.  I didn't have -- I don't think I had
```

Page 49

```
1  this.
2     Q.  Okay.  And when you say you "didn't have
3  this," you mean Exhibit 2; right?
4     A.  Yes.
5     Q.  Now, in this declaration at paragraph 10 --
6     A.  Uh-huh.
7     Q.  -- it says you saw Mr. Igne stealing gas; you
8  see that?
9     A.  Yes.
10    Q.  Okay.  What's the basis for your statement
11  that Sean Igne was stealing gas?
12    A.  Like how I saw him?
13    Q.  Yeah.  What --
14    A.  Driving --
15    Q.  -- makes you think he was stealing gas?
16    A.  The gas can was coming out of his truck while
17  we was passing to go around the -- the vehicles, and he
18  was taking the gas can out and putting it back in the
19  work truck.
20    Q.  What gas can?
21    A.  The Manu Kai gas cans.  One.  One gas can.
22    Q.  So you saw Mr. Igne --
23    A.  Uh-huh.
24    Q.  -- take a Manu Kai gas can out of his
25  personal vehicle?
```

13 (Pages 46 to 49)

ER 104

Page 50

```
 1      A.  Yes.
 2      Q.  And put it in the work truck?
 3      A.  Yes.
 4      Q.  And that's the basis for your statement that
 5  he was stealing gas?
 6      A.  Several times.
 7      Q.  Okay.  Did you ever see Mr. Igne putting
 8  gasoline from the base into his truck?
 9      A.  Putting -- putting the gas in the -- in the
10  cans, holding it for a couple days.  And come Friday,
11  without anybody seeing, you know, puts in his truck.
12  Come Monday, we go around and we see him taking it out,
13  out of his truck --
14      Q.  You see him taking --
15      A.  -- empty cans.
16      Q.  -- the can out?
17      A.  Yeah.
18      Q.  Okay.  But my question is did you ever see
19  Mr. Igne putting gasoline from the base into his truck?
20      A.  Like dumping them in, or putting the can in
21  his truck?
22      Q.  Either way.
23      A.  Yeah.
24      Q.  You saw -- what did you see?
25      A.  Putting the gas can in his truck, the full
```

Page 51

```
 1  one.
 2      Q.  You saw Mr. Igne putting a full Manu Kai gas
 3  can into his personal vehicle?
 4      A.  Yes.
 5      Q.  Okay.  When did you see that?
 6      A.  Oh.  Many times.  Fridays majority, as we
 7  working, yeah, because we're always passing by the
 8  trucks, and the -- the gas cans there during the week.
 9  And at the weekend -- before that Friday, we -- we look,
10  it's gone.
11      Q.  And what -- what is the time period in which
12  you saw Mr. Igne putting these gas cans -- full gas cans
13  into his personal vehicle?
14      A.  What you mean?  Timeframe, every week?
15  Fridays, maybe.
16      Q.  No.  I mean, what years was this happening?
17      A.  Couple years.  I'd say two-thousand -- what
18  is this?  2019.  I'd say two-thousand, like, fourteen,
19  '15, before I went off to go to my other job.  So prior
20  to that, maybe like 2012.
21      Q.  Okay.  So I'm not clear.  When -- when is it
22  that you saw this?
23      A.  What day, or what year?
24      Q.  What years?
25      A.  2012 all the way up to 2015.  Then I came
```

Page 52

```
 1  back in '18 because I was off; right?  In that two,
 2  three years that I was gone, I was in the other shop.
 3  So when I came back, things was the same where the gas,
 4  you know, of course was -- was used to accommodate in
 5  his truck.
 6      Q.  Okay.  So when you came back in 2017 or
 7  2018 --
 8      A.  Right.
 9      Q.  -- you, again -- you're saying you, again,
10  observed Sean Igne putting the Manu Kai gas into his
11  truck?
12      A.  Yes.
13      Q.  Okay.  And for -- and that was continuing
14  until when?
15      A.  It's continuing until -- until this incident
16  of the pressure washing.  So if this incident was 2019,
17  it ended in 2019 when the heat was on of, you know,
18  allegations of stealing gas and everything.
19      Q.  And in the next paragraph, you say that,
20  Mr. Igne would falsify his timesheet; do you see that?
21      A.  Uh-huh.
22      Q.  And how did he falsify his timesheet?
23      A.  Well, me and Preston work together.  So, you
24  know, when -- everybody takes off during the year -- the
25  whole year, yeah?  And at the end, everybody takes off
```

Page 53

```
 1  and he takes off, and he still has more hours than all
 2  of us put together.  And he's not putting in the right
 3  amount of hours to accommodate the days of taking off.
 4      Q.  So you're saying that Sean Igne has more
 5  vacation time at the end of the year than everybody
 6  else?
 7      A.  Yes.
 8      Q.  And that's -- so --
 9      A.  I mean, anytime you work -- sorry -- 20 years
10  and up, we accommodate so many hours every two weeks on
11  each side, paid absence and vacation, and we use almost
12  ident -- almost identical with everybody on hours that
13  we take off.  But at the end of the year he has a lot.
14  He has a lot of hours to accommodate at the end of the
15  year where he has to take out, like, three months,
16  of -- two, three months of the year.
17      Q.  And so how is he falsifying his timesheets,
18  then?
19      A.  Not putting in the -- the right amount of
20  hours to accommodate the job.
21      Q.  Okay.  Did you ever see him filling out his
22  timesheet and putting something on it that was wrong?
23      A.  You know, before we went to this computerized
24  paperless time card, we had paper time cards that we
25  could see and we handed in every week, day in, day out.
```

14  (Pages 50 to 53)

ER  105

## Page 54

1  And just by looking at that you can really see the hours
2  that he take off because you see everybody's time card.
3  Just put in one honest day's worth of your time and, you
4  know, just to justify. Preston took off this day; okay?
5  You put them in, vacation. Sean took off -- Sean took
6  off this day and don't put the right amount of hours in
7  the -- the block, yeah, for vacation or paid absence.
8      Q.  And you saw that on his timesheet?
9      A.  Well, you know, Preston shows me. Preston
10 sees them because he has -- if Sean's not there, he has
11 to be the one to hand in the time card. And you --
12 overlook everybody's time card. So, yeah, Preston shows
13 me and I see them and, yes, it's -- it's been seen from
14 me.
15     Q.  Okay. So this -- you're talking about the
16 paper time card?
17     A.  Yes.
18     Q.  Okay. Do you know when you guys switched
19 from the paper time cards to the computerized system?
20     A.  Oh. This is fresh too. I don't know. Maybe
21 two-thousand -- right before I went, maybe 2015.
22     Q.  Okay. So when you came back after your
23 leaving for your --
24     A.  Right.
25     Q.  -- auto body work, you guys were using the

## Page 55

1  electronic system --
2      A.  Yes.
3      Q.  -- for your time cards?
4      A.  Yes.
5      Q.  And at any time did you report to anybody
6  that Sean Igne was falsifying his time cards?
7      A.  Well, you know, it's -- we never been turning
8  in anybody, so, no. No. I didn't say anything to
9  nobody.
10     MS. JONES: Sorry. We've been going
11 about an hour, and we usually take a break to let the
12 court reporter have her --
13     THE DEPONENT: Yeah. Yeah.
14     MS. JONES: -- to rest her fingers. So
15 let's take a short break and come back in five minutes;
16 okay?
17     THE DEPONENT: Okay. Yeah.
18     (Whereupon, a recess was taken
19 from 10:15 a.m. until 10:22 a.m.)
20     MS. JONES: Okay. Back on the record.
21     THE DEPONENT: Yeah. All good.
22 BY MS. JONES:
23     Q.  I understand that in the past, you and your
24 coworkers at the base had a habit of getting ice at the
25 beginning of the day to fill up your cooler --

## Page 56

1      A.  Uh-huh.
2      Q.  -- to keep your drinks cold so you have a
3  cold drink at the end of the workday; is that right?
4      A.  Yes.
5      Q.  Okay. And did something happen recently
6  where you're not allowed to take ice anymore?
7      A.  Yeah. I guess had one incident where someone
8  turned Sean in and because of Sean taking excessive ice,
9  they kind of shut the ice giving away. I mean, yeah,
10 you can go in and fill up your ice jug and -- for the
11 day, and then use it for the day. But he takes them, I
12 guess, for usage at home and -- excessive ice to bring
13 it home, and I guess someone turned him in.
14     Q.  Okay. And so because of that, you guys lost
15 your privilege --
16     A.  Privilege.
17     Q.  -- to fill up your cooler to getting ice?
18     A.  Yes.
19     Q.  Okay. And you guys upset with Sean for
20 losing --
21     A.  You know what --
22     Q.  -- your ice privileges?
23     A.  -- we're over upset. We just -- we just
24 waiting for the -- the whole thing to blow off and we
25 can take ice again. I mean, we take ice but not that

## Page 57

1  much like there's a party every weekend for him. But
2  for us is like to -- our cold drinks for our -- our
3  drinks for our kids, you know, after we pau practice and
4  whatnot. But, yeah, took away a lot of -- a benefit
5  from -- for us.
6      Q.  Okay. Going back to your auto body business
7  that we talked about earlier --
8      A.  Yes.
9      Q.  -- have you advertised for any job openings
10 for that business in the past year?
11     A.  I don't advertise them too much, but people
12 always ask me if they need help, I can call them for --
13 for accommodate a job for them. And I have jobs that I
14 would rather keep it for myself to make money. Yeah.
15 But for jobs, I don't have too much to accommodate
16 everybody.
17     Q.  Okay. Have you hired any employees to do
18 painting work?
19     A.  I tried, but no success. I can see them in
20 -- several hours in the job and I go, "That's enough,"
21 you know? It's hard to find good help.
22     Q.  Okay. Has Mr. Lee ever asked you about doing
23 work for your auto business?
24     A.  Several times and I told him, "No," because
25 of -- you know, I rather do it myself than give you a



Page 58

1 cut of, you know, my paycheck. So, yeah, I come across
2 some jobs that I'm kind of busy. But after a while when
3 he's not -- you know, when he -- I'm busy, he's busy.
4 And sometimes when I'm not busy, then he come -- he asks
5 me if I -- I -- I need help on the job, but I'm kind of
6 done already.
7     Q. Okay. So are there times when you had worked
8 for Mr. Lee, but he was not available?
9     A. He wasn't available because, you know, he has
10 other things to attend. But when I'm busy and I need
11 help, then he's -- he's kind of busy too, yeah?
12     Q. Okay. When is the last time you asked him if
13 he was available for -- to do a job?
14     A. I'd say two months.
15     Q. Two months ago?
16     A. Yeah.
17     Q. Did he tell you what he was doing that he was
18 too busy to take the job?
19     A. I don't know. Washing his car or polishing
20 something, you know?
21     Q. What was the job that you had for him?
22     A. Pressure washing a vehicle. But by the time
23 he was kind of done, I was done myself. I just was kind
24 of lazy on that day.
25     Q. I don't have any further questions for you at

Page 59

1 this time. Mr. Rosenbaum might have some questions.
2     MR. ROSENBAUM: Yeah, just very quickly.
3                 EXAMINATION
4 BY MR. ROSENBAUM:
5     Q. Mr. Castro, is it common in the workplace for
6 the guys to curse?
7     A. In some way, yeah, because we talk among each
8 other. It's like -- in a local way, it's kind of like a
9 -- a gesture, but nothing bad to where we're going to
10 fight somebody, you know what I mean? But as you look
11 around, anyplace where I've worked, it's normal. But,
12 like I say, let's go to court and you cannot do all that
13 cursing and whatnot. You have to kind of be -- kind of
14 civilized, you know, presenting yourself and everything.
15 But, hey, you get me out there, I'm -- I'm just a
16 typical local boy from the island, and you'll hear them,
17 you know? It's -- I mean, around the kids you got to
18 watch. Around the ladies, you got to watch. But among
19 guys, it's like gossip, you know? It's like a normal
20 thing. But, you know, you got to know where to -- to
21 make a fine line to kind of stop it, you know?
22     Q. And in the workplace, the majority of the
23 guys there are local guys; right?
24     A. Oh. All locals. All locals.
25     Q. Okay. So amongst the guys in the workplace,

Page 60

1 it's not uncommon for them to say, "You fucka," or
2 whatever; correct?
3     A. Right. It's common. They just probably so
4 energized to see you because they haven't seen you for a
5 long time, or you did something good to where it was
6 your birthday or Happy New Year, you know? It's -- it's
7 gestures, yeah? Maybe people take it the wrong way.
8 But you got to know who to tell it to, you know what I
9 mean, because they can always turn you in.
10     Q. And on the date in question where Sean
11 approached Mr. Lee and told him -- you know, was yelling
12 over the pressure washer on that incident, at that time
13 was Mr. Igne, was he wearing shorts?
14     A. Yes.
15     Q. And was he wearing tennis shoes?
16     A. Yes.
17     Q. And was that his common work attire?
18     MS. JONES: Objection. Vague.
19 BY MR. ROSENBAUM:
20     Q. Was wearing shorts his common work attire?
21     A. Yes.
22     Q. Was wearing tennis shoes Mr. Igne's common
23 work attire?
24     A. Yes.
25     Q. Ms. Jones asked you about the ice issue

Page 61

1 that's come up recently.
2     A. Uh-huh.
3     Q. Do you know if Mr. Igne was taking 100 quarts
4 of ice to fill up his big cooler?
5     A. Yes. Every other day or whenever the thing
6 goes down.
7     Q. I want to turn your attention to Exhibit 4.
8     A. Uh-huh.
9     Q. And you testified you received this from the
10 union; correct?
11     A. Yes.
12     Q. And you didn't -- you didn't write any of
13 this up; did you?
14     A. No.
15     Q. Okay. So I want to just go through it. Look
16 at number 4.
17     A. Uh-huh.
18     Q. It reads, "I have read Sean's statement,
19 dated November 6, 2019, attached and witnessed and
20 agreed that Preston's aggressive and hostile behavior is
21 unprofessional, threatening, and adversely affects my
22 ability to work in and around Preston"; you see that?
23     A. Yes.
24     Q. Did I read that correctly?
25     A. Yes.

Page 62

1   Q.  And do you agree with that statement, as you
2   sit here today?
3   A.  I signed it.  Yes.  But in -- in my
4   perspective, working hand in hand with him, nobody
5   perfect.  You got goods, you got bads.  I -- I'm his
6   partner, so I really have to be the one that he's always
7   against him.  If you cannot be -- if you cannot tame
8   somebody down, he has more control than -- than all of
9   us.  Like him, you can calm him down.  "Hey" -- meaning
10  how you pursue yourself on him, calm him down, you know?
11  Anything can be -- can get really comfortable in -- in
12  the working environment.  I mean, he probably was upset,
13  you know, in some certain days.  But, yeah, you know,
14  talking -- you can talk to this guy.  This guy's really
15  -- he might not like hear what he has to say, but you --
16  you really talk to him in one -- in one normal way, you
17  know, being as one friend to him or a partner, you can,
18  you know -- you can calm -- calm guys down and work
19  normally.
20  Q.  Were you ever afraid of Preston Lee in the
21  workplace?
22  A.  No.
23  Q.  Were you ever threatened or verbally
24  threatened by Preston Lee in the workplace?
25  A.  No.  No.  No.

Page 63

1   Q.  Were you ever physically threatened in the
2   workplace by Preston Lee?
3   A.  No.
4   Q.  Did you ever witness Preston Lee ever
5   physically threaten anybody in the workplace?
6   A.  No.
7   Q.  Did you ever witness Preston Lee ever
8   verbally threaten anybody's well-being in the workplace?
9   A.  No.
10  Q.  Do you believe that Preston Lee is a threat
11  -- or was a threat to anybody at the workplace at
12  L3Harris?
13  MS. JONES:  Objection to the form of the
14  question.
15  THE DEPONENT:  No.
16  BY MR. ROSENBAUM:
17  Q.  So when you signed this document, did you
18  have an opportunity to make any changes to it?
19  A.  I didn't change anything.  I just signed it
20  because they handed it to me and to -- to accommodate
21  what they was trying to do to him, I just signed it.
22  Q.  And did you feel pressured to sign this
23  document by the union?
24  A.  I wasn't pressured.  I just was kind of
25  looking over it and kind of giving my -- my second

Page 64

1   opinion on it and having my personal beliefs on what I
2   believe about him differently than -- even if I signed
3   it, I understand, you know, how to communicate with this
4   person.
5   Q.  Did anybody from L3Harris management ever ask
6   you if Preston Lee was a threat to anyone in the
7   workplace?
8   A.  I think Scott Taylor.
9   Q.  And what was your response?
10  A.  No.
11  Q.  And did anybody besides Scott Taylor ever
12  approach you regarding Preston Lee's emotional or
13  psychological state in the workplace?
14  MS. JONES:  Objection.  Vague.
15  THE DEPONENT:  No.
16  BY MR. ROSENBAUM:
17  Q.  Can you look at number five?  It says,
18  "Preston's aggressive and hostile behavior at work
19  creates a hostile work environment for me, Sean and
20  others who work with Preston"; do you see that?
21  A.  Yes.
22  Q.  You cannot say how other people feel; right?
23  You can only speak to how you feel; right?
24  MS. JONES:  Objection to the form.
25  THE DEPONENT:  Right.

Page 65

1   BY MR. ROSENBAUM:
2   Q.  Okay.  So you didn't know if other people
3   were -- felt threatened by Preston Lee; did you?
4   A.  No.  I got -- I got one thing, you know --
5   Q.  Uh-huh.
6   A.  -- being as aggressive, there was an incident
7   where Sean had to take TDI or the stress leave.  While
8   he was on that stress leave for that week, he called us
9   up, me and -- me and my partner, now David, telling us
10  to go get a TRO on Preston.  I go, "What you mean a TRO?
11  We cannot get one TRO on him."
12  So -- "Oh, you guys got to go make
13  statements."
14  And I go, "Eh, we're not doing anything."
15  So we went on to HR and asked Julie Broyles
16  if -- if we make one statement where Preston is really
17  threatening us, then you make one TRO.  Why we got to
18  make one TRO?  And I guess we kind of realized.  I go,
19  "No do nothing until all said and done," you know,
20  because we're going be more in trouble.  This is -- this
21  is one -- one matter among the company, Preston, and
22  Sean than bringing -- putting all us witnesses in.  So
23  we felt -- me and David, we felt that, no, we don't have
24  to make a TRO on him.
25  Q.  And what did Ms. Broyles say?

17  (Pages 62 to 65)

ER  108

Page 66

1    A. "You're right. If you guys feel threatened,
2  do not make a TRO on him. Make Sean make a TRO on him."
3    Q. You mean if you do not feel threatened?
4    A. If we feel threatened from Preston, make a
5  TRO. Yes.
6    Q. Okay.
7    A. Yes.
8    Q. But if you don't feel threatened --
9    A. If you don't feel threatened, don't do
10  anything.
11    Q. Okay.
12    A. But --
13    Q. So essentially she's telling you that Sean --
14  that you let Sean --
15    A. Right.
16    Q. -- do the work?
17    A. Let Sean do the dirty work, not me.
18    Q. Okay. Do you feel like you were a part of
19  Sean's dirty work after looking at Exhibit 4?
20    MS. JONES: Objection to the form of the
21  question.
22    THE DEPONENT: I feel like, you know, we
23  got caught in a crossfire. We've seen a lot of things
24  over the years. And if it's going to be justice to
25  accommodate the whole incident, you know, I have nothing

Page 67

1  to hide on accommodating any help that I can provide for
2  -- for everybody.
3  BY MR. ROSENBAUM:
4    Q. And do you know what a hostile work
5  environment is?
6    A. Yeah, like -- hostile, maybe like, you know,
7  real -- real antsy, always want to fight people or, you
8  know, real -- real cocky among everybody.
9    Q. Okay. And do you believe that Preston Lee
10  created a situation like that at work?
11    A. I don't think he -- he made anything to
12  accommodate something like that.
13    Q. So he did -- in other -- in other words, I
14  just want to clarify your testimony, are you saying that
15  he did not create a hostile work environment?
16    A. He did not.
17    Q. Okay. Number 6 says, "I'm very uncomfortable
18  with working with Preston"; do you see that?
19    A. Yes.
20    Q. And was that true?
21    Were you personally uncomfortable working
22  with Preston?
23    A. You know, as I look at it now, not really
24  because we was partners. We work side by side with each
25  other. In my personal work around him, I have to trust

Page 68

1  him, you know, because we're on one plank, 15 feet in
2  the air. I cannot think that, you know, if he -- if he
3  was that -- if I was uncomfortable, I wouldn't be up
4  there with him.
5    Q. Okay.
6    A. But he was more like a, you know, support for
7  me to accommodate things.
8    Q. Okay. So you trusted Preston?
9    A. Yes.
10    Q. And you felt secure working with Preston?
11    A. Oh. Yes.
12    Q. And it also states that, "At times, I've
13  been concerned about my personal safety at work."
14    Did Preston Lee ever create a situation
15  that caused you to be concerned about your personal
16  safety at work?
17    A. No.
18    Q. Okay. It also says, "I'm also concerned
19  about the safety of others, including Sean and Rodney
20  Martin, our supervisor."
21    Were you concerned about the safety of those
22  two men?
23    A. Not really because they could take care --
24  everybody could take care of their own business to
25  accommodate what they have to do to -- to help each

Page 69

1  other or, you know, to -- to make things right, you
2  know?
3    Q. Okay. And number 7 says, "I believe that
4  Preston's aggressive and hostile behavior creates an
5  unsafe hostile work environment."
6    Do you believe that Preston's "aggressive and
7  hostile behavior" created an unsafe and hostile work
8  environment?
9    MS. JONES: Objection. Vague.
10    THE DEPONENT: He's -- he's pretty
11  aggressive in everything that he do. But if you
12  approach him in one certain way, when you accommodate
13  anything if you want something from him -- I mean, we're
14  human. We can talk, you know what I mean? So it's not
15  like you cannot -- you cannot talk to this guy.
16  BY MR. ROSENBAUM:
17    Q. And when you say "aggressive," would you
18  agree with me that what you mean is that he's actually a
19  very intense human being?
20    MS. JONES: Objection.
21    THE DEPONENT: He's intense in some other
22  ways, but his -- just being around him, you know, he's
23  real -- he can be in that other stage where he's
24  very -- you know, fun working. He's workable. He's
25  workable.

18 (Pages 66 to 69)

ER 109

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

PRESTON LEE, ) Civil No.
) 20-00489 LEK-KJM
Plaintiff, ) (Other Civil Action)
)
vs. )
)
L3HARRIS TECHNOLOGIES, INC.; )
JOHN DOES 1-10; JANE DOES )
1-10; DOE CORPORATIONS 1-10; )
DOE PARTNERSHIPS 1-10; DOE )
UNINCORPORATED ORGANIZATIONS )
1-10; and DOE GOVERNMENTAL )
AGENCIES 1-10, ) (Pages 1 - 48)
)
Defendants. )
)

DEPOSITION OF DAVID HESAPENE

taken on behalf of Defendants, taken at the Law

Office of Cades & Schutte, 3135 Akahi Street, Suite A,

Lihue, Hawaii 96766, commencing at 10:53 a.m.,

Wednesday, September 22, 2021, pursuant to Notice.

Reported by:   JESSICA AKITA, RPR
Certified Shorthand Reporter
Hawaii License No. 461

EXHIBIT "B"

Page 22

1    Q. -- 2019? I'm sorry?

2    A. No.

3    Q. You did not? Okay.

4        So putting aside the date for the moment

5    because it sounds like you're not exactly sure what date

6    it happened; is that fair?

7    A. Yeah.

8    Q. Okay. But you remember the incident where

9    Sean Igne told Preston to put on pants while pressure

10   washing; is that right?

11   A. Yes. But we was -- I was with Sean already.

12   I was Sean's partner already. Preston was pressure

13   washing the building. But Sean drove up to there, and

14   the pressure washer is loud, and he was just blowing the

15   horn and trying to get his attention, and he was trying

16   to yell at him, "Wear your pants."

17       And Preston just had turn off the machine,

18   put on his pants, and he continued pressure washing, and

19   me and Sean just went drive off.

20   Q. And later that day, there was some yelling in

21   the office while you were doing your timesheet; is that

22   correct?

23   A. Yes. Yes.

24   Q. And --

25   A. We were right next door in that shop right

Page 23

1    over, but we could hear him.

2    Q. And Preston was swearing at Sean?

3    A. No. Preston came and told Sean, "Tomorrow,

4    make sure you come work with your pants."

5        And then they start exchanging words, you

6    know, and start yelling at each other. I never hear no

7    threatening, nothing. I just heard him yelling.

8    Q. Okay. My question was did you hear Preston

9    swearing at Sean?

10   A. No.

11   Q. You don't remember that?

12   A. No. They just was yelling at each other, but

13   he was telling him for, "Make sure you come work with

14   your pants tomorrow."

15   Q. Preston was saying that to Sean?

16   A. Yes.

17   Q. And it was -- was it earlier that day when

18   there was a discussion at the lunch table about wearing

19   pants while pressure washing?

20   A. Was the same day when he got scolding about

21   that about putting on the pants. But we wasn't even

22   talking about he pressure washing. We was talking about

23   this other boy.

24   Q. Okay. But there was a discussion at the

25   lunch table about this -- this other guy --

Page 24

1    A. About using pants when you pressure washing.

2    Q. And who was at the lunch table when you were

3    having that discussion?

4    A. Me, Sean, Gilbert. I don't know. Probably

5    Preston was on the outside, but we was just talking

6    about that with the Antenna Riggers. Antenna Riggers is

7    right next to us that's why. And the boy who was

8    pressure washing, he was working grounds at that time.

9    Q. And was the discussion at the lunch table

10   that -- that he should be wearing pants, this -- this

11   guy who was pressure washing that he should be wearing

12   pants while he was doing that?

13   A. Yeah. When you're pressure washing, you got

14   to use safety, yeah?

15   Q. And the appropriate safety equipment is to

16   wear pants?

17   A. Yeah.

18   Q. Rain pants?

19   A. Rain pants, or -- yeah. Rain pants.

20   Q. Okay.

21   A. But Sean didn't personally tell Preston that

22   day -- you know, we was talking about only Preston was

23   outside. He never personally tell him that he need to

24   put on the pants, the rain pants. We was talking about

25   a different store about the boy -- the other boy.

Page 25

1    Q. Right.

2    A. Yeah.

3    Q. But when Preston came up and saw -- sorry.

4    When -- when Sean came up, you and Sean came up to the

5    building, you saw Preston pressure washing in shorts --

6    A. Yes.

7    Q. -- is that right?

8    A. Yes.

9    Q. And the pressure washer was on at the time?

10   A. Uh-huh. It's a real loud pressure washer.

11   Q. Okay. And Sean told Preston to put on the

12   rain pants?

13   A. He was blowing the horn, lifting up his hands

14   like, "What are you doing?"

15       Then Preston had turn off and he put on

16   the pants.

17   Q. Okay. So the day after this incident where

18   Preston and Sean were yelling in the office --

19   A. Yes.

20   Q. -- did Rodney Martin ask you some questions

21   about what happened?

22   A. No. Actually, we went go to the job site,

23   and then Preston was venting to me, then I was on --

24   then I end up go see Rodney for see how lie -- to talk

25   to him because I never needed -- you know, like he was

Page 26

1   already upset because he stay yelling at me. And, you

2   know, I said, "Maybe you should talk to him."

3       Told Rodney that he should talk to him

4   because we just came back to the job site the next day.

5   Q.  Okay. So you talked to Rodney Martin?

6   A.  Yes.

7   Q.  And did Rodney Martin ask you what happened

8   the day before?

9   A.  No. I just told him -- I just told him that

10  what had happened that day and was about Preston

11  pressure washing. That's about it. I didn't go give

12  him details, you know, because he was asking what had

13  happened. I said, "Preston was pressure washing without

14  pants and he -- the next day is when he was venting to

15  me."

16  Q.  And you told that to Rodney Martin?

17  A.  Yes.

18      (Exhibit 3 was marked.)

19  BY MS. JONES:

20  Q.  Okay. The court reporter has handed you

21  what's been marked Exhibit 3 to your deposition. Take a

22  look at this document and let me know when you're ready.

23  A.  Okay.

24  Q.  Do you recognize Exhibit 3?

25  A.  Yes.

Page 27

1   Q.  Okay. Is that your signature at the bottom?

2   A.  Yes.

3   Q.  And did you handwrite the date under your

4   name?

5   A.  The date? Yeah.

6   Q.  Okay.

7   A.  I think my supervisor had -- Rodney Martin

8   made the statement. We just have to give -- we just

9   tell him what had happened and he typed it up.

10  Q.  Okay. So you talked to Mr. Martin about what

11  happened. He typed up Exhibit 3, and then you reviewed

12  and signed it?

13  A.  Yes.

14  Q.  And then did -- after you signed it, did you

15  give this document to Mr. Martin?

16  A.  Give it back to him. Yeah.

17  Q.  Okay. And who is Mr. Martin?

18  A.  My supervisor.

19  Q.  He was in charge of the paint shop?

20  A.  Yes.

21  Q.  And when you talked to Mr. Martin about what

22  happened, were you honest with him?

23  A.  Yeah.

24  Q.  You told him truthfully what happened?

25  A.  Yes.

Page 28

1   Q.  And did you -- were you truthful in this

2   statement that is contained in Exhibit 3?

3   A.  Yes. Whatever I remembered what was going on

4   pretty much the day of this pressure washing thing and

5   then the next day. It's pretty much whatever I gave, I

6   was trying to give him a report.

7   Q.  You think your -- your memory of what

8   occurred was better when you signed the statement that's

9   Exhibit 3 than it is today?

10  A.  Yes. I get too much things in my head.

11  Q.  Yeah. I hear you. It was almost two years

12  ago.

13      So in the last paragraph of Exhibit 3, the

14  second sentence states, "Preston just walked up to me

15  and started ranting, 'I don't care if I going to lose my

16  job. I'm just going to punch Sean through his face.'"

17      Do you see that?

18  A.  Yes.

19  Q.  Is that what Preston said to you?

20  A.  Yes, because he was angry from the day before

21  already.

22  Q.  And -- sorry. Go ahead.

23  A.  No, then he apologized to me and just tell me

24  he sorry he had to do that, but he just wanted for vent

25  because, you know, this stuff had happened.

Page 29

1   Q.  It -- it also says at the end of this

2   paragraph, "His face was full of sweat from his anger,

3   and he wiped it away and said, 'F,' space, space, space,

4   'Rod, F,' space, space, space, 'Sean. Nobody can touch

5   me, not Rod, not Sean or HR.'"

6       Do you see that?

7   A.  Yes.

8   Q.  Okay. Now, in the statement, we have this "F

9   space, space, space."

10  A.  Okay.

11  Q.  Can you tell me exactly what it is that he

12  said? You may have been sort of being polite here and

13  not using the word. But what is it that Preston

14  actually said that day?

15  A.  He had that attitude like fuck everybody. He

16  just was angry -- angry because all this stuff was just

17  frickin happening.

18  Q.  Okay. So he said, "Fuck Rod"?

19  A.  Yeah.

20  Q.  And Preston also said, "Fuck Sean"?

21  A.  Yes.

22  Q.  And he said -- did he say "nobody can touch

23  me"?

24  A.  Oh. I didn't -- I don't remember saying

25  that.

Page 34

1    A. Yes.
2    Q. And the date that's right above it, did you
3  write that in?
4    A. I think that's my signature. Yeah.
5    Q. The date that's right above the signature on
6  Exhibit 5, is that your handwriting?
7    A. Yes.
8    Q. And what about the handwriting up at the top
9  in paragraphs one, two, and three, is that your
10  handwriting?
11    A. I never -- I never -- I don't remember the
12  dates.
13    Q. I'm just asking if this is your handwriting
14  that's -- that we see in the handwritten portion --
15    A. No.
16    Q. -- in paragraphs one, two, and three?
17    A. No.
18    Q. It's not your handwriting?
19    A. No.
20    Q. Do you know whose handwriting it is?
21    A. I have no idea.
22    Q. Okay. So L3Harris receives this document
23  from the union, and I'm wondering if -- let me back up.
24        You did not type up, you know, this Exhibit 5
25  document; correct?

Page 35

1    A. No.
2    Q. Do you know who typed up this document?
3    A. I have no idea.
4    Q. You -- did you review the document before you
5  signed it?
6    A. I don't know -- I don't recall. I don't
7  remember.
8    Q. You don't remember --
9    A. No.
10    Q. -- if you reviewed it?
11    A. Yeah.
12    Q. Did anyone from the union tell you what the
13  purpose was for this document?
14    A. I remember they was talking about something
15  about this, but I never know get all this stuff on them,
16  the "aggressive and hostile behavior" because I know the
17  reason why, probably, Mr. Lee was like that because this
18  thing was building up for so long.
19    Q. Okay. So who do you remember talking
20  about -- about that -- this document?
21    A. I don't know who gave us this. I don't know
22  if was Tony Perreira, the union rep, or somebody.
23    Q. You don't remember right now who gave it to
24  you?
25    A. Yeah.

Page 36

1    Q. Okay.
2    A. I don't remember.
3    Q. Okay. And do you recall if anybody said what
4  would be done -- what they were going to do with this
5  document?
6    A. No. They didn't tell me nothing.
7    Q. Okay. Mr. Lee's wife works out at the base
8  with you; is that correct?
9    A. Yes.
10    Q. She still works out there?
11    A. Yes.
12    Q. And was there a time when you felt that
13  Mrs. Lee was watching you and you felt like a target?
14    A. Well, because I was working with Sean is the
15  way I used to -- when I was with Sean. I used to feel
16  that way. So now I'm with Gilbert and everything's just
17  fine. And I was -- when I was working with Sean, feel
18  like I was one target because somebody's always watching
19  me.
20    Q. You felt that Mr. Lee's wife was watching --
21    A. Well --
22    Q. -- Sean?
23    A. -- it's not only her, I think. You know,
24  it's -- there's a lot of people over there that they're
25  always worried about everybody else.

Page 37

1    Q. And did Mr. Lee's wife also make a complaint
2  about you in the past?
3    A. Yeah -- well, had a few of them they turned
4  me in to corporate one time.
5    Q. And Mr. Lee's wife was one of them?
6    A. And two -- three other guys.
7        MS. JONES: I don't have any further
8  questions at this time, but Mr. Rosenbaum may have some
9  questions.
10        EXAMINATION
11  BY MR. ROSENBAUM:
12    Q. Yeah, just a couple.
13        Can you look at Exhibit 4? Look at the
14  second page. Looks like the last question you were
15  asked -- that's reflected in this document -- "Is there
16  anything else that you would like to add to or delete
17  from this statement?"
18        And it says your answer was, "I have a real
19  concern that Preston will hurt himself or others."
20        Did you ever say that?
21    A. Well, when -- I used to -- I was always
22  working with him. When he get angry, you know, he
23  always -- you know, he's mad.
24    Q. And did you -- did you state this that you
25  thought Preston would hurt himself or others?

Case 1:20-cv-00489-LEK-KJM   Document 61-3   Filed 10/22/21   Page 5 of 6   PageID #: 969

### Page 38

1    A.  No.  I don't remember.

2    Q.  No?

3    A.  Because I could -- I knew him a long time,

4 you know?  It's not like he going hurt me.

5    Q.  And if you could turn to Exhibit 5, please.

6 If you look at Exhibit 5 under the paragraph number 4,

7 it says, "I've read Sean's statement dated November 6,

8 2019, (attached)," in parentheses, "and witnessed and

9 agreed that Preston's aggressive and hostile behavior is

10 unprofessional, threatening and adversely affects my

11 ability work with and around Preston."

12    Do you see that?

13    A.  Yes.

14    Q.  Okay.  And did you believe at the time you

15 signed this that Preston's behavior was unprofessional?

16    A.  No, because when he get angry is when he get

17 -- he start, you know, getting real mad.

18    Q.  Okay.  Go ahead.  I'm sorry?

19    A.  No.  I could -- we could -- we could -- we

20 could work together fine.  It's just, you know,

21 sometimes maybe one time we had one mistake, but we

22 fixed the problem before the end of the day.

23    Q.  And did you ever see or hear Preston

24 physically threaten anybody in the workplace?

25    A.  No.

### Page 39

1    Q.  Did you ever see or hear Preston verbally

2 threaten anybody in the workplace?

3    A.  No.  Maybe he's loud and yelling, but he

4 never -- I never hear him threatening anybody.

5    Q.  Okay.  And did you believe Preston's conduct

6 adversely affect your ability to work with Preston?

7    A.  No.

8    Q.  Do you believe that Preston's actions

9 adversely affected your ability to work, period?

10    A.  No.

11    Q.  Okay.  Number 5 reads, "Preston's aggressive

12 and hostile behavior at work creates a hostile work

13 environment for me, Sean and others who work with

14 Preston."

15    Do you see that?

16    A.  Yeah.

17    Q.  Do you know what a hostile work environment

18 is?

19    A.  Yes.

20    Q.  Okay.  And what does that mean to you?

21    A.  It means very -- working very angry.

22    Q.  Okay.

23    A.  Yeah.

24    Q.  And did you believe that Preston created a

25 hostile work environment for you?

### Page 40

1    A.  No.

2    Q.  Okay.  And did you believe Preston created a

3 hostile work environment for other people in the

4 workplace?

5    A.  No.

6    Q.  And number 6 reads, "I am very uncomfortable

7 working with Preston, and at times I've been concerned

8 about my personal safety at work."

9    Do you see that?

10    A.  Yes.

11    Q.  Were you ever very uncomfortable working with

12 Preston?

13    A.  No.  Only a few times when he was angry --

14 angry with Sean.

15    Q.  Okay.  And were those the times we've

16 discussed already?

17    A.  Yes.

18    Q.  Okay.  "And at the times -- and at times I've

19 been concerned about my personal safety at work."

20    Were you ever concerned about your personal

21 safety because of Preston?

22    A.  No.

23    Q.  And then it says, "I'm also concerned about

24 the safety of others, including Sean, Rodney Martin, our

25 supervisor."

### Page 41

1    Did you ever feel that you were concerned

2 about the safety of Sean Igne?

3    A.  No.

4    Q.  Did you ever feel that you were concerned

5 about the safety of Rodney Martin?

6    A.  No.

7    Q.  Did you ever feel that you were concerned

8 about the safety of either of those two individuals

9 because of Preston Lee?

10    A.  No.

11    Q.  Do you believe that Preston's aggressive

12 behavior created an unsafe work environment?

13    A.  No.  I think they just made it like that.

14    Q.  You can't --

15    A.  The way I feel.

16    Q.  Who made him like that?

17    A.  The -- the company -- the -- they didn't take

18 care the problems, you know?  If they had problems, if

19 they -- just like they -- they don't -- they don't fix

20 the problem.  That's why Preston got very angry.

21    Q.  Okay.  Do you remember an incident where

22 there was a dead battery in a truck and there was a

23 confrontation between Preston and Mr. Igne?

24    A.  Yes.

25    Q.  And were you physically present during that?

11  (Pages 38 to 41)

Case 1:20-cv-00489-LEK-KJM   Document 61-3   Filed 10/22/21   Page 6 of 6   PageID #: 970



Page 42

1  A. Yes.
2  Q. Okay. And do you recall if there was any
3  cursing going on in that confrontation?
4  A. No. They just was yelling at each other, and
5  Sean had start apologizing to Preston because he was
6  under stress because he just went crash his car.
7  Q. So at the end of it, Sean apologized to
8  Preston?
9  A. Yeah. I heard. Yeah.
10  Q. Right at that instant?
11  A. No, not right at the instant, but they was
12  grumbling about the dead battery for -- just going back
13  and forth. Then he went apologize after because he was
14  stressing out because he went smash his car.
15  Q. And you heard Sean apologize to Preston?
16  A. No, but Sean told me he apologized to him.
17  Q. Did Sean ever tell you that he was physically
18  threatened by Preston?
19  A. No.
20  Q. Did Sean ever tell you that he felt unsafe in
21  the workplace because of Preston?
22  A. Yes.
23  Q. Did Sean ever tell you that Preston
24  threatened to kick his ass?
25  A. Did Sean? What is that again?

Page 43

1  Q. Did Sean, Mr. Igne, ever tell you that
2  Preston threatened to kick Mr. Igne's ass?
3  A. No.
4  Q. Did you ever hear that sort of allegation?
5  MS. JONES: Objection.
6  THE DEPONENT: Was -- Sean wasn't there
7  when he told me -- when he was venting to me that he
8  wanted for kick Sean's ass. But Sean -- he never
9  personally tell Sean straight in his face. Sean wasn't
10  even there.
11  BY MR. ROSENBAUM:
12  Q. Okay. And if you turn to Exhibit -- yeah,
13  this one. Yeah. Exhibit 3. And Ms. Jones questioned
14  you regarding the statement in the last paragraph. It
15  starts -- let's see. "Preston just walked up to me and
16  started ranting."
17  Do you see that?
18  I don't know where are we? Right here.
19  "Preston just walked up to me" --
20  A. Yeah.
21  Q. -- "and started ranting."
22  "And started ranting and, 'I don't care if I
23  -- if I going to lose my job. I just going to punch
24  Sean through his face.'"
25  A. Yeah.

Page 44

1  Q. Did Preston ever punch Sean through his face?
2  A. No.
3  MS. JONES: Objection.
4  BY MR. ROSENBAUM:
5  Q. Did Preston -- did you believe that Preston
6  at the time that he stated this that he was actually
7  going to assault Sean Igne?
8  A. Well, he just was -- Sean was no even there.
9  He just was venting to me --
10  Q. Okay. And did you think --
11  A. -- I think.
12  Q. Do you think he was serious like he was
13  actually going to punch Sean, or do you think he was
14  just angry --
15  A. Just angry.
16  Q. Okay. So you didn't believe that Preston was
17  going to follow through and attack Sean?
18  A. No.
19  Q. Okay. And you did not believe that; correct?
20  A. No -- yes.
21  MR. ROSENBAUM: Okay. I have no further
22  questions -- oh, wait. Wait. I have one final
23  question. I'm sorry. Luckily we're not in court here.
24  BY MR. ROSENBAUM:
25  Q. Okay. So the final sentence in this

Page 45

1  statement, "His face was full of sweat from his anger."
2  Did you tell somebody that Preston's face was
3  full of sweat because of his anger?
4  A. No.
5  Q. You never said that at all?
6  A. No.
7  Q. Okay. And he wiped it away and said, "'F'
8  Rod and 'F' Sean."
9  He did say that; right?
10  A. Yes.
11  Q. Because he was upset --
12  A. Yeah. Yeah.
13  Q. And then it says, "Nobody can touch me, not
14  Rod, not Sean or HR."
15  Did you ever in your life hear Preston say
16  anything like that?
17  A. No.
18  MR. ROSENBAUM: No further questions.
19  EXAMINATION
20  BY MS. JONES:
21  Q. Okay. You testified earlier in your response
22  to some questioning from Mr. Rosenbaum about you and
23  Preston had an incident that you guys resolved at the
24  end of the day?
25  A. Yeah, the one we was working together. We

12 (Pages 42 to 45)

ER 115

EXHIBIT F   pg 1

---

**Apo, Jasmine (US)**

| | |
|---|---|
| **From:** | West, Ross W CTR (USA) <ross.west.ctr@navy.mil> |
| **Sent:** | Wednesday, December 11, 2019 1:11 PM |
| **To:** | Arnold, Amanda (US); Kreider, Jay (US) |
| **Cc:** | Broyles, Julie (FP) (Contractor); Apo, Jasmine (US) |
| **Subject:** | FW: Gasoline Inquiry |
| **Attachments:** | TAYLOR INQUIRY INTO GASOLINE THEFT.docx; MFR --- TAYLOR INTERVIEW WITH LEE.docx; STATEMENT --- MARTIN.docx; STATEMENT --- FUJITA.docx; STATEMENT --- HESAPENE.docx; STATEMENT --- CASTRO.docx; STATEMENT --- IGNE.docx |

Jay / Amanda:

I received a call right from the NAVSUP SCO after the BOD Meeting regarding an anonymous report from a Manu Kai individual to the Navy HOT Line and PMRF Commanding Officer. I told the SCO I would look into the issue once I returned from Orlando, FL. As it turns out, we guessed the individual was Preston Lee based upon a recent disciplinary action against him. The Navy has confirmed he was the accuser. I asked Scott Taylor to conduct a formal inquiry based upon his 30+ years of military investigative experience and told PMRF of my intent to do so.

Attached is his report which has been shared with the PMRF Technical Director, NAVSUP SCO and PMRF XO. I also requested a formal investigation to be conducted by the NCIS. Due to the recent two active shooter events, many personnel are raising concerns about Preston Lee's stability. Preston himself has openly told his co-workers that he has been diagnosed with PTSD and has had other issues. Those concerns were addressed by HR in a confidential manner in the past, but I believe we need to elevate it concerns to a corporate level based upon the findings Scott presented. Apparently the situation with Preston Lee's stability is deteriorating.

R,

Ross W. West
Program Manager
Manu Kai, LLC
O: 808-335-4298
C: 703-635-9878
ross.west.ctr@navy.mil
rwest@alakaina.com

**From:** West, Ross W CTR (USA)
**Sent:** Wednesday, December 11, 2019 12:58 PM
**To:** Moore, Judith L CIV NAVSUP, 7020 <judith.moore1@navy.mil>; Kay, Robert T, Civ, PMRF, N02-Technical Director <robert.t.kay@navy.mil>
**Subject:** FW: Gasoline Inquiry

Judith / Bob:

Attached are the findings from Manu Kai's formal inquiry into the alleged fuel theft.



1

BLUF: The alleged incident seems to be from the 2007-2010 timeframe and there is not collaborating evidence to prove the theft occurred or to dis-prove the allegation. Several items have come to light:

1. There seems to be a motive of retaliation associated with the allegations.
2. Individuals have raised significant concerns with the mental health of the accuser.
3. The VLN ProKee system in use to monitor fuel usage has significant gaps with regards to accountability to fuel dispensing and usage.

Manu Kai is continuing to investigate how the VLN ProKee system might be enhanced to close the accountability loopholes and we are working with our Corporate HR/Legal department to determine what employment action can be taken regarding the mental health concerns of the accuser.

R,

Ross W. West
Program Manager
Manu Kai, LLC
O: 808-335-4298
C: 703-635-9878
ross.west.ctr@navy .mil
rwest@alakaina.com

From: Taylor, Stuart S CTR USN PMRF BARS HI (USA) <stuart.s.taylor.ctr@navy.mil>
Sent: Wednesday, December 11, 2019 11:36 AM
To: West, Ross W CTR (USA) <ross.west.ctr@navy.mil>
Cc: Broyles, Julie A CTR USN (USA) <julie.broyles.ctr@navy.mil>; Apo, Jasmine C CTR (USA) <jasmine.apo.ctr@navy.mil>
Subject: Gasoline Inquiry

Ross,

Please see attached inquiry as requested. I would consider this a draft, but I am in possession of all signed documents.

Scott

**Scott Taylor**
Manager, Security & Emergency Services
Manu Kai, LLC
PMRF, Barking Sands
Office:  335-4119
Email:  stuart.s.taylor.ctr@navy.mil

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| PRESTON LEE,<br><br>Plaintiff,<br><br>vs.<br><br>L3HARRIS TECHNOLOGIES, INC.;<br>JOHN DOES 1-10; JANE DOES 1-10;<br>DOE CORPORATIONS 1-10; DOE<br>PARTNERSHIPS 1-10; DOE<br>UNINCORPORATED<br>ORGANIZATIONS<br>1-10; and DOE GOVERNMENTAL<br>AGENCIES 1-10,<br><br>Defendants. | ) CIVIL NO. 20-00489 LEK-KJM<br>) (Other Civil Action)<br>)<br>) DECLARATION OF PRESTON LEE<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

DECLARATION OF PRESTON LEE

| | |
|---|---|
| STATE OF HAWAI'I | )<br>) SS. |
| COUNTY OF KAUA'I | ) |

I, PRESTON LEE, do hereby declare that:

1.    Unless otherwise indicated, I make this declaration based upon my

personal firsthand knowledge. All of the statements in this declaration are true. I

understand that if I make a false statement, I may be prosecuted for perjury.

2.      I am competent to testify to the matters set forth herein.

3.      I am the Plaintiff in this lawsuit.

4.      I am a fifty-seven (57) year old a combat veteran who served our country in the United States Navy from 1982-1992.

5.      I served two tours in the Persian Gulf in the late 1980's/early 1990's.

6.      In 1991 in the Persian Gulf, I was involved in a hostile confrontation with opposing forces at which time I feared for my life as I was gunning from a helicopter against hostile opposing forces in boats.

7.      Also, around this same time, a Navy boat right in front of my Navy boat was hit by a mine in the Persian Gulf, nine (9) men died and the boat had to be towed away to get fixed.

8.      The men on my boat couldn't sleep at night at all as we all feared that our boat would hit a mine and we would sink and die in our sleep. We would stay awake in fear.

9.      These instances caused me severe stress and fear for my life.

10.      These incidents are what gave rise to my PTSD as I would have nightmares regarding this situation that last to this day causing insomnia.  I wake up between 12 a.m. and 3 a.m. every night dreaming of the helicopter incident and I can see the opposing forces faces in my dreams and at that time I am extremely fearful in my dreams as it is occurring and this wakes me up from my sleep.

2

11.    I have had these PTSD symptoms since 1991 and according to my doctors I have had PTSD itself since these incidents in 1991.

12.    I never knew what PTSD was until I was informed of what it is by my doctor in or about 2016-2017 when I spoke about my PTSD symptoms with my VA doctor.

13.    I was formally diagnosed with PTSD by at least one of my doctor in or about 2017 or 2018.

14.    I was hired on or about March 20, 1994 to work on the Flight Line at the time ITT Industries ("ITT") was the main contractor for the United States Navy at Barking Sands.

15.    I worked on the Flight Line as a helicopter inspector.

16.    I was promoted during the time I worked for ITT.

17.    I had PTSD the whole time I worked at Barking Sands on the Flight Line for ITT and I never once got into any physical altercations in the workplace and never made any threats against anyone in the workplace. Never.

18.    I never had any performance issues related to my ability to perform my job duties.

19.    In November 2006, I became a painter.

20.    L3 Harris Technologies, Inc. ("L3") took over the United States Navy contract I worked under from ITT at Barking Sands in or about 2015.

3

ER 120

21.    I held the position of Painter.

22.    The entire time I worked for L3 I had PTSD, I just hadn't been diagnosed yet.

23.    I submitted documentation to the VA in 2017 and 2018 requesting disability benefits related to my PTSD diagnosis that occurred around the same time. Part of the documentation to the VA reflected my private thoughts and feelings related to my PTSD that I conveyed to my physicians. ***L3 did not have any of this documentation prior to my termination.*** They try to use things I said in confidence to my physicians against me to falsely characterize me as a violent threat in the workplace.  However, the comments I made to my doctor were not known to L3 at the time of my termination and were only discovered via discovery in this litigation via L3's subpoena to the VA. L3 attempts to mislead this Court by referencing my comments in Defs. Motion and its Concise Statement of Facts at 6-10. Again my statements to my doctors could not have formed the basis for my termination as they as were not known to L3 at the time of my termination.

24.    In February 2019, I received 100% VA disability benefits due to my PTSD.

25.    At the time the VA approved my 100% disability benefits, the VA knew I was employed at L3 and there is nothing that forbids a military veteran from receiving 100% VA benefits for PTSD and/or other injuries to continue to

4

work in the private sector.

26.    L3 became aware of my PTSD disability via L3 Lead Sean Igne in or about February 2019 after I informed Mr. Igne I received 100% VA benefits based on my PTSD.

27.    I worked on a day-to-day basis with Mr. Igne, Gilbert Castro and David Hesapene at the paint shop for L3. I worked side-by-side with these guys on a day-to-day basis

28.    I did not work with L3 employee Mark Vegas on a day to day basis as he was not in the paint shop. He was a rigger.

29.    Since disclosing my PTSD in the workplace, I was harassed and unfairly disciplined.

30.    L3 Lead Sean Igne, who worked with me side-by-side, told L3's human resources that he was afraid to work with me because of my PTSD.

31.    In or about February 2019, Mr. Igne asked me why I didn't just retire because I got my 100% VA benefits for PTSD.

32.    I told Mr. Igne it was none of his business.

33.    In or about March 2019, L3 Rigging Shop Lead Mark Vegas went to their union meeting and asked how I could be working if I had 100% disability for PTSD.

34.    Tony Pereira, L3 Lead Electrician, then stated: Wait a minute, Preston

5

ER  122

has 100% PTSD disability then he is a liability for the company. We have to inform the company because if he snaps the company will get sued. They have to let him go.

35.     Mr. Igne wrote a letter to L3 to falsely portray me in a negative light as a violent person in the workplace that was a threat to him and my coworkers. This was completely false. Mr. Igne knew this was false and as listed below, Mr. Igne has been proven to be a liar and a thief of government gas and has falsified his time cards at work. He is simply a liar and a cheat.

36.     As is clear, I had PTSD since 1991 and worked at Barking Sands since 1994 and for L3 since 2015 and I never did anything violent in the workplace and I never threatened or physically harmed anyone. Never once.

37.     Although PTSD does result in irritability and other negative emotions, part of having this disability is me learning to deal with it and maintain my mental wellbeing through learning coping mechanisms and to not let situations enflame my PTSD.

38.     Through my efforts to keep my PTSD in check, I have always kept it together at work and I have never been violent with anyone at the workplace and I would never. I told L3 the same.

39.     I conveyed this to L3's human resources', Julie Broyles, when they asked me about it as noted below. I confirmed that I did not want to hurt my

ER 123

coworkers or in any way be violent in the workplace.

40.    I have never once been in a physical altercation in the workplace and I have never physically threatened anyone in the workplace.

41.    Working at Barking Sands is and has always been a workplace for blue collar workers and many veterans. It is quite common for the employees to be cursing in the workplace and at each other.

42.    Every day that I worked at L3 my coworkers were cursing in the workplace.

43.    My former manager/supervisor Rod Martin himself would curse in the workplace. I personally heard Mr. Martin curse more than five (5) times.

44.    Mr. Igne himself would also curse in the workplace. I have heard Mr. Igne curse at least twice a day when I worked with him. I worked with Mr. Igne for fourteen (14) years.

45.    Rod Martin likely heard Mr. Igne curse in the workplace as it was so common.

46.    I also tried to remain professional in the workplace.

47.    My professional conduct is reflected in that I never had a poor performance review and, in 2019, I received from L3 an award for 25 years of dedicated service.  Now L3 tries to characterize me as violent and a threat. Why was this never document until the one incident in November 2019 noted below if I

7

ER  124

had such a history of violence.

48.    It is because I was never once physically violent in the workplace and they want to falsely characterize someone as violent that has PTSD.

49.    I worked at Barking Sands for 26 years and never was I violent. I might have been loud and might have cursed, but this was commonplace in this blue collar and veteran-filled workplace.

50.    In or about March 2019, I was told by my supervisor, Rodney Martin, to go to the human resources ("HR") at 9:00 a.m.

51.    I did as instructed and met with Julie Broyles head of L3 HR in Hawai'i and Jasmine Apo an L3 HR representative.

52.    At the meeting, Ms. Broyles confirmed she was aware of my PTSD.

53.    Ms. Boynes began to ask me a series of questions listed below related to my PTSD as Ms. Apo took notes.

54.    Ms. Broyles stated because of my PTSD they had to ask me some questions.

55.    Ms. Broyles stated they had to ask me these questions because, "We are here to help you."

56.    I came to find out it was a witch hunt and they were not trying to help me, but force me out of the workplace because of L3 completely false belief and conclusion that I was a threat because of my PTSD.

8

ER 125

57.   Ms. Broyles asked, amongst other questions:

   a.  Do you want to hurt your coworkers? I answered, "No."

   b.  Do you want to hurt yourself? I answered, "No."

   c.  Do you want to kill your coworkers? I answered "No."

   d.  Do you want to kill yourself? I answered, "No."

   e.  Do you have an anger problem? I answered, "No."

   f.  Do you want to kill people when you get angry? I answered, "No."

   g.  Do you need anger management classes? I answered, "No."

   h.  Do you need a psychiatrist? I answered, "No."

   i.  Do you have a drug problem? I answered, "No."

   j.  Do you have an alcohol problem? I answered, "No."

58.   I asked them if they were trying to fire me and Ms. Broyles and Ms. Apo said they were there to help me.

59.   Ms. Broyles asked me if I needed any accommodation.

60.   I responded, "No" as I had been functioning in the workplace up to that point for twenty-five (25) years without accommodation and without any violence or any other threatening conduct.

61.   I had been able to perform my job duties as a painter for years without anyone calling my ability to do my job functions into question. I saw no reason to need an accommodation. Nothing had changed. It was only Mr. Igne falsely saying I was a threat due to my PTSD that caused this to occur.

62.   Mr. Igne would always request I cook all the guys breakfast when we would paint a house on the base and after I got diagnosed with PTSD he

9

ER  126

stopped doing this. Mr. Igne was not afraid of me, he was afraid of my diagnosis.

63.    L3 would not end up helping me. What they did was fire me due to my PTSD.

64.    After I was called in and interviewed by HR, I spoke with L3's Bill Nordmeier, the operator for grounds department, who informed me he also had just received 100% VA disability for his back.

65.    Mr. Nordmeier was still working at L3s although he has 100% disability.

66.    Due to the way I was questioned by HR after getting his 100% disability from the federal government, Mr. Nordmeier told me he went to L3 HR to inform them that he also got his 100% disability.

67.    Mr. Nordmeier told me he went to L3 HR and disclosed that he had received 100% disability from the federal government and wanted to disclose it to L3.

68.    Mr. Nordmeier told me that HR at L3 told Mr. Nordmeier that he doesn't need to disclose it and that he shouldn't talk about his disability at work as it was personal.

69.    On or about April 9, 2019, I was called by L3's Scott Taylor and I reported to Mr. Taylor about Mr. Igne stealing the gasoline.

70.    On or about November 15, 2019, my coworker Gilbert Castro

ER 127

was verbally warned by the safety lady at Barking Sands for not wearing protective gear.

71.   After lunch on the same date, Mr. Igne yelled at me to put on pants which I immediately complied with.

72.   I was power washing at that time and was wearing shorts because I was soaking wet.

73.   I was wearing steel toed rubber boots.

74.   At that time, Mr. Igne was also wearing shorts and tennis shoes.

75.   Mr. Igne wore shorts and tennis shoes every day at work.

76.   Based on information and belief, Mr. Igne told human resources/management via a note/letter that I had previously been warned for not wear my pants. This was not true.

77.   My understanding is that Mr. Igne told L3 human resources/management that I yelled at or got aggressive with Mr. Igne when Mr. Igne asked me to put my pants on. This was a lie.

78.   On the same date, I told Mr. Igne, "Tomorrow if I have to wear long pants, you have to wear long pants. If I have to wear steel toe shoes you have to wear steel toe shoes. What is good for one is good for all. So come tomorrow morning have your PPE or else."

79.   Mr. Igne said, "Or else what, you going turn me in?"

ER   128

80.    I respond, "Yeah"

81.    Mr. Igne: "Well fuck you"

82.    I respond: "Well fuck you too."

83.    Mr. Igne and I exchanged a couple more "fuck yous" and I realized it was wrong and walked away.

84.    I never physically threatened Mr. Igne.

85.    Mr. Igne claims that when we spoke my hands were "fisted and my chest was popped out." This is completely false. I was in no way physically threatening Mr. Igne.

86.    The following workday, I was called into Mr. Martin's office regarding the letter/note that Mr. Igne wrote to human resources/management regarding the previous day's confrontation with me.

87.    Mr. Martin asked why wasn't I wearing my pants after I had already been written up by the safety lady previously?

88.    I responded, "I never got written up."

89.    Mr. Martin was surprised and said, "What?"

90.    I said, "Yeah, I never got written up. Gilbert got written up"

91.    Mr. Martin looked at the letter and told me I better not lie.

92.    Mr. Martin again asked me if I got written up by the safety lady previously and I emphatically said no.

12

93.    I had not been written up by the safety lady. There were multiple witnesses to this fact.

94.    During this meeting I told Mr. Martin, "How can he tell me to put on long pants when he is wearing shorts and tennis shoes?"

95.    Wearing shorts and tennis shoes on the jobsite is a clear OSHA safety violation that Mr. Martin clearly had been aware of for years.

96.    Mr. Martin said he was going to investigate me and this alleged incident.

97.    I stated, "Why am I always being investigated. Why don't you investigate Mr. Igne?"

98.    To note, previously in or about October 2017, Mr. Igne lied to Mr. Martin and stated I walked up to Mr. Igne with clenched fists acted like he was going to attack Mr. Igne and saying I was going to kick Mr. Igne's ass after work.

99.    This was proven to be a lie by the two witnesses present.

100.    In his letter to L3 regarding him being afraid of me, Mr. Igne cites to the incident on October 24, 2017. The truth of that incident is that Mr. Igne claimed that I had again clenched my fists and popped out my chest like I wanted to fight. This incident was investigated by L3 and David Hesapene, who was a direct witness told the truth. David Hesapene reported that I never had clenched fist and a popped out chest and never said I wanted to fight Mr. Igne.  Mr. Igne was

again lying. The investigation, done by Rodney Martin, came back that I did nothing wrong.

101. I asked Mr. Martin to write up Mr. Igne for lying regarding the October 2017 incident and Mr. Martin did nothing.

102. On November 18, 2019, I had a meeting with human recourses and Mr. Martin regarding the confrontation with Mr. Igne.

103. I was told I was being written up for breaking the code of conduct for telling Mr. Igne fuck you.

104. I responded, "I said fuck you because he told me fuck you."

105. I then said: "You guys are always investigating me for this and investigating me for that."

106. I asked why I was being investigated when others are not.

107. I said if they wanted to investigate something, you should investigate Mr. Igne for stealing gas.

108. I reported that every Tuesday and Thursday for years Mr. Igne would take 5 gallons of gas for his personal vehicle via a gas container. This is federal government gas.

109. During his deposition, my coworker, Gilbert Catsro, admitted and confirmed that Mr. Igne had been stealing gas from the workplace. In other words, Mr. Igne was stealing gas paid for by the Untied States government.

14

ER 131

110. This could have easily been investigated and confirmed via the amount of gas Mr. Igne was using for his company vehicle compared to the amount of gas he used.

111. I then told them I had to immediately take stress leave and that I could not work under these conditions as I felt I was being single out now that I was officially diagnosed with PTSD and those at the workplace knew about my diagnosis.

112. I went to see my doctor that very day to be placed on stress leave.

113. My stress leave was effective November 21, 2019.

114. On December 5, 2019, Ross West, the L3 project manager called me and requested my CAC card and secret clearance card. The CAC and secret clearance cards are national security sensitive. We received security clearance training every year. We are supposed to give the CAC card and secret clearance card to security not to Mr. West.

115. I was directed by Mr. West to give my CAC card and secret clearance card to Mr. West and if he wasn't there then give it to his secretary.

116. I objected and said that was not proper as the CAC card and the secret clearance card were national security related items that need to be secure at all times.

15

ER 132

117.   I did not think I should give such items to Mr. West.

118.   Following Mr. West's directive, I brought the CAC card and secret clearance card on December 6, 2020 to Mr. West's office.

119.   As Mr. West was not there, I did as directed and left my CAC and my secret clearance card with Mr. West's secretary.

120.   This was a clear national security violation as I should have been directed to provide the CAC card and secret clearance card to the L3 security to safeguard those security sensitive items.

121.   There were other L3 employees including Melissa Castillo and William "Bill" Milke, who were on stress leave that did not have their CAC cards and clearance cards removed by L3. They did not have PTSD.

122.   On or about April 1, 2020, I was ready to come back to work from stress leave and my doctor, Dr. Williamson, had released me to return to work.

123.   I was told by human recourse to stay home and I would be paid my full wages.

124.   I was never notified by L3 that they felt I was a threat to return to the workplace or was I given a chance to provide my side of the story. I was never called by L3 to determine if I was a threat to return to the workplace. I was never interviewed, my psychologists/psychiatrist were not interviewed, I had no

16

ER 133

chance to refute any of L3's feelings that I was a threat to return to the workplace. L3 never did any investigation into whether I was a threat to the workplace in 2020 that included me or any doctor's or family on my behalf that would verify I was not a threat to the workplace. My twenty-six (26) years working at Barking Sands, while I had PTSD, with no violence in the workplace is evidence that I was not a threat to the workplace or my coworkers.

125.    On June 22, 2020, I was issued my termination letter that does not indicate why I was terminated.

126.    I was never told why exactly I was terminated.

127.    In February 2020, as part of my worker's compensation claim's defense by the employer to deny me benefits, I did an interview with Dr. Peter Bianchi who was a "hired gun" for the defense of my work comp claim.

128.    I have been seeing a psychologist and psychiatrist through the VA and never had they said that I was a threat to the workplace as a veteran with PTSD.

129.    During this interview, I told Dr. Bianchi that when I am at home and I am drinking that I have some negative thoughts.

130.    Dr. Bianchi's February 4, 2020 report states that: *Mr. Lee describes his moods as 'pissed, tired, lonely, sad, ready to explode, hurt, my feelings is hurt, nobody listens to me'. He states that he goes home and drinks beer*

*and watches television. He states that he doesn't count how much he drinks, that he just comes home from work, drinks beer until it's time for him to go to sleep. Mr. Lee states that during this time **he has no thoughts of hurting himself or others**, but 'it crosses my mind to do something stupid though, like instigate a fight or start an argument for no reason with some people just to do something, that's only when I'm drinking though'.* Defs. Ex X attached to Defs. CSF.

131. There is nothing there that says I thought about starting a fight at work. I have these thoughts when I am sitting at home in my garage drinking not at work. It is not about starting a fight at work.

132. I can't recall exactly saying this quote, but clearly I have some negative thoughts related to my PTSD while I am at home drinking. I have never acted on any of these negative thoughts and the statements were not regarding the workplace as is evidence from the language of Dr. Bianchi's' report. L3 cherry picks some phrasing from Dr. Bianchi's report to try to make me out as a threat of violence in the workplace. I am not and would never be. If I wanted to attack someone in the workplace I could have. I never did and never would. I controlled my thoughts and/or feelings in the workplace. As Dr. Bianchi's reports states, I have "no thoughts of hurting myself or others."

133. Moreover, L3 also claims it bases its decision to terminate me on Dr. Bianchi's April 7, 2020 letter.

134.   L3 claims at CSF at 33 that it "asked Dr. Bianchi how likely it is that there would be another episode if Plaintiff returned to work, to which Dr. Bianchi responded: "It remains my opinion that without treatment the prognosis for successful maintenance of occupational functioning without another episode as the situation on 11-18-19 is at best guarded." See Defs. Ex. AA. This is again cherry picking and not giving this Court the full story. Moreover, Dr. Bianchi is not saying that he could say I was a threat to return to the workplace. His response is not firm and at best equivocal. He said it is "at best guarded". This is not affirming anything.

135.   The truth is Dr. Bianchi's April 7, 2020 letter stated, in the following paragraphs:

"Further, you requested opinion if Mr. Lee was a danger to himself or others if he is returned to work after his "timeout" without having treatment. When Mr. Lee was evaluated on 2-04-20, he evidenced no suicidal ideation and stated 'it crosses my mind to do something stupid though, like instigate a fight or start an argument for no reason with some people just to do something, that's only when I'm drinking though'. *As a result, I am of the opinion upon Dr. Williamson's clearance for Mr. Lee to return to work, it is incumbent on Dr. Williamson to certify that at the time of clearance to return to work Mr. Lee represents no risk of danger to others.*

19

ER   136

*__In addition, you requested opinion if it was medically/psychologically reasonable to return Mr. Lee to his usual and customary duties without treatment and fitness to return to work evaluation. Frankly, I am of the opinion that this determination is the province of Dr. Williamson to make upon review of my Report on Psychological Evaluation of Mr. Lee since he is the treating physician of record.__*" Defs. Ex AA.

136.    Dr. Williamson was my physician/therapist and L3 did not follow Dr. Bianchi's instructions as they did not contact Dr. Williamson to see if I was fit to return to work or if I was a threat.

137.    L3 did not do a fitness to return to work evaluation. They didn't do this as Dr. Williamson knew I was fit to return to work and would have told L3 the same upon being asked.

138.    L3 did not allow Dr. Williamson to make the determination if it was safe for me to return to work or if I was a threat as Dr. Bianchi suggested they should.

139.    L3 fired me without following the advice of their own hired Dr. Bianchi. Dr. Bianchi could not and did not say that I was threat to return to the workplace. He recommended Dr. Williamson make that determination which L3 ignored, did not ask Dr. Williamson his opinion or if he could assure I was not a threat to return to the workplace. Instead, I was fired for having PTSD.

ER 137

140.     We cannot lose sight of the fact that Dr. Bianchi's report is a result of me going on stress leave and filing a work comp case for a stress injury. My leave was not because I was a threat in the workplace. I took voluntary leave.

141.     L3's Human Resources Manager, Danielle Stewart also misrepresents what Dr. Bianchi's report said. In Ms. Stewart's declaration attached to Defs. CSF at ¶ 10 she states that Dr. Bianchi's report stated, "that Mr. Lee said he had thoughts of doing something stupid at work like instigating a fight or argument with another for no reason."

142.     As noted above in the quote from Dr. Bianchi's report and Dr. Bianchi's report as a whole, I never said this regarding anything at work. This is while I am home drinking. When Dr. Bianchi was reporting about my thoughts of instigating a fight I was talking about while I was at home. It has nothing to do with the workplace according to the letter of Dr. Bianchi's report. *See* Defs. Ex Z.

143.     Rodney Martin claims in his declaration attached to L3's motion that I ***could be*** volatile, becoming angry with my coworkers over minor issues. Martin Decl at ¶3. This is not true. He provides zero examples of this besides the one mutual confrontation with Mr. Igne that is discussed above.

144.     Mr. Martin claims he had discussions with me at various times over the years about the need to be civil towards my coworkers and remain calm and professional. This is completely untrue and this is not in my yearly evaluations as it

21

ER  138

is not true.

145.    I was never written up in all my years at Barking Sands for being volatile, uncivil or unprofessional in the workplace until the Igne incident in November 2019. In fact, I never had a negative performance evaluation. Nothing was ever said about this to me and I was never written up for these allegations of being volatile, uncivil or unprofessional in the workplace, which are not true, until I was written up due the mutual confrontation with Mr. Igne and thereafter fired.

146.    Mr. Igne was not fired by L3 for the mutual confrontation although he was extremely hostile yelling at me and cursed at me before I cursed at him and cursed at me repeatedly while yelling at me.

147.    Mr. Igne started the cursing and yelling yet he was not perceived as a threat as he does not have PTSD.

148.    There is an allegation in Defs Motion at pg. 3 that I do not dispute that I made the statement that I was going got "Punch Sean [Igne] through the face". This is a clear misrepresentation by L3. If the Court looks at the transcript of my deposition (pgs 49-50) attached to Defs. Motion, clearly I stated that I don't recall stating that and that is not what I said. I further testified, that I never acted on any of this frustration talk. I never touched anyone in the workplace and never would. There is no evidence that I ever got physical with anyone in the workplace in twenty-six (26) years.

ER 139

149.    Based on Defs. Motion and the documents provided through discovery I understand that Scott Taylor is stating that his investigation did not support theft of gas by Mr. Igne. In reality, his report found that it could not prove or disprove the allegations because the recording system for the gas did not go back far enough. In other words the data was not retained to prove my claims of gas stealing. However, Mr. Gilbert Castro witnessed this gas theft and testified at his deposition that the gas was stolen by Mr. Igne.

150.    Mr. Taylor's report also concluded without any real basis, unless he has the ability to foresee the future, that if I returned to work it is likely that "the hostile work environment will further deteriorate into violence." This statement is highly shocking as there is no evidence to support this horrible conclusion. The fact is that I never once got physically violent with anyone in the workplace. Never once. I have controlled myself, even with PTSD, as all other workers at L3 do and should. I would have never gotten violent if I was returned to work.

151.   On February 27, 2020, I timely filed my EEOC and Hawai'i Civil Rights Commission Charge of Discrimination for disability discrimination and retaliation.

152.   On or about August 19, 2020, I received my Right to Sue letter from the EEOC.

153.   On or about September 5, 2020, I received my Right to Sue

letter from the HCRC.

154.   On December 2, 2020, I timely filed my EEOC/HCRC Charge of Discrimination for disability discrimination and retaliation regarding his termination: EEOC Charge No: 37B-2021-00046; FEPA No. K-21396.

155.   On or about December 12, 2020, I received my Right to Sue letter from the HCRC- FEPA No. K-21396.

156.   On or about January 15, 2021, I received my Right to Sue letter from the EEOC Charge No: 37B-2021-00046.

Further Declarant Declares Naught

I, PRESTON LEE, do declare under penalty of perjury that the foregoing is true and correct.

DATED: Kaua'i, Hawai'i, 10/20/2021.

PRESTON LEE

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| PRESTON LEE,<br><br>Plaintiff,<br><br>vs.<br><br>L3 HARRIS TECHNOLOGIES, INC.;<br>JOHN DOES 1-10; JANE DOES 1-10;<br>DOE CORPORATIONS 1-10; DOE<br>PARTNERSHIPS 1-10; DOE<br>UNINCORPORATED<br>ORGANIZATIONS<br>1-10; and DOE GOVERNMENTAL<br>AGENCIES 1-10,<br><br>Defendants. | ) CIVIL NO. 20-00489 LEK-KJM<br>) (Other Civil Action)<br>)<br>) DECLARATION OF JIMMY<br>) COSTALES<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## DECLARATION OF JIMMY COSTALES

STATE OF HAWAI'I                )
                                ) SS.
COUNTY OF KAUA'I                )

I, JIMMY COSTALES, do hereby declare that:

1.      Unless otherwise indicated, I make this declaration based upon my

personal firsthand knowledge. All of the statements in this declaration are true. I

understand that if I make a false statement, I may be prosecuted for perjury.

2.    I am competent to testify to the matters set forth herein.

3.    I one of the Plaintiff Preston Lee's former coworkers at L3 Harris Technologies, Inc.

4.    I was Preston Lee's shop steward for IBEW Local 1260.

5.    I worked for L3 Harris and its predecessor at Barking Sands for approximately 17 years.

6.    I worked directly with Preston Lee for about 14 years.

7.    In or about January 2020, there was a meeting with L3 Harris' Human Resource's Julie Broyles and IBEW 1260 attorney Amy Ejercito.

8.    On the same date, I was asked by Amy Ejercito to do her a favor and pass out envelopes containing documents they wanted Preston Lee's coworkers at the paint shop, Gilbert Castro, David Hesapene, Mark Vegas and Lawrence Yadao, to sign.

9.    I handed out these envelopes to Preston Lee's coworkers as noted above.

10.   I told these men they had to sign these documents and return these documents to L3 Harris human resources.

11.   I was never asked by anyone at L3 Harris management or human resources whether I was afraid to work with Preston Lee, whether I was intimidated by Preston Lee or whether I was afraid of Preston Lee in any way.

2

12.    I was never afraid of Preston Lee, never afraid to work with Preston Lee, I was never intimidated by Preston Lee in any way.

13.    In fact, we worked together just fine.

Further Declarant Declares Naught

I, JIMMY COSTALES, do declare under penalty of perjury that the foregoing is true and correct.

DATED: Kaua'i, Hawai'i, _10. 7. 21_

JIMMY COSTALES

ER 444

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| PRESTON LEE, | ) CIVIL NO. 20-00489 LEK-KJM |
| | ) (Other Civil Action) |
| Plaintiff, | ) |
| | ) DECLARATION OF JOSH BURTON |
| vs. | ) |
| | ) |
| L3HARRIS TECHNOLOGIES, INC.; | ) |
| JOHN DOES 1-10; JANE DOES 1-10; | ) |
| DOE CORPORATIONS 1-10; DOE | ) |
| PARTNERSHIPS 1-10; DOE | ) |
| UNINCORPORATED | ) |
| ORGANIZATIONS | ) |
| 1-10; and DOE GOVERNMENTAL | ) |
| AGENCIES 1-10, | ) |
| | ) |
| | ) |
| Defendants. | ) |
| | ) |
| | ) |

DECLARATION OF JOSH BURTON

| | |
|---|---|
| STATE OF HAWAI'I | ) |
| | ) SS. |
| COUNTY OF KAUA'I | ) |

I, JOSH BURTON, do hereby declare that:

1.     Unless otherwise indicated, I make this declaration based upon my personal firsthand knowledge. All of the statements in this declaration are true. I understand that if I make a false statement, I may be prosecuted for perjury.

2.    I am competent to testify to the matters set forth herein.

3.    I one of the Plaintiff Preston Lee's former coworkers at ITT at Barking Sands and then at Manukai at Barking Sands in the total years from 1999 to 2006.

4.    I currently work at Barking Sand for Koa Lani after working for Manukai at Barking Sands up until Koa Lani took over the federal contract in 2021.

5.    I worked with Mr. Lee at the Flightline at Barking Sands and we worked side by side from 1999 to 2006.

6.    I was also in the Navy at Barking Sands from 1995-1998 and during that time I also worked with Mr. Lee side by side.

7.    During the total time I worked with Mr. Lee I never saw him verbally or physically harass anyone.

8.    During the total time I worked with Mr. Lee I never saw him physically threaten anyone.

9.    During the total time I worked with Mr. Lee I never saw him verbally threaten anyone.

10.    During the total time I worked with Mr. Lee I never saw him physically assault anyone.

11.    During the total time I worked with Mr. Lee I never saw him verbally

assault anyone.

12.    I never even heard of Mr. Lee verbally or physically, threatening, harassing or assaulting anyone at work or outside of work.

13.    I was never afraid of Mr. Lee during the times I worked with him.

14.    Mr. Lee was no threat to me or anyone else I witnessed in the workplace.

15.    I was never afraid of Preston Lee, never afraid to work with Preston Lee, I was never intimidated by Preston Lee in any way.

16.    In my experience, Mr. Lee is not a physical threat to anyone in the workplace and conducts himself professionally.

Further Declarant Declares Naught

I, JOSH BURTON, do declare under penalty of perjury that the foregoing is true and correct.

OCT 21 2021

DATED: Kaua'i, Hawai'i, _____.

JOSH BURTON

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| PRESTON LEE, | ) CIVIL NO. 20-00489 LEK-KJM |
| Plaintiff, | ) (Other Civil Action)<br>) |
| | ) DECLARATION OF GUY FUJITA |
| vs. | )<br>) |
| L3HARRIS TECHNOLOGIES, INC.;<br>JOHN DOES 1-10; JANE DOES 1-10;<br>DOE CORPORATIONS 1-10; DOE<br>PARTNERSHIPS 1-10; DOE<br>UNINCORPORATED<br>ORGANIZATIONS<br>1-10; and DOE GOVERNMENTAL<br>AGENCIES 1-10, | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |
| Defendants. | )<br>)<br>) |

DECLARATION OF GUY FUJITA

| | |
|---|---|
| STATE OF HAWAI'I | ) |
| | ) SS. |
| COUNTY OF KAUA'I | ) |

I, GUY FUJITA, do hereby declare that:

1.      Unless otherwise indicated, I make this declaration based upon my personal firsthand knowledge. All of the statements in this declaration are true. I understand that if I make a false statement, I may be prosecuted for perjury.

2.     I am competent to testify to the matters set forth herein.

3.     I one of the Plaintiff Preston Lee's former coworkers at Barking Sands from 1994 to 2020.

4.     During these years I would work from time to time next to Mr. Lee.

5.     I currently work at Barking Sand for Koa Lani.

6.     During the times I worked with Mr. Lee I never saw him verbally or physically threaten anyone in the workplace.

7.     During the times I worked with Mr. Lee I never saw him verbally or physically assault anyone in the workplace.

8.     I never felt unsafe working around Mr. Lee.

9.     I was never afraid of Mr. Lee during the times I worked with him.

10.     Mr. Lee was no threat to me or anyone else I witnessed in the workplace.

11.     In my experience, Mr. Lee is not a physical threat to anyone in the workplace and conducts himself professionally.

Further Declarant Declares Naught

I, GUY FUJITA, do declare under penalty of perjury that the foregoing is true and correct.

DATED: Kaua'i, Hawai'i, _Oct 8, 2021_

_____
GUY FUJITA

2

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| PRESTON LEE, | ) CIVIL NO. 20-00489 LEK-KJM |
| | ) (Other Civil Action) |
| Plaintiff, | ) |
| | ) DECLARATION OF MICHAEL |
| vs. | ) YOUNG |
| | ) |
| L3HARRIS TECHNOLOGIES, INC.; | ) |
| JOHN DOES 1-10; JANE DOES 1-10; | ) |
| DOE CORPORATIONS 1-10; DOE | ) |
| PARTNERSHIPS 1-10; DOE | ) |
| UNINCORPORATED | ) |
| ORGANIZATIONS | ) |
| 1-10; and DOE GOVERNMENTAL | ) |
| AGENCIES 1-10, | ) |
| | ) |
| | ) |
| Defendants. | ) |
| | ) |
| | ) |
| _____ | ) |

## DECLARATION OF MICHAEL YOUNG

| | |
|---|---|
| STATE OF HAWAI'I | ) |
| | ) SS. |
| COUNTY OF KAUA'I | ) |

I, MICHAEL YOUNG, do hereby declare that:

1.     Unless otherwise indicated, I make this declaration based upon my personal firsthand knowledge. All of the statements in this declaration are true. I understand that if I make a false statement, I may be prosecuted for perjury.

2.    I am competent to testify to the matters set forth herein.

3.    I one of the Plaintiff Preston Lee's former coworkers at Barking Sands from 1994 to 2005.

4.    I was also in the Navy with Mr. Lee from 1990-1992.

5.    During these years I would work on occasion next to Mr. Lee.

6.    During the times I worked with Mr. Lee I never saw him verbally or physically threaten anyone at the job.

7.    During the times I worked with Mr. Lee I never saw him verbally or physically assault anyone at the job.

8.    I never felt unsafe working around Mr. Lee.

9.    I was never afraid of Mr. Lee during the times I worked with him.

10.    Mr. Lee was no threat to me or anyone else I witnessed in the workplace.

11.    In my experience, Mr. Lee is not a physical threat to anyone in the workplace and conducts himself respectfully to his workers and managers.

Further Declarant Declares Naught

I, MICHAEL YOUNG, do declare under penalty of perjury that the foregoing is true and correct.

DATED: Kaua'i, Hawai'i, _Oct 8 Th 2021_.

_Michael Young_
MICHAEL YOUNG

2

443

ER 151

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| PRESTON LEE, | ) CIVIL NO. 20-00489 LEK-KJM |
| | ) (Other Civil Action) |
| Plaintiff, | ) |
| | ) DECLARATION OF DAVID |
| vs. | ) SHIMOGAWA |
| | ) |
| L3HARRIS TECHNOLOGIES, INC.; | ) |
| JOHN DOES 1-10; JANE DOES 1-10; | ) |
| DOE CORPORATIONS 1-10; DOE | ) |
| PARTNERSHIPS 1-10; DOE | ) |
| UNINCORPORATED | ) |
| ORGANIZATIONS | ) |
| 1-10; and DOE GOVERNMENTAL | ) |
| AGENCIES 1-10, | ) |
| | ) |
| | ) |
| Defendants. | ) |
| | ) |
| | ) |

## DECLARATION OF DAVID SHIMOGAWA

| | |
|---|---|
| STATE OF HAWAI'I | ) |
| | ) SS. |
| COUNTY OF KAUA'I | ) |

I, DAVID SHIMOGAWA, do hereby declare that:

1.    Unless otherwise indicated, I make this declaration based upon my personal firsthand knowledge. All of the statements in this declaration are true. I understand that if I make a false statement, I may be prosecuted for perjury.

2.    I am competent to testify to the matters set forth herein.

3. I one of the Plaintiff Preston Lee's former coworkers at Barking Sands from approximately 1994 to 2020.

4. From the years 1994-2020, I would see Mr. Lee nearly every day sometimes more than once a day.

5. During these years I would work on occasion next to Mr. Lee.

6. During the times I worked with Mr. Lee I never saw him verbally or physically threaten anyone at the job.

7. During the times I worked with Mr. Lee I never saw him verbally or physically assault anyone at the job.

8. I never felt unsafe working around Mr. Lee.

9. I was never afraid of Mr. Lee during the times I worked with him.

10. Mr. Lee was no threat to me or anyone else I witnessed in the workplace.

11. In my experience, Mr. Lee is not a physical threat to anyone in the workplace and conducts himself respectfully to his workers and managers.

Further Declarant Declares Naught

I, DAVID SHIMOGAWA, do declare under penalty of perjury that the foregoing is true and correct.

DATED: Kaua'i, Hawai'i, _10/08/21_____.

_____
DAVID SHIMOGAWA

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| PRESTON LEE, | ) CIVIL NO. 20-00489 LEK-KJM |
| | ) (Other Civil Action) |
| Plaintiff, | ) |
| | ) DECLARATION OF DAVID |
| vs. | ) HASAPENE |
| | ) |
| L3HARRIS TECHNOLOGIES, INC.; | ) |
| JOHN DOES 1-10; JANE DOES 1-10; | ) |
| DOE CORPORATIONS 1-10; DOE | ) |
| PARTNERSHIPS 1-10; DOE | ) |
| UNINCORPORATED | ) |
| ORGANIZATIONS | ) |
| 1-10; and DOE GOVERNMENTAL | ) |
| AGENCIES 1-10, | ) |
| | ) |
| | ) |
| Defendants. | ) |
| | ) |
| | ) |

DECLARATION OF DAVID HASAPENE

| | |
|---|---|
| STATE OF HAWAI'I | ) |
| | ) SS. |
| COUNTY OF KAUA'I | ) |

I, DAVID HASAPENE, do hereby declare that:

1.    Unless otherwise indicated, I make this declaration based upon my personal firsthand knowledge. All of the statements in this declaration are true. I understand that if I make a false statement, I may be prosecuted for perjury.

2.      I am competent to testify to the matters set forth herein.

3.      I one of the Plaintiff Preston Lee's former coworkers at L3Harris

Technologies, Inc.

4.      I worked for L3Harris and its predecessor at Barking Sands for

approximately 21 years.

5.      I worked directly with Plaintiff from 2017 to 2020.

6.      In October 2018, Mr. Sean Igne alleged that Plaintiff walked up to

Mr. Igne with clenched fists acted like he was going to attack Mr. Igne and saying

he was going to kick Mr. Igne's ass after work. I was a witness to this alleged

interaction between Mr. Igne and Plaintiff. Plaintiff did not do what Mr. Igne

alleged. Plaintiff did not walk up to Mr. Igne with clenched fists acted like he was

going to attack Mr. Igne and Plaintiff did not say he was going to kick Mr. Igne's

ass after work.

7.      On or about November 15, 2019, I witnessed Mr. Sean Igne approach

Plaintiff at the job site while Plaintiff was power washing the security building and

yelled at Plaintiff to put on his pants.

8.      Plaintiff immediately complied and put on his pants and began power

washing again.

9.      I also witnessed on the same date I heard Mr. Igne and Plaintiff

yelling at one another.

10.    Prior to the yelling, I heard Plaintiff tell Mr. Igne that Mr. Igne also had to wear his pants at the workplace.

Further Declarant Declares Naught

I, DAVID HASAPENE, do declare under penalty of perjury that the foregoing is true and correct.

DATED: Kaua'i, Hawai'i, _____8/24/21_____

_____

DAVID HASAPENE

CADES SCHUTTE
A Limited Liability Law Partnership

AMANDA M. JONES          8854-0
MICHAEL R. SOON FAH     11156-0
Cades Schutte Building
1000 Bishop Street, Suite 1200
Honolulu, HI  96813-4212
Telephone:  (808) 521-9200
Fax:  (808) 521-9210
Email:  ajones@cades.com
            msoonfah@cades.com

Attorneys for Defendant
L3HARRIS TECHNOLOGIES, INC.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| PRESTON LEE,<br><br>            Plaintiff,<br><br>      v.<br><br>L3HARRIS TECHNOLOGIES, INC.; JOHN DOES 1-10; JANE DOES 1-10; DOE CORPORATIONS 1-10; DOE PARTNERSHIPS 1-10; DOE UNINCORPORATED ORGANIZATIONS 1-10; and DOE GOVERNMENTAL AGENCIES 1-10,<br><br>            Defendants. | CIVIL NO.  1:20-CV-00489 LEK-KJM (Other Civil Action)<br><br>**DEFENDANT L3HARRIS TECHNOLOGIES, INC.'S MOTION FOR SUMMARY JUDGMENT ON ALL CLAIMS;**<br><br>**MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT;**<br><br>**CERTIFICATE OF COMPLIANCE WITH WORD LIMIT;**<br><br>**APPENDICES 1-5;**<br><br>**CERTIFICATE OF SERVICE** |

## DEFENDANT L3HARRIS TECHNOLOGIES, INC.'S MOTION FOR SUMMARY JUDGMENT ON ALL CLAIMS

Defendant L3Harris Technologies, Inc. ("**L3Harris**") moves for summary judgment on all claims in Plaintiff Preston Lee's ("**Plaintiff**") First Amended Complaint, filed February 11, 2021 ("**FAC**"). This case concerns a former employee, who ████████████████████████████ made threatening statements towards co-workers. In November 2019, Plaintiff unleashed a profanity-laced verbal attack on a co-worker, who served as the lead man in the paint shop where Plaintiff worked at the Pacific Missile Range Facility ("**PMRF**") because the lead man directed Plaintiff to wear pants while pressure-washing. The lead man lodged a complaint with their supervisor regarding this attack. Plaintiff received a written warning for his conduct. Unable to cope with being reprimanded, Plaintiff went out on medical leave for more than four months.

While on leave, Plaintiff made a complaint with the Navy at PMRF alleging that the lead man had been stealing gas from the base. During a subsequent investigation, Plaintiff told the investigator the alleged gas theft occurred from 2007-2010. When asked why Plaintiff was making this complaint in 2019, Plaintiff reportedly told the investigator it was because the lead man had just turned Plaintiff in, so Plaintiff was going to turn him in. The investigator found no evidence to support the gas theft allegation and concluded Plaintiff's complaint was retaliatory. The investigator also raised concerns about Plaintiff returning to

the workplace based on comments by co-workers interviewed for the investigation expressing fear of working with him. Also while on leave, Plaintiff was evaluated by a psychologist who reported that Plaintiff said he thought about instigating a fight with his co-workers for no reason. Concerned for the safety of his co-workers, L3Harris decided to terminate Plaintiff's employment. This suit followed.

Plaintiff alleges he was discriminated against based on a disability (alleged PTSD). L3Harris was aware of Plaintiff's claim that he had PTSD, as a result of a discussion in March 2019. No action was taken against him based on this report. Plaintiff continued to work with no discipline or other issues until November 18, 2019, when he was disciplined for his inappropriate conduct towards his lead man. There is no connection between Plaintiff's alleged disability and the actions taken by L3Harris. There were legitimate, non-discriminatory, non-retaliatory reasons for the disciplinary action and termination decision. Summary judgment should be granted on Plaintiff's claims of disability discrimination under federal and state law (counts I and III), retaliation under federal and state law (counts II and IV), and violation of the Hawaiʻi Whistleblower Protection Act (count V).

Plaintiff should also be estopped from asserting that he is a "qualified individual" with a disability and that it was wrongful to terminate his employment because the Department of Veterans Affairs ("VA") has awarded him a 100% disability rating and associated monetary benefits. In support of his application for

2

benefits, Plaintiff submitted doctor's statements and reports documenting



Plaintiff's statements to the VA

directly conflict with the notion that Plaintiff was qualified to perform the essential

functions of his job. The law does not permit Plaintiff to assert his inability to

work with others to obtain government-funded benefits and then come to court and

argue the opposite. This Motion is brought pursuant to FRCP 56, and is supported

by the attached memorandum, the separate and concise statement of material facts,

including the declarations and exhibits attached thereto. Per Local Rule 7.8, this

Motion is made following conferences of counsel on September 22 and 27, 2021.

DATED: Honolulu, Hawai'i, September 29, 2021.

*/s/ Amanda M. Jones*

CADES SCHUTTE
A Limited Liability Law Partnership

AMANDA M. JONES
MICHAEL R. SOON FAH
Attorneys for Defendant
L3HARRIS TECHNOLOGIES, INC.

3

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| PRESTON LEE, <br><br> Plaintiff, <br><br> v. <br><br> L3HARRIS TECHNOLOGIES, INC.; JOHN DOES 1-10; JANE DOES 1-10; DOE CORPORATIONS 1-10; DOE PARTNERSHIPS 1-10; DOE UNINCORPORATED ORGANIZATIONS 1-10; and DOE GOVERNMENTAL AGENCIES 1-10, <br><br> Defendants. | CIVIL NO. 1:20-CV-00489 LEK-KJM (Other Civil Action) <br><br> **MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |

## MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

**TABLE OF CONTENTS**

Page

I.    FACTUAL BACKGROUND................................................................I

    A.    Plaintiff Discloses That He Is Receiving 100% VA Disability Benefits for PTSD ................................................................2

    B.    Plaintiff Has a Profanity-Laced Outburst at Mr. Igne Because of an Instruction to Wear Pants While Pressure-Washing ....................2

    C.    Plaintiff Claims He is Unable to Work for More than Four Months After Receiving a Written Warning...............................4

    D.    L3Harris and Keaki Investigate Plaintiff's Allegation that Mr. Igne Stole Gas ................................................................5

    E.    In January 2020, L3Harris Makes the Initial Decision to Terminate Plaintiff's Employment...........................................6

    F.    In February 2020, Plaintiff Makes Concerning Statements During an Independent Psychological Examination...........................7

    G.    L3Harris Terminates Plaintiff's Employment in June 2020 ...............8

II.   LEGAL STANDARD ...................................................................10

III.  ARGUMENT................................................................................10

    A.    Plaintiff's Disability Discrimination Claims (Counts I and III) Fail As a Matter of Law ...............................................10

        1.    Plaintiff fails to state a claim of disability discrimination based on events prior to the termination of his employment...............................................................11

        2.    Plaintiff's disability discrimination claims based on his termination fail because he cannot establish a prima facie case and L3Harris had legitimate, non-discriminatory reasons for discharging him. ...........................................15

    B.    Plaintiff's Retaliation Claims (Counts II and IV) Fail Because He Cannot Show Causation and L3Harris Had Legitimate, Non-Retaliatory Reasons for Its Actions...............................22

    C.    Plaintiff's Whistleblower Claim (Count V) Fails For Similar Reasons As His Retaliation Claims...............................24

IV.   CONCLUSION.............................................................................26

-i-

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Bates v. United Parcel Serv., Inc.*,
   511 F.3d 974 (9th Cir. 2007) .................................................................... 5

*Brown v. City of Tucson*,
   336 F.3d 1181 (9th Cir. 2003) .................................................................. 12

*Calef v. Gillette Co.*,
   322 F.3d 75 (1st Cir. 2003) ...................................................................... 20

*Chancey v. Fairfield S. Co.*,
   949 F. Supp. 2d 1177 (N.D. Ala. 2013) .................................................. 17

*Cleveland v. Political Systems Corp.*,
   526 U.S. 795 (1999) ........................................................................... 17, 19

*Crosby v. State Dep't of Budget & Fin.*,
   76 Hawai'i 332, 876 P.2d 1300 (1994) ............................................... 24, 25

*Crossley v. CSC Applied Techs., L.L.C.*,
   569 F.App'x 196 (5th Cir. 2014) (Appendix 1) ....................................... 17

*Curley v. City of N. Las Vegas*,
   772 F.3d 629 (9th Cir. 2014) .................................................................. 22

*Feldman v. Am. Mem'l Life Ins. Co.*,
   196 F.3d 783 (7th Cir. 1999) .............................................................. 17, 19

*Flowers v. S. Reg'l Physician Servs. Inc.*,
   247 F.3d 229 (5th Cir. 2001) (Appendix 2) ........................................ 12, 13

*French v. Hawaii Pizza Hut, Inc.*,
   105 Hawai'i 462, 99 P.3d 1046 (2004) .................................................... 11

*Henao v. Hilton Grand Vacations Inc.*,
   772 F. App'x 510 (9th Cir. 2019) ............................................................ 24

i

*Hutton v. Elf Atochem N. Am., Inc.*,
    273 F.3d 884 (9th Cir. 2001) ................................................................ 11, 20

*Jones v. Williams*,
    791 F.3d 1023 (9th Cir. 2015) ...................................................................... 10

*Lales v. Wholesale Motors Co.*,
    133 Hawai'i 332, 328 P.3d 341 (2014) ......................................................... 23

*Levar v. Freeman Decorating Co.*,
    967 F. Supp. 1055 (N.D. Ill. 1997) ............................................................... 24

*Manatt v. Bank of America, NA*,
    339 F.3d 792 (9th Cir. 2003) ................................................................. 14, 21

*Mayo v. PCC Structurals, Inc.*,
    795 F.3d 941 (9th Cir. 2015) ........................................................... 16, 19, 20

*Muellner v. Mars, Inc.*,
    714 F. Supp. 351 (N.D. Ill. 1989) ................................................................ 24

*O'Brien v. R.C. Willey Home Furnishings*,
    748 F. App'x 721 (9th Cir. 2018) (Appendix 3) ..................................... 14, 21

*Pardi v. Kaiser Found. Hosps.*,
    389 F.3d 840 (9th Cir. 2004) ........................................................................ 23

*Porter v. California Dep't of Corrections*,
    419 F.3d 885 (9th Cir. 2005) ........................................................................ 10

*Raytheon Co. v. Hernandez*,
    540 U.S. 44 (2003) ........................................................................................ 11

*Reed v. Petroleum Helicopters, Inc.*,
    218 F.3d 477 (5th Cir. 2000) ........................................................................ 17

*Roberts v. Dimension Aviation*,
    319 F. Supp. 2d 985 (D. Ariz. 2004) ............................................................ 12

*Schefke v. Reliable Collection Agency, Ltd.*,
    96 Hawai'i 408, 32 P.3d 52 (2001) ............................................................... 11

ii

*Smith v. Clark Cty. Sch. Dist.*,
    727 F.3d 950 (9th Cir. 2013) ................................................................17

*Tagupa v. VIPdesk, Inc.*,
    125 F. Supp. 3d 1108 (D. Haw. 2015) ................................................25

*Todd v. Fayette Cty. Sch. Dist.*,
    998 F.3d 1203 (11th Cir. 2021) ..........................................................22

*Villiarimo v. Aloha Island Air, Inc.*,
    281 F.3d 1054 (9th Cir. 2002) ........................................................14, 22

*Williams v. Motorola, Inc.*,
    303 F.3d 1284 (11th Cir. 2002) ..........................................................15

*Yamada v. United Airlines, Inc.*, No.19-00551, 2021 WL 2093692
    (D. Haw. May 24, 2021) (Appendix 4) ............................................25, 26

*Yonemoto v. Shulkin*,
    725 F. App'x 482 (9th Cir. 2018) (Appendix 5) ................................16


**Statutes**

42 U.S.C. § 2000e-5(e)(1)........................................................................12

Haw. Rev. Stat. Section 378-2 ..................................................................11

Haw. Rev. Stat. Section § 368-11 ..............................................................12


**Rules**

Fed. R. Civ. P. 56(a)................................................................................13


**Other Authorities**

*Applying Performance and Conduct Standards To Employees With
    Disabilities*, EEOC-NVTA-2008-3 (September 25, 2008) ....................16

iii

# I.    FACTUAL BACKGROUND

L3Harris Technologies, Inc. ("L3Harris") is a civilian contractor that provided services to the Navy at the Pacific Missile Range Facility ("PMRF") on Kauai until March 31, 2021. Declaration of John Kreider (**Kreider Decl.**) ¶2. L3Harris supplied these services with a joint venture partner, Keaki Technologies, LLC ("**Keaki**"). *Id.*  The joint-venture was called "Manu Kai." *Id.*

Plaintiff worked as a painter at PMRF until his employment was terminated on June 22, 2020. FAC ¶¶13, 90.  Plaintiff and his co-workers were members of the International Brotherhood of Electrical Workers ("**IBEW**"). Declaration of Danielle Stewart (**Stewart Decl.**) ¶3.  Plaintiff's work was directed by lead man Sean Igne and Plaintiff's and Mr. Igne's supervisor was Facilities Supervisor Rodney Martin. *Id.*; Plaintiff's Depo. Trans. (Exhibit B) ("**Lee Tr.**") at 16:6-16:10; 17:22-17:24.

Plaintiff could be volatile, becoming angry with his co-workers over minor issues. Declaration of Rodney Martin (**Martin Decl.**) ¶3.  Mr. Martin spoke to Plaintiff at various times about the need to be civil towards his co-workers and remain calm and professional. *Id.*  Plaintiff admits that handling disagreements with co-workers in a calm manner was a requirement for his job and swearing at or threatening a co-worker violates company policy.  Lee Tr. at 23:11-14; 27:15-21; Ex. X and Y.

1

### A.   Plaintiff Discloses That He Is Receiving 100% VA Disability Benefits for PTSD

In March 2019, L3Harris learned that Plaintiff had been sharing with his co-workers that he had been diagnosed with PTSD and had received a 100% disability rating from the Department of Veteran Affairs (**VA**). Stewart Decl. ¶4.

On March 13, 2019, human resources representatives met with Plaintiff to see if Plaintiff needed any accommodations. Lee Tr. at 178:5-178:12. During the meeting, Plaintiff disclosed that he had been diagnosed with PTSD and stated that he did not need any accommodations. Lee Tr. at 179:15-180:1. No action was taken against Plaintiff at this meeting. Stewart Decl. ¶4; Lee Tr. at 180:2-180:19.

### B.   Plaintiff Has a Profanity-Laced Outburst at Mr. Igne Because of an Instruction to Wear Pants While Pressure-Washing

On November 6, 2019, Mr. Igne observed Plaintiff pressure-washing while wearing shorts and asked him to put on rain pants.[1] Lee Tr. at 24:2-24:7. Ex. O. Plaintiff could not hear Mr. Igne over the noise of the gasoline-powered pressure washer, so Mr. Igne attempted to get Plaintiff's attention by honking and yelling. Lee Tr. at 30:22-31:4. Plaintiff's co-worker brought him a pair of rain pants and Plaintiff put them on and continued working. Lee Tr. at 24:7-24:12.

Later that day, Plaintiff went to the paint shop office where Mr. Igne was

---

[1] Shortly before this incident, a safety officer observed Plaintiff's co-worker on the roof without fall protection and warned that she would be watching them. Martin Decl. ¶7; Lee Tr. 31:5-32:1. No one was written up in connection with this warning. Martin Decl. ¶7.

2

and began yelling and swearing at Mr. Igne, threatening that if Plaintiff has to wear PPE (Personal Protective Equipment)[2] then Mr. Igne does as well, and Mr. Igne better be wearing PPE on Monday, or else Plaintiff would turn Mr. Igne in. Ex. Q; Lee Tr. at 37:21-38:16; 39:11-39:22.  Mr. Igne responded, "why, are you going to turn me in?"  Ex. O; Lee Tr. at 39:23-39:24.  In response, Plaintiff returned and continued yelling and swearing at Mr. Igne. Ex. O; Lee Tr. at 25:6-25:15; 39:25-40:5.

Mr. Igne lodged a complaint about the incident with Mr. Martin. Martin Decl. ¶4; Ex. N; Lee Tr. at 40:10-41:16.  Mr. Martin interviewed and obtained signed statements from Plaintiff and co-workers who witnessed the incident.  Lee Tr. at 41:17-41:20; Martin Decl. ¶4; Exs. O-R; BB (**Castro Tr.**) at 16:18-19:22; CC (**Hesapene Tr.**) at 26:5-28:6.  In his signed statement, Plaintiff admitted he "was mad and [he] yelled and swore at [Mr. Igne] many times in a loud disruptive manner". Ex. O; Lee Tr. at 46:17-46:20; 47:23-48:1 (admitting that the contents of his statement are an accurate account of the incident).

Plaintiff's co-workers similarly supported that Plaintiff was angry and swore at Mr. Igne. Exs. P-R.  One co-worker reported that the next morning, Plaintiff said he "was going to punch Sean [Igne] through his face."  Plaintiff does not dispute making this statement. Lee Tr. at 49:16-50:18; Hesapene Tr. at 28:13-28:21.

----

[2] Mr. Igne was not pressure-washing that day and was wearing shorts, as Plaintiff often did at work.  Lee Tr. 35:15-35:17; 44:24-45:5.

C.    **Plaintiff Claims He is Unable to Work for More than Four Months After Receiving a Written Warning**

On November 18, 2019, Mr. Martin and a HR representative met with Plaintiff to issue a written warning for his unprofessional conduct toward Mr. Igne. Ex. S; Martin Decl. ¶4; Lee Tr. at 53:5-53:25.  The warning did not include a suspension, demotion, or cut in pay. Ex. S; Lee Tr. at 64:14-65:10.

During the meeting, Plaintiff accused Mr. Igne of stealing gasoline from the base.  Martin Decl. ¶6; Lee Tr. at 55:21-55:24.  Mr. Martin told Plaintiff that they could discuss those accusations later and the purpose of this meeting was to discuss Plaintiff's conduct towards Mr. Igne. Martin Decl. ¶6.  Mr. Martin explained the expectation that Plaintiff act in a professional manner toward co-workers and reviewed the "Respect in the Workplace" training Plaintiff previously received. *Id.* ¶8. Plaintiff sat with his head down during this discussion and it was apparent that he was not listening. *Id.*; *see also* Lee Tr. 58:3-21 (testifying that what Mr. Martin was saying "was going in one ear and coming out the other").

At the conclusion of the meeting, Plaintiff said that he needed to see his doctor and voluntarily left work. FAC ¶77; Martin Decl. ¶9; Lee Tr. at 65:11-65:16; 67:3-67:8. Subsequently, Plaintiff filed a workers' compensation claim because of ▮▮▮▮▮▮▮▮▮▮▮ Lee Tr. at 77:19-78:9; Ex. K.  Plaintiff submitted doctor's notes claiming he was unable to work for the remainder of November and all of December, January, February, and March. *See* Exs T and U.

4

**D.    L3Harris and Keaki Investigate Plaintiff's Allegation that Mr. Igne Stole Gas**

While Plaintiff was on leave, Mr. Martin investigated Plaintiff's allegation that Mr. Igne was stealing gasoline and found no evidence to support it.   Martin Decl. ¶10.   In December 2019, Ross West, a Keaki program manager, advised L3Harris that Plaintiff had made a complaint to the Navy that Mr. Igne was stealing gasoline.[3] Stewart Decl. ¶6; Lee Tr. at 83:20-84:3.   Keaki assigned an employee named Scott Taylor to investigate the matter. Stewart Decl. ¶6; Ex. V. In the investigation report, which Keaki shared with L3Harris (Stewart Decl. ¶6), Mr. Taylor wrote when he interviewed Plaintiff by telephone, Plaintiff said Mr. Igne had been stealing gas from 2007-2010. Ex. V at 5; Lee Tr. 93:11-93:19. When asked why Plaintiff was only reporting the alleged theft in 2019, Plaintiff reportedly told Mr. Taylor, "Because he just turned me in, so I will turn him in." Ex. V at 5; Lee Tr. 94:15-95:16.   Mr. Taylor reported that Plaintiff "talked in a rage with excessive profanity throughout", and he "was shocked by [Plaintiff's] degree of anger, given that he was about three weeks removed from his 18 Nov 19 counselling." Ex. V at 6.

---

[3] In December, Mr. West also wanted to restrict Plaintiff from accessing the employee areas of the base by collecting his CAC card and badge. Given that Plaintiff was on leave at the time, and collection of those items was consistent with the policy for employees on an extended leave, L3Harris agreed with Mr. West's request to collect those items from Mr. Lee.   Kreider Decl. ¶3; Ex. W, Section 6.10.

Mr. Taylor's report concluded that a preponderance of evidence did not support theft of gas by Mr. Igne, and that "revenge is the clear motive for [Plaintiff] making the allegation." *Id.* at 4. The report, which also included statements from co-workers, found that Plaintiff "has demonstrated a pattern of violent behavior." *Id.* at 4, 9-17. The report stated that if Plaintiff "returned to his assigned position at the end of his medical leave, it is likely that the hostile work environment will further deteriorate into violence." *Id.* at 4.

When Keaki transmitted Mr. Taylor's report, Keaki told L3Harris it needed to "elevate" the concerns to a corporate level for consideration. *Id.* at 1; *see also* Stewart Decl. ¶6; Kreider Decl. ¶4. L3Harris also received from IBEW statements signed by some of Plaintiff's co-workers expressing concern for their safety if Plaintiff returned to the workplace. Stewart Decl. ¶7; Castro Tr. at 40:3-42:3.

**E.   In January 2020, L3Harris Makes the Initial Decision to Terminate Plaintiff's Employment**

In January 2020, after reviewing the circumstances involving the incident between Plaintiff and Mr. Igne in November 2019, the statements obtained by Mr. Taylor and the statements presented by IBEW, L3Harris' human resources business partner recommended terminating Plaintiff because of Plaintiff's aggressive conduct towards his co-workers, in order to maintain a safe and healthy workplace. Stewart Decl. ¶7. A L3Harris manager approved the termination in January 2020. Kreider Decl. ¶4. The recommendation and approval had nothing

to do with PTSD or any other alleged medical condition or disability. *Id.* ¶5; Stewart Decl. ¶8.

However, shortly before human resources was going to notify Plaintiff of his termination, Plaintiff presented a doctor's note extending his leave. Stewart Decl. ¶9. Since L3Harris generally does not terminate employees while on leave, the company stopped implementation of the termination at that time.[4] *Id.*

**F.    In February 2020, Plaintiff Makes Concerning Statements During an Independent Psychological Examination**

In February 2020, in conjunction with his workers' compensation claim, Plaintiff underwent an independent psychological exam ("**IPE**") conducted by clinical psychologist Dr. Peter Bianchi.[5] Stewart Decl. ¶10; Ex. Z. Dr. Bianchi's report explained, among other things, that Plaintiff: ████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

---

[4] After L3Harris put the termination on hold, on February 27, 2020, Plaintiff filed a charge of discrimination alleging disability discrimination and retaliation. Ex. L.

[5] ████████████████████████████████████████

████████████████████████████████████████



Ex. Z at 7-8 (emphasis added).

his doctor released

him to return to work effective April 1, 2020. Ex. U at 5; Lee Tr. at 80:11-20.

### G.    L3Harris Terminates Plaintiff's Employment in June 2020

To evaluate how best to address the situation, L3Harris placed Plaintiff on

paid administrative leave effective April 1, 2020. Stewart Decl. ¶11. L3Harris

asked for Dr. Bianchi's opinion of the likelihood of another episode if Plaintiff

returned to work. Ex. AA at 1. Dr. Bianchi responded,

*Id.*

L3Harris also asked for Keaki's position on returning Plaintiff to work. Stewart Decl. ¶12.  Mr. West relayed Keaki's position that it would not permit Plaintiff to return to the restricted areas of the base unless Plaintiff or L3Harris could provide medical clearance guaranteeing that Plaintiff was not a danger to himself or coworkers. *Id.*

On June 22, 2020, L3Harris terminated Plaintiff's employment. Stewart Decl. ¶14; FAC ¶90.  The final decision to terminate Plaintiff's employment was based on several factors. Stewart Decl. ¶14.  First, Plaintiff's comments to Dr. Bianchi regarding ████████████████████████████████████████ ████████████████████████████████████████ *Id.*  His statements suggested that he had not learned from the warning he received in November 2019. *Id.*  Second, Keaki would not allow Plaintiff access to the base unless L3Harris could guarantee that he would not be a danger to himself or others, which L3Harris could not do. *Id.*  Combined with the concerns described above that prompted the initial discussion to terminate Plaintiff's employment in January 2020, the human resources business partner again recommended that L3Harris terminate Plaintiff's employment, which decision was approved. *Id.*; Kreider Decl. ¶6.

On November 13, 2020, Plaintiff filed the instant lawsuit. On December 12, 2020, Plaintiff filed his second Charge of Discrimination with the Hawaii Civil

9

Rights Commission and EEOC which included allegations regarding his termination. Ex. M at 4. Plaintiff subsequently filed his FAC.

## II.   LEGAL STANDARD

Summary judgment is proper when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When the moving party does not have the ultimate burden of persuasion at trial, the movant can satisfy its initial burden by "'either produc[ing] evidence negating an essential element of the nonmoving party's claim . . . or show[ing] that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial.'" *Jones v. Williams*, 791 F.3d 1023, 1030-31 (9th Cir. 2015).

"[O]nce the moving party meets the requirements of Rule 56 by showing there is an absence of evidence to support the non-moving party's case, the burden shifts to the party resisting the motion, who must set forth specific facts showing that there is a genuine issue for trial." *Porter v. California Dep't of Corrections*, 419 F.3d 885, 891 (9th Cir. 2005) (cleaned up).

## III.   ARGUMENT

### A.   Plaintiff's Disability Discrimination Claims (Counts I and III) Fail As a Matter of Law

Discrimination claims under the Americans with Disabilities Act ("ADA") and Section 378-2 of the Hawaii Revised Statutes ("HRS") are analyzed under the

*McDonnell Douglas* burden-shifting framework. *See Raytheon Co. v. Hernandez*, 540 U.S. 44, 49, n.3 (2003); *Schefke v. Reliable Collection Agency, Ltd.*, 96 Hawaiʻi 408, 425, 32 P.3d 52, 69 (2001).

Plaintiff must establish a *prima facie* case by showing that "(1) he is a disabled person within the meaning of the statute; (2) he is a qualified individual with a disability; and (3) he suffered an adverse employment action because of his disability." *Hutton v. Elf Atochem N. Am., Inc.*, 273 F.3d 884, 891 (9th Cir. 2001); *French v. Hawaii Pizza Hut, Inc.*, 105 Hawaiʻi 462, 467, 99 P.3d 1046, 1051 (2004). If the plaintiff establishes a *prima facie* case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its employment action. *Raytheon*, 540 U.S. at 49 n.3. If the defendant meets this burden, then the plaintiff must offer evidence demonstrating the explanation is pretextual. *Id.*

1.  Plaintiff fails to state a claim of disability discrimination based on events prior to the termination of his employment.

The FAC appears to allege that Plaintiff suffered discrimination prior to the termination of his employment. These claims fail as a matter of law.

First, Plaintiff alleges that in February or March 2019, Mr. Igne and fellow union members harassed him on the basis of his PTSD by stating that they were afraid to work with him and saying that he should retire. FAC ¶¶19, 21, 23-25; Lee Tr. at 184:11-189:5. Even assuming a claim of harassment under the ADA is

11

actionable[6], Plaintiff's claim must be dismissed as untimely because Plaintiff did not file his Charge of Discrimination until February 27, 2020, which is more than 180 or 300 days after the alleged harassment occurred. *See* HRS § 368-11(c)(1) (requiring state law discrimination claims to be filed with the HCRC within 180 days after the alleged unlawful discriminatory practiced occurred); 42 U.S.C. § 2000e-5(e)(1) (300 day deadline for federal discrimination claims).

Moreover, Plaintiff cannot show that his co-workers' comments were based on his alleged PTSD or that they were severe or pervasive. *Flowers v. S. Reg'l Physician Servs. Inc.*, 247 F.3d 229, 235-36 (5th Cir. 2001) (Appendix 2) (plaintiff must show "that the harassment complained of was based on her disability or disabilities" and it was severe or pervasive). Plaintiff said his co-workers' comments concerned why Plaintiff didn't retire after receiving 100% VA benefits, not his alleged PTSD, which comments Plaintiff addressed on his own. Lee Tr. at 184:11-189:5; 230:8-232:19. Furthermore, there is no evidence that Plaintiff reported the alleged harassment such that L3Harris could be found negligent for failing to address it. *See Flowers*, 247 F.3d at 236 (plaintiff must show "that the employer knew or should have known of the harassment and failed to take prompt, remedial action") Martin Decl. ¶ 12; Lee Tr. at 188:15-189:5; 196:16-197:4; Ex. J

---

[6] The Ninth Circuit has not decided this issue. *See Brown v. City of Tucson*, 336 F.3d 1181, 1190 (9th Cir. 2003). If it is, the elements would be similar to harassment claims under Title VII. *See, e.g., Roberts v. Dimension Aviation*, 319 F. Supp. 2d 985, 988 (D. Ariz. 2004) (citing *Flowers*, 247 F.3d at 235-36).

12

ER 177

Response #14.

Second, Plaintiff alleges that human resources improperly questioned him about his PTSD during a meeting in March 2019 meeting. FAC ¶¶29-37. Even assuming the questions were improper, Plaintiff did not timely file a Charge of Discrimination within 180 or 300 days of this incident.[7]

Third, Plaintiff claim that he suffered discrimination when Keaki's program manager took his access badges fails because requiring Plaintiff to return his badges while he was on leave was consistent with Manu Kai policy. FAC ¶¶80-81, 87; Lee Tr. at 96:13-98:17; Ex. W, Section 6.10. There is no evidence that this policy was unequally applied to Plaintiff because of his alleged PTSD. *See* Kreider Decl. ¶5.

Fourth, Plaintiff argues that he was unfairly disciplined at the November 2019 meeting.[8] FAC ¶¶53-73. However, there were legitimate, non-discriminatory reasons for the disciplinary action, based on Plaintiff's improper outburst towards Mr. Igne. Martin Decl. ¶4; Ex. O; Lee Tr. 27:15-27:21.[9] Even if L3Harris inaccurately assessed fault for the incident, L3Harris honestly believed that

---

[7] Plaintiff admits no disciplinary action was imposed on him as a result of this meeting, and he requested no accommodations. Lee Tr. at 180:2-180:19.

[8] Plaintiff identified no other disciplinary action after he disclosed he had PTSD and the termination of his employment. Lee Tr. at 236:7-237:4.

[9] The FAC suggests Plaintiff believes the disciplinary action was based on the inaccurate premise that Plaintiff had previously been "written up" by the safety officer. FAC ¶¶54-61. Plaintiff is simply mistaken. No one was written up by the safety officer and that was not the basis for the warning. Martin Decl. ¶7.

Plaintiff's inappropriate conduct warranted discipline based on the statements received from Plaintiff and his co-workers. *See Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1063 (9th Cir. 2002) (holding that an employer need only show that it "honestly believed its reason for its actions"); Exs O-R; Martin Decl. ¶4.

Furthermore, the November 2019 warning occurred **nine months** after Plaintiff disclosed his alleged PTSD. This is too long to raise an inference of causation that L3Harris disciplined Plaintiff because of his PTSD. *See O'Brien v. R.C. Willey Home Furnishings*, 748 F. App'x 721, 723 (9th Cir. 2018) (Appendix 3) (explaining that causation may be inferred if the adverse employment action takes place "**shortly after** his employer discovers that he is disabled."); *cf. Manatt v. Bank of America, NA*, 339 F.3d 792, 802 (9th Cir. 2003) (declining to find an inference of causation where "nine months lapsed between the date of Manatt's complaint and the Bank's alleged adverse decision").

Finally, to the extent Plaintiff argues that L3Harris discriminated against him by asking him to undergo the IPE, it fails to state a claim. L3Harris was entitled to ask Plaintiff to submit to an IPE in light of Plaintiff's workers compensation claim and recent belligerent behavior. *See, e.g., Williams v. Motorola, Inc.*, 303 F.3d 1284, 1291 (11th Cir. 2002) (employee's recent belligerent behavior, threats, and acts of insubordination justified a medical examination); Stewart Decl. ¶10.

Therefore, the disability discrimination claims premised on events prior to

14

Plaintiff's termination should be dismissed.

    2.    **Plaintiff's disability discrimination claims based on his termination fail because he cannot establish a *prima facie* case and L3Harris had legitimate, non-discriminatory reasons for discharging him.**

Plaintiff's discrimination claims based on his termination fail for three independent reasons.  First, Plaintiff cannot establish that he is a "qualified individual" necessary to make a *prima facie* case. Second, Plaintiff cannot show that his employment was terminated because of his PTSD.  Third, even if Plaintiff could establish a *prima facie* case, L3Harris terminated Plaintiff's employment for legitimate, non-discriminatory reasons.

    *a.*    *Plaintiff cannot establish he is a qualified individual*

To establish a prima facie case of disability discrimination, the plaintiff must show that he is a qualified individual who can perform his essential job functions with or without reasonable accommodation. *Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 990 (9th Cir. 2007).  "If a disabled person cannot perform a job's 'essential functions' (even with a reasonable accommodation), then the ADA's employment protections do not apply." *Id.* at 989 (citations omitted).

"An essential function of almost every job is the ability to appropriately handle stress and interact with others." *Mayo v. PCC Structurals, Inc.*, 795 F.3d 941, 944 (9th Cir. 2015); *see also Yonemoto v. Shulkin*, 725 F. App'x 482, 484 (9th Cir. 2018) (Appendix 5) (holding that an employee was not qualified where he

could not "complete substantive work independently, take constructive criticism, and avoid interpersonal issues"). The Ninth Circuit explained the rationale for this rule as follows:

> The [ADA] does not require an employer to retain a potentially violent employee. Such a requirement would place the employer on a razor's edge—in jeopardy of violating the Act if it fired such an employee, yet in jeopardy of being deemed negligent if it retained him and he hurt someone. The Act protects only "qualified" employees, that is, employees qualified to do the job for which they were hired; and threatening other employees disqualifies one.

*Mayo*, 795 F.3d at 944.

The EEOC similarly recognizes that the "ADA does not protect employees from the consequences of violating conduct requirements even where the conduct is caused by the disability," and employers are entitled to prohibit "violence, threats of violence, stealing, or destruction of property."[10]

A plaintiff can be estopped from establishing that he is a "qualified individual" under the ADA where the plaintiff previously applied for and received disability benefits from the government based on statements that genuinely conflict with the plaintiff's assertion that he can perform the essential functions of his job. *Cleveland v. Political Systems Corp.*, 526 U.S. 795, 805-06 (1999). *Cleveland* concerned statements made to obtain social security disability benefits, but courts

---

[10] *Applying Performance and Conduct Standards To Employees With Disabilities*, EEOC-NVTA-2008-3 (September 25, 2008), available at https://www.eeoc.gov/laws/guidance/applying-performance-and-conduct-standards-employees-disabilities#conduct (responses to questions 8 and 9).

16

have applied *Cleveland* and granted summary judgment to employers based on

inconsistent statements made in other types of benefits applications, including

disability benefits from the VA. *Smith v. Clark Cty. Sch. Dist.*, 727 F.3d 950, 956

(9th Cir. 2013) (holding that *Cleveland* applies to receipt of other types of

disability benefits); *Crossley v. CSC Applied Techs., L.L.C.*, 569 F.App'x 196 (5th

Cir. 2014) (Appendix 1) (affirming summary judgment where employee with

PTSD previously submitted a VA benefits application claiming she was totally

disabled); *Reed v. Petroleum Helicopters, Inc.*, 218 F.3d 477, 480 (5th Cir. 2000)

(affirming summary judgment in favor of the employer based on plaintiff's

doctor's statements in her benefits application); *Feldman v. Am. Mem'l Life Ins.

Co.*, 196 F.3d 783, 792 (7th Cir. 1999) (affirming summary judgment for employer

where plaintiff's prior statements in benefits application contradicted the notion

that she could work as a traveling salesperson); *Chancey v. Fairfield S. Co.*, 949 F.

Supp. 2d 1177, 1181 (N.D. Ala. 2013) (granting summary judgment against

employee with PTSD where employee was clearly seeking 100% benefits).

Here, Plaintiff should be estopped from claiming he is a qualified individual

based on his submissions to the VA that he is 100% disabled, which resulted in

100% disability benefits. Ex. F; Ex. H at 5 ███████████████████████████

██████; Ex. D at 2; Ex. E.[11] In connection with his application, Plaintiff submitted

medical records indicating that ████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████ █ ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████   Ex. H at 7, 13.

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

---

[11] The VA's decision granting Plaintiff 100% disability benefits identifies a list of evidence the VA considered, including ███████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████   *See* Ex. D at 2-3 (for ease of reference, the referenced documents from the decision are highlighted).
[12]
████████████████████████████████████████████████████████████



Ex. I at 2, 3, 5.

The VA's decision to award Plaintiff 100% disability benefits were based on precisely these factual findings and statements. Ex. D at 4.

Plaintiff cannot overcome these **factual findings and statements** submitted in support of his benefits application, which flatly contradict his ability to "appropriately handle stress and interact with others," *Mayo*, 795 F.3d at 944 *see also Feldman*, 196 F.3d at 791 ("Although *Cleveland* clarified that an ADA claim is not estopped simply because an individual applied for or received SSDI benefits, a plaintiff cannot avoid summary judgment merely by asserting that she is a qualified individual if she made prior statements, in applying for [disability benefits], regarding her disability that are squarely contradictory."). Given that

---

13

Plaintiff continues to receive taxpayer-funded disability benefits, he should be estopped from claiming that he is a qualified individual. Lee Tr. 130:4-130:6; Ex. J Response #5.

Even if Plaintiff is not estopped, Plaintiff cannot meet his burden to establish that he is a qualified individual because of his conduct in the workplace and subsequent statements to Dr. Bianchi. *See Mayo*, 795 F.3d at 947; *Calef v. Gillette Co.*, 322 F.3d 75, 80-83, 87 (1st Cir. 2003) (affirming summary judgment where the employee was terminated after the employee made erratic and irrational statements towards his supervisor).

Plaintiff does not dispute that he yelled and swore at Mr. Igne, made threatening statements about punching Mr. Igne in the face, and told Dr. Bianchi ▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. O; Lee Tr. 27:15-27:21; 49:8-50:15; 114:9-20. Because Plaintiff cannot establish he is a qualified individual, his discrimination claims should be dismissed.

    *b.*   *Plaintiff cannot establish that L3Harris terminated his employment because of his alleged PTSD.*

Summary judgment should also be granted because Plaintiff cannot establish that he "suffered an adverse employment action because of his disability." *Hutton*, 273 F.3d at 891. To prove causation, the Plaintiff must show that the employment action would not have occurred **but for** his disability. *Mayo*, 934 F.3d at 1105 (joining other circuits in holding that the "motivating factor" standard for causation

20

ER 185

no longer applies to ADA discrimination cases), *cert. denied*, 140 S. Ct. 2720 (2020).

"[C]ausation may be inferred from timing alone where an employee is terminated shortly after his employer discovers that he is disabled." *O'Brien*, 748 F.App'x at 723. Plaintiff's termination more than a year after L3Harris learned of his alleged PTSD is too long for causation to be inferred. *See, e.g., Manatt* 339 F.3d at 802 (nine months too long to infer causation). Plaintiff has no other evidence that would establish that L3Harris terminated Plaintiff's employment because of his alleged PTSD. *See* Lee Tr. 119:16-119:21 (admitting that no one has ever told Plaintiff that he was discharged because of PTSD).

c.   *L3Harris had legitimate, non-discriminatory reasons for terminating Plaintiff's employment.*

Even if Plaintiff could establish a *prima facie* case, L3Harris terminated Plaintiff's employment for legitimate, non-discriminatory reasons. Stewart Decl. ¶14; Kreider Decl. ¶¶5, 6. L3Harris was not required to ignore Plaintiff's profanity-laced outburst towards Mr. Igne, the concerns raised by his co-workers and Keaki about his continued presence in the workplace, and Plaintiff's disturbing comments to Dr. Bianchi. Although Plaintiff testified he would not have acted

upon his threats[14], L3Harris was not required to take that risk. *Curley v. City of N. Las Vegas*, 772 F.3d 629, 632 (9th Cir. 2014) ("[T]he plaintiff's threats were an independent and sufficient basis for dismissal, regardless of whether he posed an actual danger."); *Villiarimo*, 281 F.3d at 1063 ("Courts 'only require that an employer honestly believed its reason for its actions"); *Todd v. Fayette Cty. Sch. Dist.*, 998 F.3d 1203, 1218 (11th Cir. 2021) (teacher suffering from depressive disorder could not avoid summary judgment on ADA claim where the employer honestly believed that she threatened her co-workers).   Thus, Plaintiff's discrimination claims fail and should be dismissed.

**B.   Plaintiff's Retaliation Claims (Counts II and IV) Fail Because He Cannot Show Causation and L3Harris Had Legitimate, Non-Retaliatory Reasons for Its Actions.**

Like his discrimination claims, Plaintiff's retaliation claims fail because he cannot establish his termination was causally connected to any protected conduct. Even if he could establish a *prima facie* case, as noted above, L3Harris had legitimate, non-retaliatory reasons for its actions and Plaintiff is estopped from arguing otherwise based on his statements to the VA.

"To establish a prima facie case of retaliation under the ADA, an employee must show that: (1) he or she engaged in a protected activity; (2) suffered an

---

[14] *See* Lee Tr. at 49:22-50:15. However, Plaintiff's contention that he would never follow through with his threats is belied by own admissions of numerous physical altercations. *Id.* at 147:20-152:3; Ex. I at 5.

adverse employment action; and (3) there was a causal link between the two."
*Pardi v. Kaiser Found. Hosps.*, 389 F.3d 840, 849 (9th Cir. 2004). If the employee establishes a *prima facie case*, the employer must offer a legitimate reason for the adverse employment action. *Id.* If the employer does so, the burden shifts back to the employee to show that the reason is pretextual. *Id.* The same requirements and analysis apply to claims under Hawai'i law. *Lales v. Wholesale Motors Co.*, 133 Hawai'i 332, 339 n.6, 328 P.3d 341, 348 n.6 (2014).

Although Plaintiff's FAC does not clearly say what protected activity he engaged in, Plaintiff's response to interrogatories identified his EEOC Charges as the only discrimination complaints he made.  Ex. J Response #14. There is no evidence that L3Harris terminated Plaintiff because he filed those charges.  An initial decision to terminate Plaintiff's employment was actually made in January 2020 (before the filing of any charge), and stopped because of the extension of Plaintiff's leave.  Stewart Decl. ¶ 9; Kreider Decl. ¶6.  The subsequent final decision to terminate Plaintiff's employment in June 2020 was not based on the filing of his charge. Stewart Decl. ¶6, 8.  No other actions taken by L3Harris were based on any complaint of discrimination either. *See, e.g.*, Stewart Decl. ¶¶6, 8; Kreider Decl. ¶¶5, 6; Martin Decl. ¶¶3, 7.

Even if Plaintiff could establish a *prima facie* case, summary judgment is appropriate because L3Harris had legitimate, non-retaliatory reasons for

ER 188

terminating Plaintiff's employment, as discussed in Section III.A.2.c. *supra.* Plaintiff cannot establish otherwise and should be estopped from contending it was wrongful to terminate his employment given Plaintiff's statements to the VA in support of his successful application for disability benefits. *See Muellner v. Mars, Inc.*, 714 F. Supp. 351, 360 (N.D. Ill. 1989) (holding an employee was estopped from asserting her discharge was retaliatory where the plaintiff previously represented to the social security administration that she was totally disabled); *Levar v. Freeman Decorating Co.*, 967 F. Supp. 1055, 1059 (N.D. Ill. 1997) (granting summary judgment for employer on Plaintiff's ADA and state retaliation claims for the period she received union benefits based on her representation that she was totally disabled).

## C. Plaintiff's Whistleblower Claim (Count V) Fails For Similar Reasons As His Retaliation Claims

Count V of the FAC also fails as a matter of law. "To establish a prima facie case for retaliation under the [Hawaii Whistleblower Protection Act ("**HWPA**")], the plaintiff must prove that: (1) he engaged in a protected activity; (2) he was subjected to an adverse employment action; and (3) the protected activity was a 'substantial or motivating factor' in the adverse employment action." *Henao v. Hilton Grand Vacations Inc.*, 772 F. App'x 510, 511 (9th Cir. 2019) (citing *Crosby v. State Dep't of Budget & Fin.*, 76 Hawai'i 332, 876 P.2d 1300, 1310 (1994)).

"In order for an employee to prevail under the HWPA, however, the

24

employer's challenged action must have been taken 'because' the employee engaged in protected conduct in order to be considered 'discriminat[ory]' under the HWPA. In other words, a causal connection between the alleged retaliation and the 'whistleblowing' is required." *Crosby*, 76 Hawai'i at 342, 876 P.2d at 1310. Thus, "employers are entitled to summary judgment if they can demonstrate that they would have reached the same adverse employment decision even in the absence of the employee's protected conduct." *Tagupa v. VIPdesk, Inc.*, 125 F. Supp. 3d 1108, 1120 (D. Haw. 2015) (citation and internal quotation marks removed). "If a plaintiff establishes his prima facie case, the burden would then shift to the defendant to articulate a legitimate, nondiscriminatory reason for his termination." *Yamada v. United Airlines, Inc.*, No.19-00551, 2021 WL 2093692, at *7 (D. Haw. May 24, 2021) (Appendix 4).

Although not identified in his FAC, Plaintiff stated at his deposition that his alleged protected activity occurred in November 2019 when he reported Mr. Igne was stealing gas and leaving work early. Lee Tr. at 197:5-198:12. Plaintiff's decision to make allegations against his lead man because he was "pissed off" that his lead man had made a complaint about Plaintiff's angry outburst is hardly the sort of conduct that the HWPA was designed to encourage or protect. *Id.* at 93:11-96:6; Ex. V at 5.

Furthermore, Plaintiff cannot establish a causal connection between his

25

ER 190

alleged protected activity and his termination, which occurred more than six months later. *See Yamada*, 2021 WL 2093692, at *7 (holding that six months between the protected activity and plaintiff's termination was too long to raise an inference of causation for HWPA claim). And even if Plaintiff could establish a *prima facie* case, L3Harris had legitimate reasons for terminating Plaintiff's employment wholly unrelated to Plaintiff's report. *See* Section III.A.2.c *supra*. Thus, summary judgment should also be entered on Plaintiff's HWPA claim.

## IV.   CONCLUSION

For the foregoing reasons, L3Harris respectfully requests that the Court enter summary judgment in its favor on all claims asserted in the FAC.

DATED: Honolulu, Hawai'i, September 29, 2021.

CADES SCHUTTE
A Limited Liability Law Partnership

*/s/ Amanda M. Jones*
AMANDA M. JONES
MICHAEL R. SOON FAH
Attorneys for Defendant
L3HARRIS TECHNOLOGIES, INC.

26

Crossley v. CSC Applied Technologies, L.L.C., 569 Fed.Appx. 196 (2014)

29 A.D. Cases 1718

569 Fed.Appx. 196
This case was not selected for
publication in the Federal Reporter.
Not for Publication in West's Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1
generally governing citation of judicial
decisions issued on or after Jan. 1, 2007. See
also Fifth Circuit Rules 28.7, 47.5.3, 47.5.4.
(Find CTA5 Rule 28 and Find CTA5 Rule 47)
United States Court of Appeals,
Fifth Circuit.

Pamela L. CROSSLEY, Plaintiff–Appellant

v.

CSC APPLIED TECHNOLOGIES,
L.L.C., Defendant–Appellee.

No. 13–10788
|
Summary Calendar.
|
May 22, 2014.

## Synopsis

**Background:** Former employee brought action against employer for discrimination in violation of Americans with Disabilities Act (ADA). The United States District Court for the Northern District of Texas granted summary judgment to employer. Employee appealed.

**Holding:** The Court of Appeals held that employee was not "qualified individual" under ADA.

Affirmed.

## Attorneys and Law Firms

**\*197** William Sam Hommel, Jr., Tyler, TX, for Plaintiff–Appellant.

Samuel Zurik, III, Attorney, Rachel E. Linzy, Esq., Kullman Firm, New Orleans, LA, for Defendant–Appellee.

Appeal from the United States District Court for the Northern District of Texas, USDC No. 6:12–CV–2.

Before DAVIS, SOUTHWICK, and HIGGINSON, Circuit Judges.

## Opinion

PER CURIAM:[*]

Plaintiff–Appellant Pamela Crossley ("Crossley") filed suit against Defendant–Appellee CSC Applied Technologies, L.L.C. ("CSC") alleging that CSC discriminated against her by failing to accommodate her disability, in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12112(b)(5)(A). The district court granted summary judgment in favor of CSC. Crossley timely appealed.

Crossley is a United States Army veteran who worked for CSC as an aircraft mechanic in San Angelo, Texas. CSC has a helicopter servicing contract with the U.S. Army that requires the company to provide repairs at varying times and locations. As such, the mechanics have to deploy to other locations whenever needed. The job description for aircraft mechanic explicitly lists as qualifications that the employee must be willing to work any shift or schedule as required to support the workload and must be willing to deploy to support off-station exercises or other duties as assigned.

As a result of an incident that occurred during her military service, Crossley suffered from and received weekly treatment for posttraumatic stress disorder ("PTSD"). In February 2011, CSC informed its employees that there would be a reduction in aircraft at the San Angelo site and that it would have to reassign employees to other locations. Crossley informed her supervisors that she was unable to travel due to her medical appointments. She submitted a letter from her physician explaining that she could not travel and acknowledged that she understood she could be laid off if she was not able to accept a location transfer.

On March 4, 2011, CSC terminated Crossley, informing her that she was eligible for rehire and may apply for positions for which she was qualified that became available in the future. However, Crossley did not apply for the positions that subsequently became available at the San Angelo location. On March 15, 2011, Crossley **\*198** filed an application with the Department of Veterans Affairs for total disability benefits, claiming that her disability prevented her "from securing or following any substantially gainful occupation." Crossley subsequently filed the instant suit.

# APPENDIX 1

We review the district court's grant of summary judgment *de novo,* applying the same standards as the district court. *Milton v. Texas Dep't of Criminal Justice,* 707 F.3d 570, 572 (5th Cir.2013). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). "Evidence is construed in the light most favorable to the non-moving party ... draw[ing] all reasonable inferences in that party's favor. Conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence are insufficient to create a genuine issue of material fact." *Milton,* 707 F.3d at 572 (internal quotation marks and citations omitted). We may affirm summary judgment on any ground supported by the record. *Feist v. Louisiana, Dep't of Justice, Office of Att'y Gen.,* 730 F.3d 450, 452 (5th Cir.2013).

The ADA provides: "No covered entity shall discriminate against a qualified individual on the basis of disability." 42 U.S.C. § 12112(a). Discrimination includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability ... unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." *Id.* at (b)(5)(A). Therefore, to prevail in her failure-to-accommodate claim, Crossley must prove that: "(1) [she] is a qualified individual with a disability; (2) the disability and its consequential limitations were known by [CSC]; and (3) [CSC] failed to make reasonable accommodations for such known limitations." *Feist,* 730 F.3d at 452 (internal quotation marks omitted).

A qualified individual is one who "with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds." 42 U.S.C. § 12111(8). To avoid summary judgment on the question of whether she is a qualified individual, Crossley must show: (1) "that [she] could perform the essential functions of the job in spite of [her] disability" or (2) "that a reasonable accommodation of [her] disability would have enabled [her] to perform the essential functions of the job." *Turco v. Hoechst Celanese Corp.,* 101 F.3d 1090, 1093 (5th Cir.1996).[1]

CSC's contract with the government required employees to make repairs at varying times and locations. Thus, the description of Crossley's position explicitly states: "Qualifications: ... Must be willing to work any shift and/ or flexible schedules as required to support the workload **\*199** and the mission. Must be willing to deploy to support

off station exercises and perform other supportive duties as assigned." Crossley testified that when CSC took over the contract, she understood that she would have to work in different locations. Additionally, while still employed Crossley wrote letters stating that she could not travel and that she understood that she could be laid off due to her inability to accept work at another location. Indeed, Crossley concedes on appeal that travel was an essential function of her job that she could not perform when she states, "There is no dispute that Crossley successfully performed all essential tasks of her job throughout her employment with CSC, except for the travel requirement." Thus, Crossley has not shown that she is a qualified individual under the ADA. *See Gober v. Frankel Family Trust,* 537 Fed.Appx. 518, 521–22 (5th Cir.2013) (unpublished) (affirming summary judgment for employer where evidence showed that plaintiff could not report to work after hours, which was an essential function of the position even if it happened only infrequently).

Moreover, after filing the instant suit, Crossley filed an application with the Department of Veterans Affairs requesting total disability benefits due to her inability to secure or perform any occupation. In *Cleveland v. Policy Mgmt. Corp.,* 526 U.S. 795, 797–98, 119 S.Ct. 1597, 143 L.Ed.2d 966 (1999), the Supreme Court held that although a plaintiff's pursuit and receipt of Social Security Disability Insurance ("SSDI") benefits does not automatically estop her from pursuing an ADA claim, "[t]o survive a defendant's motion for summary judgment, she must explain why that SSDI contention is consistent with her ADA claim that she could perform the essential functions of her previous job, at least with reasonable accommodation." This court has explained that "while an employee's boilerplate representation of total disability in a benefits application may be a legal conclusion that can, through an adequate explanation, be reconciled with a subsequent ADA suit, an employee's specific factual statements that she was unable to perform her essential job duties at the time of the adverse employment action entitle the employer to summary judgment, at least absent a particularized showing that reasonable accommodations were possible." *Bell v. Hercules Liftboat Co., L.L.C.,* 524 Fed.Appx. 64, 68 (5th Cir.2013) (unpublished) (quoting *Reed v. Petroleum Helicopters, Inc.,* 218 F.3d 477, 479–80 (5th Cir.2000)) (internal quotation marks omitted).

In *Reed,* 218 F.3d at 478, the plaintiff worked as an offshore helicopter pilot and injured her back on the job. She filed several applications for SSDI benefits, in which she claimed

Crossley v. CSC Applied Technologies, L.L.C., 569 Fed.Appx. 196 (2014)

29 A.D. Cases 1718

that she was totally disabled, unable to work, and unable to sit, stand, or walk for long periods of time. *Id.* at 479. After her termination, she sued her employer under the ADA, and this court affirmed summary judgment for the employer, reasoning that her specific factual statements were "inconsistent with her claim that she could fly a helicopter, an essential function of her job" and that she "did not dispute that the only reasonable accommodation for an inability to fly is to be placed on temporary leave." *Id.* at 480. This court further reasoned that she gave no explanation for the inconsistency or her physician's assessment that she was not safe to fly. Finally, this court found it irrelevant that some of the factual statements occurred after her termination because she "provided no evidence that she could perform an essential function of her job, namely flying, with any reasonable accommodation." *Id.* at 480–81.

Similarly here, Crossley provides no evidence that she could perform an essential **\*200** function of her job—travel. Indeed, as noted above, Crossley concedes that travel was an essential function and that she could not perform it. Furthermore, in her statement in support of her claim for total disability benefits, Crossley explained that CSC terminated her because of her inability to travel. The benefits application stated that in order to support her claim, Crossley would have to show that her disability was sufficient, without regard to other factors, to prevent her from obtaining or keeping any substantially gainful employment. Crossley's physician stated in her application that she was "unemployable" due to her disability.

Moreover, under *Cleveland,* 526 U.S. at 807, 119 S.Ct. 1597, even when a benefits application contains only on a legal conclusion, "the court should require an explanation of any apparent inconsistency." The only argument Crossley offers for the inconsistency is her "good faith believe [sic] that she could perform the essential functions of her job with

CSC." However, to survive summary judgment, Crossley's explanation must be sufficient for a reasonable juror to conclude that, assuming Crossley's good-faith belief in her statement *on her benefits application,* she nevertheless could perform the essential functions of the job with or without reasonable accommodation. *See Cleveland,* 526 U.S. at 807, 119 S.Ct. 1597. Crossley concedes that she could not perform an essential function of her job and asserts that the only reasonable accommodation for her inability to travel was to be placed on indefinite leave "to see if additional jobs opened up in San Angelo which could have accommodated her need for treatment at the VA." *See Rogers v. Int'l Marine Terminals, Inc.,* 87 F.3d 755, 759 (5th Cir.1996) (rejecting as meritless employee's contention that employer was required to afford him indefinite leave, explaining that "[n]othing in the text of the reasonable accommodation provision requires an employer to wait an indefinite period for an accommodation to achieve its intended effect"); *see also Amsel v. Texas Water Dev. Bd.,* 464 Fed.Appx. 395, 400 (5th Cir.2012) ("Indefinite leave is not a reasonable accommodation."). Additionally, Crossley does not allege that indefinite leave would have addressed her inability to travel. *See Barber v. Nabors Drilling U.S.A., Inc.,* 130 F.3d 702, 709 (5th Cir.1997) ("[T]he law does not require an employer to transfer from the disabled employee any of the essential functions of his job."). Finally, Crossley did not even apply for the jobs that subsequently became available in San Angelo, despite the fact that she was aware of her eligibility for rehire. Accordingly, Crossley has not shown that she is a qualified individual under the ADA.[2]

We AFFIRM the district court's judgment.

**All Citations**

569 Fed.Appx. 196, 29 A.D. Cases 1718

Footnotes

*    Pursuant to 5th Cir. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5th Cir. R. 47.5.4.

1    EEOC regulations provide:
     (3) Evidence of whether a particular function is essential includes, but is not limited to:
     (i) The employer's judgment as to which functions are essential;
     (ii) Written job descriptions prepared before advertising or interviewing applicants for the job;
     (iii) The amount of time spent on the job performing the function;
     (iv) The consequences of not requiring the incumbent to perform the function;
     (v) The terms of a collective bargaining agreement;
     (vi) The work experience of past incumbents in the job; and/or

**Crossley v. CSC Applied Technologies, L.L.C., 569 Fed.Appx. 196 (2014)**

29 A.D. Cases 1718

(vii) The current work experience of incumbents in similar jobs.

29 C.F.R. § 1630.2(n)(3)(i)–(vii).

2    Crossley contends, in one sentence, that the district court erred in summarily overruling Crossley's objections to CSC's summary-judgment evidence because the "affidavits" that CSC submitted did not identify the details of the affiants' personal knowledge and contained bare factual allegations and legal conclusions. Crossley does not explain how the one declaration that CSC submitted, which was based on the declarant's direct knowledge gained from his position at CSC and contained more than bare allegations, was objectionable. This argument is waived, *see Carl E. Woodward, L.L.C. v. Acceptance Indem. Ins. Co.,* 743 F.3d 91, 96 (5th Cir.2014), and, in any event, is meritless.

---

**End of Document**             © 2021 Thomson Reuters. No claim to original U.S. Government Works.

ER 195

772 Fed.Appx. 510 (Mem)
This case was not selected for
publication in West's Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1
generally governing citation of judicial
decisions issued on or after Jan. 1, 2007.
See also U.S.Ct. of App. 9th Cir. Rule 36-3.
United States Court of Appeals, Ninth Circuit.

Jose HENAO, Plaintiff-Appellant,

v.

HILTON GRAND VACATIONS
INC., Defendant-Appellee.

No. 17-17269
|
Submitted June 12, 2019* Honolulu, Hawaii
|
Filed June 17, 2019

**Attorneys and Law Firms**

Charles Harry Brower, Esquire, Attorney, Charles H. Brower, AAL, ALC, Honolulu, HI, Michael P. Healy, Esquire, Attorney, Michael P. Healy, Esq., Honolulu, HI, for Plaintiff-Appellant

Andrew L. Pepper, Esquire, Attorney, Jackson Lewis P.C., Honolulu, HI, for Defendant-Appellee

Appeal from the United States District Court for the District of Hawaii, Derrick Kahala Watson, District Judge, Presiding, D.C. N. :16-cv-00646-DKW-RLP

Before: THOMAS, Chief Judge, and CALLAHAN and CHRISTEN, Circuit Judges.

**MEMORANDUM****

Plaintiff-appellant Jose Henao appeals the district court's grant of summary judgment in favor of defendant-appellee Hilton Grand Vacations Company, LLC, ("Hilton") in Henao's diversity action alleging that he was wrongfully terminated in violation **\*511** of Hawaii Revised Statutes § 378–62, also known as Hawaii's Whistleblower Protection Act (HWPA). We have jurisdiction under 28 U.S.C. § 1291, and we affirm.

Henao was hired by Hilton as a sales agent in 2012. Henao alleges that he was wrongfully terminated in July 2016 after complaining to his employer about unlawful age discrimination practices. Henao subsequently filed a complaint in Hawaii state court claiming that he was wrongfully terminated by Hilton due to his complaints to management about unlawful age discrimination in violation of the HWPA. Hilton removed the case to federal district court, then moved for summary judgment on the basis that Henao was never terminated by Hilton. The district court granted summary judgment for Hilton, agreeing that Henao was never actually terminated and thus was unable to satisfy the "adverse employment action" requirement of his HWPA claim.

To establish a prima facie case for retaliation under the HWPA, the plaintiff must prove that: (1) he engaged in a protected activity; (2) he was subjected to an adverse employment action; and (3) the protected activity was a "substantial or motivating factor" in the adverse employment action. See Crosby v. State Dep't of Budget & Fin., 76 Hawai'i 332, 876 P.2d 1300, 1310 (1994). The sole adverse employment action alleged in Henao's complaint as the basis for his HWPA claim was his wrongful termination in July 2016.

According to Henao, the district court erred in granting summary judgment because a rational factfinder could conclude that he had been terminated by Hilton in July 2016 based on evidence of the following facts: (1) he was told by two supervisors to "pick up [his] personals and go home"; (2) two colleagues also heard on separate occasions from different supervisors that Henao had been terminated; (3) Hilton thereafter placed Henao's brokerage license in inactive status; and (4) Hilton did not oppose Henao's application for unemployment compensation, which the State of Hawaii subsequently granted. Even if we accept each of Henao's factual allegations as true, however, they present no controversy with regard to the record evidence that: (1) the two supervisors who allegedly told Henao to "go home" lacked any authority to fire him; and (2) the Hilton executives who did possess the authority to terminate Henao chose not to do so and communicated this decision to Henao on multiple occasions thereafter.

As to Henao's remaining arguments, even assuming the district court erred in its interpretation of Henao's leave pursuant to the Family Medical Leave Act, and erred by

# APPENDIX 2

Henao v. Hilton Grand Vacations Inc., 772 Fed.Appx. 510 (2019)

excluding two of his colleagues' statements, neither of these errors affect the lack of genuine controversy regarding the termination authority of Henao's supervisors. Thus, even after drawing all reasonable inferences supported by the evidence in favor of Henao, there is no genuine issue as to whether Henao was terminated as alleged in his HWPA claim. *See Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th

Cir. 2002). Accordingly, we affirm the district court's grant of summary judgment.

**AFFIRMED.**

**All Citations**

772 Fed.Appx. 510 (Mem)

Footnotes

*       The panel unanimously concludes this case is suitable for decision without oral argument. *See* Fed. R. App. P. 34(a)(2).

**       This disposition is not appropriate for publication and is not precedent except as provided by Ninth Circuit Rule 36-3.

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

2018 A.D. Cases 471,276

748 Fed.Appx. 721
This case was not selected for
publication in West's Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1
generally governing citation of judicial
decisions issued on or after Jan. 1, 2007.
See also U.S.Ct. of App. 9th Cir. Rule 36-3.
United States Court of Appeals, Ninth Circuit.

Steven O'BRIEN, Plaintiff-Appellant,

v.

R.C. WILLEY HOME
FURNISHINGS, Defendant-Appellee.

No. 16-16677
|
Argued and Submitted March 12,
2018 San Francisco, California
|
FILED DECEMBER 19, 2018

**Synopsis**
**Background:** Employee brought action against employer,
alleging claims of discrimination in violation of the
Americans with Disabilities Act (ADA) and Nevada statute
prohibiting termination for lawful use of alcohol not
adversely impacting job performance, as well as retaliatory
discharge under Nevada law. The United States District Court
for the District of Nevada, No. 2:15-cv-00329-RCJ-CWH,
Robert Clive Jones, J., 2016 WL 4548674, denied employee's
motion for partial summary judgment, and granted employer's
motion for summary judgment. Employee appealed.

**Holdings:** On rehearing, the Court of Appeals held that:

employee failed to demonstrate employer's legitimate,
nondiscriminatory reason for terminating him was a pretext
for discrimination, as required to support ADA claim, and

employee failed to show that filing of workers' compensation
claim proximately caused his discharge, as required to support
claim of retaliatory discharge under Nevada law.

Affirmed in part, reversed in part, and remanded.

Callahan, J., filed opinion, dissenting in part.

Opinion, 742 Fed.Appx. 180, superseded.

**Attorneys and Law Firms**

**\*722**  James P. Kemp, Kemp & Kemp, Las Vegas, NV, for
Plaintiff-Appellant.

Lyssa Anderson, Kaempfer Crowell Renshaw Gronauer &
Fiorentino, Las Vegas, NV, David C. Castleberry, Esquire,
Manning Curtis Bradshaw & Bednar PLLC, Salt Lake City,
UT, for Defendant-Appellee.

Appeal from the United States District Court for the District
of Nevada, Robert Clive Jones, District Judge, Presiding,
D.C. No. 2:15-cv-00329-RCJ-CWH

Before: WALLACE and CALLAHAN, Circuit Judges, and
SELNA,* District Judge.

**ORDER**

The Court grants Defendant-Appellee R.C. Willey Home
Furnishing's Petition for Panel Rehearing.

The Court amends the first sentence in the second full
paragraph, page 2 of its Memorandum as follows: "Here,
neither party disputes that R.C. Willey discharged O'Brien
because he presented for work with a .067% blood alcohol
level as a result of the lawful use of alcohol outside R.C.
Willey's premises during his nonworking hours."

The Court is simultaneously issuing an amended
Memorandum.

All other relief is denied.

**AMENDED MEMORANDUM**\*\*

Plaintiff-Appellant Steven O'Brien ("O'Brien") appeals from
the judgment of the district court in which: (1) the district
court denied O'Brien's motion for partial summary judgement
on his Nev. Rev. Stat. § 613.333 claim; and (2) the district
court granted summary judgment in favor of Defendant-
Appellee R.C. Willey Home Furnishings ("R.C. Willey") on

# APPENDIX 3

O'Brien v. R.C. Willey Home Furnishings, 748 Fed.Appx. 721 (2018)
2018 A.D. Cases 471,276

all claims. We have jurisdiction under 28 U.S.C. § 1291, and we affirm in part, reverse in part, and remand.

1. We reverse the district court's grant of summary judgment in favor of R.C. Willey on the Nev. Rev. Stat. § 613.333 claim. Under Nevada law, it is unlawful for an employer to:

> Discharge or otherwise discriminate against any employee concerning the employee's compensation, terms, conditions or privileges of employment,

because the employee engages in the lawful use in this state of any product outside the premises of the employer during the employee's nonworking hours, if that use does not adversely affect the employee's ability to perform his or her job or the safety of other employees.

Nev. Rev. Stat. § 613.333(1)(b).

Here, neither party disputes that R.C. Willey discharged O'Brien because he presented for work with a .067% blood alcohol level as a result of the lawful use of alcohol outside R.C. Willey's premises during his nonworking hours. However, genuine disputes remain regarding whether O'Brien's use of alcohol adversely affected his ability to perform his job or the safety of other **\*723** employees. Specifically, there is a genuine dispute of material fact regarding whether O'Brien was actually available to drive on September 25, 2013, given that he had been placed on light duty, was required to work at a pay rate substantially below what he was paid as a commercial driver, was prescribed narcotic and opioid pain medications, and was medically restricted from sitting for longer than he could tolerate. Moreover, if O'Brien was performing only a light duty position and was not available to drive, there is a genuine dispute as to whether his alcohol use adversely affected the safety of other employees because a reasonable jury could conclude that managing paperwork and handling delivery calls, even while intoxicated, did not pose a safety risk to other employees.

We also affirm the district court's denial of O'Brien's motion for partial summary judgment on the Nev. Rev. Stat. § 613.333 claim.[1]

Accordingly, the action is remanded to the district court for further proceedings consistent with this decision.

2. We affirm the district court's summary judgment in favor of R.C. Willey on O'Brien's Americans With Disabilities Act ("ADA") claim. The ADA makes it unlawful to discharge

a person with a qualifying disability on account of that disability. 42 U.S.C. § 12112(a). The McDonnell Douglas burden-shifting analysis applies to disability discrimination claims under the ADA. See Snead v. Metro. Prop. & Cas. Ins. Co., 237 F.3d 1080, 1093 (9th Cir. 2001).

Under McDonnell Douglas, a plaintiff must first establish a prima facie case of discrimination. See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Once a plaintiff establishes a prima facie case, the burden shifts to the employer to provide a legitimate, non-discriminatory reason for the discharge. See id. If the employer does so, the burden shifts back to the employee to show that the employer's proffered reason was a pretext for discrimination. See id. at 804, 93 S.Ct. 1817; Snead, 237 F.3d at 1093.

To establish a prima facie case of discrimination under the ADA, O'Brien must show that he "(1) is disabled; (2) is qualified; and (3) suffered an adverse employment action because of [his] disability." Snead, 237 F.3d at 1087. The parties do not dispute that O'Brien is a disabled person within the meaning of the ADA or that he is qualified to perform his job. Furthermore, causation may be inferred from timing alone where an employee is terminated shortly after his employer discovers that he is disabled. See Davis v. Team Elec. Co., 520 F.3d 1080, 1094 (9th Cir. 2008). Because O'Brien was terminated shortly after the date that he was injured, the temporal proximity between his injury and his termination supports an inference of causation. Therefore, we conclude that O'Brien established a prima facie case of discrimination.

However, R.C. Willey articulated a legitimate, nondiscriminatory reason for **\*724** O'Brien's termination by presenting evidence that O'Brien was terminated because of the results of the breathalyzer tests he took on September 25, 2013, and his violation of R.C. Willey's alcohol policy. Because O'Brien failed to present sufficient evidence of pretext to rebut this legitimate justification, his ADA claim fails at the third stage of the McDonnell Douglas analysis. Even though the district court found that O'Brien's claim failed at the prima facie case stage of the McDonnell Douglas analysis, we nevertheless affirm on this alternative ground.

3. We affirm the district court's summary judgment in favor of R.C. Willey on O'Brien's retaliatory discharge claim. Nevada recognizes a "narrow" exception to the at-will employment doctrine, which provides that "retaliatory

O'Brien v. R.C. Willey Home Furnishings, 748 Fed.Appx. 721 (2018)

2018 A.D. Cases 471,276

discharge by an employer stemming from the filing of a workmen's compensation claim by an injured employee is actionable in tort." Hansen v. Harrah's, 100 Nev. 60, 675 P.2d 394, 397 (1984). Under this exception, "a plaintiff must demonstrate that his protected conduct was the proximate cause of his discharge." Allum v. Valley Bank of Nev., 114 Nev. 1313, 970 P.2d 1062, 1066 (1998) (emphasis omitted). A retaliatory discharge claim cannot be based upon a mixed motives theory. Id.

Here, O'Brien has not demonstrated that his filing of a workers' compensation claim was the proximate cause of his discharge. Instead, the evidence indicates that there is no genuine dispute that R.C. Willey terminated O'Brien, at least in part, for violating the company's alcohol policy. Because O'Brien cannot maintain a retaliatory discharge claim where the filing of a workers' compensation claim was at most *a* motivating factor, see id., R.C. Willey was entitled to summary judgment. Accordingly, we affirm the district court's summary judgment in favor of R.C. Willey on the retaliatory discharge claim.

4. Finally, the dissent agrees that there is a genuine dispute regarding O'Brien's availability to drive and on that basis concludes that the result for the ADA and retaliatory discharge claims should be different. Dissent 1–4. However, even if R.C. Willey was mistaken about O'Brien's availability to drive and O'Brien was tested as a result of this mistake, this error does not vitiate the legitimacy of the grounds for his termination. Demonstrating that an employer's legitimate, non-discriminatory reason for termination was based on a mistake does not show pretext. See Dep't of Fair Emp't & Hous. v. Lucent Techs., Inc., 642 F.3d 728, 746 (9th Cir. 2011); U.S. E.E.O.C. v. Republic Servs., Inc., 640 F.Supp.2d 1267, 1313–14 (D. Nev. 2009); McKinney v. Am. Airlines, Inc., 641 F.Supp.2d 962, 973 (C.D. Cal. 2009).

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.

Each party shall bear their own costs.

Callahan, J., dissenting in part:
I agree with the majority that issue preclusion does not apply to Plaintiff-Appellant Steven O'Brien's claim brought under Nev. Rev. Stat. § 613.333, and that the district court properly denied O'Brien's motion for partial summary judgment on the § 613.333 claim. I respectfully dissent,

however, from the remainder of the majority's decision affirming in part and reversing in part the district court's grant of summary judgment to Defendant-Appellee R.C. Willey Home Furnishings.

First, whether R.C. Willey violated O'Brien's civil rights for purposes of his Americans with Disabilities Act ("ADA") and retaliatory discharge claims requires determining, as an initial matter, whether O'Brien was available to drive on September 25, 2013. The majority acknowledges this is a disputed issue of material fact *725 given O'Brien's "light duty" status and prescribed narcotic and opioid medications. It also finds that a tight temporal nexus between O'Brien's injury and the date of his termination "supports an inference of causation." Yet the majority incongruously concludes that R.C. Willey articulated a legitimate, nondiscriminatory, non-pretextual reason for terminating O'Brien: his violation of R.C. Willey's policy against having a blood alcohol level above .04% while on duty.

Second, the majority reverses on an issue where it should affirm. The majority holds that O'Brien states an actionable claim under Nev. Rev. Stat. § 613.333 because it finds O'Brien was terminated for his off-duty drinking. Not so. As the majority accurately states in the context of O'Brien's ADA and retaliatory discharge claims, O'Brien was terminated when he violated R.C. Willey's policy *while at work*.

## I. The Americans With Disabilities Act and Retaliatory Discharge Claims

A prima facie case of discrimination under the ADA requires a plaintiff to show that he "(1) is disabled; (2) is qualified; and (3) suffered an adverse employment action because of [his] disability." Snead v. Metro. Prop. & Cas. Ins. Co., 237 F.3d 1080, 1087 (9th Cir. 2001). I agree with my colleagues that O'Brien establishes a prima facie case of discrimination for the reasons stated by the majority. Where I part ways is on whether R.C. Willey rebuts that showing. The answer to that question hinges on the resolution of a disputed issue of material fact—O'Brien's availability to drive in his post-injury, "light duty" position.

O'Brien's availability to drive bears directly on whether R.C. Willey's averred justification for his termination was pretextual. If O'Brien could not have been dispatched to operate a commercial vehicle, then R.C. Willey's administration of the breathalyzer test was likely inconsistent with federal law. Federal regulations provide that "[a]

driver shall *only* be tested for alcohol while the driver is performing safety-sensitive functions, just before the driver is to perform safety-sensitive functions, or just after the driver has ceased performing such functions."[1] 49 C.F.R. § 382.305(m) (emphasis added).

O'Brien argues he was unavailable to drive a commercial truck—and thus ineligible to "perform[ ] safety-sensitive functions"—after R.C. Willey placed him on "light duty" status because he was prescribed pain medications that, by law, barred him from operating commercial vehicles. He also contends that R.C. Willey knew he was medically restricted from operating such vehicles. Moreover, it is undisputed O'Brien told his supervisors that he had been drinking at night to help with his pain, and that they administered a breathalyzer test to him in the morning, thereby increasing the likelihood the test results would be positive. If O'Brien is correct that he was ineligible to "perform[ ] safety-sensitive functions" in his "light duty" position, then it is at best unclear why R.C. Willey administered the breathalyzer test when doing so appears to be inconsistent with federal law. A jury could reasonably conclude that, under the circumstances, testing O'Brien and then firing him for failing the breathalyzer test was a pretext for an ulterior motive.

**\*726** O'Brien's retaliatory discharge claim turns on the same disputed fact. As the majority recognizes, Nevada law prohibits terminating an employee for filing a workers' compensation claim—something O'Brien did fourteen days after he was injured. *Hansen v. Harrah's*, 100 Nev. 60, 675 P.2d 394, 397 (1984). "[A] plaintiff must demonstrate that his protected conduct was *the* proximate cause of his discharge." *Allum v. Valley Bank of Nev.*, 114 Nev. 1313, 970 P.2d 1062, 1066 (1998) (emphasis in original).

The majority concludes that "O'Brien's termination was based solely on the results of the breathalyzer tests and his violation of R.C. Willey's alcohol policy," and not on his workers' compensation claim stemming from his injury. But, as with O'Brien's ADA claim, determining *whether* O'Brien's injury and subsequent claim was the proximate cause of his termination runs through an inquiry into O'Brien's availability to drive. Accordingly, I would reverse the district court and deny summary judgment to R.C. Willey on his ADA and retaliatory discharge claims.

## II. The Nev. Rev. Stat. § 613.333 Claim

Nevada law bars an employer from terminating an employee for the employee's lawful off-duty, off-premises activities. Nev. Rev. Stat. § 613.333(1)(b). Section 613.333(1)(b) provides that an employer may not

[d]ischarge or otherwise discriminate against any employee concerning the employee's compensation, terms, conditions or privileges of employment,

because the employee engages in the lawful use in this state of any product outside the premises of the employer during the employee's nonworking hours, if that use does not adversely affect the employee's ability to perform his or her job or the safety of other employees.

The majority holds that O'Brien defeats summary judgment on his § 613.333 claim because, it finds, "neither party disputes that R.C. Willey discharged O'Brien because he presented for work with a .067% blood alcohol level as a result of the lawful use of alcohol outside R.C. Willey's premises during his nonworking hours," and because a genuine dispute remains whether his use of alcohol "adversely affected his ability to perform his job or the safety of other employees." I agree that because it is disputed whether O'Brien was available to drive, it is unclear whether his alcohol consumption impaired anyone's safety.

I do not, however, agree that O'Brien was terminated for his off-duty drinking. Rather, both O'Brien and R.C. Willey are in accord that O'Brien was terminated for violating the company's policy against arriving at work with a blood alcohol level above .04%, *not for his off-duty drinking*. R.C. Willey is emphatic on this point, and O'Brien has acknowledged it, alleging that he was terminated "due to the results of the September 25, 2013 Breathalyzer tests." Pls. Mot. for Partial Summ. J. at 4 (Dist. Ct. Dkt. No. 25). Indeed, the record is bereft of evidence supporting a necessary element of a § 613.333(b)(1) claim: that O'Brien was terminated for "engag[ing] in the lawful use" of alcohol "during [his] nonworking hours." Put another way, O'Brien proffers no evidence showing that R.C. Willey terminated him for lawfully drinking off-duty rather than for being at work with alcohol in his system. Accordingly, I would affirm the district court's grant of summary judgment to R.C. Willey on the § 613.333 claim.

I respectfully dissent.

O'Brien v. R.C. Willey Home Furnishings, 748 Fed.Appx. 721 (2018)
2018 A.D. Cases 471,276

**All Citations**

748 Fed.Appx. 721, 2018 A.D. Cases 471,276

Footnotes

| * | The Honorable James V. Selna, United States District Judge for the Central District of California, sitting by designation. |
|---|---|
| ** | This disposition is not appropriate for publication and is not precedent except as provided by Ninth Circuit Rule 36-3. |
| 1 | The district court's determination that a Nevada Department of Administration Appeals Officer's findings were entitled to preclusive effect was erroneous because issue preclusion is inapplicable when the burden of persuasion shifts between the parties in two proceedings. See Dias v. Elique, 436 F.3d 1125, 1129 (9th Cir. 2006); Restatement (Second) of Judgments § 28, Westlaw (database updated June 2018); 18 Charles Alan Wright, et al., Federal Practice & Procedure § 4422 (3d ed.), Westlaw (database updated Apr. 2017). Nevertheless, this error is not grounds for reversal because the court narrowly construed the findings such that they did not entitle O'Brien to partial summary judgment on the § 613.333 claim. |
| 1 | See also 49 C.F.R. § 382.107 (defining a "safety-sensitive function" as a period in which a driver "is actually performing, ready to perform, or immediately available to perform any safety-sensitive functions"); 49 C.F.R. § 382.107 ("[s]afety-sensitive functions" include time spent "waiting to be dispatched, unless the driver has been relieved from duty by the employer"). |

**End of Document**                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

2021 WL 2093692
Only the Westlaw citation is currently available.
United States District Court, D. Hawai'i.

Jon K. YAMADA, Plaintiff,

v.

UNITED AIRLINES, INC., John Does 1-5, Jane Does 1-5, Doe Corporations 1-5, Doe Partnerships 1-5, Doe Non-Profit Organizations 1-5, Doe Governmental Agencies 1-5, Defendants.

CIV. NO. 19-00551 LEK-KJM
|
Signed 05/24/2021

**Attorneys and Law Firms**

Charles H. Brower, Michael P. Healy, Honolulu, HI, for Plaintiff.

Eileen C. Zorc, Ronald Tang, Marr Jones & Wang, Honolulu, HI, for Defendant United Airlines, Inc.

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Leslie E. Kobayashi, United States District Judge

*1 Before the Court is Defendant United Airlines, Inc.'s ("Defendant" or "United") Motion for Summary Judgment ("Motion"), filed on September 16, 2020. [Dkt. no. 29.] Plaintiff Jon K. Yamada ("Plaintiff") filed his memorandum in opposition to the Motion ("Memorandum in Opposition") on November 21, 2020, and Defendant filed its reply on November 27, 2020. [Dkt. nos. 41, 49.] This matter came on for hearing on December 11, 2020. On January 28, 2021, an entering order was issued informing the parties of this Court's ruling on the Motion. [Dkt. no. 56.] This Order supersedes that entering order. Defendant's Motion is hereby granted for the reasons set forth below.

## BACKGROUND

Plaintiff had been employed by United starting in 1989, and since 2013 as a Ground Service Equipment ("GSE") Technician in Honolulu. See Decl. of Jon K. Yamada ("Pltf.'s Decl."), filed 11/21/20 (dkt. no. 43), at ¶ 2. In Honolulu, Plaintiff typically worked with fellow technicians Jeff Magno ("Magno") and Wade Nakabayashi ("Nakabayashi"), and would sometimes act as the lead technician, which required him to plan, direct, coordinate, instruct, and delegate work to other technicians as instructed by his supervisor, Brian Wong ("Wong"). [Def.'s Concise Statement of Facts in Supp. of Motion for Summary Judgment ("CSOF"), filed 9/16/20 (dkt. no. 30), at ¶¶ 2-3; Pltf.'s response to Def.'s CSOF, ("Pltf.'s CSOF"), filed 11/21/20 (dkt. no. 42), at ¶¶ 2-3 (stating CSOF at ¶¶ 2-3 are undisputed).] The parties have identified three key events in Plaintiff's employment history with United that are particularly relevant to the current litigation.

To begin with, in or around June 2015, Plaintiff witnessed Nakabayashi showing a gun and ammunition to Magno while at work. [Pltf.'s Decl. at ¶ 6.] According to Plaintiff, he saw Nakabayashi holding the gun in its case, and overheard Nakabayashi tell Magno that he got the gun from a friend. [Id.] Although Plaintiff did not report the gun to anyone at that time, he later became aware that Magno told an individual named Brian Sugi about the incident, who in turn reported it to the Chief Steward for their union, Moki Kim ("Kim"). See CSOF, Decl. of Eileen C. Zorc ("Zorc Decl."), Exh. K (excerpts of Trans. of Oral and Videotaped Depo. of Jon K. Yamada, dated 7/30/20) at 146-47.[1] The record does not reveal any further action on the gun incident in 2015.

Next, on March 3, 2016, when Nakabayashi drove to a nearby automotive store to buy supplies for a repair project, Plaintiff and Magno followed him in a separate vehicle. [CSOF at ¶ 6; Pltf.'s CSOF at ¶ 6 (disputing CSOF at ¶ 6, but only as to why Plaintiff followed Nakabayashi).] Plaintiff explains that he had been acting as the lead technician that day, Nakabayashi had not told Plaintiff or anyone else why he was leaving, and he did not seek permission before leaving the work area. Therefore, Plaintiff followed him to find out where he was going. Furthermore, Plaintiff states that he was concerned about Nakabayashi because Nakabayashi had been under a lot of stress since his divorce in 2014. [Pltf.'s Decl. at ¶ 8.] The next day, Wong told Plaintiff that Nakabayashi had approached him and expressed that Plaintiff and Magno had followed him to the store, and that Nakabayashi felt threatened. Plaintiff explained to Wong why he had followed Nakabayashi, stating he had left without permission and Plaintiff was concerned about Nakabayashi's behavior and

# APPENDIX 4

Yamada v. United Airlines, Inc., Slip Copy (2021)

2021 WL 2093692

stress level. Wong replied that he had spoken to Nakabayashi, and that he thought Nakabayashi seemed fine. [Id. at ¶¶ 9-10.]

**\*2** On March 5, 2016, Plaintiff called United's Human Resources Department with multiple concerns about Nakabayashi, including the June 2015 gun incident. [Id. at ¶¶ 11-12.] Around that time, Plaintiff also sent a letter to United Chief Executive Officer Oscar Munoz, voicing numerous complaints about working conditions, management decisions, Wong, discrimination, and other issues, but not the June 2015 gun incident. [Zorc Decl., Exh. R (letter from Plaintiff to Oscar Munoz, dated 3/8/16).]

While the investigation into the incident of Plaintiff following Nakabayashi was ongoing, Wong reported that Plaintiff and others were giving Nakabayashi the cold shoulder, and his suspicion that one of the GSE technicians had unplugged the computer Nakabayashi normally used. See CSOF, Decl. of Anhvu Ly ("Ly Decl."),[2] Exh. D (email from Wong to Ly and Jim Keating, dated 4/22/16). Wong warned Plaintiff that retaliation against Nakabayashi was prohibited. [Pltf.'s Decl. at ¶ 14.] Plaintiff told Wong that: Plaintiff did not turn off or unplug Nakabayashi's computer; Nakabayashi was distancing himself from the other workers; and Nakabayashi would sit by himself in the tool cage while everyone else worked. [Id. at ¶ 15.] On April 29, 2016, Plaintiff emailed Ly about the investigation, acknowledging that the time he followed Nakabayashi off the property had been viewed by some, including Kim and Ly, as harassment. [Zorc Decl., Exh. T (email from Plaintiff to Ly, dated 4/29/16) at PageID #: 390.] However, he told Ly that he was concerned about Nakabayashi's behavior, and complained about Kim, Wong, and how the conflict had been handled in the workplace. [Id.]

On May 24, 2016, Wong placed Plaintiff on an eighteen-month termination warning for failing to report seeing the gun, and for following Nakabayashi off the property. [Zorc Decl., Exh. S (Termination Warning letter addressed to Plaintiff from Wong, dated 5/24/16).] Magno received an eighteen-month termination warning for the same conduct. [Ly Decl., Exh. E (Termination Warning letter addressed to Magno from Wong, dated 5/24/16).] Nakabayashi received an eighteen-month termination warning for bringing the gun to work. [Id., Exh. F (Termination Warning letter addressed to Nakabayashi from Wong, dated 5/24/16).[3]] Also on May 24, 2016, Ly sent Plaintiff a letter indicating that the investigation had been closed, and reiterating that retaliation was prohibited. [Zorc Decl., Exh. V (letter from Ly to Plaintiff, dated 5/24/16).]

On June 8, 2016, Plaintiff sent an email to Charles Duncan, the Vice President of Maintenance at United at that time, stating that he believed he received the eighteen-month termination warning because of his March 8, 2016 letter to Oscar Munoz. See Zorc Decl., Exh. U (3/13/17 email from Plaintiff to Tin Shing Chao, forwarding an email addressed to Charles Duncan, signed by Plaintiff, dated 6/8/16). The email to Charles Duncan does not mention Plaintiff and Magno following Nakabayashi to the auto parts store. See id. Ly, along with Wong, GSE Maintenance Managing Director Ray Ames, GSE Maintenance Director Gary Dyer, and GSE Maintenance Senior Manager James Keating, flew to Honolulu and met with Plaintiff on August 30, 2016. [Ly Decl. at ¶ 11.] They discussed Plaintiff's history of not communicating or assigning work to Nakabayashi, counseled him that he was required to do so when acting as the lead technician, and reminded him that retaliation against Nakabayashi was prohibited. [Id.]

**\*3** The final event occurred on or around February 18, 2017, when Plaintiff drove a truck Nakabayashi was using from where it was parked at Gate 10 in the Airport Operations Area ("AOA") to the GSE workshop and parked it on the rooftop parking lot above the workshop, requiring Nakabayashi to walk back from the AOA. [Pltf.'s Decl. at ¶¶ 24-25; Ly Decl. at ¶ 14.] On February 25, 2017, Ly returned to Honolulu to investigate the incident. [Ly Decl. at ¶ 13.] Ly determined that the rooftop parking lot was not visible from ground level, the roof was the farthest in distance and took the longest to get to out of all the parking areas around the shop, and vehicles and equipment were usually parked on the side of the shop. [Id.] According to Plaintiff, he parked the truck on the roof because the usual parking area was congested with equipment. [Pltf.'s Decl. at ¶ 27.] However, Ly determined there was ample parking on the side of the shop, and inquired with Wong about whether the work logs indicated an unusually high volume of work on February 18, 2017 that would explain the alleged parking shortage. Wong reported to Ly that there was not an unusually high volume of work that day. Upon personally inspecting the roof, Ly did not find any company vehicles. [Ly Decl. at ¶ 13.]

On February 25, 2017, Ly, along with Wong and shop steward Wes Wakata ("Wakata"), interviewed Plaintiff. [Id. at ¶ 14.] Plaintiff explained that he spotted the truck while driving around the AOA looking for equipment with Magno, exited Magno's vehicle, and drove the truck to the rooftop parking lot above the workshop without stopping. [Id.] During the

Yamada v. United Airlines, Inc., Slip Copy (2021)
2021 WL 2093692

interview, Plaintiff also stated that: 1) no one had reported the truck as abandoned or blocking the gate; 2) Plaintiff did not look for other parking before taking the truck to the roof; 3) February 18, 2017 was probably Plaintiff's first time parking a company truck on the roof, and he had not parked another company vehicle on the roof since; 4) Magno followed Plaintiff up to the roof and drove Plaintiff back to the shop, parking his vehicle in or near the shop; 5) Plaintiff thought the truck had been abandoned, and that he needed it because it had a lift gate, but he did not explain why the lift gate was needed; and 6) despite counseling and although they worked together at least once per week, Plaintiff had only assigned work and communicated with Nakabayashi one time since his August 30, 2016 meeting with Ly and GSE management. [Id. at ¶ 15.] Magno similarly reported that he did not park vehicles on the roof, did not know of a situation where a technician would park a vehicle on the roof when there was available street-level parking, and that no other company vehicles were on the roof that day. [Id. at ¶¶ 16-16.b.]

Sometime before March 1, 2017, Ly reviewed the records for the access gate between the shop and Gate 10, which showed that Plaintiff and Magno had used their access cards twice to access the AOA, at 3:30 p.m. and 4:57 p.m. [Id. at ¶ 19.] Ly saw pictures of video surveillance footage that showed the truck was moved from Gate 10 at around 5:05 p.m. [Id.] On March 1, 2017, Ly participated in another interview with Plaintiff, along with Wong, Wakata, and union representatives Justin Muraki and Roger Kanakaole. [Id. at ¶ 20.] Plaintiff restated that he had only taken one trip out from the shop, and he had not stopped at the shop before picking up the truck Nakabayashi had been using and driving it to the roof. [Id.] Plaintiff acknowledges that his answer later changed as to how many times he went into the AOA to retrieve the truck, although he claims it is because he initially misremembered. See Pltf.'s Decl. at ¶ 28. However, Ly determined that Plaintiff had been dishonest during the interview, as evidenced by the access card swipes and the unusual act of parking a company vehicle on the roof. After discussing the situation with Ly, Wong removed Plaintiff from service, pending the outcome of the investigation. [Ly Decl. at ¶ 20.]

On March 2, 2017, Plaintiff sent another letter by mail to Oscar Munoz, complaining that every investigation so far "ha[d] been prejudiced by cronyism, an omission of key facts and evidence, collusion, or conflicts of interests to produce a false narrative." [Zorc Decl., Exh. P (letter addressed to Oscar Munoz from Plaintiff, dated 3/2/17) at PageID #: 382.]

Plaintiff concluded the letter by asking Mr. Munoz to meet with Plaintiff and his coworkers personally to resolve their issues. [Id.]

*4  On March 9, 2017, Plaintiff sent an email to the State of Hawai'i Department of Labor & Industrial Relations Occupational Safety and Health ("HIOSH") complaining about United and the preceding events. [Pltf.'s errata to Pltf.'s Decl., filed 11/23/20 (dkt. no. 45), Exh. 2 (email from Plaintiff to dlir.hiosh.complaints@hawaii.gov, dated 3/9/17).] In his email, Plaintiff stated that United was retaliating against him for reporting the time Nakabayashi brought the gun to work in 2015. [Id.] On March 13, 2017, Tin Shing Chao, M.P.H., an Occupational Health Branch Manager at HIOSH, responded to Plaintiff's email with a series of questions about the incident. [Def.'s errata to Exhibit Q in its CSOF, filed 11/20/20, (dkt. no. 40) at PageID #: 547-48.] On March 14, 2017, Plaintiff emailed his answers to the questions. [Id. at PageID #: 546-47.]

On March 15, 2017, United issued Plaintiff a Notice of Separation letter, informing Plaintiff that his employment with United was terminated. [Zorc Decl., Exh. N (Notice of Separation letter from United, signed by Wong, to Plaintiff, dated 3/15/17 ("Separation Letter")).] In the Separation Letter, Wong explained that the company's investigation into the February 18, 2017 incident revealed that Plaintiff had not followed United's "Working Together Guidelines" in his interactions with Nakabayashi. [Id.] Specifically, Plaintiff drove the truck Nakabayashi had been using to the roof of the shop for the purpose of concealing the truck from Nakabayashi. Also, the Separation Letter noted that Plaintiff's statement during United's investigation was inconsistent with the evidence, such as the surveillance video and access card records. Finally, the decision was informed in part by the fact that Plaintiff had previously followed Nakabayashi to spy on him and refused to assign him work or communicate with him when acting as the lead technician. United determined that Plaintiff's behavior was motivated by personal animus against Nakabayashi. [Id.] According to the Separation Letter, because Plaintiff had already received a termination warning on May 24, 2016 and had since continued to violate United's rules and policies, United terminated Plaintiff's employment. [Id. at PageID #: 372]

Plaintiff initiated the instant case on March 13, 2019, and Defendant removed the case pursuant to diversity jurisdiction. [Notice of Removal, filed 10/11/19 (dkt. no. 1), at ¶ 6; id., Decl. of Dorota Karpierz, Exh. A (Complaint).]

Yamada v. United Airlines, Inc., Slip Copy (2021)
2021 WL 2093692

Plaintiff alleges a single claim: termination in retaliation for whistleblowing regarding unsafe and hostile workplace conditions, in violation of the Hawai'i Whistleblowers' Protection Act ("HWPA"), Haw. Rev. Stat. § 378-62. In the Motion, Defendant asserts that Plaintiff cannot establish a prima facie case under the HWPA, that Defendant had legitimate, nondiscriminatory reasons for terminating Plaintiff, and that Plaintiff failed to mitigate his damages.

**STANDARD**

The HWPA provides, in pertinent part:

> An employer shall not discharge, threaten, or otherwise discriminate against an employee regarding the employee's compensation, terms, conditions, location, or privileges of employment because:
>
> (1) The employee ... reports or is about to report to the employer, or reports or is about to report to a public body, verbally or in writing, a violation or a suspected violation of:
>
> > (A) A law, rule, ordinance, or regulation, adopted pursuant to law of this State, a political subdivision of this State, or the United States[,]
> >
> > ....
>
> unless the employee knows that the report is false[.] Section 378-62(1)(A).

"In Crosby v. State Department of Budget & Finance, 76 Hawai'i 332, 342, 876 P.2d 1300, 1310 (1994), the Hawaii Supreme Court essentially adopted the familiar McDonnell Douglas burden-shifting framework for claims under Hawaii's Whistleblowers' Protection Act."[4] Chan v. Wells Fargo Advisors, LLC, 124 F.Supp.3d 1045, 1055 (D. Hawai'i 2015). The Ninth Circuit has stated:

> **\*5** Under th[e McDonnell Douglas burden-shifting] analysis, plaintiffs must first establish a prima facie case of employment discrimination. Noyes v. Kelly Servs., 488 F.3d 1163, 1168 (9th Cir. 2007). If plaintiffs establish a prima facie case, "[t]he burden of production, but not persuasion, then shifts to the employer to articulate some legitimate, nondiscriminatory reason for the challenged action." Chuang v. Univ. of Cal. Davis, Bd. of Trs., 225 F.3d 1115, 1123–24 (9th Cir. 2000). If defendant meets this

burden, plaintiffs must then raise a triable issue of material fact as to whether the defendant's proffered reasons for their terminations are mere pretext for unlawful discrimination. Noyes, 488 F.3d at 1168; see also Coleman v. Quaker Oats Co., 232 F.3d 1271, 1282 (9th Cir. 2000) (plaintiffs must "introduce evidence sufficient to raise a genuine issue of material fact" as to pretext).

Hawn v. Exec. Jet Mgmt., Inc., 615 F.3d 1151, 1155-56 (9th Cir. 2010) (some alterations in Hawn).

"To establish a prima facie case for retaliation under the HWPA, the plaintiff must prove that: (1) he engaged in a protected activity; (2) he was subjected to an adverse employment action; and (3) the protected activity was a 'substantial or motivating factor' in the adverse employment action." Henao v. Hilton Grand Vacations Inc., 772 F. App'x 510, 511 (9th Cir. 2019) (citing Crosby v. State Dep't of Budget & Fin., 76 Hawai'i 332, 876 P.2d 1300, 1310 (1994)).

In analyzing whether the defendant took the challenged action because of the employee's protected activity – i.e. whether there is "a causal connection between the alleged retaliation and the 'whistleblowing' " – the Hawai'i Supreme Court has looked to HWPA's legislative history, which "indicates that the legislature intended that the required burden of proof be similar to that utilized in traditional labor management relations discharge cases." Crosby, 76 Hawai'i at 342, 876 P.2d at 1310. The supreme court noted:

> Under the National Labor Relations Act, as amended, 29 U.S.C. §§ 151-168 (1988), an employee has the burden of showing that his or her protected conduct was a "substantial or motivating factor" in the decision to terminate the employee. See also Parnar v. Americana Hotels, Inc., 65 Haw. 370, 380, 652 P.2d 625, 631 (1982) (noting that "the plaintiff alleging a retaliatory discharge bears the burden of proving that the discharge violates a clear mandate of public policy").

In reviewing an initial draft of the HWPA, the House Standing Committee reported:

> the bill imposes the burden of proof on the employee and also establishes a higher standard of proof than normally applied in civil cases. Under existing custom and practice in labor management relations discharge cases, the burden of proof is placed on the employer. Accordingly, your Committee amended the bill to remove subsection (d) of section -3, thereby maintaining

the existing custom and practice of placing the burden of proof on the employer in discharge cases.

Hse. Stand. Comm. Rep. No. 25, in 1987 House Journal, at 1090. We note, however, that an aggrieved employee always retains the ultimate burden of proof in a retaliatory discharge case. Sonicraft, Inc. v. NLRB, 905 F.2d 146, 150 (7th Cir. 1990), cert. denied, 498 U.S. 1024, 111 S. Ct. 671, 112 L. Ed. 2d 664 (1991). The legislature must have been referring to the corresponding rule that "the burden of negating causation is on the employer." Id. Once the employee shows that the employer's disapproval of his [protected activity] played a role in the employer's action against him or her, "[t]he employer can defend affirmatively by showing that the termination would have occurred regardless of the protected activity." NLRB v. Howard Elec. Co., 873 F.2d 1287, 1290 (9th Cir. 1989) (citing NLRB v. Transportation Management Corp., 462 U.S. 393, 401-03, 103 S. Ct. 2469, 2474, 76 L. Ed. 2d 667 (1983)).[5] "In other words, the employer has an affirmative defense (no causation), as to which of course he bears the burden of persuasion, but so far as the main case is concerned the burden of persuasion never shifts." Sonicraft, 905 F.2d at 150....

*6 Id. (some alterations in Crosby) (footnote omitted).

## DISCUSSION

### I. Plaintiff's Prima Facie Case

For purposes of this Motion, it is undisputed that Plaintiff engaged in protected activity in March of 2016 when he reported to United's Human Resources Department that Nakabayashi brought the gun to work in June of 2015, and later in 2016 and 2017 when he sent letters and emails to United's management personnel and outside parties. It is also undisputed that Plaintiff experienced an adverse employment event when he was terminated on March 15, 2017.[6] Therefore, the only remaining element of Plaintiff's prima facie case is the causal link between his protected activity and his termination. Plaintiff does not address how his protected activity and termination are causally related. See Mem. in Opp. at 15-16. Still, Plaintiff's burden of proof at the prima facie stage of the case is minimal. See Aragon v. Republic Silver State Disposal, Inc., 292 F.3d 654, 659 (9th Cir. 2002). To make a prima facie showing of a causal connection, i.e. that the plaintiff's protected activity was a substantial or motivating factor in the adverse employment action,

"a plaintiff can introduce evidence regarding the 'proximity in time between the protected action and the allegedly retaliatory employment decision,' from which a 'jury logically could infer' [the connection]." Griffin [v. JTSI, Inc.], 654 F. Supp. 2d [1122,] 1132 [(D. Hawai'i 2008)] (quoting Coszalter v. City of Salem, 320 F.3d 968, 977 (9th Cir. 2003)). That is, "[although] an employee may always present direct evidence of motive, proximity in time is one type of circumstantial evidence that is sufficient on its own to meet the plaintiff's burden." Id. (citation omitted).

Tagupa v. VIPdesk, Inc., 125 F. Supp. 3d 1108, 1120 (D. Hawai'i 2015) (some alterations in Tagupa).

Plaintiff has presented no evidence of a causal connection between his protected activity and his termination. On a motion for summary judgment, the record must be viewed in the light most favorable to Plaintiff as the non-moving party, and all inferences must be drawn in Plaintiff's favor. See S.R. Nehad v. Browder, 929 F.3d 1125, 1132 (9th Cir. 2019); see also Fed. R. Civ. P. 56(a) ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."). Even in the light most favorable to Plaintiff, there are no facts in the record, or argued in the Memorandum in Opposition, to directly connect any statement Plaintiff made in his emails, letters, phone calls, or otherwise, to his eventual termination. The Court therefore turns to circumstantial evidence.

*7 With respect to whether proximity in time could be evidence of causation, the record does not suggest that anyone at United knew about Plaintiff's emails to Tin Shing Chao. Therefore, Plaintiff has not made a prima facie showing of a causal connection between those emails and Plaintiff's termination. On the other hand, Plaintiff's March 2, 2017 letter to Oscar Munoz preceded Plaintiff's termination by just thirteen days. Given the minimal degree of evidence required at the prima facie stage, it must be addressed.

In Clark County School District v. Breeden, the United States Supreme Court noted that the requisite temporal proximity "must be very close" if temporal proximity is the only evidence of causation. 532 U.S. 268, 273 (2001) (per curiam) (citations and internal quotation marks omitted). However, the Ninth Circuit also "cautioned that courts should not engage in a mechanical inquiry into the amount of time between the [protected activity] and alleged retaliatory action." Anthoine v. N. Cent. Cntys. Consortium, 605 F.3d 740, 751 (9th Cir. 2010) (citation omitted). "There is no

Yamada v. United Airlines, Inc., Slip Copy (2021)
2021 WL 2093692

'bright line' rule providing that any particular period is always too long or always short enough to support an inference." You v. Longs Drugs Stores Cal., LLC, 937 F. Supp. 2d 1237, 1258 (D. Hawai'i 2013) (citing Coszalter v. City of Salem, 320 F.3d 968, 977–78 (9th Cir. 2003)), aff'd, 594 F. App'x 438 (9th Cir. 2015). Therefore, "whether an adverse employment action is intended to be retaliatory is a question of fact that must be decided in the light of the timing and the surrounding circumstances." Anthoine, 605 F.3d at 751 (brackets, citation, and quotation marks omitted).

There is no evidence in the record to suggest that Plaintiff's March 2, 2017 letter to Oscar Munoz was part of United's decision to terminate Plaintiff's employment. Importantly, by the time Plaintiff wrote the letter, the disciplinary process was nearly complete. Plaintiff's offending conduct as described by United in Plaintiff's Separation Letter had already occurred, see Zorc Decl., Exh. N (Separation Letter), Ly's investigation into Plaintiff's conduct was underway, if not complete, see, e.g., Ly' Decl. at ¶¶ 13-14, 19-21, and Plaintiff had been suspended in light of his conduct, id. at ¶ 20. Given the surrounding circumstances, although Plaintiff's March 2, 2017 letter is reasonably close in time to his termination, Plaintiff has presented no evidence that it was causally related to his termination.

With respect to Plaintiff's earlier protected activity, such as his March 2016 phone call to United's Human Resources Department, or his June 2016 email to Charles Duncan, those events are too remote in time, and there are too many intervening events, including the incident of February 18, 2017, to indicate a causal connection between those communications and his March 2017 termination. See Anthoine, 605 F.3d at 751.

Plaintiff has established a causal connection between his protected activity and his termination to even the minimal degree necessary to make his prima facie case for whistleblower retaliation. On that basis alone the Motion is granted. However, because Plaintiff invokes the concept of pretext in his Memorandum in Opposition, and it is the only argument raised by Plaintiff in his Memorandum in Opposition, the Court will also address the second part of the McDonnell Douglas burden-shifting analysis.

## II. Plaintiff's Allegations of Pretext
If a plaintiff establishes his prima facie case, the burden would then shift to the defendant to articulate a legitimate, nondiscriminatory reason for his termination. See Chuang,

225 F.3d at 1123-24; see also Tagupa, 125 F. Supp. 3d at 1120 ("[E]mployers are 'entitled to summary judgment if they can demonstrate that they would have reached the same adverse employment decision even in the absence of the employee's protected conduct.' " (some citations and internal quotation marks omitted) (quoting Anthoine v. N. Cent. Counties Consortium, 605 F.3d 740, 752 (9th Cir. 2010))). Even if Plaintiff had made his prima facie case, Defendant met its burden by providing evidence that Plaintiff was terminated for his behavior other than his protected activity, including but not limited to the events of February 18, 2017. See Zorc Decl., Exh. N (Separation Letter). The burden would then shift back to Plaintiff to raise a triable issue of fact as to whether Defendant's stated reason for Plaintiff's termination was a mere pretext for retaliation. See Noyes, 488 F.3d at 1168.

*8 Plaintiff asserts that Defendant's proffered reason for his termination is pretextual. However, even viewed in the light most favorable to Plaintiff, the evidence, including the investigation conducted by Ly, Plaintiff's conduct in admittedly moving the truck to the roof, his inconsistent statements during the investigation as to the number of trips he took to the AOA, the time he followed Nakabayashi off the property, and his refusal to communicate with or assign Nakabayashi work when acting as a lead, all support Defendant's stated reasons for Plaintiff's termination. Plaintiff's conclusory argument is that Defendant's true reason for terminating Plaintiff was for him reporting a hostile work environment when he called Human Resources about the gun incident in March of 2016. Therefore, Plaintiff argues, Defendant's proffered reason must be pretextual because it was reasonable and not improper for Plaintiff to move the truck to the roof. Plaintiff's argument is a purely speculative allegation as to Defendant's true motives, see Mem. in Opp. at 14-15, is not supported by the record, and does not constitute evidence sufficient to show that a triable issue of fact remains in dispute. See Knowles v. Hawai'i Pac. Univ., Civ. No. 16-00678 ACK-KSC, 2018 WL 3370520, at *9 (D. Hawai'i July 10, 2018) (explaining that speculative allegations are insufficient to "create a factual dispute for purposes of summary judgment") (citing Nelson v. Pima Cmty. Coll., 83 F.3d 1075, 1081–82 (9th Cir. 1996)). In light of the evidence in the record, Plaintiff failed to raise a triable issue of fact as to pretext.

In sum, Plaintiff failed to demonstrate a causal connection between his protected activity and his termination at the prima facie stage of the analysis. Furthermore, even if he had made

**Yamada v. United Airlines, Inc., Slip Copy (2021)**
2021 WL 2093692

such a prima facie showing, he did not rebut Defendant's legitimate reasons proffered for his termination by raising a triable issue of fact as to pretext. On that basis, Defendant has carried its burden on its motion for summary judgment by showing that there are no genuine issues of material fact in dispute. Therefore, the Motion is granted. Because summary judgment is granted, the Court does not reach Defendant's arguments regarding mitigation of damages.

For the foregoing reasons, Defendants Motion for Summary Judgment, filed September 16, 2020, is HEREBY GRANTED.

IT IS SO ORDERED.

**All Citations**

Slip Copy, 2021 WL 2093692

**CONCLUSION**

Footnotes

1   On September 17, 2020, Defendant filed its Errata to Exhibit K. [Dkt. no. 32.]
2   Anhvu Ly ("Ly") is a Human Resources Manager for United. [Ly Decl. at ¶ 1.]
3   Nothing in the record other than Plaintiff's statements suggests that Nakabayashi violated official policies or unofficial customs when he left work to pick up supplies at the auto parts store. Notably, the incident is not mentioned in Nakabayashi's termination warning letter, but Plaintiff following Nakabayashi was cited in Plaintiff's termination warning letter as a reason for the discipline. Compare Zorc Decl., Exh. S (Plaintiff's Termination Warning letter) with Ly Decl., Exh. F (Nakabayashi's Termination Warning letter).
4   The "McDonnell Douglas burden-shifting framework" refers to the analysis set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 782 (1973).
5   Transportation Management Corp. was abrogated on other grounds by Director, Office of Workers' Compensation Programs, Department of Labor v. Greenwich Collieries, 512 U.S. 267 (1994).
6   It is also undisputed that Plaintiff's May 4, 2016 termination warning is outside the two-year statute of limitations. See Haw. Rev. Stat. § 378-63. Therefore, the only relevant adverse employment action is Plaintiff's March 15, 2017 termination.

---

**End of Document**                                                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

ER 209

725 Fed.Appx. 482
This case was not selected for
publication in West's Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1
generally governing citation of judicial
decisions issued on or after Jan. 1, 2007.
See also U.S.Ct. of App. 9th Cir. Rule 36-3.
United States Court of Appeals, Ninth Circuit.

Emiko YONEMOTO, in her capacity as
the authorized representative of the Estate
of Ronald Yonemoto, Plaintiff-Appellant,

v.

David J. SHULKIN, Secretary, United
States Department of Veterans
Affairs, Defendant-Appellee.

Nos. 15-16769, 16-16076
|
Submitted February 13, 2018[*] Honolulu, Hawaii
|
Filed February 15, 2018

**Synopsis**
**Background:** Employee of the United States Department of Veterans Affairs, who worked as health systems specialist within Geriatrics Rehabilitation and Extended Care (GREC), brought action against his employer, alleging that he was retaliated against, in violation of Title VII, and that employer denied him reasonable accommodation for his diabetes and depression, in violation of Rehabilitation Act. The United States District Court for the District of Hawai'i, 114 F.Supp.3d 1067, J. Michael Seabright, C.J., entered judgment for employer on all but one claim and awarded attorney's fees and costs, and representative of employee's estate appealed.

**Holdings:** The Court of Appeals held that:

evidence was sufficient to establish that employee was unable to perform the essential functions of the job;

failure to engage in an interactive process with employee to find a reasonable accommodation did not result in liability under the Rehabilitation Act; and

court could reduce recovery of costs and attorney's fees based on unsuccessful claims.

Affirmed.

**Attorneys and Law Firms**

*483 Elbridge W. Smith, Esquire, Attorney, Smith Himmelmann, Carl M. Varady, Attorney, Honolulu, HI, for Plaintiff-Appellant

Thomas A. Helper, Assistant U.S. Attorney, DOJ—Office of the US Attorney, Honolulu, HI, for Defendant-Appellee

Appeal from the United States District Court for the District of Hawaii, J. Michael Seabright, Chief Judge, Presiding, D.C. No. 1:11-cv-00533-JMS-RLP

Before: O'SCANNLAIN, CLIFTON, and IKUTA, Circuit Judges.

*484 MEMORANDUM[**]

Emiko Yonemoto, in her capacity as the authorized representative of the Estate of Ronald Yonemoto, appeals the district court's decision following a bench trial and its order granting attorneys' fees and costs. We have jurisdiction under 28 U.S.C. § 1291.

The district court's evidentiary decisions were not "illogical, implausible, or without support in inferences that may be drawn from the record." *United States v. Hinkson*, 585 F.3d 1247, 1263 (9th Cir. 2009). Namely, the district court did not abuse its discretion in admitting out-of-court statements to show Dr. Michael Carethers's state of mind, *see Larez v. City of L.A.*, 946 F.2d 630, 642 (9th Cir. 1991), or in admitting testimony from Brian O'Neill, James Hastings, and Kaulatie JangDhari to show Yonemoto was unable to perform GS-13 level work. The evidence admitted was relevant and probative as to whether Yonemoto could perform GS-13 level work, and the evidence's probative value outweighed any prejudice.

The district court did not err in rejecting Yonemoto's Title VII retaliation and hostile work environment claims. The Veterans Administration (VA) offered a legitimate, nondiscriminatory reason for both the office move and the lack of assigned work and Yonemoto was unable to carry his "ultimate burden" of persuading the court that the VA "intentionally discriminated"

# APPENDIX 5

against him. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). Yonemoto waived his retaliation claim based on the denial of his proposal for a modified schedule because it was not properly raised before the district court. *See Pickern v. Pier 1 Imports (U.S.), Inc.*, 457 F.3d 963, 968–69 (9th Cir. 2006). The fact that Yonemoto presented this claim to the EEOC is irrelevant. *See Navajo Nation v. U.S. Forest Serv.*, 535 F.3d 1058, 1080 n.27 (9th Cir. 2008).

The district court did not err in rejecting Yonemoto's Rehabilitation Act claim. Yonemoto was unable to perform the essential functions of the job because "[a]n essential function of almost every job is the ability to appropriately handle stress and interact with others," *Mayo v. PCC Structurals, Inc.*, 795 F.3d 941, 944 (9th Cir. 2015), and the district court did not clearly err in concluding that Yonemoto was unable to complete substantive work independently, take constructive criticism, and avoid interpersonal issues. Because the district court's "account of the evidence is plausible in light of the record viewed in its entirety," we may not reverse it. *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 574, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985).

**\*485** Although the VA failed to engage in an interactive process with Yonemoto to find a reasonable accommodation, *Barnett v. U.S. Air, Inc.*, 228 F.3d 1105, 1112 (9th Cir. 2000) (en banc) *judgment vacated on other grounds by U.S. Airways Inc. v. Barnett*, 535 U.S. 391, 122 S.Ct. 1516, 152 L.Ed.2d 589 (2002), the district court did not err in concluding that no reasonable accommodation was possible, *see Morton v. United Parcel Serv., Inc.*, 272 F.3d 1249, 1256 & n.7 (9th Cir. 2001) *overruled on other grounds by Bates v. United Parcel Serv., Inc.*, 511 F.3d 974 (9th Cir. 2007) (en banc), and therefore the VA has no liability on this ground.

Further, Yonemoto's Rehabilitation Act claim includes only discrete acts that occurred on or after July 3, 2011 because Yonemoto's initial contact with an EEO counselor occurred on August 17, 2011, and Yonemoto's claim may include only those discriminatory acts that occurred within 45 days prior to his report to the EEOC. 29 C.F.R. § 1614.105(a)(1); *see also Lyons v. England*, 307 F.3d 1092, 1108 (9th Cir. 2002). The EEOC did not expressly determine that Yonemoto's claim regarding incidents beginning November 29, 2010 was timely, and therefore the VA's reference to such claim had no effect. *See Girard v. Rubin*, 62 F.3d 1244, 1245–46 (9th Cir. 1995).

Finally, the district court did not abuse its discretion in its award of costs and fees. Even if Yonemoto's unsuccessful claims are related to his one successful claim, the limited nature of Yonemoto's success justified a reduction in costs and fees. *See Hensley v. Eckerhart*, 461 U.S. 424, 435–37, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). Yonemoto received limited damages on the successful claim and his success did not lead to any alteration in VA policies or any other "meaningful public benefit." *McCown v. City of Fontana*, 565 F.3d 1097, 1103 (9th Cir. 2009). The district court properly "considered the relationship between the amount of the fee awarded and the results obtained," *Hensley*, 461 U.S. at 437, 103 S.Ct. 1933, and reduced the "attorneys fee award so that it is commensurate with the extent of the plaintiff's success," *McCown*, 565 F.3d at 1104 (quoting *McGinnis v. Ky. Fried Chicken*, 51 F.3d 805, 810 (9th Cir. 1994) ).

**AFFIRMED.**

**All Citations**

725 Fed.Appx. 482, 56 NDLR P 143

---

Footnotes

\*      The panel unanimously concludes this case is suitable for decision without oral argument. *See* Fed. R. App. P. 34(a)(2).

\*\*     This disposition is not appropriate for publication and is not precedent except as provided by Ninth Circuit Rule 36-3.

---

**End of Document**                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

CADES SCHUTTE
A Limited Liability Law Partnership

AMANDA M. JONES          8854-0
MICHAEL R. SOON FAH      11156-0
Cades Schutte Building
1000 Bishop Street, Suite 1200
Honolulu, HI 96813-4212
Telephone: (808) 521-9200
Fax: (808) 521-9210
Email: ajones@cades.com
        msoonfah@cades.com

Attorneys for Defendant
L3HARRIS TECHNOLOGIES, INC.

## IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| PRESTON LEE,<br><br>        Plaintiff,<br><br>    v.<br><br>L3HARRIS TECHNOLOGIES, INC.;<br>JOHN DOES 1-10; JANE DOES 1-10;<br>DOE CORPORATIONS 1-10; DOE<br>PARTNERSHIPS 1-10; DOE<br>UNINCORPORATED<br>ORGANIZATIONS 1-10; and DOE<br>GOVERNMENTAL AGENCIES 1-10,<br><br>        Defendants. | CIVIL NO. 1:20-CV-00489 LEK-KJM<br>(Other Civil Action)<br><br>**DEFENDANT L3HARRIS<br>TECHNOLOGIES, INC.'S<br>SEPARATE AND CONCISE<br>STATEMENT OF MATERIAL<br>FACTS IN SUPPORT OF ITS<br>MOTION FOR SUMMARY<br>JUDGMENT;**<br><br>**DECLARATION OF AMANDA M.<br>JONES;**<br><br>**DECLARATION OF LINDSAY<br>HAEN;**<br><br>**DECLARATION OF DANIELLE<br>STEWART;** |

ER 212

**DECLARATION OF RODNEY MARTIN;**

**DECLARATION OF JOHN KREIDER;**

**EXHIBITS A-CC;**

**CERTIFICATE OF COMPLIANCE WITH WORD COUNT;**

**CERTIFICATE OF SERVICE**

## DEFENDANT L3HARRIS TECHNOLOGIES, INC.'S SEPARATE AND CONCISE STATEMENT OF MATERIAL FACTS IN SUPPORT OF ITS <u>MOTION FOR SUMMARY JUDGMENT</u>

Pursuant to Local Rule 56.1, Defendant L3Harris Technologies, Inc. ("**L3Harris**") submits this Separate and Concise Statement of Material Facts in support of its Motion for Summary Judgment.

| No. | FACT | CITATION |
|---|---|---|
| 1. | L3Harris is a civil contractor who supplied services to the U.S. Navy at the Pacific Missile Range Facility ("**PMRF**") at Barking Sands on Kauai under a contract with its joint venture partner, Keaki Technologies, Inc. ("**Keaki**"), which joint-venture was called "Manu Kai." | Declaration of John Kreider (**Kreider Decl.**) ¶2. |
| 2. | Plaintiff Preston Lee ("**Plaintiff**") worked as a painter for L3Harris until his employment was terminated on June 22, 2020. | Ex. A (**FAC**) ¶¶13, 90 |
| 3. | Plaintiff worked under the direction of lead man, Sean Igne, and Mr. Igne's and Plaintiff's supervisor was Rodney Martin. | Ex. B ("**Lee Tr.**") at 16:6-16:10; 17:22-17:24. |

2

| No. | FACT | CITATION |
|---|---|---|
| 4. | Handling disagreements with co-workers in a calm manner is a requirement for Plaintiff's position and swearing at or threatening a co-worker violates company policy. | Lee Tr. at 23:11-23:14; 27:15-27:21; Ex. X and Y; Martin Decl. ¶3 |
| 5. | | Ex. F; Lee Tr. at 132:5-132:8 |
| 6. | | Ex. G at 2, 3-4; Lee Tr. at 133:8-134:18 |
| 7. | | Ex. H at 1, 5; Lee Tr. at 138:13-142:10 |
| 8. | | Ex. I; Lee Tr. at 156:11-158:20 |
| 9. | | Ex. I at 5; Lee Tr. at 144:14-144:21; 162:16-164:17 |
| 10. | | Ex. D at 4 |
| 11. | | *Id.* at 2-3 |

3

| No. | FACT | CITATION |
|---|---|---|
| 12. | ███████████████████████ | Ex. E; Lee Tr. 130:4-130:6; Ex. J Response #5 |
| 13. | In March 2019, L3Harris learned that Plaintiff had been sharing with his co-workers that he had been diagnosed with PTSD and received a 100% VA disability rating. | Declaration of Danielle Stewart (**Stewart Decl.**) ¶4; Lee Tr. at 176:24-177:16 |
| 14. | On March 13, 2019, Plaintiff met with human resources representatives where he disclosed that he had been diagnosed with PTSD and stated that he did not need any accommodations. | Stewart Decl. ¶4; Lee Tr. 177:25-178:15 |
| 15. | No disciplinary action was taken against Plaintiff at this meeting. | Stewart Decl. ¶4; Lee Tr. at 180:2-180:19 |
| 16. | On November 6, 2019, Mr. Igne observed Plaintiff pressure-washing while wearing shorts and asked Plaintiff to put on rain pants. | Lee Tr. at 24:2-24:7. Ex. O |
| 17. | Later that day, Plaintiff began yelling and swearing at Mr. Igne, stating that if Plaintiff has to wear PPE (Personal Protective Equipment) then Mr. Igne does as well, and Mr. Igne better be wearing PPE on Monday, or else Plaintiff would turn Mr. Igne in. | Ex. O; Lee Tr. at 25:6-25:15; 37:21-38:16; 39:11-39:22; 39:25-40:5; 46:17-46:20; 47:23-48:1 |
| 18. | Plaintiff admits that his behavior violated L3Harris' code of conduct. | Ex. O; Lee Tr. 27:15-27:21; 61:6-61:15 |
| 19. | Mr. Igne reported this incident to Rodney Martin, who interviewed Plaintiff and his coworkers whose statements validated that Plaintiff acted aggressively and swore at Mr. Igne, and that the day after the incident, Plaintiff told a co-worker he wanted to punch Mr. Igne in his face. | Declaration of Rodney Martin (**Martin Decl.**) ¶4, 5; Exs N; O; P-R; Lee Tr. at 49:16-50:18; Ex. BB at 16:8-19:22; Ex. CC at 28:13-28:21. |
| 20. | On November 18, 2019, Mr. Martin and a human resources representative met with Plaintiff and issued Plaintiff a written disciplinary warning for his unprofessional conduct towards Mr. Igne, which did not include a suspension, demotion, or pay cut. | Martin Decl. ¶4; FAC ¶69; Ex. S; Lee Tr. at 53:5-53:25; 64:2-65:10 |

| No. | FACT | CITATION |
|---|---|---|
| 21. I | During the meeting, Plaintiff accused Mr. Igne of stealing gas. | FAC ¶¶75-76; Martin Decl. at 6; Lee Tr. at 55:21-58:2 |
| 22. | At the conclusion of the meeting, Plaintiff stated that he needed to see his doctor and voluntarily left work. | FAC ¶77; Martin Decl. ¶9; Lee Tr. at 67:3-67:8 |
| 23. | Plaintiff subsequently initiated a workers compensation claim for ███████ ███████, and submitted doctor's notes claiming he was unable to work for the remainder of November and December, January, February, and March. | Ex. K.; Lee Tr. at 77:25-78:9; Exs T and U |
| 24. | While Plaintiff was on leave, a Keaki program manager requested that Plaintiff return his CAC card and access badge, consistent with Manu Kai policy. | Kreider Decl. ¶3; Ex. W at 4, Section 6.10 |
| 25. | While on leave, Plaintiff made a complaint to the Navy accusing Mr. Igne of stealing gasoline and this complaint was forwarded to Keaki, who appointed an employee named Scott Taylor to investigate. | Lee Tr. 83:18-83:24; Ex. V |
| 26. | Keaki forwarded Mr. Taylor's report to L3Harris and asked L3Harris to elevate concerns regarding Plaintiff. | Ex. V at 1, 4-6; Stewart Decl. ¶6; Kreider Decl. ¶4 |
| 27. | In January 2020, after reviewing the November 2019 incident, the statements obtained by Mr. Taylor and the statements obtained by IBEW, L3Harris' human resources business partner recommended terminating Plaintiff because of Plaintiff's aggressive conduct towards his co-workers, in order to maintain a safe and healthy workplace. | Stewart Decl. ¶7 |
| 28. | Before L3Harris could notify Plaintiff of his termination, Plaintiff presented a doctor's note extending his leave, and L3Harris decided not to implement the termination at that time. | Stewart Decl. ¶9; Ex. U at 1 |
| 29. | In February 2020, in conjunction with his workers compensation claim, Plaintiff underwent an independent psychological exam conducted by Dr. Peter Bianchi. | Ex. Z; Lee Tr. at 103:25-104:7 |

5

| No. | FACT | CITATION |
|-----|------|----------|
| 30. | Dr. Bianchi's report states that ███████████████████████████████ | Ex. Z at 7-8; Lee Tr. at 111:11-111:24; 113:24-115:18 |
| 31. | ████████████ his doctor released him to return to work effective April 1, 2020. | Ex. U at 5; Lee Tr. at 80:11-80:20 |
| 32. | To evaluate how best to address the situation, L3Harris placed Plaintiff on paid administrative leave effective April 1, 2020. | Stewart Decl. ¶11; Lee Tr. at 115:23-116:1 |
| 33. | L3Harris asked Dr. Bianchi how likely it is that there would be another episode if Plaintiff returned to work, to which Dr. Bianchi responded, ████████████ | Ex. AA at 1 |
| 34. | Manu Kai's program manager relayed Keaki's position that it would not permit Plaintiff to return to the areas of the base for which access cards were required unless Plaintiff or L3Harris had a medical clearance guaranteeing that Plaintiff was not a danger to himself or his coworkers. | Stewart Decl. ¶12 |
| 35. | On June 22, 2020, L3Harris terminated Plaintiff's employment based on the concerns that prompted the initial decision in January 2020 to terminate Plaintiff's employment, as well as Plaintiff's comments to Dr. Bianchi regarding ████████████ and Keaki not allowing Plaintiff access to the base unless L3Harris could guarantee that he would not be a danger to himself or others. | FAC ¶90; Stewart Decl. ¶14 |
| 36. | Plaintiff has never been told by anyone at L3Harris that he was discharged because of PTSD. | Lee Tr. 119:16-119:21 |

6

| No. | FACT | CITATION |
|-----|------|----------|
| 37. | Plaintiff did not make a complaint about discrimination or harassment by his co-workers until he filed his first EEOC Charge on February 27, 2020. | Martin Decl. ¶12; Lee Tr. at 188:19-189:5; 196:16-197:4; Ex. J Response #14; Ex. L |

DATED:  Honolulu, Hawaiʻi, September 29, 2021.

/s/ Amanda M. Jones

AMANDA M. JONES
MICHAEL R. SOON FAH
Attorneys for Defendant
L3HARRIS TECHNOLOGIES, INC.

ER 218

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| PRESTON LEE,<br><br>          Plaintiff,<br><br>     v.<br><br>L3HARRIS TECHNOLOGIES, INC.;<br>JOHN DOES 1-10; JANE DOES 1-10;<br>DOE CORPORATIONS 1-10; DOE<br>PARTNERSHIPS 1-10; DOE<br>UNINCORPORATED<br>ORGANIZATIONS 1-10; and DOE<br>GOVERNMENTAL AGENCIES 1-10,<br><br>          Defendant. | CIVIL NO.  1:20-CV-00489 LEK-KJM<br>(Other Civil Action)<br><br>**DECLARATION OF AMANDA M.<br>JONES** |

## <u>DECLARATION OF AMANDA M. JONES</u>

I, Amanda M. Jones, hereby declare as follows:

1.     I am an attorney with Cades Schutte LLP, attorneys for L3Harris

Technologies, Inc. ("**L3Harris**") in the above-captioned action. I make this

Declaration based on personal knowledge of the matters set forth herein. The

records attached to this Declaration are maintained by my firm in the ordinary

course of business as part of the firm's representation of L3Harris.

2.     Attached hereto as Exhibit A is a true and correct copy of Plaintiff

Preston Lee's First Amended Complaint filed herein on February 11, 2021.

3.      Attached hereto as Exhibit B is a true and correct copy of the court reporter's certificate, witness correction sheet, and excerpts from the transcript of Plaintiff Preston Lee's deposition, which I conducted in this case on June 25, 2021.

4.      Attached hereto as Exhibit C is a true and correct copy of the examination portion of the Deposition of Uilani Matavao Upon Written Interrogatories dated March 30, 2021 by which Ms. Matavao authenticated the records she produced as Custodian of Records of the Department of Veteran Affairs ("**VA**") to Ralph Rosenberg Court Reporters in response to L3Harris' Notice of Taking Deposition Upon Written Interrogatories dated March 10, 2021 and the subpoena duces tecum issued in this case (the "**VA Produced Records**"). The documents attached as Exhibits D through I come from the VA Produced Records.

5.      Attached hereto as Exhibit D is a true and correct copy of pages 232 to 236 of the VA Produced Records which contains the Department of Veteran Affairs' February 7, 2019 decision awarding Plaintiff a 100% VA disability rating.

6.      Attached hereto as Exhibit E is a true and correct copy of pages 332-338 of the VA Produced Records which contains the Department of Veteran Affairs' letter to Plaintiff dated February 12, 2019.

7.      Attached hereto as Exhibit F is a true and correct copy of pages 590 to 594 of the VA Produced Records which contains Plaintiff's Application for

Disability Compensation and Related Compensation Benefits submitted to the VA dated May 10, 2017.

8.  Attached hereto as Exhibit G is a true and correct copy of pages 595 to 600 of the VA Produced Records which contains Plaintiff's Statement in Support of Claim dated September 26, 2017, and Plaintiff's General Release for Medical Provider Information to the Department of Veterans Affairs attached thereto.

9.  Attached hereto as Exhibit H is a true and correct copy of pages 1011 to 1026 of the VA Produced Records which contains Plaintiff's Statement in Support of Claim dated March 25, 2018, Plaintiff's Notice of Disagreement dated March 25, 2018, and Plaintiff's medical records attached thereto.

10.  Attached hereto as Exhibit I is a true and correct copy of pages 1032 to 1041 of the VA Produced Records which contains Plaintiff's evaluation dated April 30, 2018.

11.  Attached hereto as Exhibit J is a true and correct copy of the General Objections, Plaintiff's responses to Interrogatories Nos. 1, 5, and 14, and the verification page for Plaintiff's Response to Defendant L3Harris Technologies, Inc.'s First Request for Answers to Interrogatories to Plaintiff Preston Lee dated June 10, 2021.

12.  Attached hereto as Exhibit K is a true and correct copy of Plaintiff's

Claim for Workers' Compensation Benefits filed with the State of Hawaii Department of Labor and Industrial Relations on December 20, 2019, which was marked as Exhibit 4 in Plaintiff's deposition dated June 25, 2021. Plaintiff authenticated this document in his deposition. *See* Ex. B at 76:25-77:9.

13.    Attached hereto as Exhibit L is a true and correct copy of the Charge of Discrimination that Plaintiff filed with the Hawaii Civil Rights Commission on February 27, 2020, which was marked as Exhibit 14 in Plaintiff's deposition dated June 25, 2021. Plaintiff authenticated this document in his deposition. *See* Ex. B at 182:18-183:4.

14.    Attached hereto as Exhibit M is a true and correct copy of the Pre-Complaint Questionnaire that Plaintiff filed with the Hawaii Civil Rights Commission on December 12, 2020, which was marked as Exhibit 15 in Plaintiff's deposition dated June 25, 2021. Plaintiff authenticated this document in his deposition. *See* Ex. B at 189:17-190:2.

15.    Attached hereto as Exhibit BB is a true and correct copy of the court reporter's certificate, deposition exhibits 2, 3, and 4, and excerpts from the transcript of Gilbert Castro's deposition, which I conducted in this case on September 22, 2021.

16.    Attached hereto as Exhibit CC is a true and correct copy of the court reporter's certificate, deposition exhibits 3 and 4, and excerpts from the transcript

of David Hesapene's deposition, which I conducted in this case on September 22, 2021.

I declare under penalty of perjury that the foregoing is true and correct.

DATED: Honolulu, Hawaii, September 29, 2021.


/s/ Amanda M. Jones
AMANDA M. JONES

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| PRESTON LEE,<br><br>      Plaintiff,<br><br>  v.<br><br>L3HARRIS TECHNOLOGIES, INC.;<br>JOHN DOES 1-10; JANE DOES 1-10;<br>DOE CORPORATIONS 1-10; DOE<br>PARTNERSHIPS 1-10; DOE<br>UNINCORPORATED<br>ORGANIZATIONS 1-10; and DOE<br>GOVERNMENTAL AGENCIES 1-10,<br><br>      Defendant. | CIVIL NO.  1:20-CV-00489 LEK-KJM<br>(Other Civil Action)<br><br>**DECLARATION OF<br>LINDSAY HAEN** |

## DECLARATION OF LINDSAY HAEN

I, Lindsay Haen, hereby declare as follows:

1.    I am the Director, Human Resources of the Mission Networks Division at L3Harris Technologies, Inc. ("**L3Harris**").  I make this Declaration based on personal knowledge of the matters set forth herein.

2.    As the Director, Human Resources, I have access to and am responsible for the maintenance of employment records for current and former employees at L3Harris, which records include documents and files relating to former L3Harris employee Preston Lee.

3. Based on my review of files and records relating to the documents attached hereto, and unless otherwise noted, copies of each of the attached documents have been maintained by L3Harris in the ordinary course of business since they were created or received, except that any exhibit stickers and Bates numbers contained on these documents were added after they were produced in connection with this litigation.

4. Attached hereto as Exhibit N is a true and correct copy of a complaint letter from Sean Igne and originally addressed to Rodney Martin dated November 6, 2019, which was sent to human resources. Records reflect that statements were obtained from other employees regarding the incident referenced in Mr. Igne's letter. Attached hereto as Exhibits O, P, Q, and R, are true and correct copies of the statements obtained from Preston Lee, David Hesapene, Mark Vegas, and Gilbert Castro, respectively, all dated November 7, 2019, which were sent to human resources.

5. Attached hereto as Exhibit S is a true and correct copy of the Disciplinary Warning issued to Preston Lee dated November 18, 2019, which is maintained in Mr. Lee's personnel file maintained by human resources.

6. Attached hereto as Exhibits T and U are true and correct copies of doctors' notes for Mr. Lee that were received by the human resources department and have been maintained since that time in separate confidential files relating to

Mr. Lee.

7.      Attached hereto as Exhibit X are true and correct copies of L3Harris' Workplace Threats and Violence corporate policies effective as of January 2, 2016, and as of January 1, 2020.  The historical employment policies of L3Harris are maintained by the human resources department.

8.      Attached hereto as Exhibit Y is a true and correct copy of L3Harris' Code of Conduct, which is also maintained by the human resources department.

9.      Attached hereto as Exhibit Z is a true and correct copy of report by Dr. Peter Bianchi's Independent Psychological Evaluation dated February 4, 2020 pertaining to Mr. Lee, which has been maintained by the human resources department in a separate confidential file since it was received by the human resources department.

10.     Attached hereto as Exhibit AA is a true and correct copy a letter from Dr. Bianchi's letter dated April 7, 2020 pertaining to Mr. Lee, which has been maintained by the human resources department in a separate confidential file since it was received by the human resources department.

I declare under penalty of perjury that the foregoing is true and correct.

DATED:  _Melbourne, Florida_ , September _29_ , 2021.
        [city, state]

_Lindsay Haen_
LINDSAY HAEN

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| PRESTON LEE,<br><br>        Plaintiff,<br><br>    v.<br><br>L3HARRIS TECHNOLOGIES, INC.;<br>JOHN DOES 1-10; JANE DOES 1-10;<br>DOE CORPORATIONS 1-10; DOE<br>PARTNERSHIPS 1-10; DOE<br>UNINCORPORATED<br>ORGANIZATIONS 1-10; and DOE<br>GOVERNMENTAL AGENCIES 1-10,<br><br>        Defendant. | CIVIL NO.  1:20-CV-00489 LEK-KJM<br>(Other Civil Action)<br><br>**DECLARATION OF DANIELLE<br>STEWART** |

## DECLARATION OF DANIELLE STEWART

I, Danielle Stewart, hereby declare as follows:

1.     I worked at L3Harris Technologies, Inc. ("**L3Harris**") from July 2018 to May 2021.  I started as a Human Resources Business Partner and later became Human Resources Manager.  I make this declaration based on personal knowledge of the matters stated herein, unless otherwise noted.

2.     L3Harris is a civilian contractor that provided services to the United States Navy at the Pacific Missile Range Facility ("**PMRF**") at Barking Sands, Kauai until March 31, 2021 when L3Harris's contract ended and it no longer

employed any workers at PMRF. L3Harris supplied these services under a contract with its joint venture partner, Keaki Technologies, LLC ("**Keaki**"). The joint-venture was called "Manu Kai."

3. In my role as Human Resources Business Partner, I was aware that Plaintiff Preston Lee worked at L3Harris as a painter. I never met him in person, but in my capacity as Human Resources Business Partner, I was informed of issues that arose during his employment and was ultimately involved with the decision to terminate Mr. Lee's employment. Sean Igne was one of Mr. Lee's co-workers and the lead man for the paint shop. Their supervisor was Rodney Martin. Mr. Lee and his co-workers in the paint shop were members of the International Brotherhood of Electrical Workers, Local Union 1260 ("**IBEW**").

4. I was informed in around March 2019, that Mr. Lee had been sharing with coworkers that he had been diagnosed with PTSD and had been awarded a 100% disability rating from the VA. Jasmine Apo, an HR specialist for L3Harris working at PMRF who reported to me, informed me that she and Julie Broyles, an HR Manager for Keaki, spoke with Mr. Lee and asked if he needed any accommodations. Mr. Lee reportedly said none was needed. No action was taken against Mr. Lee relating to the reported PTSD diagnosis.

5. In November 2019, I was informed that a complaint had been made about Mr. Lee engaging in aggressive, unprofessional conduct towards Mr. Igne, in

- 2 -

violation of L3Harris policies, which was investigated by Rodney Martin. I was informed that Mr. Martin's investigation revealed that Mr. Lee had violated L3Harris policies and engaged in inappropriate conduct towards Mr. Igne warranting disciplinary action, which was issued by Mr. Martin later that month. I was informed that when the disciplinary action was issued, Mr. Lee alleged that Mr. Igne had been stealing gas from the base. I was also informed that Mr. Lee left work immediately after the meeting and later claimed that he was unable to work due to stress associated with the disciplinary action.

6.     After Mr. Lee went out on leave, Keaki program manager Ross West informed L3Harris that Mr. Lee had reported Mr. Igne's alleged gas theft to a Navy hotline and PMRF commanding officer. Mr. West informed L3Harris that he assigned a Keaki employee, Scott Taylor, to conduct an inquiry into the complaint. Mr. West subsequently shared Mr. Taylor's report with L3Harris, which included signed statements from Mr. Lee's co-workers expressing concern about working with Mr. Lee due to his conduct. Mr. West asked that these matters be elevated to a corporate level. I reviewed Mr. Taylor's report and the statements that Mr. Taylor obtained and discussed them with my manager, Amanda Arnold, and Jay Kreider, a L3Harris manager who oversaw operations at PMRF.

7.     After receiving Mr. Taylor's report, L3Harris also received from IBEW statements signed by some of Mr. Lee's co-workers expressing concern for

their safety if Mr. Lee returned to the workplace.  In reviewing the circumstances involving the incident with Mr. Igne in early November 2019, the statements obtained by Mr. Taylor and the statements presented by the union, and consulting with L3 legal counsel, I recommended to my manager, Amanda Arnold, in January 2020, that Mr. Lee's employment be terminated due to his aggressive conduct towards his co-workers, so that we could maintain a safe and healthy workplace.

8.      My recommendation to terminate Mr. Lee's employment had nothing to do with Mr. Lee reportedly having PTSD or any other medical condition or disability.  At the time I made this recommendation, I was not aware of any complaints having been made by Mr. Lee of discrimination, harassment, or retaliation.

9.      I began making arrangements to notify Mr. Lee of the termination decision when he returned from leave later in January.  However, right before we were to notify Mr. Lee about the termination decision, he presented a doctor's note extending his leave.  L3Harris generally does not terminate employees while on leave, so we stopped the termination from being implemented at that time.

10.      While Mr. Lee was on leave, in connection with a workers' compensation claim he had filed, Mr. Lee underwent an independent psychological exam with Dr. Peter Bianchi in February 2020.  I received a copy of Dr. Bianchi's report, which stated, among other things, that Mr. Lee had said he had thoughts of

- 4 -

doing something stupid at work like instigating a fight or argument with others for no reason. Particularly given Mr. Lee's prior angry outburst directed at Mr. Igne and the concerns expressed by his co-workers, Mr. Lee's threatening statement to Dr. Bianchi raised concerns about returning Mr. Lee to the workplace.

11.     Mr. Lee later submitted a doctor's note stating that he could return to work on April 1, 2020. To evaluate how best to address the situation, I decided, in consultation with L3Harris legal counsel and my manager, to place Mr. Lee on paid administrative leave effective April 1, 2020, until we could make a decision on how to proceed with his employment.

12.     As part of the assessment, I asked Mr. West for Keaki's position on returning Mr. Lee back to work following his administrative leave. Mr. West relayed that Keaki's position was that it would not permit Mr. Lee to return to the employee areas of the base for which access cards were required that Keaki had taken possession of unless Mr. Lee or L3Harris could provide medical clearance guaranteeing that Mr. Lee was not a danger to himself or coworkers.  L3Harris could not provide that guarantee for Mr. Lee or any other employee.

13.     Following further discussions with Mr. Kreider and Ms. Arnold, and after consulting legal counsel, I again recommended termination of Mr. Lee's employment.  I was aware at this point that Mr. Lee had filed a charge of discrimination with the Equal Employment Opportunity Commission against

- 5 -

DATED:  Ashburn, Virginia, September 24 , 2021.

DANIELLE STEWART

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| PRESTON LEE, | CIVIL NO.  1:20-CV-00489 LEK-KJM |
| Plaintiff, | (Other Civil Action) |
| v. | **DECLARATION OF RODNEY MARTIN** |
| L3HARRIS TECHNOLOGIES, INC.; JOHN DOES 1-10; JANE DOES 1-10; DOE CORPORATIONS 1-10; DOE PARTNERSHIPS 1-10; DOE UNINCORPORATED ORGANIZATIONS 1-10; and DOE GOVERNMENTAL AGENCIES 1-10, | |
| Defendant. | |

## <u>DECLARATION OF RODNEY MARTIN</u>

I, Rodney Martin, hereby declare as follows:

1.     I was employed by L3Harris Technologies, Inc. ("**L3Harris**") as the

Facilities Maintenance Supervisor at the Pacific Missile Range Facility until my

retirement on January 10, 2020.   I make this declaration based on personal

knowledge of the matters stated herein, unless otherwise noted.

2.     In my role as Facilities Maintenance Supervisor, I oversaw facilities

maintenance operations for Manu Kai, which was the joint-venture between

L3Harris and Keaki Technologies.  My responsibilities as Facilities Maintenance

Supervisor included oversight of the paint shop where Plaintiff Preston Lee worked. I was Mr. Lee's supervisor. Sean Igne was the lead man for the paint shop and a co-worker of Mr. Lee.

3.    I served as Mr. Lee's supervisor for several years. While I got along with him fine, Mr. Lee could be volatile, becoming angry with his co-workers over minor issues. I had discussions with him at various times over the years about the need to be civil towards his co-workers and remain calm and professional. In particular, Mr. Lee did not like Mr. Igne, and vice versa. The dislike between them went back several years when they first started working together.

4.    In November 2019, Mr. Igne contacted me and was very upset about an interaction he had with Mr. Lee at work. Mr. Igne expressed to me that he felt threatened by Mr. Lee and did not feel comfortable working with him after that. He relayed that other workers were present during the interaction. Mr. Igne made a written complaint to me about this incident. I investigated the incident by speaking with Mr. Lee and other individuals who were present, and I took statements from those involved. While Mr. Lee and Mr. Igne had somewhat differing versions of the interaction, the statements by his co-workers generally supported Mr. Igne's version of events and that Mr. Lee was swearing, angry and aggressive towards Mr. Igne. Based on the interviews that I conducted, I concluded that Mr. Lee's conduct towards Mr. Igne violated L3Harris policies, and

that a written warning should be issued to Mr. Lee for his inappropriate conduct. I met with Mr. Lee and a human resources representative later that month to issue the written disciplinary action to Mr. Lee. I understand that Mr. Lee is now making allegations of disability discrimination. However, the disciplinary action that was issued had nothing to do with any disability that Mr. Lee might have.

5.     In speaking with Mr. Lee's co-workers at the time of this incident, his co-workers did express concern about Mr. Lee's volatile conduct. They expressed to me that they were concerned that Mr. Lee was a loose cannon and they did not know when he was going to snap because of how angry he would become about little things.

6.     When we met with Mr. Lee to issue the written warning, Mr. Lee accused Mr. Igne of stealing gas on the base. I told Mr. Lee that we could discuss that later, as the purpose of the meeting was to discuss his conduct towards Mr. Igne. This allegation was consistent with how Mr. Lee had engaged in the past when his conduct was questioned. He would frequently bring up other issues or make accusations against others to try to avoid responsibility for his actions.

7.     When I spoke with Mr. Lee about the incident with Mr. Igne, Mr. Lee had argued that he had not been written up by the safety officer for failing to wear proper protective equipment while pressure washing. However, the disciplinary action had nothing to do with Mr. Lee allegedly having been written up by a

PMRF safety officer.  No one had been written up by the safety officer. I understood the officer had said she would be watching the guys after she observed Gilbert Castro on the roof without fall protection. I tried to explain that to Mr. Lee, but he refused to listen, and continued to insist he had not been written up.  The disciplinary action issued to Mr. Lee was based on Plaintiff's aggressive and unprofessional behavior towards Mr. Igne, not a failure to wear protective equipment or having purportedly been written up by a PMRF safety officer.  When I learned about the safety officer's comment, I told the paint shop employees to be careful and to be sure to wear fall protection, but I did not write anyone up for that.

8.    During the meeting at the human resources office to issue the disciplinary action to Mr. Lee, I explained what was expected of him going forward, including that he needed to act in a professional manner towards his co-workers, including his lead man.  I also reviewed the "Respect in the Workplace" training that he had previously received.  During this portion of the discussion, Mr. Lee sat with his head down.  It did not appear as though he heard anything that I was saying.  There was no indication that Mr. Lee was going to change his conduct going forward.  It did not appear that Mr. Lee was remorseful for his actions.

9.    At the conclusion of the meeting, Mr. Lee said that he was going to the doctor and would find a lawyer and file a grievance.  He then said he was leaving.  He voluntarily left work that day and never returned before I retired in

January 2020.

10.   After the meeting, I investigated Mr. Lee's allegation that Mr. Igne was stealing gasoline from base. As part of my investigation, I interviewed Mr. Lee's coworkers about this allegation.  Based on my investigation, I found no evidence to support Mr. Lee's accusations.

11.   In December 2019, I was interviewed by a Keaki employee named Scott Taylor, who was also investigating Mr. Lee's accusations that Mr. Igne was stealing gas from base. I informed Mr. Taylor that I found no evidence to support Mr. Lee's accusations.

12.   I understand that Mr. Lee has alleged that he was harassed by his co-workers based on a disability.  I am not aware of any such harassment.  Mr. Lee did not make any complaints to me about any such harassment.  If he had, I would have investigated those allegations, like I did with Mr. Igne's complaint about Mr. Lee and like I did with Mr. Lee's allegation of gas theft.

I declare under penalty of perjury that the foregoing is true and correct.

DATED:  ___Kekaha___, Hawaii, September _9_, 2021.

_Rodney Martin_
RODNEY MARTIN

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| PRESTON LEE,<br><br>      Plaintiff,<br><br>  v.<br><br>L3HARRIS TECHNOLOGIES, INC.;<br>JOHN DOES 1-10; JANE DOES 1-10;<br>DOE CORPORATIONS 1-10; DOE<br>PARTNERSHIPS 1-10; DOE<br>UNINCORPORATED<br>ORGANIZATIONS 1-10; and DOE<br>GOVERNMENTAL AGENCIES 1-10,<br><br>      Defendant. | CIVIL NO.  1:20-CV-00489 LEK-KJM<br>(Other Civil Action)<br><br>**DECLARATION OF JOHN<br>KREIDER** |

## DECLARATION OF JOHN KREIDER

I, John Kreider, hereby declare as follows:

1.     I have been employed with L3Harris Technologies, Inc. ("**L3Harris**")

since 2008.  My current position is General Manager, Surveillance and Automated

Solutions.  I have held this position since 2017.  My responsibilities in this position

included management of the L3Harris contract at the Pacific Missile Range

Facility ("**PMRF**") on Kauai until that contract ended on March 31, 2021.  I make

this declaration based on personal knowledge of the matters stated herein, unless

otherwise noted.

2.     L3Harris is a civilian contractor that provided services to the United States Navy at PMRF until March 31, 2021 when L3Harris's contract ended and it no longer employed any workers at PMRF.  L3Harris supplied these services under a contract with its joint venture partner, Keʻaki Technologies, LLC ("**Keʻaki**").  The joint-venture was called "Manu Kai."  As part of my job responsibilities with L3Harris, I had monthly meetings with Ross West, a Keʻaki employee, who was the program manager at PMRF responsible for the Navy contract.  In addition, I had discussions with Mr. West outside of the monthly meetings when issues arose.

3.     I do not believe I have ever met Preston Lee.  However, I was made aware by Mr. West in December 2019 of concerns that Keʻaki had about Mr. Lee's conduct towards his co-workers and disruption of the workplace.  Mr. West wanted to restrict Mr. Lee from accessing the employee areas of the base by collecting his CAC card and badge.  I understood Mr. Lee was on leave at the time, and collection of those items was consistent with the policy for employees on an extended leave.  I agreed with Mr. West's request to collect those items from Mr. Lee.  With respect to the policy, attached hereto as Exhibit W is a true and correct copy of Manu Kai's Standard Operating Procedure for Contract Employee Identification Lanyards and Badges at the Pacific Missile Range Facility, dated April 26, 2019. This procedure has been maintained in the ordinary course of L3Harris's business as part of our operational records relating to the L3Harris

contract at PMRF.

4.   Mr. West also requested that L3Harris elevate the concerns about Mr. Lee.  Attached hereto as Exhibit V is a true and correct copy of an email that I received from Mr. West dated December 11, 2019, which attached a report by Ke'aki employee Scott Taylor regarding the report of gas theft made by Mr. Lee as outlined in Mr. West's email. This email with Mr. West's report has been retained since it was received from Mr. West as part of L3Harris' operational records in the ordinary course of business.  I had discussions with Danielle Stewart, the Human Resources Business Partner, and her manager, Amanda Arnold, to review the circumstances the led to a prior written warning being issued to Mr. Lee due to an angry outburst directed at his lead man, and concerns raised by Mr. Lee's co-workers that were conveyed during Keaki's investigation of a gas theft complaint that Mr. Lee made against the lead man following the disciplinary action issued to Mr. Lee.  I understood that Ms. Stewart had consulted with the L3Harris legal department, and thereafter recommended termination of Mr. Lee's employment in January 2020. I approved that termination decision in January 2020.

5.   I was aware at the time that I approved the termination decision of references to the fact that Mr. Lee had PTSD.  I do not know if he has PTSD or not, and that was not a factor in my decision to approve the termination decision.  I approved the termination decision because of Mr. Lee's disruptive conduct in the

workplace.  Likewise, my approval of Mr. West's request to collect the CAC card

and badge from Mr. Lee had nothing to do with Mr. Lee allegedly having PTSD.

6.     The decision to terminate Mr. Lee's employment in January 2020 was

not implemented in January 2020.  I had discussions with Ms. Stewart and Ms.

Arnold several months later about this issue again.   Termination of Mr. Lee's

employment was again recommended by Ms. Stewart, and I agreed with that

recommendation due to the concerns about having Mr. Lee return to the base given

his prior conduct at work.  My agreement to terminate Mr. Lee's employment had

nothing to do with PTSD or any other medical condition or alleged disability.

I declare under penalty of perjury that the foregoing is true and correct.

DATED:  Herndon, Virginia, September 29, 2021.

JOHN KREIDER

FUJIWARA AND ROSENBAUM, LLLC

ELIZABETH JUBIN FUJIWARA 3558
JOSEPH T. ROSENBAUM 9205
1100 Alakea St., 20th Fl., Ste B
Honolulu, Hawaii 96813
Telephone: 808-203-5436

Attorneys for Plaintiff
PRESTON LEE

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| PRESTON LEE,<br><br>       Plaintiff,<br><br>     vs.<br><br>L3HARRIS TECHNOLOGIES, INC.;<br>JOHN DOES 1-10; JANE DOES 1-10;<br>DOE CORPORATIONS 1-10; DOE<br>PARTNERSHIPS 1-10; DOE<br>UNINCORPORATED<br>ORGANIZATIONS<br>1-10; and DOE GOVERNMENTAL<br>AGENCIES 1-10,<br><br>       Defendants. | ) CIVIL NO. 20-00489 LEK-KJM<br>) (Other Civil Action)<br>)<br>) FIRST AMENDED COMPLAINT;<br>) DEMAND FOR JURY TRIAL<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## <u>FIRST AMENDED COMPLAINT</u>

COMES NOW Plaintiff PRESTON LEE [hereinafter referred to as "MR.

## EXHIBIT A

ER 243

LEE"] and complains against the above-named Defendants alleges and avers as follows:

## I. NATURE OF CASE

1. The basis of this case is employment discrimination law violations as related to MR. LEE's employment at L3HARRIS TECHNOLOGIES, INC. [hereinafter referred to as "L3"].

## II. JURISDICTION

2. MR. LEE brings this action pursuant, including, but not limited to, the Americans With Disabilities Act ["ADA"] and Hawaii Revised Statutes ["HRS"] Chapter 378 Part I, Discriminatory Practices, to obtain full and complete relief and to redress the tortious conduct described herein.

3. At all times relevant herein, MR. LEE was a resident of the County of Kaua'i, State of Hawaii.

4. At all times relevant herein, Defendant L3 is an employer within the meaning of HRS Chapter 378. L3 was and is doing business in the County of Kaua'i, State of Hawaii.

5. At all times relevant herein, Defendant L3's is a for-profit business incorporated in the State of Delaware.

6. Upon information and belief, and at all times relevant herein, Defendant L3's employees, agents and/or representatives, were acting within the

course and scope of their duties as employees, agents and/or representatives of L3;

therefore, L3 is liable for the intentional and/or tortious and/or wrongful conduct of

said employees, agents and/or representatives pursuant to the doctrine of

Respondeat Superior and/or principles of Agency.

      7.    Defendants JOHN DOES 1-100, JANE DOES 1-100, DOE

CORPORATIONS 1-10, DOE PARTNERSHIPS 1-10, DOE

UNINCORPORATED ORGANIZATIONS 1-10, and DOE GOVERNMENTAL

AGENCIES 1-10 are sued herein under fictitious names because their true names,

identities and capacities are unknown to the MR. LEE, except that they are

connected in some manner with Defendants, and are/were agents, servants,

employees, employers, representatives, co-venturers, associates, or independent

contractors of Defendants herein, and were acting with the permission and consent

and within the course and scope of said agency and employment and/or were in

some manner presently unknown to the MR. LEE engaged in the activities alleged

herein and/or were in some way responsible for the injuries or damages to the MR.

LEE, which activities were a proximate cause of said injuries or damages to the

MR. LEE.  MR. LEE has made good faith and diligent efforts to identify said

Defendants, including interviewing individuals with knowledge of the claims

herein. At such time as their true names and identities become known, the MR.

LEE will amend this Complaint accordingly.

8.    All Defendants will be collectively referred to as "DEFENDANTS".

9.    All events done by DEFENDANTS described herein occurred within the County of Kaua'i, State of Hawai'i, and within the jurisdiction and venue of this Court.

### III. STATEMENT OF FACTS

10.    MR. LEE was hired on March 20, 1994 to work on the Flight Line at the time ITT Industries was the main contractor for the United States Navy at Barking Sands.

11.    MR. LEE worked on the Flight Line as a helicopter inspector.

12.    MR. LEE never had any performance issues related to his ability to perform his job duties.

13.    In November 2006, MR. LEE became a painter.

14.    L3 took over the United States Navy contract MR. LEE worked under from ITT Industries in or about 2015.

15.    MR. LEE had the position of Painter.

16.    MR. LEE is a combat veteran and was diagnosed with Post-Traumatic Stress Disorder in February 2019.

17.    In February 2019, MR. LEE received 100% VA disability due to his PTSD.

18.     L3 became aware of MR. LEE's disability via L3 Lead Sean Igne on or about February 2019.

19.     Since being diagnosed with PTSD, MR. LEE was harassed and unfairly disciplined.

20.     L3 Lead Sean Igne told L3's human resources that he was afraid to work with MR. LEE because of MR. LEE's PTSD.

21.     Mr. Igne asked MR. LEE why he doesn't just retire.

22.     MR. LEE told Mr. Igne it was none of his business.

23.     In or about March 2019, L3 Rigging Shop Lead Mark Vegas went to their union meeting and asked how can MR. LEE be working if he had 100% disability for PTSD.

24.     Tony Pereira, L3 Lead Electrician, then stated: Wait a minute, Preston has 100% PTSD disability then he is a liability for the company. We have to inform the company because if he snaps the company will get sued. They have to let him go.

25.     Upon information and belief, Mr. Vegas helped Mr. Igne write letters to L3 to falsely portray MR. LEE in a negative light.

26.     In March 2019, MR. LEE was told by his supervisor, Rodney Martin, to go to the human resources ("HR") at 9:00 a.m.

27.     MR. LEE did as instructed and met with Julie Broyles head of

L3 HR and Jasmine Apo an L3 HR representative.

28. At the meeting, Ms. Broyles confirmed she was aware of MR. LEE's PTSD.

29. Ms. Boynes began to ask MR. LEE a series of questions listed below related to his PTSD as Ms. Apo took notes.

30. Ms. Broyles stated because of your PTSD we have to ask you some questions.

31. Ms. Broyles stated we have to ask you these questions because we are here to help you.

32. Ms. Broyles asked, amongst other questions:

 a. Do you want to hurt your coworkers? MR. LEE Answered, "No."

 b. Do you want to hurt yourself? MR. LEE Answered, "No."

 c. Do you want to kill your coworkers? MR. LEE Answered, "No."

 d. Do you want to kill yourself? MR. LEE Answered, "No."

 e. Do you have an anger problem? MR. LEE Answered, "No."

 f. Do you want to kill people when you get angry? MR. LEE Answered, "No."

 g. Do you need anger management classes? MR. LEE Answered, "No."

h. Do you need a psychiatrist? MR. LEE Answered, "No."

i. Do you have a drug problem? MR. LEE Answered, "No."

j. Do you have an alcohol problem? MR. LEE Answered, "No."

33. MR. LEE asked them if they were trying to fire him and Ms. Broyles and Ms. Apo said they were there to help MR. LEE.

34. After MR. LEE was called in and interviewed by HR, he spoke with L3's Bill Nordmeier, the operator for grounds department, who also had just received 100% VA disability for his back.

35. Due to the way MR. LEE was questioned by HR after getting his 100% disability from the federal government, Mr. Nordmeier went to L3 HR to inform them that he also got his 100% disability.

36. Mr. Nordmeier went to L3 HR and disclosed that he had received 100% disability from the federal government and wanted to disclose it to L3.

37. HR at L3 told Mr. Nordmeier that he doesn't need to disclose it and that he shouldn't talk about his disability at work as it was personal.

38. On or about April 9, 2019, MR. LEE was called by L3's Scott Taylor and MR. LEE reported to Mr. Taylor about Mr. Igne stealing the gasoline.

39. On or about November 15, 2019, MR. LEE's coworker Gilbert

Castro was written up for not wearing protective gear.

40.    After lunch on the same date, Mr. Igne yelled at MR. LEE to put on pants which MR. LEE complied with.

41.    MR. LEE was power washing at that time and was wearing shorts because he was soaking wet.

42.    MR. LEE was wearing steel toed rubber boots.

43.    At that time, Mr. Igne was also wearing shorts and tennis shoes.

44.    Mr. Igne wore shorts and tennis shoes nearly every day at work.

45.    Based on information and belief, Mr. Igne told human resources/management via a note/letter that MR. LEE had previously been written up for not wear his pants. This was not true.

46.    Based on information and belief, Mr. Igne told human resources/management that MR. LEE yelled at or got aggressive with Mr. Igne when Mr. Igne asked MR. LEE to put his pants on. This was a lie.

47.    On the same date, MR. LEE told Mr. Igne, "Tomorrow if I have to wear long pants, you have to wear long pants. If I have to wear steel toe shoes you have to wear steel toe shoes. What is good for one is good for all. So come tomorrow morning have your PPE or else."

48.    Mr. Igne said, "Or else what, you going turn me in?"

49.    MR. LEE respond, "Yeah"

50.    Mr. Igne: "Well fuck you"

51.    MR. LEE "Well fuck you too."

52.    Mr. Igne and MR. LEE exchanged a couple more "fuck yous" and MR. LEE realized it was wrong and walked away.

53.    The following work day, MR. LEE was called into Mr. Martin's regarding a letter/note that Mr. Igne wrote to human resources/management regarding the previous day's confrontation with MR. LEE.

54.    MR. LEE was told Mr. Igne reported via the aforementioned note/letter that MR. LEE was previously written by the safety lady for not his wearing pants. This was not true.

55.    Mr. Martin asked why wasn't MR. LEE wearing his pants after he had already been written up by the safety lady previously?

56.    MR. LEE responded, "I never got written up."

57.    Mr. Martin was surprised and said, "What?"

58.    MR. LEE said, "Yeah, I never got written up. Gilbert got written up"

59.    Mr. Martin looked at the letter and told MR. LEE he better not lie.

60.    Mr. Martin again asked MR. LEE if he got written up by the safety lady previously and MR. LEE emphatically said no.

-9-

61. MR. LEE had not been written up by the safety lady. There are multiple witnesses to this fact.

62. During this meeting MR. LEE told Mr. Martin, "How can he tell me to put on long pants when he is wearing shorts and tennis shoes?"

63. Wearing shorts and tennis shoes on the jobsite is a clear OSHA safety violation that Mr. Martin clearly had been aware of for years.

64. Mr. Martin said he was going to investigate this.

65. Mr. Lee stated, "Why am I always being investigated. Why don't you investigate Mr. Igne.

66. To note, previously in or about October 2018, Mr. Igne lied to Mr. Martin and stated MR. LEE walked up to Mr. Igne with clenched fists acted like he was going to attack Mr. Igne and saying he was going to kick Mr. Igne's ass after work.

67. This was proven to be a lie by the two witnesses present.

68. MR. LEE asked Mr. Martin to write up Mr. Igne for lying regarding the October 2018 incident and Mr. Martin did nothing.

69. On November 18, 2019, MR. LEE had a meeting with human recourses and Mr. Martin regarding the confrontation with Mr. Igne.

70. MR. LEE was told he was written up for breaking the code of conduct for telling Mr. Igne fuck you.

-10-

71.     MR. LEE responded, "I said fuck you because he told me fuck you."

72.     MR. LEE then said: "You guys are always investigating me for this and investigating me for that."

73.     MR. LEE left he said why is he being investigated when others are not.

74.     MR. LEE said if they wanted to investigate something, you should investigate Mr. Igne for stealing gas.

75.     MR. LEE reported that every Tuesday and Thursday for years Mr. Igne would take 5 gallons of gas for personal vehicle via a gas container.

76.     This could have easily been investigated and confirmed via the amount of gas Mr. Igne was using for his company vehicle compared to the amount for gas he used.

77.     MR. LEE told them he had to immediately take stress leave and that he could not work under these conditions.

78.     MR. LEE went to see his doctor that every day to be placed on stress leave.

79.     MR. LEE's stress leave was effective November 21, 2019.

80.     On December 5, 2019, Ross West, the L3 project manager called MR. LEE and requested his CAC card and secret clearance card.

81. MR. LEE was directed by Mr. West to give his CAC card and secret clearance card to Mr. West and if he wasn't there then give it to his secretary.

82. MR. LEE objected and said that was not proper as the CAC card and the secret clearance card were national security related items that need to be secure at all times.

83. MR. LEE did not think he should give such items to Mr. West.

84. Following Mr. West's directive, MR. LEE brought the CAC card and secret clearance card on December 6, 2020 to Mr. West's office.

85. As Mr. West was not there, Mr. LEE did as directed and left his CAC and his secret clearance card with Mr. West's secretary.

86. This was a clear national security violation as MR. LEE should have been directed to provide the CAC card and secret clearance card to the L3 security to safeguard those security sensitive items.

87. There were other L3 employees who were on stress leave that did not have their CAC cards and clearance cards removed by L3.

88. On or about April 1, 2020, MR. LEE was ready to come back to work from stress leave.

89. He was told by human recourse to stay home and he would be paid his full wages.

-12-

90.     On June 22, 2020, MR. LEE was issued his termination letter that does not indicate why he was terminated.

91.     MR. LEE was never told why exactly he was terminated.

92.     On February 27, 2020, MR. LEE timely filed his EEOC and Hawai'i Civil Rights Commission Charge of Discrimination for disability discrimination and retaliation.

93.     On or about August 19, 2020, MR. LEE received his Right to Sue letter from the EEOC.

94.     On or about September 5, 2020, MR. LEE received his Right to Sue letter from the HCRC.

95.     On December 2, 2020, MR. LEE timely filed his EEOC/HCRC Charge of Discrimination for disability discrimination and retaliation regarding his termination: EEOC Charge No: 37B-2021-00046; FEPA No. K-21396.

96.     On or about December 12, 2020, MR. LEE received his Right to Sue letter from the HCRC- FEPA No. K-21396.

97.     On or about January 15, 2021, MR. LEE received his Right to Sue letter from the EEOC Charge No: 37B-2021-00046.

## COUNT I
## DISABILITY DISCRIMINATION (ADA)

98.   MR. LEE incorporates paragraphs 1 through 97 as though fully set forth herein.

-13-

ER 255

99.   An employer shall not discriminate against an employee based on disability under the Americans with Disabilities Act

100.   L3's conduct as described above is a violation of the ADA.

101.   The aforementioned acts and/or conduct of the L3 entitles MR. LEE to damages as provided by law. As a direct and proximate result of said unlawful employment practices MR. LEE has suffered extreme mental anguish, outrage, depression, great humiliation, severe anxiety about his future and his ability to support himself, as well as painful embarrassment among his relatives and friends, damage to his good reputation, disruption of his personal life, loss of enjoyment of the ordinary pleasures of everyday life and other general damages in an amount which meets the minimal jurisdictional limits of this Court.

## COUNT II
## RETALIATION

102.   MR. LEE incorporates paragraphs 1 through <u>101</u> as though fully set forth herein.

103.   The treatment of MR. LEE, as described aforesaid, evidences retaliation against MR. LEE at L3 for complaining of discrimination at the L3.

104.   It shall be unlawful discriminatory practice for an employer to retaliate against an individual under the ADA.

105.   The L3's conduct as described above is a violation of the ADA. These aforementioned acts and/or conduct of the L3 entitle MR. LEE to damages

as provided by law. As a direct and proximate result of said unlawful employment practices MR. LEE has suffered extreme mental anguish, outrage, depression, great humiliation, severe anxiety about his future and his ability to support himself, as well as painful embarrassment among his relatives and friends, damage to his good reputation, disruption of his personal life, loss of enjoyment of the ordinary pleasures of everyday life and other general damages in an amount which meets the minimal jurisdictional limits of this Court.

## COUNT III
## DISABILITY DISCRIMINATION (State Law)

106.   MR. LEE incorporates paragraphs 1 through 105 as though fully set forth herein.

107.   The disability discrimination of MR. LEE and creation of a hostile work environment, as described aforesaid, evidences a discriminatory environment towards MR. LEE at L3.

108.   An employer shall not discriminate against an employee based on disability under HRS, § 378-2 which states in pertinent part as follows:

§ 378-2:  It shall be unlawful discriminatory practice:

(1) Because of race, sex, sexual orientation, age, religion, color, ancestry, disability . . .

(A) For any employer to refuse to hire or employ or to bar or discharge from employment, or otherwise to discriminate against any individual in compensation or in the terms, conditions, or privileges of employment

-15-

ER 257

109.   L3's conduct as described above is a violation of HRS, § 378-2(1).

110.   These aforementioned acts and/or conduct of L3 entitles MR. LEE to damages as provided by law. As a direct and proximate result of said unlawful employment practices MR. LEE has suffered extreme mental anguish, outrage, depression, great humiliation, severe anxiety about his future and his ability to support himself, as well as painful embarrassment among his relatives and friends, damage to his good reputation, disruption of his personal life, loss of enjoyment of the ordinary pleasures of everyday life and other general damages in an amount which meets the minimal jurisdictional limits of this Court.

**COUNT IV**
**RETALIATION (State Law)**

111.   MR. LEE incorporates paragraphs 1 through 110 as though fully set forth herein.

112.   It shall be unlawful discriminatory practice for an employer to discriminate against an individual under HRS, § 378-2(2) who "has filed a complaint . . . respecting the discriminatory practices prohibited under this part."

113.   L3's conduct as described above is a violation of HRS, § 378-2 (2).

-16-

114.    The aforementioned acts and/or conduct of L3 entitles MR.

LEE to damages as provided by law.  As a direct and proximate result of said

unlawful employment practices MR. LEE has suffered extreme mental anguish,

outrage, depression, great humiliation, severe anxiety about her future and her

ability to support himself, as well as painful embarrassment among his relatives

and friends, damage to his good reputation, disruption of his personal life, loss of

enjoyment of the ordinary pleasures of everyday life and other general damages in

an amount which meets the minimal jurisdictional limits of this Court.

## COUNT V
## VIOLATION OF HRS 378 PART V WHISTLEBLOWERS' PROTECTION ACT

115.    MR. LEE incorporates paragraphs 1 through 114 as though

fully set forth herein.

116.        The treatment of MR. LEE, as described aforesaid,

evidences retaliation against MR. LEE at L3 for reporting illegal practices at L3.

117.    An employer shall not retaliate against an employee based on

their whistleblowing under HRS, § 378-62 which states in pertinent part as

follows:

§ 378-62:  An employer shall not discharge, threaten or
otherwise discriminate against an employee…because:

(1)     The employee… reports or is about to report
to the employer…verbally or in writing, a
violation or suspected violation of:

(A)  A law, rule, ordinance, or regulation, adopted
     pursuant to the law of this State, a political
     subdivision of the State or the United States;

118.   L3's conduct as described above is a violation of HRS § 378-62(1)(A). These aforementioned acts and/or conduct of L3 entitle MR. LEE to damages as provided by law. As a direct and proximate result of said unlawful employment practices MR. LEE has suffered extreme mental anguish, outrage, depression, great humiliation, severe anxiety about his future and his ability to support himself, as well as painful embarrassment among his relatives and friends, damage to his good reputation, disruption of his personal life, loss of enjoyment of the ordinary pleasures of everyday life and other general damages in an amount which meets the minimal jurisdictional limits of this Court

## **PRAYER FOR RELIEF**

WHEREFORE, MR. LEE respectfully prays that this Court enter judgment granting the following relief on all causes of action:

A.     That this Court enter a declaratory judgment that L3 have violated the rights of MR. LEE;

B.     That this Court award MR. LEE special damages for the aforementioned Counts;

C.     That this Court award MR. LEE compensatory damages, proximately caused by L3 illegal conduct, including, but not limited to, general

-18-

damages for emotional distress in an amount to be proven at trial;

       D.    As L3's treatment of MR. LEE, as aforesaid, constitutes extreme and outrageous behavior which exceeds all bounds usually tolerated by decent society.  In committing the above acts and omissions, L3 acted wantonly and/or oppressively and/or with such malice as implies a spirit of mischief or criminal indifference to civil obligations and/or there has been some willful misconduct that demonstrates that entire want of care which would raise the presumption of a conscious indifference to consequences, justifying an award of punitive or exemplary damages in an amount to be proven at trial, that this Court award MR. LEE exemplary or punitive damages in an amount to be proven at trial;

       E.    That this Court award MR. LEE reasonable attorney's fees and costs of suit herein as well as prejudgment and post-judgment interest;

       F.    That this Court order appropriate injunctive relief;

       G.    That this Court retain jurisdiction over this action until L3 has fully complied with the order of this Court and that this Court require L3 to file such reports as may be necessary to secure compliance;

       H.    That this Court award MR. LEE such other and further relief both legal and equitable as this Court deems just, necessary and proper under the circumstances.

       DATED:  Honolulu, Hawaii, February 11, 2021.

/s/ Joseph T. Rosenbaum
ELIZABETH JUBIN FUJIWARA
JOSEPH T. ROSENBAUM
Attorneys for Plaintiff
PRESTON LEE

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| PRESTON LEE, | ) CIVIL NO. 20-00489 LEK-KJM |
| | ) (Other Civil Action) |
| Plaintiff, | ) |
| | ) DEMAND FOR JURY TRIAL |
| vs. | ) |
| | ) |
| L3HARRIS TECHNOLOGIES, INC.; | ) |
| JOHN DOES 1-10; JANE DOES 1-10; | ) |
| DOE CORPORATIONS 1-10; DOE | ) |
| PARTNERSHIPS 1-10; DOE | ) |
| UNINCORPORATED | ) |
| ORGANIZATIONS | ) |
| 1-10; and DOE GOVERNMENTAL | ) |
| AGENCIES 1-10, | ) |
| | ) |
| | ) |
| Defendants. | ) |
| | ) |
| _____ | ) |

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands trial by jury on all issues so triable herein.

DATED:     Honolulu, Hawaii, February 11, 2021.

/s/ Joseph T. Rosenbaum
ELIZABETH JUBIN FUJIWARA
JOSEPH T. ROSENBAUM
Attorneys for Plaintiff
PRESTON LEE

-21-

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| PRESTON LEE, | ) CIVIL NO. 20-00489 LEK-KJM |
| | ) (Other Civil Action) |
| Plaintiff, | ) |
| | ) CERTIFICATE OF SERVICE |
| vs. | ) |
| | ) |
| L3HARRIS TECHNOLOGIES, INC.; | ) |
| JOHN DOES 1-10; JANE DOES 1-10; | ) |
| DOE CORPORATIONS 1-10; DOE | ) |
| PARTNERSHIPS 1-10; DOE | ) |
| UNINCORPORATED | ) |
| ORGANIZATIONS | ) |
| 1-10; and DOE GOVERNMENTAL | ) |
| AGENCIES 1-10, | ) |
| | ) |
| | ) |
| Defendants. | ) |
| | ) |
| | ) |

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that one copy of the foregoing document was duly

served via EM/ECF on February 11, 2021 to the following:

AMANDA M. JONES
MICHAEL R. SOON FAH
Attorneys for Defendant
L3HARRIS TECHNOLOGIES, INC.

DATED:  Honolulu, Hawaii, February 11, 2021.

FUJIWARA AND ROSENBAUM, LLLC

By  /s/ Joseph T. Rosenbaum

JOSEPH T. ROSENBAUM
Attorney for Plaintiff
PRESTON LEE

1

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF HAWAII

PRESTON LEE,            | CIVIL NO. 1:20-CV-00489 LEK-KJM
                    | (Other Civil Action)
      Plaintiff,  |
                    |
      v.           |
                    |
L3HARRIS TECHNOLOGIES,  |
INC.; JOHN DOES 1-10; JANE |
DOES 1-10; DOE CORPORATIONS|
1-10; DOE PARTNERSHIPS   |
1-10; DOE UNINCORPORATED  |
ORGANIZATIONS 1-10; and   |
DOE GOVERNMENTAL AGENCIES  |
1-10.                 |
      Defendants.  |

## VIDEOTAPED DEPOSITION OF PRESTON LEE

Taken on behalf of Defendant L3Harris Technologies, Inc. at
the law offices of Cades Schutte LLP, 1000 Bishop Street,
Suite 1200, Honolulu, Hawaii on Friday, June 25, 2021
commencing at 9:21 a.m. pursuant to Notice.

Reported by:
Priscilla Gonzaga, CSR #127
State of Hawaii

**EXHIBIT B**

2

1    APPEARANCES:

2    For Plaintiff:

3            JOSEPH ROSENBAUM, ESQ.
             Fujiwara and Rosenbaum, LLLC
4            1100 Alakea Street, 20th Floor, Suite B
             Honolulu, Hawaii 96816
5

6

7    For Defendant L3Harris Technologies, Inc.:

8            AMANDA JONES, ESQ.
             Cades Schutte LLP
9            1000 Bishop Street, Suite 1200
             Honolulu, Hawaii 96813
10

11

12   Also Present:

13           Alan Nielsen, Videographer

14

15

16

17

18

19

20

21

22

23

24

25

3

I N D E X

EXAMINATION BY:                                              PAGE

    MS. JONES                                                  5


EXHIBITS FOR IDENTIFICATION:

    EXHIBIT 1                                                 45
        Letter to Rodney Martin From
        Preston Lee

    EXHIBIT 264                                               64
        Disciplinary Warning

    EXHIBIT 3                                                 70
        Medical Excuse Form

    EXHIBIT 4                                                 77
        Workers' Comp Claim

    EXHIBIT 5                                                 78
        Medical Excuse Forms

    EXHIBIT 6                                                 81
        Request for Leave

    EXHIBIT 7                                                106
        Employee Counseling Record

    EXHIBIT 8                                                124
        Department of Veterans Affairs
        Document

    EXHIBIT 9                                                129
        Department of Veterans Affairs
        Disability Benefits

    EXHIBIT 10                                               130
        Application for Disability
        Compensation

    EXHIBIT 11                                               133
        Statement in Support of Claim

    EXHIBIT 12                                               138
        Statement in Support of Claim

4

1      EXHIBIT 13                                    156
           PTSD Disability Benefits
2          Questionnaire

3      EXHIBIT 14                                    182
           Charge of Discrimination

4
       EXHIBIT 15                                    189
5          Pre-Complaint Questionnaire

6      EXHIBIT 16                                    206
           Records from Department of
7          Veterans Affairs

8      EXHIBIT 17                                    214
           VA Progress Notes

9
       EXHIBIT 18                                    237
10         VA Document

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

5

1          (Reporter's disclosure is available.)

2          VIDEOGRAPHER:  This is the deposition of

3    Preston Lee in the matter of Preston Lee vs. L3Harris

4    Technologies, Inc., et al.

5          We're located at Cades Schutte, 1000 Bishop

6    Street, Suite 1200, Honolulu, Hawaii.

7          My name is Alan Nielsen, video specialist

8    for Certified Legal Video Services.

9          Will the counsel please state your names.

10         MR. ROSENBAUM:  Joseph Rosenbaum here on

11   behalf of plaintiff Preston Lee.

12         MS. JONES:  And Amanda Jones for L3Harris

13   Technologies.

14         VIDEOGRAPHER:  Thank you.

15         Today is June 25th, 2021.  We're on the

16   record at 9:21 a.m.

17         Will the court reporter please swear in our

18   deponent.

19                   PRESTON LEE,

20   called as a witness, having been first duly sworn,

21   was examined and testified as follows:

22                   EXAMINATION

23   BY MS. JONES:

24      Q    Good morning, Mr. Lee.  My name is Amanda

25   Jones.  I represent L3Harris Technologies.

6

1        Will you please state your full name for the

2   record.

3        A    Preston Lee.

4        Q    And today, I'm going to refer to L3Harris

5   Technologies, Inc., the defendant in the lawsuit as

6   L3Harris.  Will that make sense to you?

7        A    Yes, ma'am.

8        Q    And are you under the influence of any

9   drugs, alcohol or medications that would impair your

10  ability to understand questions and answer truthfully

11  today?

12       A    No, ma'am.

13       Q    Is there any other reason that you may have

14  difficulty understanding questions or answering

15  truthfully today?

16       A    No, ma'am.

17       Q    Although this is a somewhat informal setting

18  here in a conference room in a law office and there's

19  no judge present, the deposition testimony that

20  you're giving today will be subject to the same oath

21  and penalties of perjury that would apply if you were

22  giving testimony in court in front of a judge.  Do

23  you understand that?

24       A    Yes, ma'am.

25       Q    Have you ever had your deposition taken

Case: 22-15288, 07/06/2022, ID: 12487394, DktEntry: 11-3, Page 228 of 299
Case 1:20-cv-00489-LEK-KJM   Document 50-7   Filed 09/29/21   Page 7 of 70   PageID #: 420

7

1   before?

2       A    No.

3       Q    So I'm going to go through a few rules for

4   today's deposition.

5            First, if at any time you do not understand

6   my question, please let me know and I will rephrase

7   the question to try to make it clearer.  Will you do

8   that?

9       A    Yes.

10      Q    If at any time during the deposition you

11  realize that you've answered something incorrectly or

12  incompletely, please let me know and we can revisit

13  that question.  Okay?

14      A    Yes.

15      Q    If you choose, you have the right to review

16  the transcript from today's deposition and make

17  corrections to that deposition transcript.  Is that

18  something you'd like to do?

19           MR. ROSENBAUM:  Yes.  We'd like -- sorry.

20  We'd like to do that through my office please.

21      Q    (By Ms. Jones) Okay.  So Mr. Lee, I do want

22  to let you know that if you do make changes to your

23  deposition testimony after the deposition is

24  completed, we have a right to comment about the fact

25  to the judge or to the jury that you changed your

8

1  deposition testimony later on.  Do you understand

2  that?

3      A     Yes, ma'am.

4      Q     Okay.  So that leads me back to my prior

5  point which is during the deposition today, if at any

6  point you realize that something was incorrect,

7  please let me know so we can understand your

8  testimony.  Okay?

9      A     Yes.

10     Q     If I ask you a question and you do not know

11  the answer, please tell me you don't know.  Do not

12  guess at something that you don't know.  Okay?

13     A     Yes.

14     Q     We will be taking breaks periodically during

15  today's deposition.  If you need a break at another

16  time, please let me know and we can take a break.  I

17  would just ask that you answer whatever question is

18  pending before we go on a break.  Okay?

19     A     Yes.

20     Q     Now, the court reporter here is taking down

21  everything that I'm saying and everything that you're

22  saying.  And so for that reason, it's important that

23  we try not to talk over each other.  You're doing a

24  pretty good job of waiting until I'm finished asking

25  my question before you start.  But just please

16

1      A    Yes.  Pressure washing, scrubbing, chipping,
2  treating the metal.
3      Q    And did you, as a painter, typically work
4  with a partner, another painter?
5      A    Yes, ma'am.
6      Q    And who was your supervisor in 2019?
7      A    Rodney Martin.
8      Q    How long was Rodney Martin your
9  supervisor --
10      A    Fourteen years.
11      Q    Okay.  I'm just going to ask you to wait
12  till I'm finished with my question before you start.
13  I know you're figuring out where I'm going.  But just
14  to help out the court reporter, yeah?
15           Okay.  So Mr. Martin was your supervisor for
16  about 14 years?
17      A    Yes.  Sorry.
18      Q    And did you ever have any problems with Mr.
19  Martin?
20      A    Definitely.
21           MR. ROSENBAUM:  Objection, form of the
22  question.  Go ahead.
23           THE WITNESS:  He treated me unfairly from
24  the day I started.
25      Q    (By Ms. Jones) How so?

17

1     A     Every time a situation came up, he
2  automatically blamed me.  And then after he does his
3  so-called I'm gonna do an investigation on you, after
4  he does an investigation and come to find out that my
5  leadman is lying, he doesn't do nothing about it.
6  And then I ask my supervisor to write up my leadman
7  because he's turning me on this false allegations and
8  you telling me I'm gonna get fired, after he do the
9  investigation, nothing happens.  And then when I
10  explain to him to write up my leadman for lying,
11  nothing happens.  We notify HR.  Nothing happens.
12  And that's been going on for 14 years.
13     Q     So from the time you started at the paint
14  shop?
15     A     From the time I started in 2006, day one.
16     Q     Now prior to that, you were working out
17  there but in a different department, is that --
18     A     I was working on helicopters.  I sorry,
19  yeah.  I have to wait.  I getting all kind of da kine
20  already but.
21          MR. ROSENBAUM:  Take your time.
22     Q     (By Ms. Jones) Now earlier, you referred to
23  a leadman.  Who is that?
24     A     Sean Igne.
25     Q     And how long did you work with Sean Igne?

Case: 22-15288, 07/06/2022, ID: 12487394, DktEntry: 11-3, Page 232 of 299
Case 1:20-cv-00489-LEK-KJM   Document 50-7   Filed 09/29/21   Page 11 of 70   PageID #:
424

23

1    Gilbert came back, he said oh, you know what Rod, I

2    like Gilbert.  Give David back to Preston.  And then

3    Rod said no, we already did the paperwork, you taking

4    David.  I taking Gilbert.  Again, now, he's pissed

5    off already.  You know what I mean?  Every little

6    thing I do, he gets all pissed off and he try and

7    screw me over.

8         Q    Okay.  So at some point, Gilbert became your

9    partner, is that right?

10        A    Yes.

11        Q    Now, do you agree that handling

12   disagreements or disputes with your co-workers in a

13   calm manner was a requirement for your job?

14        A    Of course.

15        Q    Do you recall having attended training on

16   respect in the workplace?

17        A    I can imagine but I don't recall.  I can't

18   tell you if I did or didn't.

19        Q    Was it -- do you recall it ever being

20   conveyed to you during your employment that employees

21   must be respectful towards their co-workers?

22        A    Well, at the time when Sean and me got into

23   the argument when he told me to -- how did it go?

24   How do you say 'em?  I not going to say --

25        MR. ROSENBAUM:  No, you can say it.  Say

24

1   exactly what he told you.

2          THE WITNESS:  Okay.  This last incident that

3   came up when he -- when he told -- when he was

4   yelling at me -- I was power washing and he came up

5   behind me and I was standing right next to the power

6   washer.  And he -- and he told me -- he was yelling

7   at me to put on my pants.  So when I -- when he told

8   me to put on my pants, I turned around.  Gilbert was

9   coming already with my pants.  So he gave me my

10  pants.  It's just a rubber.  I slipped it on.  I

11  picked up the power washer.  I started power washing

12  again.  And then Sean left.  So I told Gilbert when

13  we went back to the shop, that I'm going to fix this

14  guy 'cause I've had it already.

15         We went back to the shop.  I did my

16  timesheet.  Sean was in the shop -- on the computer.

17  And I knocked on the door nicely and I said Sean, if

18  I gotta wear my PPE, you gotta wear your PPE.  I said

19  come Monday, you better -- you better have steel toe

20  shoes and long pants.  Because when he told me put on

21  my pants, he standing there with tennis shoes and

22  shorts.  So I told Gilbert how can he be standing

23  there and everybody knows he work with tennis shoes,

24  not steel toe shoes.  He wear tennis shoes and

25  shorts.

25

1   The only reason why I was wearing shorts is

2   'cause I was soaking wet and I was power washing one

3   building.  This guy works with shorts and tennis

4   shoes the whole day.

5        Q    Okay.

6        A    Every job.  So when I went over, I told him

7   he need to wear long pants and steel toe shoes.  And

8   then he said why, you going turn me in?  I said you

9   damn right I going turn you in.  I -- and then he

10  said you know what, F you.  Then I said eh, F you

11  too.  Then he said F you.  Then I said F you too

12  then.  I went catch myself and I said -- I stay

13  getting fed up already.  And if I don't walk away is

14  gonna get blown out of proportion.  So I turned

15  around and walked away.

16       And then I waited for the time for us to go

17  home.  When I went to the car to go home, I notice

18  nobody was leaving.  And that's when I knew they went

19  write one letter and everybody went agree to say that

20  I was swearing at Sean.  But yet, he was the one that

21  started the swearing.

22       Q    Okay.  So Mr. Lee, I'm going to ask you some

23  more questions about that.  But my specific question

24  to you was whether or not it had ever been conveyed

25  to you while you were employed there that employees

RALPH ROSENBERG COURT REPORTERS, INC.

ER 278

27

1    Q    Okay, let me --

2    A    Or if somebody come up to me and tell me

3  specifically hey, Preston, you cannot be -- no.

4    Q    Let me be more specific on my question then.

5  Okay.

6         So you don't -- you may have but you don't

7  recall if you attended training that discussed

8  respect in the work place, is that correct --

9    A    Yes, yes.

10   Q    Did anyone like a manager or human

11 resources, prior to the incident with Sean Igne, ever

12 have a conversation with you about the need to be

13 respectful to co-workers in the workplace?

14   A    I can't recall.

15   Q    Do you agree that it would violate company

16 policies to swear at a co-worker?

17   A    Well, I know for a fact it's against the

18 code of conduct.

19   Q    What about do you agree that it's against

20 company policy to threaten a co-worker?

21   A    Of course.

22   Q    And in your position as a painter, you are

23 also a member of the union, is that right?

24   A    Yes, ma'am.

25   Q    Which one is that?

30

```
1   that?

2        A    Never.

3        Q    Did you know who she was prior to that?

4        A    Have no clue.

5        Q    So I want to go back and ask you about the

6   pressure washing incident that you spoke a little bit

7   about earlier when -- when Sean told you to put on

8   your pants.  Okay.  So you were doing pressure

9   washing work at the time, right?

10       A    Yes.

11       Q    And you were wearing shorts while you were

12  doing that pressure washing, is that correct?

13       A    I was wearing a T-shirt with a rain jacket

14  with shorts and steel toe boots.

15       Q    And you -- Mr. Igne told you to put on rain

16  pants, is that correct?

17       A    Yes, ma'am.

18       Q    Now, in the days leading up to --

19       A    Wait, let me -- can I go back?  I'm sorry.

20  He didn't tell me to put on my pants.  He was yelling

21  at me to put on my pants.

22       Q    Okay.  And was the pressure washing machine

23  was going at the time?

24       A    I was standing right next to it.

25       Q    Okay.  And is that like a gasoline powered
```

31

```
 1   machine --

 2        A    Yes, ma'am.

 3        Q    So is it pretty loud?

 4        A    Very.

 5        Q    Okay.  So in the days leading up to this

 6   incident where Sean yelled for you to put the pants

 7   on, were you aware that a navy safety officer had

 8   spoken with Gilbert Castro about workplace safety

 9   issues?

10        A    Yes, ma'am.

11        Q    How were you aware of that?

12        A    Because when we went back to the shop,

13   Gilbert told me that during -- while we was working,

14   he got caught on top of the roof without his PPE.

15   And I told him why did he go -- you know, the whole

16   trip and everything.  And he said he just went there

17   roof ask for just to rinse 'em off and the lady

18   went -- right there went bust him.  And then he had

19   to sign papers with our safety.  And then she wrote

20   him up.  And they -- our safety came and got

21   involved, had to read him one lecture.  He had to

22   sign.  And I was like when all this when happen?  He

23   was like oh, I was on this side, you was on that

24   side.  And that's why I didn't know 'cause he was on

25   side of the building, I was on the other side of the
```

32

1    building.

2        Q    And was there also a discussion at lunchtime

3    about the fact that this safety officer had talked to

4    Gilbert?

5        A    I -- Gilbert told me that he told Sean that

6    he got written up after everything was done, was said

7    and done, after Sean came and yelled at me and

8    everything.  I didn't know Gilbert got written up

9    till the end of the day.

10       Q    Okay.  But so you don't recall a

11   lunchtime --

12       A    No.

13       Q    -- conversation about the safety officer

14   having a conversation with Gilbert?

15       A    No.  And I didn't get written up.  The lady

16   never write me up.  I never talk to no -- I never

17   talk to no lady.  I never know about no lady.  I

18   don't know nothing until the end of the day.

19       Q    Okay.  So prior to Sean telling you to put

20   on pants, you don't -- you're not aware of

21   conversation about the safety officer, you know,

22   watching you guys and looking what --

23       A    That's --

24            MR. ROSENBAUM:  Objection, form of the

25   question.  Go ahead.

35

1          And Gilbert Costales was right there

2   watching Rodney Martin read the letter to me.  And

3   all that investigation, all lies.  I never get

4   written up.  Safety never make me sign any papers.

5   And they went ask Gilbert.  Gilbert told them he got

6   written up.  So why Sean went lie, I have no idea.

7          David Hesapene is Sean Igne's partner.

8   David Hesapene said -- he said that Sean was yelling

9   at me to put on my pants.  He never tell me nicely.

10  So I get two witnesses right there.

11      Q    Okay.  I'm going to move on.

12          Do you believe that it was appropriate to

13  wear shorts while working?

14      A    Yes.

15      Q    And did you wear shorts while working on

16  other occasions?

17      A    Yes.

18      Q    Do you believe it was appropriate to wear

19  shorts while pressure washing?

20      A    Yes.

21      Q    And prior to this incident where Sean yelled

22  at you to put on the pants, had anyone ever told you

23  that rain pants need to be worn while pressure

24  washing?

25      A    Did anyone -- did anyone come to me and tell

RALPH ROSENBERG COURT REPORTERS, INC.

ER 283

1  meeting or in a discussion.

2      A    I can't remember that but I guarantee you my

3  supervisor, Rodney Martin, knows that we was wearing

4  shorts while we pressure washing and he was -- it

5  was -- it was -- it was all right.

6      Q    So at the end of the workday on the day when

7  Sean yelled for you to put on your pants, okay --

8      A    No, it wasn't at the end of the day.  This

9  is during the -- this is like right after lunch.

10     Q    I'm not -- I'm not finished with my question

11  yet.  So just wait till I'm finished, okay?

12         So the day when -- let's go back to the day

13  when Sean yells for you to put on your pants, okay?

14  At the end of the workday that day, you went to the

15  office where Sean was working on his timesheet, is

16  that right?

17     A    Yes.

18     Q    Okay.

19     A    It's our office.  I got to go -- I have to

20  go there.

21     Q    Okay.  And when you went to the office and

22  you encountered Sean, you were mad at him because he

23  had told you to put on pants, is that correct?

24     A    Actually, I wasn't mad.  Actually, I wanted

25  to just put him in his place.  So -- so -- so that's

38

1   why when I went over there -- 'cause I got no problem

2   wearing pants every day, wearing steel toe every day.

3   So it doesn't bother me.  I have to wear pants every

4   day and steel toe every day.

5           Sean comes in every day with shorts and

6   tennis shoes.  So it's okay for him to wear shorts

7   and tennis shoes.  And then when I put on my shorts

8   because -- and I'm power washing, that's the only

9   time I put on shorts 'cause we gonna get soaking wet.

10  And then I'm the one working.  He's sitting down

11  watching me and he telling me to put on pants when

12  he's wearing shorts and tennis shoes.  That's when I

13  went in there and I told him if I gotta wear my PPE,

14  you gotta wear your PPE.  And that's when he lost it

15  because he don't want to wear his PPE.  I got no

16  problems wearing it so I wear mine every day.

17      Q    So did you yell at Mr. Igne?

18      A    Negative.

19      Q    You didn't yell at him at any time?

20      A    Negative.

21          MR. ROSENBAUM:  Objection.  You mean when

22  he's in the office at that moment or any time in the

23  whole course of his employment?

24      Q    (By Ms. Jones) Right now I'm asking about

25  the incident when you went to the office on the day

RALPH ROSENBERG COURT REPORTERS, INC.

ER 285

39

1    that Mr. Igne told you to put on the pants, okay --

2        A    Okay.

3        Q    When you went to the office that day and you

4    had a discussion with Sean, did you yell at him at

5    any point during that --

6        A    No.

7        Q    Wait till I'm finished please.  Okay?

8             During that discussion at the office, did

9    you yell at Sean Igne at any point?

10       A    No.

11       Q    Did you swear at Mr. Igne at any point

12   during that discussion?

13       A    When I told him that he has -- if I got to

14   wear my PPE, you gotta wear your PPE.  He asked me if

15   I would turn him in.  I said if you don't wear it,

16   I'm going to turn you in.  And then I was talking to

17   him like I talking to you.  But, you know, some guys

18   say I get one deep voice, a loud voice.  I just told

19   him like how I talking to you.  If I gotta wear my

20   PPE, you gotta wear your PPE.  And then he said why?

21   If I gotta wear my PPE, you gotta wear your PPE.  So

22   come Monday, you better have all your stuff together.

23   And I said it just how I'm talking to you.  And he

24   said why, you going turn me in?  I said you damn

25   right I going turn you in.  And that's when -- you

RALPH ROSENBERG COURT REPORTERS, INC.

40

1    know what, fuck you.  And then I say you know,

2    fuck you.  I was -- then I did it twice, maybe three

3    times and then I caught myself and I was the one that

4    walked away.  Even though he the one that started it,

5    I the one that walked away.

6        Q    So the day after that incident, you --

7    did Mr. Martin tell you that he needed to talk to you

8    about what had happened?

9        A    No.

10       Q    Did you talk to Mr. Martin the next day

11   about what -- the interaction between you and Sean?

12       A    I don't think so.  I don't know if it was --

13   I don't think it was the next day because Sean called

14   in sick the next day.  And he wrote one letter and he

15   sent the letter to HR and sent the letter to Rodney

16   Martin.

17             After Rodney got the letter, then he called

18   me to his office.  I don't know if that was the next

19   day or what but Rodney talked to me like prior to me

20   going home.  It was at the end of the workday.  So as

21   I recall -- and that's when he called me in the

22   office and he had the letter.  He had the letter

23   like -- like if this is the letter to be -- to be

24   like a -- an A that he is, he had the letter written

25   upside down and he put the letter right next to me

41

1    like this.  Like I could -- instead -- instead of

2    have the letter -- you know what I mean, like a

3    normal person, here, read what Sean wrote, he put the

4    letter all the way next to me.  And Rodney is sitting

5    right here.  Right?  I can see the letter right here.

6    Then he's like oh, you see the letter?  Yes.  Oh,

7    Rodney went write this about you.  I said so what --

8           MR. ROSENBAUM:  Rodney or Sean?

9           THE WITNESS:  Rodney wrote -- Sean wrote the

10   letter about me.

11       Q     (By Ms. Jones) Okay.  So Rodney told you

12   that Sean had written something?

13       A     Right.

14       Q     About the interaction that you and Sean had,

15   is that right?

16       A     Right.

17       Q     Okay.  And did Rodney ask you what happened?

18       A     Yes.

19       Q     And did you describe for him what happened?

20       A     And as soon as I did, Rodney lost it.

21       Q     What do you mean he lost it?

22       A     He was all pissed off because everything

23   Sean wrote was all lies.

24       Q     So --

25       A     Rodney -- Rodney Martin, even like -- he's

44

1  Why would I go over there and start swearing at him?

2  And Rod couldn't say nothing.  I said exactly.  And I

3  said what about all this letters right here?  It's

4  all lies.  I said you know what, Rodney, do your

5  investigation.  But I tell you what, I like write up

6  Sean for lying 'cause I never get written up.  I

7  never get -- sign any -- any statements with the base

8  safety.  I never do nothing.  And now you telling me

9  I going get fired.  I want a -- if -- after you do

10  your so-called investigation, I want you to write up

11  Sean.

12      Q    Okay.

13      A    Right after that, nothing.  They do their

14  investigation, nothing.

15      Q    So did Mr. Martin have you prepare a

16  statement regarding the interaction between you and

17  Sean?

18      A    I never have to write one statement because

19  it was all lies and Rod knows it.

20      Q    And on the day that Sean told you to put on

21  pants, do you know what tasks Sean was performing

22  that day?

23      A    I have no clue and I no care.

24      Q    Do you know if he was doing any pressure

25  washing that day?

45

```
 1        A      I know he wasn't.

 2        Q      Okay.

 3        A      Because -- let me finish.  I know he wasn't

 4   because we have the power washers so he cannot be

 5   power washing nothing.

 6        Q      Okay.  Mr. Lee, the court reporter has

 7   handed you what's been marked Exhibit 1 to your

 8   deposition.  You can also --

 9        A      Oh, can I ask one question too?

10             COURT REPORTER:  Wait, wait, wait, wait.

11             MR. ROSENBAUM:  She got to mark it --

12             MS. JONES:  You can mark --

13             COURT REPORTER:  This is 1 or this is 1?

14             MS. JONES:  Oh, it's just a copy for Mr.

15   Rosenbaum.  It's the same thing.

16             MR. ROSENBAUM:  This one is mine?

17             MS. JONES:  No.

18             COURT REPORTER:  No, that one is his.  This

19   one's yours.

20             MR. ROSENBAUM:  Thank you.

21        Q      (By Ms. Jones) Mr. Lee, the court reporter

22   has handed you what's been marked Exhibit 1 to your

23   deposition.  Let me know when you're finished

24   reviewing the document.

25        A      Yeah.
```

46

1    Q   Do you recognize this document?

2    A   I don't recognize -- I mean I don't know --

3  this is what happened but.

4    Q   Okay.  So is that your signature at the

5  bottom?

6    A   Yes.

7    Q   Okay.  And did Rodney have you -- provide

8  this document to you to review and sign?

9    A   I guess.

10    Q   What do you mean you guess?  You don't

11  remember?

12    A   No, I don't remember but this is what

13  happened.

14    Q   Okay.  But that is your signature at the

15  bottom?

16    A   Yes, ma'am.

17    Q   Okay.  And you're saying that this document

18  that's Exhibit 1 describes what happened between you

19  and Sean?

20    A   Yeah, pretty much.  That's why I like know

21  the letter that he wrote because he put down that he

22  wasn't yelling at me.  He told me nicely to put on my

23  pants.  He couldn't have did that 'cause I was

24  standing next to the power washer.  Gilbert and David

25  is witness to that.

47

1      Q    Okay, I understand.

2      A    And then everything from -- his lying from

3   when he told me to put on my pants.  He lied about me

4   getting written up by the safety lady.  All of this

5   all lies.

6      Q    You can put that on the side now.  She needs

7   to collect that at the end so.

8          MR. ROSENBAUM:  This one's mine.  I can keep

9   it.  Just that one, one copy they got to keep for the

10  court reporter.

11     Q    (By Ms. Jones) So the letter that Sean

12  wrote, did you ever actually read it?

13     A    No.  I wanted to but they told me oh, I'm

14  sorry, it's confidential information.

15     Q    So Rodney conveyed to you parts of what were

16  in the letter?

17     A    Yes.

18     Q    Okay.  But you didn't actually read it

19  yourself?

20     A    No.  I even asked HR for the copy of the

21  letter, confidential information.  But I tell you

22  it's all lies though.

23     Q    Okay.  And when you spoke with Mr. Martin

24  about the incident with Sean, were you honest with

25  him?

48

1      A      One hundred ten percent.

2      Q      Did you tell any of your co-workers that you

3  were upset with Sean Igne about this incident with

4  him telling you to put on pants?

5      A      I tell everybody about the way I feel about

6  Sean on a daily basis.

7      Q      But at -- in November 2019 after this

8  incident with Sean, did you tell your co-workers that

9  you were upset with Sean for telling you to put on

10 pants?

11     A      Yes.

12     Q      Did you tell co-workers that you were upset

13 because Sean had written a letter about you?

14     A      Yes.

15     Q      Now, earlier you talked about David

16 Hesapene?

17     A      Wait, wait.  I like -- can I say something

18 about what you just asked me?

19     Q      Yeah.

20     A      Okay.  Not only I went ask them -- I was

21 upset about him writing the letter.  I was upset

22 because he lied about the letter and everybody knows

23 that he lied about the letter.  But when I asked to

24 see the letter, is all confidential.  And then when I

25 ask to say how can he lie and turn me in and do all

49

1   of this and nothing happens?  And then that's where

2   everything starts.  Just do your job.

3        Q    Okay.  So I want to ask you about David

4   Hesapene.  You mentioned him earlier, one of your

5   co-workers, right?  Did you have any problems with

6   David while you were working there?

7        A    No.

8        Q    So did you tell David -- after this argument

9   that you had with Sean in the office, did you tell

10  David that you didn't care if you lost your job, you

11  were going to punch Sean through his face?

12       A    I don't recall saying that but I didn't.  I

13  never did.  I never threaten him.  I never did touch

14  him.  I never say anything.  I never do anything to

15  harm anybody.

16       Q    Is it possible that you told David that you

17  were going to punch Sean through his face?

18       A    Let me put it this way.  Wait, how did you

19  say that again?  You said that I told David that I

20  was going punch Sean in his face?

21       Q    Right.

22       A    No, that's not what I said.  I said -- I

23  might have said I like punch him in his face but

24  that's just speaking out loud.  You know what I mean?

25  When I get mad at him when we talking that's like

50

1   ooh, I love give him one but I just -- that's just
2   the way I talk.  That don't mean I'm going to hit
3   him.  And it shows that.  I work there 27 years.  I
4   never -- I never touch nobody.  I never threaten
5   nobody.  I never hit nobody.  In 27 years.  I might
6   have said -- I might have said a lot of things to a
7   lot of people.  There's a lot of guys I don't like
8   and I speak my mind.  But that don't mean I'm going
9   to go over there and do something.  And I never did.
10  But like I said, I hate that guy.  I hate this guy.
11  You know what I mean?  But I don't go over there talk
12  to 'em because I don't like the guy.  I just stay
13  away.  But I'm not afraid to say I hate -- that guy
14  right there, hey, I hate that fucker.  You know what
15  I mean?  That's how I speak.
16       Q    Okay.  Did you also tell David, nobody can
17  touch me, not Rod, not Sean, not HR?
18       A    I'm not sure but I might have.
19       Q    Do you recall words to that effect that you
20  used with David?
21       A    I might have said that because I never did
22  nothing wrong.
23       Q    Okay.
24       A    How they gonna touch me when I never do
25  nothing wrong?

53

1    life.  You know what I mean?  I just -- sometimes I

2    get so pissed off that I gotta go straight home and

3    just -- I scream sometimes.  I yell, I cry because of

4    the stuff that they do to me.

5        Q    Okay.  I want to move on now and talk about

6    November 18, 2019.  That was the day you had a

7    meeting at the HR office.  You recall that?

8        A    Yeah.

9        Q    Okay.  So on November 18th, were you told by

10   Rodney Martin that you needed to meet with him and

11   HR?

12       A    Yes.

13       Q    And that meeting, was that held at the HR

14   office?

15       A    Yes.

16       Q    Who was present during that meeting --

17       A    Julie --

18       Q    Hold on.  You just got to wait until I'm

19   finished.  The court reporter has to be able to have

20   time to take it down.  Okay?

21            So who was present during the meeting on

22   November 18th at the HR office?

23       A    Julie Broyles and Rodney Martin.

24       Q    And you?

25       A    Me.

1    Sean and you the one that -- and then Gilbert was

2    like eh, no, no, no, no, no blame me.  I never tell

3    Sean nothing.  And that's when Gilbert came and told

4    me hey, Rod -- Rod went call me this and that and I

5    told him Sean went lie everything.  I said that's not

6    my fault.  That's his -- that's his kuleana he went

7    lie.  I no care.

8        Q    So when you went to the meeting at HR, did

9    you think you were going to be fired during the

10   meeting?

11       A    Of course not.

12       Q    Okay.  Now --

13       A    Wait, let me go back.  Why was I -- why

14   would I get fired for not doing nothing?

15       Q    Preston, I'm not suggesting anything.  I'm

16   just asking what you thought when you were going into

17   the meeting.  So you didn't have any indication that

18   you were going to get fired when you walked in, is

19   that right?

20       A    No.

21       Q    Okay.  Earlier on during that meeting, you

22   made an accusation about Sean Igne stealing gas from

23   the base, is that right?

24       A    Yes.

25       Q    Okay.  And why did you bring that up?

RALPH ROSENBERG COURT REPORTERS, INC.

ER 297

58

1   I said investigate Sean Igne stealing gas.  He been

2   doing it for years.  And we get witnesses for that.

3        Q    Okay.  So during the meeting on November 18,

4   2019, did Rodney Martin discuss the respect in the

5   workplace training that you'd had previously?

6        A    I have no clue.

7             MR. ROSENBAUM:  Do you remember?

8             THE WITNESS:  No.

9        Q    (By Ms. Jones) You don't remember?  Okay.

10            Do you recall anything that Rodney Martin

11  conveyed to you during that November 18th meeting?

12       A    He might have said that you gotta work

13  together.  You gotta -- well, he gotta respect you.

14  I gotta respect him and that -- but it was going in

15  one ear and coming out the other because they go out

16  of their way to screw me over for 14 years and

17  nothing happens.  We can go through this.  You can

18  ask me different ways.  You can do whatever.  We

19  going round and round in circles here.  It's the same

20  question.  He mistreated me the whole time I was

21  there.

22       Q    Are you talking about Sean?

23       A    Yes, Sean and Rod.

24       Q    Okay.  Did Rodney Martin say anything to you

25  during the November 18th meeting that was upsetting

64

1      A    I don't recall.

2      Q    Okay.  The court reporter has handed you

3   what's been marked Exhibit 2 to your deposition.

4   Please take a look at that and let me know when

5   you're ready.

6      A    Okay.

7      Q    Do you recognize Exhibit 2?

8      A    Yeah.

9      Q    And is that your signature on the lower

10   left --

11      A    Yes.

12      Q    Hold on.  Mr. Lee, if you can just please

13   wait till I'm finished.

14           Is that your signature on the lower left

15   corner of the first page of Exhibit 2?

16      A    Yes.

17      Q    And did you sign this during the meeting

18   with Mr. Martin and Ms. Broyles on November 18, 2019?

19      A    Yes.

20      Q    And did you understand that a written

21   warning was being issued to you during this meeting

22   on November 18th?

23      A    Yes.

24      Q    And you were not suspended as a result of

25   this disciplinary action, correct?

1    A    Correct.

2    Q    And you were not terminated, correct?

3    A    Correct.

4    Q    And when -- so when they finished discussing

5    this with you, you were free to go back to work, is

6    that right?

7    A    I couldn't.

8    Q    Well, the company wasn't prohibiting you

9    from going back to work, is that correct?

10   A    Correct.

11   Q    Now, you, at the conclusion of the meeting,

12   ended up leaving work, is that right?

13   A    Yes.

14   Q    And did you say that you needed to leave and

15   go to the doctor?

16   A    Yes.

17   Q    And did you say that you were going to be

18   finding a lawyer?

19   A    Yes.

20   Q    And is that because you were contemplating

21   filing or initiating some kind of legal action?

22   A    Yes.

23   Q    Why?

24   A    Because I'm being discriminated against.

25   Q    Because of the disciplinary warning?

67

1  reasons why.  I can go on and on.  You ain't got

2  enough time.

3      Q    Okay.  And so did you leave work as soon as

4  the meeting was finished?

5      A    I told you, yes.

6      Q    So you didn't finish your shift that day, is

7  that correct?

8      A    Yes, ma'am.

9      Q    Okay.  And did you ever go back to work at

10 L3Harris again after that?

11     A    Well, I don't know how you -- I don't know

12 how to say this but they made me -- they told me to

13 fill out my timesheet and just stay home and they

14 going pay me.

15     Q    That was in April, right?

16     A    Right.

17     Q    But you never went back?  You were never in

18 the workplace again after that?

19          MR. ROSENBAUM:  Did you ever physically go

20 back to work after that day --

21          THE WITNESS:  No, never.  That's why I

22 cannot understand how did I instigate one fight when

23 I wasn't even there.

24     Q    (By Ms. Jones) Okay.  Now, did you go to see

25 Dr. Williamson on November 18th after the meeting at

77

1    you what's been marked as Exhibit 4 to your

2    deposition.  You recognize this document, Mr. Lee?

3        A    Yes.

4        Q    Is this a claim you filed, a workers' comp

5    claim you filed?

6        A    Yes.

7        Q    And is this your handwriting on this

8    document?

9        A    Yes.

10       Q    And do you see on the -- there's a box that

11   says "describe how accident occurred" towards the

12   bottom.

13       A    Okay.

14       Q    And did you write in that box "I got written

15   up for code of conduct"?

16       A    Yes.

17       Q    That's your handwriting?

18       A    Yes.

19       Q    And is that what the basis for your workers'

20   comp claim was?

21            MR. ROSENBAUM:  Objection, calls for a legal

22   opinion or legal conclusion.

23            THE WITNESS:  No.  My workers' comp

24   complaint was that Sean wrote me -- I wrote that

25   because I never like write one whole -- one whole

83

1          MR. ROSENBAUM:  Okay.

2          MS. JONES:  Okay.  Let's go off the record.

3          VIDEOGRAPHER:  Okay.  We're going off the

4    record at 10:59 a.m.

5               (Recess taken.)

6          VIDEOGRAPHER:  Back on the record at

7    11:10 a.m.

8          Q     (By Ms. Jones) Mr. Lee, earlier we talked

9    about the -- at the November 18 meeting, that you had

10   made an accusation about Sean Igne stealing gasoline.

11   Had you made any allegations about Sean stealing gas

12   prior to the November 18, 2019 meeting?

13         A     No.

14         Q     After making that allegation during that

15   meeting on November 18th, did you also call a navy

16   hotline and report that Sean Igne was stealing gas?

17         A     No.

18         Q     Did you make a report to anybody else about

19   Sean Igne stealing gas?

20         A     I told Rod.  I told Julie.  And I told -- I

21   called the -- I called the captain of the base.

22         Q     Who's that?

23         A     I don't know his name.  The CO, whatever his

24   name.

25         Q     And what did you say when you called the

84

1    captain of the base?

2        A    That I have witnessed him stealing gas from

3    the base.

4        Q    Witnessed Sean?

5        A    Yes.  I didn't hear -- I didn't hear it.  I

6    didn't -- somebody didn't tell me.  I seen him

7    physically take a gas can, fill it up at the gas

8    station, put it in our truck, drive to his truck,

9    take the gas can out of the -- the work truck, put it

10   in his personal truck and then at the end of the day,

11   drive his truck home with the gas in his truck.

12       Q    And --

13       A    And he do this when I'm in the vehicle.  And

14   he do this every Tuesday and Thursday.  Why?  I don't

15   know.  But every Tuesday and Thursday  -- Tuesdays

16   and Thursdays for years.

17       Q    That was when you and Sean were partnered

18   together?

19       A    No.  That was when like sometimes my van is

20   in the shop or I have to ride with them.  And he

21   still does it.

22       Q    And is that what you told the captain of the

23   base when you called him?

24       A    Yes.  I told that to Rod.  I told the exact

25   same thing I told you to Julie.  And I told that to

RALPH ROSENBERG COURT REPORTERS, INC.

ER 304

93

```
1       A    No.  I mean I work -- he knows I work with

2   Sean.  I mean what you mean describe how when -- we

3   work together.  He knows that.

4       Q    Did you tell Mr. Taylor that you hated Mr.

5   Igne?

6       A    I have no clue.

7       Q    You don't remember?

8       A    What does that have to do with anything

9   though?  I told everybody I hate -- everybody knows I

10  hate him for what he's doing to me.

11      Q    Did you tell Mr. Taylor that you had

12  observed Mr. Igne putting gas into his personal gas

13  can every Tuesday and Thursday during the periods

14  from 2007 to 2010?

15      A    Didn't I just say that?

16           MR. ROSENBAUM:  Just focus on those --

17           THE WITNESS:  Yes.

18           MR. ROSENBAUM:  --  2007 to 2010.

19           THE WITNESS:  Yes.

20      Q    (By Ms. Jones) And do you recall that Mr.

21  Taylor asked you why are you now -- just now

22  reporting this in 2019?

23      A    Yes.

24      Q    And did you say because he just turned me in

25  so I will turn him in?
```

94

```
 1      A      No.

 2      Q      You didn't say that?

 3      A      No.

 4      Q      Did you say anything -- words to that

 5  effect?

 6      A      No.

 7      Q      What did you say when he asked you --

 8      A      I told him --

 9      Q      Hold on.  What did you say when Mr. Taylor

10  asked you why you're just now reporting this in 2019?

11      A      Because he's been doing it for over how many

12  years and nobody does nothing about it.  Everybody

13  knows he's being stealing gas.  The other painters

14  see him stealing gas, not only me.

15      Q      Then why bring it up in 2019?

16      A      Because I'm fed up already.  Every -- he

17  turned me in for every little -- we went through this

18  already.  He turned me in from the day I got there to

19  2021.  He turned me in, he lied.  He turned me in, he

20  lied.  He turned me in, he lied.  He turned me in, he

21  lied.  Nothing happens.  The paper the one that says

22  oh, go to your -- your superior, go see your leadman.

23  You cannot see your leadman, go to your supervisor.

24  Cannot go to your super -- go to the -- go to HR.

25  They all know all about this.  They all know how they
```

RALPH ROSENBERG COURT REPORTERS, INC.

ER 306

95

1    was treating me.  They all know about him turning me

2    in and not doing nothing.  Who else I going turn to?

3    I already talk -- my leadman is the one that is -- is

4    instigating this trouble by turning me in and writing

5    me up.  The supervisor does his so-called

6    investigation even though he's not one investigator.

7    I even told him to his face, you do -- you do so much

8    investigating, you should've been one cop.  Why you

9    one supervisor over here?  He investigate all of this

10   stuffs, every single time, comes out to be all lies.

11   I want to write up Sean.  Nothing happens.  I go back

12   and I tell HR the same thing what I just told you.

13   Nothing happens.  Where else can I turn?

14          Q    So did you report this in 2019 'cause you're

15   pissed off that Sean had made a complaint about you?

16          A    I was pissed off with Sean in 2006.

17          Q    Okay.  But you weren't reporting this in

18   2006 --

19          A    Exactly.  I just let it -- I just -- because

20   you know why?  I was brought up, do your job, shut

21   your mouth.  I no care what that lady doing.  I no

22   care what that guy doing.  It's none of your

23   business.  Just do your job.  That's how I was

24   raised.

25          Q    But in 2019, you make a report that Sean is

1 stealing gas. And my question is did you decide to

2 make that allegation about Sean because you were

3 pissed off that he had complained about you?

4 A I was pissed off from 2006. I went turn him

5 in 2019 because I just had it already. But let it be

6 known I was pissed off from 2006.

7 Q Did you have any further discussions with

8 the captain of the base about this allegation?

9 A No.

10 Q You never tried to call him back or

11 anything?

12 A No.

13 Q Now, in your -- the complaint that you filed

14 in this lawsuit, you allege that in December of 2019,

15 Ross West called you and requested your CAC card and

16 secret clearance card. You recall that allegation?

17 A He called for -- what day was that?

18 Q Your complaint says it was in December of

19 2019.

20 A Okay. That's right. And he asked me for

21 any CAC card and my -- my secret clearance ID.

22 Q So the -- the C-A-C is -- you call that the

23 CAC card?

24 A CAC card, yeah -- yes.

25 Q And is the secret clearance card, is that

RALPH ROSENBERG COURT REPORTERS, INC.

Case: 22-15288, 07/06/2022, ID: 12487394, DktEntry: 11-3, Page 265 of 299
Case 1:20-cv-00489-LEK-KJM   Document 50-7   Filed 09/29/21   Page 44 of 70   PageID #:
457

97

```
 1   also sometimes referred to as the blue badge?
 2        A    Yes, ma'am.
 3        Q    And who did you understand Ross West to be?
 4        A    My project manager.
 5        Q    And so you knew Ross West already?
 6        A    Yes.
 7        Q    You knew he was the project manager out
 8   there?
 9        A    Yes.
10        Q    Did you have any problems with Ross West
11   prior to this?
12        A    I have a problem with what he did.
13        Q    But my question is prior to him calling you
14   in December of 2019 about the badge, did you have any
15   problems with Ross West?
16        A    No, ma'am.
17        Q    And the conversation with Ross West about
18   the CAC card and the badge, that was a phone
19   conversation?
20        A    Yes, ma'am.
21        Q    And that was while you were out on leave?
22        A    Yes, ma'am.
23        Q    The CAC card and the blue badge were needed
24   to access areas of the base that are for employees
25   only, is that correct?
```

98

1    A    That's -- that's for access with people with

2  secret clearance.  You can work on the base but you

3  might not have a clearance.  So you cannot get into

4  the facilities.

5    Q    Okay.  So . . .

6    A    Not everybody has a CAC -- has a security

7  clearance ID.

8    Q    Right.  So but after you turned those in,

9  you were still able to get on base with your military

10 ID, is that right?

11   A    Yes.  But my question is why did Ross West

12 take my CAC card and my blue badge when I was on --

13 when I was on -- when I was on leave when there was

14 other individuals that was on leave?  He never took

15 their CAC card.  That's why I feel that he's

16 discriminating against me and only me.  Why did he

17 only take my CAC card?

18   Q    Okay.  So when -- when he collected the CAC

19 card, that just prevented you from accessing areas

20 that you need to access to work, is that right?

21   A    Let me rephrase that.  He didn't -- how did

22 she answer the question?  Ross West didn't -- didn't

23 take my CAC card.  He wasn't there.  So I gave it to

24 his secretary which that was illegal right there.

25 Because we have training like I said.  You sign this

99

1    things every time and we have training.  And there's

2    legal ways of doing this.  You cannot give your CAC

3    card to anybody.  That's against navy policy and we

4    have training on that.  If -- if Ross West would walk

5    up to a computer and a CAC card is in the computer,

6    he going take the CAC card and then when the person

7    comes back, he gotta go see Ross West to get your CAC

8    card back because you're not supposed to leave that

9    CAC card in anybody's possession.

10           And on top of that, when he told me to bring

11   the CAC card, he said if I'm not there, just give it

12   to my secretary.  How I know my secretary not using

13   my CAC card when I'm not there?

14       Q    Okay.  So while you're not working, do you

15   need the CAC card for anything?

16       A    Yes.

17       Q    What?

18       A    I need to come in every two weeks to log on

19   the computer.  Because if you don't, the computer

20   will gonna -- since your CAC card is being activated,

21   it's going to shut you down.  Then you cannot do your

22   timesheet from a military computer.

23       Q    Were you doing a timesheet during the entire

24   time that you're on leave?

25       A    Yes.

100

1      Q      You were coming on base while you were on

2   leave?

3      A      Yes.

4      Q      So after you turned in your card, how were

5   you doing that?

6      A      I had to do it from home.

7      Q      And so you -- so you just logged on from

8   home to do your timesheet?

9      A      Yes.  But the reason why I was doing it on

10  the -- on the base because if I don't do it -- if I

11  don't -- I don't use my CAC card, it's gonna -- after

12  30 days or two weeks or whatever, it's gonna shut

13  off.  And then to reboot the CAC card, the

14  supervisor, Rodney Martin, is gonna have to go and do

15  all kind stuffs which is gonna totally piss him off.

16  So that's why I just keep going on the base and doing

17  this so my CAC card don't get turned off for not

18  being in use.

19     Q      Okay.  So when Ross West called you about --

20  he told you that you -- he needed to collect your CAC

21  card, is that right?

22     A      Yes.

23     Q      Did he saying anything else?

24     A      I asked him why and he said that's my job

25  that's why.

RALPH ROSENBERG COURT REPORTERS, INC.

ER 312

1    Q    Did he say anything else?

2    A    And I said fine.

3    Q    Did you -- okay.  So you didn't -- did you

4    say anything else to Ross?

5    A    He called me up.  He said Preston, I need

6    your CAC card.  I said why?  He said it's my job.  I

7    said fine.  I said it's 3:30.  It's too late for me

8    to come in and give you the CAC card.  He said can

9    you come in Monday?  This was a Friday.  I said no

10   problem.  I said I'll see you bright and early -- I

11   see you bright and early Monday morning.  He goes

12   well, if I'm not there, just give it to Lovely --

13   Lovey.  I said you let me give my CAC card to your

14   secretary?  He said yes.  I said fine, knowing that

15   it's illegal to give my CAC card to anybody.

16   Q    Did you tell him that?

17   A    No.

18   Q    You didn't tell Ross that?

19   A    Nope.  It's not -- why I gonna tell my

20   project manager how for do his job?

21   Q    I'm just asking --

22   A    So -- no, and I'm just saying --

23   Q    I'm not arguing --

24   A    I'm not argue -- and I just saying

25   there's -- there's -- there's -- there's the right

102

1   way how to do it.  And he should have told me take my

2   CAC card and go to security and turn it in, not give

3   to one other -- one secretary.

4        Q    I understand.  I'm just asking you what

5   was --

6        A    I'm just telling you that's -- that's how

7   you supposed to do it but he didn't want me to do it

8   that way.  So I did it the way he wanted 'cause he's

9   the project manager.

10       Q    Understood.  Okay.  And you -- Lovey is Mr.

11  West's secretary?

12       A    Yes.

13       Q    You knew that already from before?

14       A    Yes.

15       Q    Okay.  And you knew who she was so you'd

16  recognize her?

17       A    Yes.

18       Q    So did you go in on the Monday and deliver

19  the badges that he asked?

20       A    Yes.

21       Q    And so did you see Mr. West at the time?

22       A    I gave it to her 'cause he wasn't there.

23  That's -- he -- I supposed to go in and give it to

24  Mr. West.  I went in there.  He wasn't there.  So he

25  instructed me if I'm not there, give it to my

1  you?

2       A    Mr. Lee, your position has been terminated.

3       Q    Is that all?

4       A    That's it.  And I said okay, why?  And she

5  said oh, you know why.  I said no, I don't know why.

6  She goes oh, well, because of -- because of the stuff

7  that happened at work.  I said okay, fine.  I said

8  thank you for -- thank you for letting me work for

9  this company for all these years but I going tell you

10 right now, you guys are firing me wrongfully and I'm

11 gonna seek legal assistance.  And that was brought up

12 at the hearing at the unemployment.

13      Q    And was there any other discussion during

14 the phone call with Ms. Stewart?

15      A    No.

16      Q    Did she -- did Danielle say anything about

17 PTSD during that phone call?

18      A    Nope.

19      Q    Has anyone told you that you were fired

20 because you had PTSD?

21      A    Nope.

22      Q    Did you talk to the union about filing a

23 grievance regarding your termination?

24      A    Nope.

25      Q    During your employment and while you're

135

1        VIDEOGRAPHER:  Okay.  We're going off the

2   record at 12:18 p.m.

3            (Recess taken.)

4        VIDEOGRAPHER:  Okay.  We're going back on

5   the record at 12:48 p.m.

6        Q    (By Ms. Jones) Mr. Lee, before we get to the

7   next exhibit, I don't think I asked you before but

8   Gilbert Castro who, I guess, was your partner at

9   least for a short period of time, did you have any

10   problems with him?

11       A    Yeah.  We friends but I had problems with

12   him.  I had to tell him -- set him straight a couple

13   times.

14       Q    About what?

15       A    About work.

16       Q    Well, like how to do things or --

17       A    Well, like I said in 2006, when I first got

18   there, him and Sean was partners.  Okay.  And then

19   before they split up -- no -- yeah.  What happened

20   was -- no, no.  What happened was when I first got --

21   when I first got there, I bumped Gilbert.  Okay?  So

22   that's why Sean and Rodney didn't accept me because I

23   took away the friend, right?  And it's a Filipino

24   thing.  Everybody in there is Filipino except for me.

25   No -- and Rodney -- Rodney too.  He's not Filipino

RALPH ROSENBERG COURT REPORTERS, INC.

ER 316

```
1              THE WITNESS:  No.

2       Q    (By Ms. Jones) And there was no disciplinary

3  action imposed on you during that meeting in

4  March 2019, correct?

5       A    Yes.

6       Q    Yes there was or there was -- sorry, my

7  question was probably bad.  Let me restate it.

8              Was any disciplinary action imposed upon you

9  as -- during or as a result of the meeting in

10 March 2019?

11             MR. ROSENBAUM:  Objection, calls for a legal

12 opinion.  But go ahead.

13             MS. JONES:  No, it doesn't.

14             THE WITNESS:  The answer is no because I

15 didn't do nothing wrong.  But they was trying to see

16 if I did -- was going -- why would you ask me if I

17 like -- like fight my co-worker just out of the

18 blues?  I mean what -- what basis do they have that

19 to ask me?

20      Q    (By Ms. Jones) And did they tell you during

21 that meeting that a co-worker had come to HR to raise

22 a concern?

23      A    No.  I asked that question.

24      Q    You asked why they were calling you in?

25      A    I said because of Sean Igne telling you guys
```

182

1      Q      And what about Julie, did you have any

2   meetings with her between March 2019 and

3   November 2019?

4      A      Not that I recall.  But they was there when

5   I got in the car accident though.

6      Q      For the disciplinary meeting when --

7      A      When I -- when I banged the bumper on my

8   van.

9      Q      Yeah.  So that was 2015, right?

10     A      Okay.  Well -- I don't know but they was

11  there for that so.

12     Q      Yeah.  I was just asking about the period

13  between March 2019 and November 2019.

14     A      Okay.

15     Q      And you don't recall any meetings during

16  that period --

17     A      No, ma'am.

18     Q      Okay.  So the court reporter has handed you

19  what's been marked Exhibit 14 to your deposition.

20     A      Yeah.

21     Q      Do you recognize this document?

22     A      Yes.

23     Q      Is this a charge of discrimination that you

24  filed with the EEOC?

25     A      Definitely.

RALPH ROSENBERG COURT REPORTERS, INC.

ER 318

183

1     Q     And is that your signature at the bottom?

2     A     Yes, ma'am.

3     Q     On both pages 1 and 2?

4     A     Yep.  Yes, ma'am.

5     Q     Did you have a lawyer when you submitted

6  this charge?

7     A     No, ma'am.  I did this -- I did all this.

8  Get this one and the human -- the -- the human -- not

9  human rights -- human rights?  No, it's Hawaii Civil

10  Rights, huh?  What the name?

11          MR. ROSENBAUM:  That's this one.

12          THE WITNESS:  Human rights?  No, this is

13  different.  This is the EOC.

14          MR. ROSENBAUM:  Yes, Hawaii Civil Rights

15  Commission.

16          THE WITNESS:  Okay.  Yeah, I did all this

17  before -- before I found him.  I did all this on my

18  own.

19     Q     (By Ms. Jones) When did you hire Joe?

20     A     After this I think.  Because these guys the

21  one told me to -- this is what happens.  I went -- I

22  went contact these guys.  They made me fill out all

23  these paperwork.  And -- and I submitted it to them.

24  They did their investigation.  And they was the one

25  told me that I was discriminated against and I need

184

1    to get legal -- seek one lawyer and sue the company

2    because they cannot do what they did to me.  And

3    that's where we stay today.

4        Q    Okay.  So in the -- looking at Exhibit 14.

5        A    Sorry.  14?

6        Q    Yeah.  At the -- there's four paragraphs --

7    no, first page.  There's four paragraphs --

8        A    Okay.

9        Q    -- under the particulars are.  See that?

10       A    Uh-hum, yes, ma'am.

11       Q    And then in the third paragraph, it says

12   "Since my diagnosis in February 2019, I've been

13   subjected to repeated harassment and discipline by

14   Respondent.  For example, Sean" -- I think it should

15   be Igne.

16       A    Yes, ma'am.

17       Q    "Has informed the company that he is afraid

18   to work with me because of my condition.  Mr. Igne

19   has also asked me why I just do not retire."  You see

20   that?

21       A    Yep, that's true.

22       Q    So when did those things occur?

23       A    In February.

24       Q    So in February of 2019?  So those things

25   happened in between the time that you got the award

185

```
 1   from the VA and in between the time that you had the
 2   meeting with Jasmine and Julie?
 3       A    Say that, what you just said.
 4       Q    Did -- so these things occurred in between
 5   the time you got the disability determination from
 6   the VA and the time you had the meeting with Jasmine
 7   and Julie in March 2019?
 8            MR. ROSENBAUM:  Objection, form of the
 9   question --
10            THE WITNESS:  No.  No.  What happened was I
11   got the decision in February.  Sean found out that I
12   had PTSD.  He told me why don't I retire.  And then
13   since I told him I not gonna retire, oh, if I did
14   this, if I had this -- eh, you never have 'em.  So
15   don't worry about it.
16            Then after he found out that I wasn't gonna
17   retire, still to try and get me out, he went upstairs
18   and told them he was afraid to work with me because
19   I'm a PTSD.
20       Q    (By Ms. Jones) So that's what I'm saying is
21   these things that you're talking about that Sean did,
22   that was all happening in the February 2019 time
23   period?
24       A    Yes, ma'am.  Yes, ma'am.
25       Q    Okay.
```

RALPH ROSENBERG COURT REPORTERS, INC.

Case: 22-15288, 07/06/2022, ID: 12487394, DktEntry: 11-3, Page 278 of 299
Case 1:20-cv-00489-LEK-KJM   Document 50-7   Filed 09/29/21   Page 57 of 70   PageID #:
470

186

1    A    And see look, I even forgot but it says

2   right here.  He told me for -- ask me how come I

3   don't retire.  Remember I said that?  I remembered

4   that.

5    Q    Okay.  And then the next paragraph says

6   "Additionally, Rigging Shop Lead Mark Vegas has gone

7   to the Union and told them that I should not be

8   working there because I have PTSD."

9    A    Yep.

10    Q    "Mr. Vegas has helped Mr. Igne to write

11  letters against me which have been turned in to

12  Respondent."  You see that?

13    A    Yep.

14    Q    When did that happen?

15    A    That happened right after they found out I

16  had PTSD.  That same month February, the third week,

17  Wednesday, they went to the union meeting.  And they

18  start the union meeting with old business.  Okay.  We

19  have any new business?  Yes, Mark, you have anything

20  to say?  Well, how can Preston work when he get PTSD?

21    Q    So this was a union meeting in February

22  2019?

23    A    Yep.  And that's how the whole company found

24  out that I get PTSD from Mark Vegas.

25         MR. ROSENBAUM:  Tell her the full story.

187

1          MS. JONES:  Okay, no, no, no.  Hold on, Joe.

2    Let me ask the questions please.

3          Q     (By Ms. Jones) Were you at the meeting?

4          A     No.

5          Q     Somebody told -- did somebody tell you about

6    the meeting?

7          A     Okay.  Like Joe said, this is what happened.

8    Mark Vegas went to the meeting.  They asked any

9    business, old business, no.  New business, yes Mark?

10   Oh, how can Preston work when he get PTSD?  And then

11   Tony Pereira came in.  That -- another steward said

12   what?  Oh, Preston get PTSD, how can he be working?

13   Oh, you know what, we gotta turn him, in, brah

14   because he's liable.  If he snap at work, the

15   company's liable.  They going get sued.  So we gotta

16   go to the company and tell them that they gotta let

17   Preston go because eh, he's a liability.

18          Then right there, ring.  Hello?  Eh,

19   Preston, where you stay?  I said I stay home.  Why?

20   Brah, you need to come to the union meeting.  I said

21   for what?  Oh, the union meeting about you.  I go

22   what you mean about me?  They said eh, the whole

23   union meeting is about you.  Huh?  Mark Vegas said

24   this, Tony Pereira said this.  What?  Eh, they

25   trying -- they gonna try get you fired.  This, this

RALPH ROSENBERG COURT REPORTERS, INC.

ER 323

188

1   and this. How do I know? I get more than one friend

2   there.

3       Q    Okay. So who --

4       A    So multiple -- you like know their names?

5       Q    Who called you during the meeting to tell

6   you what was happening?

7       A    Dywle Lee and Galen Alvarez. And they still

8   employed by the company.

9       Q    Okay.

10      A    And they gonna testify on my behalf.

11      Q    And -- and this -- again, this whole meeting

12  that you're talking about was in February 19, this

13  whole discussion?

14      A    Yes. I pretty sure, yes.

15      Q    And did you -- when you went to the meeting

16  after that with Jasmine and Julie, did you talk to

17  them about what happened at the union meeting?

18      A    No.

19      Q    Did you talk to them about what Sean had

20  said about retiring?

21      A    I don't know if I asked them about me

22  retiring. But I asked them if Sean was the one that

23  went turn me in. I like hear 'em from them. And

24  they said they cannot tell me that. But I know it

25  was Sean that turned me in.

189

1      Q    Yeah.  No, I'm just saying did you say to

2  them what Sean said?

3      A    No.  You know what, to tell you the truth,

4  I'm not sure.  I might have but I'm over it already.

5  You know what I mean?

6           MS. JONES:  Okay.  Let's -- I want to give

7  the court reporter a chance to rest her fingers for a

8  minute.  So we're going to take a five-minute break,

9  okay?

10          MR. ROSENBAUM:  Sounds good.

11          MS. JONES:  Let's go off the record.

12          VIDEOGRAPHER:  Okay.  We're going off the

13  record at 1:53 p.m.

14          (Recess taken).

15          VIDEOGRAPHER:  Back on the record at

16  2:06 p.m.

17     Q    (By Ms. Jones) Mr. Lee, the court reporter

18  has just handed you what's been marked Exhibit 15 to

19  your deposition.  Do you recognize this document?

20     A    Not really but, yeah, go ahead.

21     Q    Do you recognize this being your

22  handwriting?

23     A    This is my handwriting, yes.

24     Q    And is that your signature on the bottom of

25  page 4?

RALPH ROSENBERG COURT REPORTERS, INC.

ER 325

1    MR. ROSENBAUM:  The last one.

2    THE WITNESS:  Yes.

3    Q    (By Ms. Jones) Can you turn to page 3

4    please.

5    A    Yes.

6    Q    So you see there's -- is this your

7    handwriting on page 3?

8    A    I don't think so.

9    Q    You don't think so?

10   A    No.

11   Q    Did somebody help you with this charge or

12   this questionnaire?

13   A    What does it say?  I don't know what this

14   thing says.  I like my chance -- charge of

15   discrimination for something discrimination and after

16   or stress leave related to . . . I don't know who

17   wrote this.  It's not me.

18   Q    So if -- let me reference on the front page

19   the date up at the top.  It says November 17, 2020.

20   You see that?

21   A    Yes, ma'am.

22   Q    Okay.  So this was after your employment was

23   terminated?  Do --

24   A    I was terminated already.

25   Q    Yeah.  Your employment was terminated

Case: 22-15288, 07/06/2022, ID: 12487394, DktEntry: 11-3, Page 283 of 299
Case 1:20-cv-00489-LEK-KJM   Document 50-7   Filed 09/29/21   Page 62 of 70   PageID #:
475

196

1       Q      Right.  So they paid you for an extra day?

2       A      How do you know that?

3       Q      Well, that's what you're telling me.

4       A      No, that's what they telling me.  I want to

5    see the pay stub.  How did they pay me to the 23rd

6    when I didn't submit a -- when I didn't submit a time

7    card?

8       Q      Okay.  So --

9       A      I'm asking you.  You asking me and I'm

10   asking you.

11      Q      Okay.  Mr. Lee, I'm sorry but I'm not going

12   to answer questions today.  This is your deposition,

13   not mine.  Okay?  So let's move on.  I don't think

14   that's critical anyway about if they paid you for an

15   extra day or not.

16             Going back to -- you talked earlier about

17   the union -- this union meeting in February of 2019

18   that some of the guys called you to tell you about.

19   Did you ever file a complaint with the union about

20   what was being discussed at the meeting?

21      A      Nope.

22      Q      Did you file a complaint with anybody else

23   about what was being discussed during this union

24   meeting?

25      A      Because of what was discussed at that union

197

1    meeting, I never went to any more union meetings.

2        Q    But did you file a complaint with anybody

3    else about --

4        A    I answered that, no.

5        Q    So in this lawsuit, the complaint that you

6    filed in this lawsuit, you . . . there's an

7    allegation in your complaint that you were retaliated

8    against for "reporting illegal practices at

9    L3Harris".  What illegal practices did you report?

10       A    Sean stealing gas.

11       Q    Anything else?

12       A    Him going home.

13       Q    What do you mean him going home?

14       A    He would leave three times a week.

15       Q    Okay.  Any other illegal practices that you

16   reported?

17       A    No.  I don't know.

18       Q    When -- when did you report that Sean was

19   leaving work?

20       A    The same time he was stealing gas.

21       Q    You said that during the meeting with Julie

22   and Rodney?

23       A    (Moves head up and down.)

24       Q    Is that a yes?

25       A    Yes, I'm sorry.

198

```
1        Q     So -- and so what exactly did you say to

2   Julie and Rodney during the meeting about Sean

3   leaving?

4        A     He steal gas every Tuesdays and Thursdays,

5   okay.  And three time a week, he brings his personal

6   vehicle to the job site.  And between 12 and

7   2 o'clock, he gets in his truck and he goes home.

8   And he logs eight hours.  And I guarantee you Gilbert

9   go witness to that too.  And how do I know he goes

10  home and logs eight hours?  I check his timesheet.

11  And I'm willing to take a lie detector test for that

12  too.

13       Q     Are you currently employed anywhere?

14       A     No, ma'am.

15       Q     Since your employment with L3Harris was

16  terminated in June of 2020, have you submitted an

17  application for any job?

18       A     I call.

19       Q     But did you actually submit an application

20  to anybody --

21       A     No.  I call to see if there's employment.

22       Q     In your interrogatory responses, you said

23  that you called three painting companies.  Is that

24  what you're referring to?

25       A     Yes, ma'am.
```

RALPH ROSENBERG COURT REPORTERS, INC.

230

1    would leave.

2        Q    Okay.  So --

3        A    If he has the gall to come up and tell

4    everybody that when this is all over and I win, that

5    I'm gonna walk up to him and shake his hand and tell

6    him thank you for everything he done for me which is

7    he never do shit for me.  But I'm not that dumb.

8        Q    The -- I want to go back and ask you

9    about -- I know we talked about this a little bit but

10   I just want to make sure that I have an understanding

11   of -- totality of what you're claiming in terms of

12   harassment.  Remember we talked -- we talked about

13   the fact that I was asking about people harassing you

14   for a disability.  So you told me about Sean Igne

15   making some comments about when are you going to

16   retire that I understand was in February of 2019.

17   And you also said that Mark Vegas made some comments

18   during the union meeting, right?

19       A    Yes, ma'am.

20       Q    Other than Sean Igne asking about when

21   you're going to retire, did anyone else say anything

22   to you, any of your co-workers say anything to you

23   about having PTSD or, you know, harassing you in any

24   way?

25       A    Of course.

RALPH ROSENBERG COURT REPORTERS, INC.

ER 330

231

1    Q      Who?

2    A      Steven Duarte.  He told me in a long

3  conversation, to make it short.  If he could retire,

4  he would because that's his goal too, have enough

5  money to retire and no work.  And he feels that since

6  I get hundred percent PTSD, that I should retire and

7  walk away and this bullshit and him.  Who else?

8    Q      So let me ask you about Steven.  When --

9  when did Steven make that comment?

10   A      Right after everybody find out I had PTSD.

11   Q      So this is in February of 2019?

12   A      I don't know if it's in February.  Might

13  have been -- could have been in March after the union

14  meeting 'cause after the union meeting, everybody

15  knew about it.

16   Q      So this was either in February or March that

17  Steven made this comment?

18   A      Say that again.

19   Q      So when Steven made this comment to you,

20  that was either in February or March of 2019?

21   A      Yes, yes.

22   Q      And did you feel that Steven's comment to

23  you about retirement was harassing you?

24   A      Of course.

25   Q      Why?

232

1    A    Why is he telling me I should retire because

2  I get PTSD?  It's none of his F-ing business.

3    Q    Did you tell him that?

4    A    You want -- you want me -- you want to know

5  what I told him?

6    Q    Yes.

7    A    I told him -- I told him like this.  I said

8  Steven, you so worried about what I getting.  I said

9  you can get 'em too.  And he said huh?  I said you

10  can get -- you can get 'em too.  He goes how I can

11  get 'em?  I told him grow some fucking balls, go down

12  to the VA office, raise your right hand and join the

13  military.  And you would -- you too could get

14  disability.  But you one big pussy.  That's why you

15  not gonna get shit.  Get the fuck out of my van is

16  what I told him.

17    Q    Did he ever talk to you about -- say

18  anything to you about it after that?

19    A    No.

20    Q    Did you ever make any complaints about what

21  Steven said to you?

22    A    Yes.

23    Q    To whom?

24    A    To my wife when I come home and I'm pissed

25  and I like -- I like scream and yell and let it out

236

1  came and turned me in.  That's regardless.  But he

2  telling me why don't I retire and I said it's not --

3  it's not his damn business, brah, what I do.

4      Q    Did you make any complaints to L3Harris

5  about comments by Mark Vegas?

6      A    No.

7      Q    Between the time -- so in March of 2019, you

8  had this meeting with Jasmine and Julie.  Between

9  that meeting up until the meeting in November when

10  you issued the written warning, was there any

11  disciplinary action imposed on you?

12      A    On me?

13      Q    Yes.

14      A    Additional -- additional --

15      Q    Were you disciplined for anything?

16      A    No.

17      Q    So you weren't written up or anything like

18  that?

19      A    For?

20      Q    Anything.

21      A    From what time period you talking?

22      Q    From March of 2019 when you had the meeting

23  with Jasmine and Julie.

24      A    Yeah.

25      Q    Up until the written warning that was issued

249

1            C E R T I F I C A T E

2    STATE OF HAWAII                    )
                                        ) SS:
3    CITY AND COUNTY OF HONOLULU        )

4

5        I, PRISCILLA GONZAGA, Certified Shorthand
     Reporter, do hereby certify:

6        That on June 25, 2021, appeared before me
     PRESTON LEE, the witness whose deposition is
7    contained herein; that prior to being examined he was
     by me duly sworn:

8

9        That the deposition was taken down by me in
     machine shorthand and was thereafter reduced to
     typewriting; that the foregoing represents, to the
10   best of my ability, a true and correct transcript of
     the proceedings had in the foregoing matter.

11

12       That pursuant to Rule 30(e) of the Hawaii
     Rules of Civil Procedure, a request for an
     opportunity to review and make changes to this
13   transcript:

14       __x__   Was made by the deponent or a party (and/or
                 their attorney) prior to the completion of
15               the deposition.

16       _____  Was **not** made by the deponent or a party
                 and/or their attorney) prior to the
17               completion of the deposition.

18       _____  Was waived.

19       I further certify that I am not an attorney
     for any of the parties hereto, nor in any way
20   concerned with the cause.

21

         Dated: This __//__ day of July 2021 in
22   Honolulu, Hawaii.

23

24

25       _____
         Priscilla Gonzaga, CSR # 127

RALPH ROSENBERG COURT REPORTERS, INC.

ER 334

## WITNESS CORRECTION SHEET

**CASE:** LEE VS. L3HARRIS TECHNOLOGIES, INC.; CIVIL NO. 1:20-CV-00489 LEK-KJM

**DEPOSITION OF PRESTON LEE (VIDEOTAPED), TAKEN ON 6-25-21.**

| PAGE | LINE | CORRECTION | REASON |
|------|------|------------|--------|
|      |      |            |        |
|      |      |            |        |
|      |      |            |        |
|      |      |            |        |
|      |      |            |        |
|      |      |            |        |
|      |      |            |        |
|      |      |            |        |
|      |      |            |        |
|      |      |            |        |
|      |      |            |        |
|      |      |            |        |

(If additional space is needed, attach a blank sheet)

Signature of Deponent: _____   Date: _____

==================================================================

## CERTIFICATE

☐ Please be advised that the deponent signed and/or made corrections to the deposition within 30 days of notification.

☒ Please be advised that 30 days have expired and the deponent has failed to read and sign the deposition.

☐ Please be advised that signature and/or corrections were received and are **not being filed** with the transcript because:

    ☐ the deponent failed to sign and/or make corrections within 30 days after notification that the transcript was available for review.

    ☐ a request for an opportunity to review the transcript was **not** made by the deponent or a party before completion of the deposition.

☐ Please be advised that the above-named case is going to trial and/or hearing and the deponent has **not** had 30 days to read and sign the deposition before the filing of this transcript with the Court.

DATED:    8-30-21, HONOLULU, HAWAII.

CSR NO. 235

*Ralph Rosenberg* by d.y.
**Ralph Rosenberg Court Reporters, Inc.**
*1001 Bishop Street, Suite 2460, Honolulu, HI 96813*
*Phone: (808) 524-2090   Fax: (808) 524-2596*

ER 335



1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

PRESTON LEE,                          )   CIVIL NO. 1:20-CV-00489 LEK-KJM
                                      )   (Other Civil Action)
              Plaintiff,              )
                                      )
       vs.                            )
                                      )
L3HARRIS TECHNOLOGIES, INC.;          )
JOHN DOES 1-10; JANE DOES 1-10;       )
DOE CORPORATIONS 1-10; DOE            )
PARTNERSHIPS 1-10; DOE                )
UNINCORPORATED ORGANIZATIONS          )
1-10; and DOE GOVERNMENTAL            )
AGENCIES 1-10,                        )
                                      )
              Defendants.             )
                                      )

(040121.01 dkf)


DEPOSITION OF UILANI MATAVAO
UPON WRITTEN INTERROGATORIES


Taken on behalf of Defendant L3HARRIS TECHNOLOGIES, INC., at the
office of Veterans Affairs, VA Pacific Islands Health Care System,
459 Patterson Road, Honolulu, Hawaii, commencing at 7:25 a.m., on
March 30, 2021, pursuant to subpoena.




RECORDS RE:                          OBTAINED FROM:

PRESTON LEE                          VETERANS AFFAIRS, VA PACIFIC
                                     ISLANDS HEALTH CARE SYSTEM



BEFORE:   Yvonne Lindo, Notary Public, State of Hawaii

2

**UILANI MATAVAO,**

1

2    Called as a witness by and on behalf of the Defendant L3HARRIS

3    TECHNOLOGIES, INC., being first duly sworn to tell the truth, the whole

4    truth, and nothing but the truth was examined and testified upon written

5    interrogatories as follows:

6                                    EXAMINATION

7    1.    Q.    Please state your full name.

8          A.    **Uilani Matavao.**

9    2.    Q.    What is your residence address?

10         A.    **Care of 459 Patterson Road, Honolulu.**

11   3.    Q.    Please state the name of your employer and your employer's

12   current business address.

13         A.    **V.A., 459 Patterson Road, Honolulu.**

14   4.    Q.    What is your job or position with your employer?

15         A.    **Medical Records Clerk.**

16   5.    Q.    In that position with your employer, do you have under your

17   care, custody, and/or control records kept by your employer?

18         A.    **Yes.**

19   6.    Q.    Are you appearing pursuant to a subpoena requiring your

20   appearance before a court reporter or notary public for the purpose of

21   answering these questions and requiring you to bring the records

22   described in the subpoena?

23         A.    **Yes.**

24   7.    Q.    Do you have the originals or complete and legible copies of all

25   of those records with you?

3

1       **A.**    **Yes.**

2  8.    Q.    Are those records complete?

3       **A.**    **Yes, to the best of my knowledge.**

4  9.    Q.    If your answer to question 8 is "no," please describe in detail

5  those records that are incomplete, and to the best of your knowledge

6  explain why the records are incomplete.

7       **A.**    **(Not applicable).**

8  10.    Q.    Are the documents that you have brought with you here today

9  documents under your care, custody, and/or control?

10       **A.**    **Yes.**

11  11.    Q.    Has any portion of those records ever been removed from your

12  care, custody, and/or control prior to this time?

13       **A.**    **Not to my knowledge.**

14  12.    Q.    If so, when and by whom?

15       **A.**    **(Not applicable).**

16  13.    Q.    Has any portion of those records ever been altered or

17  destroyed prior to this time?

18       **A.**    **Not to my knowledge.**

19  14.    Q.    If so, when and by whom?

20       **A.**    **(Not applicable).**

21  15.    Q.    Please identify and describe in detail all such records or

22  portions of records that have been altered or destroyed.

23       **A.**    **(Not applicable).**

24  16.    Q.    For documents that you have brought with you here today from

25  your employer, are those documents maintained in the regular course

4

1    of your employer's business?

2         **A.    Yes.**

3    17.  Q.    If the answer to the preceding question is "no," please describe

4    in detail those records that are not kept by your employer in the

5    regular course of business.

6         **A.    (Not applicable).**

7    18.  Q.    Please turn over to the Notary Public at this time the originals

8    or complete and legible copies of all of your records pertaining to the

9    matters referred to in the subpoena which you have brought with you.

10        **A.    Yes.**

11   19.  Q.    Have you turned over the original records or copies?

12        **A.    Copies.**

13   20.  Q.    Please describe briefly, but completely, so that they may be

14   readily identified, the records which you have turned over to the

15   Notary Public.

16        **A.    Requested medical records.**

17   21.  Q.    Are there any other records that come within the scope of the

18   subpoena, but that you have not turned over to the Notary Public?

19        **A.    No, to my knowledge.**

20   22.  Q.    Please describe briefly but completely so that they may be

21   readily identified any of your records that come within the scope of the

22   subpoena, but that you have not turned over to the Notary Public.

23        **A.    (Not applicable).**

24   23.  Q.    If you object to production of any document on the ground of

25   privilege or otherwise, state: the specific objection and the facts upon

5

1   which you rely as the basis for each such objection, the nature and

2   title of the document as to which the privilege is claimed, the general

3   subject matter of the document, the date of its preparation or

4   communication, and the sender(s), recipient(s), and custodian(s) of

5   the document.

6       **A.      (Not applicable).**

7   24.   Q.      Do you agree to waive the reading and signing of this

8   deposition?

9       **A.      Yes.**

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   STATE OF HAWAII                     )
                                        ) SS.
2   CITY AND COUNTY OF HONOLULU         )

3       I, Yvonne Lindo, Notary Public, State of Hawaii, hereby certify:

4       That on the aforementioned date and time, the witness whose deposition is
    contained herein appeared before me; that prior to being examined upon written
5   interrogatories the witness was by me duly sworn; and that the deposition was taken
    by me and the foregoing is a correct transcription of my notes to the best of my
6   ability.

7       And, pursuant to Rule 31 of the Hawaii/Federal Rules of Civil Procedure,
8   a request for an opportunity to review and make changes to this transcript
    ___ was made / ✔ was not made by the deponent or a party prior to the
9   completion of the deposition.

10      I further certify that I am not an attorney for any of the parties hereto nor in
    any way concerned with the cause.

11
        Dated this _30th_ day of _March_, 2021, at Honolulu, Hawaii.
12

13

14                                  YVONNE LINDO
                                    Notary Public, State of Hawaii
15                                  My Commission expires: 7/23/2024

16                          NOTARY CERTIFICATION

17  Document: Written Deposition of __Wilma Mataua__
    dated _3/30/21_ consisting of __6__ pages, performed in the First Judicial
18  Circuit, State of Hawaii. Dated this _30th_ day of _March_

19
    Yvonne Lindo
20  Notary Public, State of Hawaii
    My Commission expires: 7/23/2024
21

22      I, Ralph Rosenberg, hereby certify that the foregoing was duly executed and
    produced under my direction and control.

23

24                                  _____
                                    RALPH ROSENBERG, CSR 179
                                    Notary Public, State of Hawaii
25                                  My Commission expires: 8/25/2022

CADES SCHUTTE LLP
A Limited Liability Law Partnership

AMANDA M. JONES          8854-0
MICHAEL R. SOON FAH      11156-0
1000 Bishop Street, Suite 1200
Honolulu, HI 96813-4212
Telephone: (808) 521-9200
FAX: (808) 521-9210
Email:     ajones@cades.com
           msoonfah@cades.com

Attorneys for Defendant
L3HARRIS TECHNOLOGIES, INC.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| PRESTON LEE,<br><br>      Plaintiff,<br><br>   v.<br><br>L3HARRIS TECHNOLOGIES, INC.;<br>JOHN DOES 1-10; JANE DOES 1-10;<br>DOE CORPORATIONS 1-10; DOE<br>PARTNERSHIPS 1-10; DOE<br>UNICORPORATED<br>ORGANIZATIONS 1-10; and DOE<br>GOVERNMNENTAL AGENCIES 1-<br>10.<br><br>      Defendants. | CIVIL NO. 1:20-CV-00489 LEK-KJM<br>(Other Civil Action)<br><br>**DEFENDANT L3HARRIS<br>TECHNOLOGIES, INC.'S NOTICE<br>OF TAKING DEPOSITION UPON<br>WRITTEN INTERROGATORIES;<br>EXHIBIT A**<br><br><br>[Re: Custodian of Records for<br>Department of Veterans Affairs] |

## DEFENDANT L3HARRIS TECHNOLOGIES, INC.'S NOTICE OF
## TAKING DEPOSITION UPON WRITTEN INTERROGATORIES

TO:   Elizabeth J. Fujiwara
      Joseph T. Rosenbaum
      Fujiwara and Rosenbaum, LLLC
      1100 Alakea Street, 20th Floor, Suite B
      Honolulu, HI 96813

      Attorney for Plaintiff

PLEASE TAKE NOTICE that pursuant to Rules 31 and 45 of the Federal Rules of Civil Procedure, Defendant L3HARRIS TECHNOLOGIES, INC. ("L3HARRIS") will take the deposition upon written interrogatories and any duly served cross, redirect, and re-cross interrogatories, of the following individual at the date, time and place indicated below:

| Deponent Name and Address | Deposition Date and Time |
|---|---|
| Custodian of Records for Department of Veterans Affairs VA Pacific Islands Health Care System 459 Patterson Road 136D Honolulu, Hawaii 96720 | March 29, 2021 10:00 a.m. |

The deposition upon written interrogatories shall be taken pursuant to the Federal Rules of Civil Procedure before a notary public duly authorized by law to administer oaths at the offices of Ralph Rosenberg Court Reporters, 1001 Bishop Street, Suite 2460, American Savings Bank Tower, Honolulu, HI 96813 [Telephone: (808) 524-2090]. A list of the written interrogatories to be answered

2