**No. 22-15288**

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

---

PRESTON LEE,

Plaintiff-Appellant

v.

L3HARRIS TECHNOLOGIES, INC.

Defendant-Appellee

---

On Appeal from the United States District Court
District of Hawaii Civil No. 1:20-00489 (LEK/KJM)
(Honorable Leslie E. Kobayashi)

---

**APPELLANT'S EXCERPTS OF RECORD
VOLUME 3 of 3**

---

FUJIWARA AND ROSENBAUM, LLLC

JOSEPH T. ROSENBAUM          9205
ELIZABETH JUBIN FUJIWARA     3558
Topa Financial Center
745 Fort St, Ste 1501
Honolulu, Hawaii 96813
Telephone: (808) 203-5436

Attorney for Plaintiff-Appellant
PRESTON LEE

is included in the subpoena attached hereto and made a part hereof as Exhibit A. The deponent will be required to produce at deposition the documents, electronically stored information, and objects enumerated in the subpoena attached as Exhibit A.

DATED: Honolulu, Hawai'i, March 10, 2021.

CADES SCHUTTE LLP
A Limited Liability Law Partnership

AMANDA M. JONES
MICHAEL R. SOON FAH
Attorneys for Defendant
L3HARRIS TECHNOLOGIES, INC.

3

ER 345

<u>EXHIBIT 1 to Subpoena</u>

<u>INTERROGATORIES</u>

1.   Please state your full name.

2.   What is your residence address?

3.   Please state the name of your employer and your employer's current business
     address.

4.   What is your job or position with your employer?

5.   In your position with your employer, do you have under your care, custody,
     and/or control records kept by your employer?

6.   Are you appearing pursuant to a subpoena requiring your appearance before a
     court reporter or notary public for the purpose of answering these questions
     and requiring you to bring the records described in the subpoena?

7.   Do you have the originals or complete and legible copies of all of those
     records with you?

8.   Are those records complete?

9.   If your answer to question 8 is "no," please describe in detail those records
     that are incomplete, and to the best of your knowledge explain why the
     records are incomplete.

10.  Are the documents that you have brought with you here today documents
     under your care, custody, and/or control?

11.   Has any portion of those records ever been removed from your care, custody, and/or control prior to this time?

12.   If so, when and by whom?

13.   Has any portion of those records ever been altered or destroyed prior to this time?

14.   If so, when and by whom?

15.   Please identify and describe in detail all such records or portions of records that have been altered or destroyed.

16.   For documents that you have brought with you here today from your employer, are those documents maintained in the regular course of your employer's business?

17.   If the answer to the preceding question is "no," please describe in detail those records that are not kept by your employer in the regular course of business.

18.   Please turn over to the Notary Public at this time the originals or complete and legible copies of all of your records pertaining to the matters referred to in the subpoena which you have brought with you.

19.   Have you turned over the original records or copies?

20.   Please describe briefly, but completely, so that they may be readily identified, the records which you have turned over to the Notary Public.

21.   Are there any other records that come within the scope of the subpoena, but

2

that you have not turned over to the Notary Public?

22. Please describe briefly but completely so that they may be readily identified any of your records that come within the scope of the subpoena, but that you have not turned over to the Notary Public.

23. If you object to production of any document on the ground of privilege or otherwise, state: the specific objection and the facts upon which you rely as the basis for each such objection, the nature and title of the document as to which the privilege is claimed, the general subject matter of the document, the date of its preparation or communication, and the sender(s), recipient(s), and custodian(s) of the document.

24. Do you agree to waive the reading and signing of this deposition?

3

ER 348

HID 88A  (Rev. 02/11) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT
for the
District of Hawaii

| | | |
|---|---|---|
| Preston Lee | ) | |
| *Plaintiff* | ) | Civil Action No.   1:20-CV-00489 LEK-KJM |
| v. | ) | |
| L3 Harris Technologies, Inc. et al. | ) | (If the action is pending in another district, state where: |
| *Defendant* | ) | ) |

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To:  Custodian of Records, Department of Veterans Affairs, VA Pacific Islands Health Care System, 495 Patterson
Road 136D, Honolulu, HI 96720

&#9745; *Testimony:*  YOU ARE COMMANDED to appear at the time, date, and place set forth below to testify at a
deposition to be taken in this civil action. If you are an organization that is *not* a party in this case, you must designate
one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf
about the following matters, or those set forth in an attachment:

Please see the interrogatories contained in the Notice of Taking Depositon Upon Written Interrogatories, attached hereto
as Exhibit 1. Authorizations will be provided when this subpoena is served.

| Place:  Ralph Rosenberg Court Reporters, Inc.<br>1001 Bishop Street, Suite 2460, Honolulu, HI  96813 | Date and Time:<br>03/29/2021 10:00 am |
|---|---|

The deposition will be recorded by this method:   Stenographic means.

&#9745; *Production:*  You, or your representatives, must also bring with you to the deposition the following documents,
electronically stored information, or objects, and permit their inspection, copying, testing, or sampling of the
material:

See Exhibit 2.

The provisions of Fed. R. Civ. P. 45(c), relating to your protection as a person subject to a subpoena, and Rule
45 (d) and (e), relating to your duty to respond to this subpoena and the potential consequences of not doing so, are
attached.

Date:  03/09/2021

CLERK OF COURT

OR   _Michael Soon Fah_

Signature of Clerk or Deputy Clerk                          Attorney's signature

The name, address, e-mail, and telephone number of the attorney representing *(name of party)*  L3 Harris Technologies, Inc.
, who issues or requests this subpoena, are:

Michael R. Soon Fah (msoonfah@cades.com), Cades Schutte LLP, 1000 Bishop Street, Suite 1200, Honolulu, HI
96813; Telephone:  (808) 521-9200

# EXHIBIT "A"

AO 88A (Rev. 06/09) Subpoena to Testify at a Deposition in a Civil Action (Page 2)

Civil Action No.  1:20-CV-00489 LEK-KJM

## PROOF OF SERVICE

*(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

      This subpoena for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

      ☐ I served the subpoena by delivering a copy to the named individual as follows: _____

_____ on *(date)* _____ ; or

      ☐ I returned the subpoena unexecuted because: _____

_____

      Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness fees for one day's attendance, and the mileage allowed by law, in the amount of

      $ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $    0.00 .

      I declare under penalty of perjury that this information is true.

Date: _____     _____
                                   *Server's signature*

                                 _____
                                   *Printed name and title*

                                 _____
                                   *Server's address*

Additional information regarding attempted service, etc:

Case 1:20-cv-00489-LEK-KJM   Document 50-8   Filed 09/29/21   Page 15 of 19   PageID #: 498

AO 88A  (Rev. 06/09) Subpoena to Testify at a Deposition in a Civil Action (Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), and (e) (Effective 12/1/07)

**(c) Protecting a Person Subject to a Subpoena.**

(1) *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The issuing court must enforce this duty and impose an appropriate sanction — which may include lost earnings and reasonable attorney's fees — on a party or attorney who fails to comply.

(2) *Command to Produce Materials or Permit Inspection.*

(A) *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.

(B) *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing or sampling any or all of the materials or to inspecting the premises — or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:

(i) At any time, on notice to the commanded person, the serving party may move the issuing court for an order compelling production or inspection.

(ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

(3) *Quashing or Modifying a Subpoena.*

(A) *When Required.* On timely motion, the issuing court must quash or modify a subpoena that:

(i) fails to allow a reasonable time to comply;

(ii) requires a person who is neither a party nor a party's officer to travel more than 100 miles from where that person resides, is employed, or regularly transacts business in person — except that, subject to Rule 45(c)(3)(B)(iii), the person may be commanded to attend a trial by traveling from any such place within the state where the trial is held;

(iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or

(iv) subjects a person to undue burden.

(B) *When Permitted.* To protect a person subject to or affected by a subpoena, the issuing court may, on motion, quash or modify the subpoena if it requires:

(i) disclosing a trade secret or other confidential research, development, or commercial information;

(ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party; or

(iii) a person who is neither a party nor a party's officer to incur substantial expense to travel more than 100 miles to attend trial.

(C) *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(c)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:

(i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and

(ii) ensures that the subpoenaed person will be reasonably compensated.

**(d) Duties in Responding to a Subpoena.**

(1) *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:

(A) *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.

(B) *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.

(C) *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.

(D) *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

(2) *Claiming Privilege or Protection.*

(A) *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:

(i) expressly make the claim; and

(ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.

(B) *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information to the court under seal for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(e) Contempt.** The issuing court may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena. A nonparty's failure to obey must be excused if the subpoena purports to require the nonparty to attend or produce at a place outside the limits of Rule 45(c)(3)(A)(ii).

# RALPH ROSENBERG COURT REPORTERS, INC.

1001 Bishop Street, Suite 2460, Honolulu, Hawaii 96813
Phone: (808) 524-2090    Fax: (808) 524-2596

# NOTICE

Copies were produced by the Deponent in lieu of originals.  This is the best reproduction that could be made due to the poor quality of some of the pages produced.

*Ralph Rosenberg*
*Court Reporters, Inc.*

Hawaii's Full-Service Court Reporting Firm

Ralph Rosenberg Court Reporters, Inc.
Honolulu, Hawaii    (808) 524-2090



1

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| PRESTON LEE, | CIVIL NO. 1:20-CV-00489 LEK-KJM |
|      Plaintiff, | (Other Civil Action) |
| vs. | |
| L3HARRIS TECHNOLOGIES, INC.; JOHN DOES 1-10; JANE DOES 1-10; DOE CORPORATIONS 1-10; DOE PARTNERSHIPS 1-10; DOE UNINCORPORATED ORGANIZATIONS 1-10; and DOE GOVERNMENTAL AGENCIES 1-10, | **ADDITIONAL RECORDS RECEIVED ON 04/09/2021** |
|      Defendants. | **VOLUME 1 OF 3** |

(040121.01 dkf)

### DEPOSITION OF UILANI MATAVAO
### <u>UPON WRITTEN INTERROGATORIES</u>

Taken on behalf of Defendant L3HARRIS TECHNOLOGIES, INC., at the office of Veterans Affairs, VA Pacific Islands Health Care System, 459 Patterson Road, Honolulu, Hawaii, commencing at 7:25 a.m., on March 30, 2021, pursuant to subpoena.

<u>RECORDS RE:</u>

PRESTON LEE

<u>OBTAINED FROM:</u>

VETERANS AFFAIRS, VA PACIFIC ISLANDS HEALTH CARE SYSTEM

BEFORE:   Yvonne Lindo, Notary Public, State of Hawaii

**Ralph Rosenberg Court Reporters, Inc.**
**Honolulu, Hawaii       (808) 524-2090**



1

1    IN THE UNITED STATES DISTRICT COURT

2

3    FOR THE DISTRICT OF HAWAII

4    PRESTON LEE,                        )  CIVIL NO. 1:20-CV-00489 LEK-KJM
                                         )  (Other Civil Action)
5             Plaintiff,                 )
                                         )
6                                        )
         vs.                             )
7                                        )
     L3HARRIS TECHNOLOGIES, INC.;        )  **ADDITIONAL RECORDS**
8    JOHN DOES 1-10; JANE DOES 1-10;     )  **RECEIVED ON 04/09/2021**
     DOE CORPORATIONS 1-10; DOE          )
9    PARTNERSHIPS 1-10; DOE              )
     UNINCORPORATED ORGANIZATIONS        )
10   1-10; and DOE GOVERNMENTAL          )  **VOLUME 2 OF 3**
     AGENCIES 1-10,                      )
11                                       )
                                         )
12            Defendants.                )
                                         )
13   (040121.01 dkf)

14            DEPOSITION OF UILANI MATAVAO

15            UPON WRITTEN INTERROGATORIES

16

17   Taken on behalf of Defendant L3HARRIS TECHNOLOGIES, INC., at the
     office of Veterans Affairs, VA Pacific Islands Health Care System,
18   459 Patterson Road, Honolulu, Hawaii, commencing at 7:25 a.m., on
     March 30, 2021, pursuant to subpoena.

19

20

21   RECORDS RE:                    OBTAINED FROM:

22   PRESTON LEE                    VETERANS AFFAIRS, VA PACIFIC
                                    ISLANDS HEALTH CARE SYSTEM
23

24

25   BEFORE:   Yvonne Lindo, Notary Public, State of Hawaii

**Ralph Rosenberg Court Reporters, Inc.**
Honolulu, Hawaii        (808) 524-2090



1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

PRESTON LEE,                                )   CIVIL NO. 1:20-CV-00489 LEK-KJM
                                            )   (Other Civil Action)
            Plaintiff,                      )
                                            )
      vs.                                   )
                                            )
L3HARRIS TECHNOLOGIES, INC.;                )   **ADDITIONAL RECORDS**
JOHN DOES 1-10; JANE DOES 1-10;             )   **RECEIVED ON 04/09/2021**
DOE CORPORATIONS 1-10; DOE                  )
PARTNERSHIPS 1-10; DOE                      )
UNINCORPORATED ORGANIZATIONS               )   **VOLUME 3 OF 3**
1-10; and DOE GOVERNMENTAL                  )
AGENCIES 1-10,                              )
                                            )
            Defendants.                     )
                                            )

(040121.01 dkf)

DEPOSITION OF UILANI MATAVAO
UPON WRITTEN INTERROGATORIES

Taken on behalf of Defendant L3HARRIS TECHNOLOGIES, INC., at the
office of Veterans Affairs, VA Pacific Islands Health Care System,
459 Patterson Road, Honolulu, Hawaii, commencing at 7:25 a.m., on
March 30, 2021, pursuant to subpoena.

RECORDS RE:                     OBTAINED FROM:

PRESTON LEE                     VETERANS AFFAIRS, VA PACIFIC
                                ISLANDS HEALTH CARE SYSTEM

BEFORE:   Yvonne Lindo, Notary Public, State of Hawaii

**Ralph Rosenberg Court Reporters, Inc.**
Honolulu, Hawaii         (808) 524-2090

# FILED UNDER SEAL:

VA Decision

# EXHIBIT "D"

# FILED UNDER SEAL:

VA Letter

# EXHIBIT "E"

# FILED UNDER SEAL:

VA Application

# EXHIBIT "F"

# FILED UNDER SEAL:

Statement in Support

# EXHIBIT "G"

# FILED UNDER SEAL:

Notice of Disagreement

# EXHIBIT "H"

# FILED UNDER SEAL:

Evaluation

# EXHIBIT "I"

FUJIWARA AND ROSENBAUM, LLLC

ELIZABETH JUBIN FUJIWARA 3558
JOSEPH T. ROSENBAUM 9205
1100 Alakea St., 20th Fl., Ste B
Honolulu, Hawaii 96813
Telephone: 808-203-5436

Attorneys for Plaintiff
PRESTON LEE

### IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| PRESTON LEE,<br><br>Plaintiff,<br><br>vs.<br><br>L3HARRIS TECHNOLOGIES, INC.;<br>JOHN DOES 1-10; JANE DOES 1-10;<br>DOE CORPORATIONS 1-10; DOE<br>PARTNERSHIPS 1-10; DOE<br>UNINCORPORATED<br>ORGANIZATIONS<br>1-10; and DOE GOVERNMENTAL<br>AGENCIES 1-10,<br><br>Defendants. | ) CIVIL NO. 20-00489 LEK-KJM<br>) (Other Civil Action)<br>)<br>) PLAINTIFF'S RESPONSE TO<br>) DEFENDANT L3HARRIS<br>) TECHNOLOGIES, INC.'S FIRST<br>) REQUEST FOR ANSWERS TO<br>) INTERROGATORIES TO<br>) PLAINTIFF PRESTON LEE<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

### PLAINTIFF'S RESPONSE TO DEFENDANT L3HARRIS TECHNOLOGIES, INC.'S FIRST REQUEST FOR ANSWERS TO INTERROGATORIES TO PLAINTIFF PRESTON LEE

Comes now Plaintiff PRESTON LEE by and through his attorneys, Elizabeth Jubin Fujiwara and Joseph T. Rosenbaum of the Fujiwara and Rosenbaum, LLLC and does hereby respond and object as follows to Defendant L3Harris Technologies, Inc.'s First Request for Answers to

**EXHIBIT J**

Interrogatories to Plaintiff Preston Lee ("Request"):

I.  <u>GENERAL RESPONSES AND OBJECTIONS TO FIRST REQUEST
    FOR ANSWERS TO INTERROGATORIES</u>

The following general responses and objections to the Request are incorporated by reference into each and every specific response and objection contained herein:

1.  Plaintiff objects to the Request to the extent that it may be deemed or construed to call for information protected from disclosure by the attorney-client privilege, the doctrine of attorney work product rule or other applicable privileges, immunity, rule or law ("Privileged Information"). Plaintiff will not produce Privileged Information, and any undertaking by Plaintiff to produce information or documents should be understood to exclude Privileged Information. The inadvertent disclosure of any Privileged Information should not be construed to constitute a waiver of any relevant privilege or immunity.

2.  Plaintiff objects to the Request on the ground that it is vague and ambiguous, and seeks information that is not relevant to the subject matter of this litigation, or reasonably calculated to lead to discovery of admissible evidence.

3.  Plaintiff objects to the Request on the ground that it is overly broad and unduly burdensome.

4.  Plaintiff objects to the Request insofar as the Request seeks to impose requirements that exceed the requirements of the Federal Rules of Civil Procedure.

5.  Plaintiff objects to the Request to the extent that it requests information not relevant to the subject matter of this action nor reasonably calculated to lead to the discovery of admissible evidence.

6.  Any response by Plaintiff does not constitute a waiver of any objection stated herein. Furthermore, no objection, limitation, or lack thereof, made in these responses and objections shall be deemed to constitute an admission by Plaintiff or a waiver of Plaintiff's right to supplement these responses or objections to any request for interrogatory.

7.  Plaintiff objects to the Request because it exceeds the number of permissible interrogatories (without leave of court) under Rule 33 of the Federal Rules of Civil Procedure.

DATED:  Honolulu, Hawaii, June 10, 2021.

–2–

ER 363

/s/ Joseph T. Rosenbaum
JOSEPH T. ROSENBAUM

II.   SPECIFIC ANSWERS AND OBJECTIONS

## INTERROGATORY NO. 1

Please state your full name and the name of each person who participated or assisted in the preparation of responses to these interrogatories. (Do not identify anyone who simply typed or reproduced the responses.)

Answer:

Myself, Preston Lee, and my attorney Joseph T. Rosenbaum

## INTERROGATORY NO. 2

Please provide your educational history starting with high school. As to each school or training program you attended, please provide:

    a.   the name of the educational institution or training program;

    b.   whether you graduated and if not, the last grade or level completed;

    c.   the dates of attendance; and

    d.   any degree or certificate received.

Answer:

Mililani High School 1977-1981- Graduated with Diploma

## INTERROGATORY NO. 3

Identify the name and address of any person or entity with whom you sought work or employment during the period from November 2019 to the present.

Answer:      I am on unemployment now.
I called local painting companies- Callahan Painting- not hiring
                                    Ho'omana Painting – not hiring

–3–

ER 364

GEK Autobody and Painting – not hiring

## INTERROGATORY NO. 4

For each person or entity that you identified in response to the previous interrogatory, state:

    a.    The person you submitted your application to or sought employment or work from;

    b.    The position(s) you applied for;

    c.    The date(s) you applied for each identified position;

    d.    Whether you were offered a position; and

    e.    Whether you accepted the position(s) (if applicable).

Answer:    No one is hiring that I inquired with, so I could not apply.

## INTERROGATORY NO. 5

Identify all your sources of income for the period of January 1, 2019 to the present. [For purposes of this request, "income" means money or other value received, including but not limited to compensation for services as an employee or contractor, wages, salaries, bonuses, tips, fees, commissions, benefits, business income, interest, rents, royalties, dividends, annuities, pensions, insurance proceeds and government benefits (including veterans and disability benefits and unemployment). For purposes of this request, "identify" means to provide the name of the individual or entity that provided the income and the amount of income you received from each source.]

Answer:

–4–

ER 365

c/o Ke Aki Technologies, LLC
1600 Kapiolani Blvd Ste 530,
Honolulu, HI 96814
(808) 944-3885
The expected subjects of witness's discoverable information include, but are not limited to, the tortuous conduct Plaintiff experienced.

18. David Hesapene
c/o Ke Aki Technologies, LLC
1600 Kapiolani Blvd Ste 530,
Honolulu, HI 96814
(808) 944-3885
The expected subjects of witness's discoverable information include, but are not limited to, the tortuous conduct Plaintiff experienced.

19. ████████████████████████████

The expected subjects of witnesses' discoverable information include, but are not limited to, the tortuous conduct Plaintiff experienced and his resultant injuries and damages.

<u>INTERROGATORY NO. 14</u>

Please identify any complaints you made of discrimination you made regarding your employment at L3Harris. For purposes of this request, "identify" means to provide (a) the date the complaint was made; (b) the names of the persons to whom you complained; (c) a brief description of who and what you complained about; and (d) the manner in which the complaint was conveyed (i.e. in person conversation, email, phone call, written complaint, etc.).

<u>Answer:</u> I made a complaint of discrimination to the EEOC/HCRC on or about February 27, 2020. I complained about the disability discrimination and harassment I was experiencing related to my PTSD disability. See my Charge of Discrimination with the

HCRC that will be produced. I believe I mailed the complaint into the HCRC.

I made a complaint of discrimination to the EEOC/HCRC on or about December 2, 2020. I complained about the disability discrimination and retaliation for my wrongful termination. See my Charge of Discrimination with the HCRC that will be produced. I believe my lawyer mailed the complaint into the HCRC.

<u>INTERROGATORY NO. 15</u>

Please state (1) the total monetary amount of all disability benefits that you have received from the Department of Veteran Affairs ("VA"); (2) each month and year that you have received disability benefits from the VA; and (3) the monetary amounts of such benefits that you received for each month specified in part (2) above.

<u>Answer</u>:

Plaintiff objects to the Request that it is not relevant to the subject matter of this litigation, or reasonably calculated to lead to discovery of admissible evidence.

DATED: Honolulu, Hawaii, June 10, 2021.

/s/ Joseph T. Rosenbaum
JOSEPH T. ROSENBAUM

## VERIFICATION

STATE OF HAWAII

COUNTY OF _Honolulu_

PRESTON LEE, being first duly sworn on oath, deposes and says that the

answers to the foregoing interrogatories are true to the best of his knowledge and

belief.

_____

PRESTON LEE

Subscribed and sworn to before me this

_24_ day of, 2021.                        6·24·2021

_____

Name: _Velda K. Lee_

Notary Public, State of Hawaii

VELDA K. LEE
Notary Public, State of Hawaii
My commission expires: My Commission Expires: 9/19/2024

_____

Printed Name of Notaw

---

NOTARY CERTIFICATION STATEMENT

Document Identification or Description: _plaintiff responses
to defense LBHarris Technology Inc 1st reqst Answer to Interrogatories_

Doc. Date: _6·24·2021_ or C] Undated at time of notarization.

No. of Pages: _14_ Jurisdiction: _First_ Circuit
(in which notarial act is performed)

_____

Signature of Notmy                Date of Notarization and
                                  Certification Statement

_June 24, 2021_                                    (Official Stamp or
                                                          Seal)

VELDA K. LEE
Notary Public, State of Hawaii
My Commission Expires: 9/19/2024

Printed Name of Notaty

# FILED UNDER SEAL:

Workers Compensation Claim

# EXHIBIT "K"

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | [X] FEPA | 21083 |
| | [X] EEOC | 486-2020-00221 |

| Hawai'i Civil Rights Commission | and EEOC |
|---|---|
| State or local Agency, if any | |

| Name (Indicate Mr., Ms., Mrs.) | Home Phone (Incl. Area Code) | Date of Birth |
|---|---|---|
| Mr. Preston T. Lee | (808) 635-0164 | 1963 |

| Street Address | City, State and ZIP Code | |
|---|---|---|
| P.O. Box 1240, Kekaha, HI 96752 | | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (If more than two, list under PARTICULARS below.)

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| L3 HARRIS | 201 - 500 | (808) 335-4024 |

| Street Address | City, State and ZIP Code | |
|---|---|---|
| PMRF Barking Sands,  Kekaha, HI 96752 | | |

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| **EXHIBIT 14** Preston Lee - 6/25/21 | | |

| Street Address | City, State and ZIP Code | |
|---|---|---|

| DISCRIMINATION BASED ON (Check appropriate box(es).) | DATE(S) DISCRIMINATION TOOK PLACE |
|---|---|
| | Earliest   Latest |
| [ ] RACE  [ ] COLOR  [ ] SEX  [ ] RELIGION  [ ] NATIONAL ORIGIN | 03-01-2019   02-06-2020 |
| [X] RETALIATION  [ ] AGE  [X] DISABILITY  [ ] GENETIC INFORMATION | |
| [ ] OTHER (Specify) | [X] CONTINUING ACTION |

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

I was hired on March 20, 1994 to work on the Flight Line. At the time ITT was in charge of the contract. Respondent has since taken over that contract. My current position is Painter.

Respondent is aware of my disability.

Since my diagnosis in February 2019, I have been subjected to repeated harassment and discipline by Respondent. For example, Lead Sean Igue has informed the company that he is afraid to work with me because of my condition. Mr. Igue has also asked me why I just do not retire.

Additionally, Rigging Shop Lead Mark Vegas has gone to the Union and told them that I should not be working there because I have PTSD. Mr. Vegas has helped Mr. Igue to write letters against me, which have been turned in to Respondent.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |
| 02/23/2020 | EEOC HLO |
| Date            Charging Party Signature | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (month, day, year) FEB 27 2020 |

RECEIVED

**EXHIBIT L**

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | [X] FEPA<br>[X] EEOC | 21083<br>**486-2020-00221** |

| Hawai'i Civil Rights Commission | and EEOC |
|---|---|
| *State or local Agency, if any* | |

In March 2019, I was called in to Human Resources by Human Resources Director Julie Broyles and Human Resources Representative Jasmine Apo. I was told that they were aware of my condition, and they asked if I wanted to hurt myself, hurt others, and if I want to kill someone when I get angry. When I asked who disclosed my disability, I was told that it was none of my business.

In November 2019, a co-worker was written up by Safety for not wearing protective gear. I was not spoken to about this matter. However, Mr. Igue directed me after lunch to put on pants, which I complied with. I did ask how he could tell me to wear pants when he was wearing shorts. Later on that day we engaged in a verbal altercation over this matter.

Facilities Maintenance Supervisor Rodney Martin spoke to me days later and indicated that I had been written by Safety, which was not true. I inquired with Human Resources about Mr. Igue and told them that I was always being written up, and that Mr. Igue should be investigating for stealing gas every Tuesday and Thursday.

On November 21, 2019, I was placed on a medical leave of absence.

On December 13, 2019, my Project Manager called me at home and demanded I turned in my CAC card and security badge. On December 16, 2019, I turned it in to the Secretary.

On February 6, 2010, I underwent a psychological examination, which was mandated by Respondent.

I believe that I have been discriminated against due to my disability and retaliation, in violation of the Americans with Disabilities Act of 1990, as amended.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State and Local Agency Requirements* |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT |
| 02/23/2020x                              *Charging Party Signature*<br>*Date* | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE<br>*(month, day, year)* |

# EXHIBIT M

EEOC No.: 37B-2021-00046

## Pre-Complaint Questionnaire – Employment
Hawai`i Civil Rights Commission
830 Punchbowl Street, Room 411, Honolulu, HI 96813
TEL: (808) 586-8636, FAX: (808) 586-8655, TDD: (808) 586-8692        86795

# E

**Directions:** Please fill this out completely.   We'll use the information to see if we have jurisdiction to draft a discrimination complaint and to investigate it.  Include any paperwork that shows discrimination occurred.  Read the closing statement at the end, and sign and date it. Mail or drop off at the above address. An investigator will contact you for an intake interview.

Date: _11 / 17 / 2020_

## 1. Information about you:

Name: _LEE_          _Preston_          _T_
       Last            First           Middle Initial(s)

Address: _4628 A_          _KEKAHA_          _HI_          _96752_
        Number/Street         City                Zip Code

                  _1 808  635 0164_
    Home Phone             Cell Phone            Work Phone

Email Address: _____ Age* and Date of Birth: _57  11/02/196_

Race or Ancestry*: _HAWAIIAN_    _JAPANESE_ Sex*: _M_

Person to contact if we can't reach you:

_Jackie Lee  wife_          _SAME_          _808 635 407_
Name and Relationship            Address            Phone No.

## 2. Information about the employer:

Name: _L3 HARRIS TECHNOLOGIES INC._

Address: _____
        Number/Street         City                Zip Code

**Island:**

_____ O`ahu   _X_ Kaua`i   _____ Maui   _____ Hawai`i   _____ Moloka`i   _____ Lana`i

Telephone: _335 4242_    Number of Employees: _450_

Date Hired: _1994_    Pay/Salary: _32.00_

Job Title: _Painter_

*Used for statistical purposes only
Revised: September 2015

**EXHIBIT**

**15**

Preston Lee - 6/25/21

**3. Check type of discrimination:**

_____ Race
_____ Color
__✓__ Ancestry (includes national origin)
_____ Age
_____ Religion
_____ Credit History or Report
_____ Arrest & Court Record
_____ Breast Feeding

_____ Sex (includes gender identity & pregnancy)
_____ Sexual Orientation
_____ Marital Status
__✓__ Retaliation (opposed discrimination)
_____ National Guard Obligation
_____ Child Support Garnishment
_____ Domestic/Sexual Violence Victim Status
__✓__ Disability: _PTSD_

**4. Check act of discrimination:**

__✓__ Fired/Discharged
_____ Laid Off
_____ Not Hired
__✓__ Harassed

_____ Sexually Harassed
_____ Denied Promotion
_____ Refused Accommodation
_____ Other: _____

**5. Date of the last act of discrimination:** _June 22 2020_
   (Statute of limitations is 180 days)

**6. Name and job title of the person who discriminated against you:**

_SEAN LONE / Estates Management_

**7. What reason did the person give to you for the discrimination?**

_PTSD_

**8. How did you learn about the Civil Rights Commission?**

_e.e.o.c_

**9. Did you file a complaint with the Federal EEOC about this?** __✓__ YES _____ NO

**10. Do you have an attorney representing you in this matter?** __✓__ YES _____ NO

_Joseph T Rosenbaum_        _808 203 5436_
      Name                  Phone No.
                            _808 393 4643_

2

**Directions:** Provide a summary of the discrimination with the name of the person who treated you this way. Use a separate sheet of paper if needed.

| Date | Describe the discrimination |
|------|------------------------------|
| 2/27/2020 → | I filed my charge of discrimination for disability discrimination |
| 6/22/2020 → | After being on stress leave related to my disability I was terminated based on a false claim |

3

ER 375

| Date | Describe the discrimination (continued) |
|------|------------------------------------------|
|      |                                          |
|      |                                          |
|      |                                          |
|      |                                          |
|      |                                          |
|      |                                          |
|      |                                          |
|      |                                          |
|      |                                          |
|      |                                          |
|      |                                          |
|      |                                          |
|      |                                          |
|      |                                          |
|      |                                          |
|      |                                          |
|      |                                          |
|      |                                          |
|      |                                          |
|      |                                          |

**Closing Statement:** I declare under penalty of perjury the foregoing is true and correct.

_____
Signature

# 11/20/2020

Date

4

ER 376

SEAN D. IGNE
P.O. Box 696
Eleele, Hawaii 96705
Mobile Phone: 808-635-4386
Email: scigne0696@gmail.com


November 6, 2019

L3Harris Technologies, Inc.
P.O .Box 399
Waimea, HI 96796
Attn: Mr. Rodney A. Martin (rodney.a.martin.ctr@navy.mil)

Dear Rod,

This letter is being sent to inform you of the incident that occurred today Wednesday, November 6, 2019 with my subordinate Preston Lee (P3 Painter).

It was brought to my attention that yesterday, November 5, 2019. The Government Safety Person, Kathleen approached Gilbert Castro (P3 Painter), while on the job at building 358. She asked him who is the person (Preston Lee) water blasting with the green shorts? She advised him that he shouldn't be wearing shorts to water blast. Gilbert relayed the message to me and Preston, that Kathleen advised him that he shouldn't be using shorts while water blasting.

Today, November 6, 2019 while Preston and Gilbert continued to water blast building 358, David Hesapene (P3 Painter) and I went to assist them with preparation of the building.

As we approached the building with my work vehicle, I noticed that Preston had shorts on. I honked the horn because he was unable to hear me while he was water blasting.

I then stepped out of the truck and signaled a motion to him placing my hands from my hip to my shoe, asking him where is your long pants? He stared at me, and then later put on his rain pants then continued on water blasting.

**EXHIBIT N**
ER 377

During the end of the day today, while I was in the office doing my timecard. Preston opened the door and started yelling at me, from now on your better use long pants and steel toed shoes! If not I'm going to f___ing (explicit language) turn you in! I said why are you yelling? No, you better use your steel toed shoes and long pants or I going turn you in I telling you! He shut the office door between us, and I said why you going turn me in? He re-opened the door again, with his hands fisted and popped out chest towards me and said why! You turn me in before! I said you going turn me in? for what? He said F____ (explicit language) yeah for not using PPE.  That was the end of the conversation.

Gilbert Castro, David Hesapene & Mark Vegas overheard and witnessed everything that transpired in the office today.

On October 24, 2017, I also reported to you and Human Resources of another incident & outburst with Preston Lee claiming a Hostile work environment that caused me to feel stressed with unsafe working conditions. This was rectified with hand shack between us, no further actions were taking to protect my well being and safety.

Please accept this letter as notification of my refusal to work with my subordinate, Preston Lee (P3 Painter). I have been working for years in a very stressful, unsafe and hostile work environment. Preston has been all the following listed below:

- Argumentative and insulting behavior towards myself and other employees.
- Chooses to break the chain of command, refuses to take daily work orders directly from me, goes to our Supervisor for directions as well as provides job status updates.
- Distruptive workplace behavior that resists supervisory direction (As the lead painter, he complains time and time again when I give him any duties that he doesn't agree with.)
- For years we have worked together on jobs he doesn't talk to me only on the shop break table.
- Inability to control his anger
- Inappropriate & emotionally unstable behavior (Yelling and swearing) that impact the well being of our shop and disrupts the work conditions.

- Mistreatment to others and myself
- Retaliation for corrections actions for betterment of duties.
- Uses vulgar language daily, almost every sentence he says, explicit language is used.
- Verbal threats toward myself and other employees.

I feel that he continues to do all the items listed above, because he thinks, and I quote him "that I'm untouchable and no one can to anything to me because of my disabilities."

I've worked here for a very long time and have always been trained annually to know that this is a zero-tolerance Company.

I would like to kindly ask that these allegations be taken seriously, and it will be investigated accordingly. Allowing me to be comfortable and safe in my working environment again.

Thank you for your time,

*Sean D. Igne*

Sean D. Igne,
Lead Journeyman Painter

cc: Jasmine Apo, Human Resources  via email: jasmine.apo.ctr@navy.mil
    Julie Broyles, Human Resources  via email: julie.broyles.ctr@navy.mil
    Chlorie Igne, Spouse via email: chlorie_i@hotmail.com

To:     Rodney Martin

Date:   11/7/19

Subject: Incident Concerning Preston Lee and Sean Igne

On 11/16/19 at approximately 1230 hours I was pressuring washing the north wall of BS 358 when I heard my Lead, Sean Igne yelling at me to put my pants on. I stared at him as I couldn't figure out why he was asking me to put pants on when he himself was going to start working on painting the roof of the building with shorts and tennis shoes.

My co-worker Gilbert Castro had heard Sean initially blowing his truck horn when he first drove up and then heard what he was trying to tell me over the loud noise that the pressure washer was making so he brought my rain suit long pants over to me to put on. I continued working on pressure washing the building walls while thinking why do I have to long pants while he gets to wear shorts. I was pissed off about the way Sean treats me, never ask me for information but will always ask my co-worker even though I'm senior to my co-worker, he never makes me feel inclusive in the Paint Shop etc… and I just got madder as the went on.

When I got back to shop at the end of the day I went into the Paint Shop office and told Sean that "if I gotta wear pants then you gotta wear pants, if I gotta wear steel toe shoes then you gotta wear steel toe shoes." I was talking to him at a normal voice level, I was not yelling at him. Sean then yelled at me "why, you gone to turn me in?" and then that's when it started meaning that's when I started yelling and swearing at him and he yelling back at me. I told him what's fair is fair, if I gotta wear pants and steel toe shoes so do you. I admit I was mad and I yelled and swore at him many times in a loud disruptive manner which in reflection I should not have and I'm sorry for doing so. While I was yelling at Sean he yelled back at me "what you going turn me in?" He made me more angry when he yelled back and I retaliated with more verbal attacks on his behavior that day.

Preston Lee        *(signature)*        11/07/19

EXHIBIT
1
Preston Lee - 6/25/21

L3HARRIS-000461

To:     Rodney Martin

Date:   11/7/19

Subject: Incident Concerning Preston Lee and Sean Igne

On 11/6/19 my Lead, Sean Igne and I returned to BS 1111 to finish the exterior painting of that beach cottage and after lunch we went to BS 358 to join Preston Lee and Gilbert Castro in painting that building. We got there close to 1230 and pulled up along the north side of the building where Preston was pressure washing the wall.

As we pulled up on the lawn, Sean blew his horn a few times to get Preston's attention but he couldn't hear because the pressure washer and the water hitting the wall must have been too loud. Sean and I got out of the truck and he started walking over towards Preston. When he got close enough to not get sprayed with water bouncing back off the wall, he yelled out to Preston "put your pants on" while motioning with his hands from his waist to his legs to show he was talking about covering your legs. Preston turned around and just looked at Sean without saying  anything. Gilbert overheard what was going on and since he was at the van that he and Preston work out of, he grabbed Preston's rain gear and brought over to him. Preston put the gear on and went back to pressure washing while Sean and I hauled the fall protection gear up on to the roof and got going with painting the roof.

At the end of the day when we got back to the shop I went into the Riggers office to enter my time into the company computer with Gilbert and Mark. It was around 1545 hours when and we heard Preston going off, yelling at Sean about why he had to wear long pants while Sean was working in short pants and tennis shoes. He told Sean that he better be wearing long pants the next day. Preston was swearing the F word at Sean and Sean yelled back in defense "why you going to turn me in,  I just told you to put PPE on". I couldn't hear everything that was being said clearly but will say that Preston was extremely loud and angry and not acting in a civil manner.,

On the morning of 11/7/19 after arriving at BS 358 to continue painting the roof, Gilbert, Preston and I were on the north side of the building where we kept our gear overnight. Preston just walked up to me and started ranting "I don't care if I going to lose my job, I just going to punch Sean through his face". I told him "I thought you guys settled this years ago but I guess not". His face was full of sweat from his anger and he wiped it away and said "F_ _ _ Rod , F_ _ _ Sean, nobody can touch me, not Rod, not Sean or HR".

David Hesapene

11/7/19

To:     Rodney Martin

Date:   11/7/19

Subject: Incident Concerning Preston Lee and Sean Igne

On 11/6/19 at approximately 1545 hours I was in my office which is on the north side of the partition wall from the Paint Shop office in the same building, BS 236 with Gilbert Castro and David Hesapene. We were waiting for each other to use the only timecard Kiosk computer that is shared between the two shops. Around the above time mentioned, we could all here Preston explode in anger with Sean about something to do with having to wear pants. His voice was very loud as he yelled and swore at Sean and seemed to get louder as he went on with his threatening attack saying to Sean that "he better be wearing pants tomorrow too."

There was such a flurry of words coming out of Preston's mouth that it was difficult to remember everything he was saying plus I was in another office with the door closed but I could still hear him yelling. Sean had to yell back at him in defense of the attack that was being made on him.

The next afternoon, 11/7/19, he was bragging in the shop out loud  that Sean tried and he cannot touch me, Rodney cannot touch me and HR cannot touch me.

Mark Vegas

*Mark Vegas* 11/7/19

**EXHIBIT O**

To:     Rodney Martin

Date:   11/7/19

Subject: Incident Concerning Preston Lee and Sean Igne


I'm going to give you some background information that had a play in what happened between Preston Lee and Sean Igne at approximately 1545 hours on Wednesday, 11/6/19.

On 11/5/19, I was pressure washing the roof of BS 358 and Preston was pressure washing the walls when a NAVFAC Safety Inspector, Kathleen Lambrix, who is in charge of overseeing the safety of the NOVA project at Makaha Ridge was walking by BS 358 and saw me on the roof without fall protection gear on.

She asked me to come down and told me that even though the roof was flat I still need to have life lines strung across the roof and my fall protection gear on. I apologized and told her that I would comply. We talked in general about PPE and how important it was to wear it. She asked me if the guy pressure washing the walls in shorts (Preston) worked with  me and I said yes. The only other thing she said to me before leaving was with her two fingers pointing at my eyes, "I'm going to be watching you".

At the end of the day I told my Lead, Sean Igne who was working on another job site that day, what had happened to me and what the Safety Inspector talked to me about and that I was sorry.

The next day, 11/6/19, Preston and I returned to BS 358 to continue pressure washing the walls  of the building. Preston was on washing the north wall on the building and I had I was at our work van getting some gear out of it when I heard a horn blowing. Sean Igne and David Hesapene had arrived on site at approximately 1215 – 1230 hours to start working on painting the roof. He was trying to get Preston's attention but because the gas powered pressure washer was so loud he had walked to within 5' or so of Preston and yelled over the noise of the pressure washer "put on your pants" meaning put on your rain gear. Sean was motioning with his hands from his waist down to his ankles while he was trying to convey the message to Preston over the loud noise of the pressure washer. Preston looked at Sean and I, knowing that Sean wanted Preston to wear his rain gear because of the PPE discussion I had with the Safety inspector, even though she didn't actually day anything about it, wanted to be proactive, so I grabbed Preston's rain gear out of the van and walked over and gave it to him. Preston but his rain gear on and went back to pressure washing without incident. Sean and David grabbed all of the fall protection gear, set it up on the roof and started working on painting the roof without incident.

At the end of the day when we got back to the shop and were working on entering our timecard information into the Kiosk computer in the Antenna Riggers office which is on the other side of the partition wall from the our Paint shop office in the same building, I heard Preston yelling at Sean in an angry tone about why he had to wear long pants while Sean was working in short pants and if he, Preston was going to have to wear long pants then Sean better be wearing long pants the next day. I heard Preston swearing and Sean and Sean say something like "why you going to turn me in" but could

**EXHIBIT R**

not hear all the details that were being said because I was in another room and the office door was closed. I could tell that Preston was very angry and was very loud.

Gilbert Castro

11 - 7 -19

# *HARRIS*

## DISCIPLINARY WARNING

*Depending on the nature and severity of the issue(s) addressed in this written warning, Harris may bypass or accelerate steps in the progressive discipline process at any time.*

Date: __11/13/19__          ☒ **STEP 1: First Written Warning** *(Copy given to employee)*

Date: _____    ☐ **STEP 2: Final Written Warning** *(Copy given to employee)*

Name/EID: __Preston Lee_____          Job Title: __PW3 Painter_____

Segment/Location: __PMRF_____          Department: __Public Works_____

### Reason for Counseling:

On 06 November 2019 at approximately 1545 hours you approached your shop lead person, in an unprofessional and inappropriate manner after you was asked, to put additional PPE while pressure washing the north side of building 338. These actions were disruptive and created a hostile work environment. Your behavior violated company policy 00-HR-08, section 2.2 Reasons for Disciplinary Action – Offenses or deficiencies which may result in disciplinary action to include, but not limited to:

- Violation of any company policy, established practice or the L3 Harris Code of Conduct
- Harassment of any kind

Failure to comply with L3 Harris Code of Conduct policies under the following conditions:

- Engage in a retaliatory behavior against others
- Making Ethical Decisions
- Maintaining a Safe and Healthy Workplace
- Workplace Free From Violence

**EXHIBIT**

**2**

Preston Lee - 6/25/21

### Corrective Action Required:

Conduct yourself in a civil manner at all times, which includes speaking in a normal tone of voice without explicit language. Comply with company policies, rules and regulations. If you don't understand why you are being asked to do something, ask your lead person to clarify and go up the chain of command if you are not satisfied with the response.

Review company policy #00-HR-08, L3 Harris Code of Conduct manual and complete Respect in the Workplace training with Manu Kai's HR Manager.

### Follow-Up and Consequences:

Repeated inappropriate conduct as described above will result in a Final Written Warning or possibly Termination depending of the severity of the situation.

Rodney Martin
_____          *Rodney Martin*          11-18-19
**Supervisor Name (Print)**          Supervisor Signature          Date

Julie Broyles
_____          *Julie Bro*          11/18/19
**HR Representative Name (Print)**          HR Representative Signature          Date

_____          4 / 18 / 2019
Employee Signature *          Date Received          NOV 2019

*Employee suggested no Representative present.*

[Original to Personnel File – Copy to Employee]

ER 285

EXHIBIT S

L3HARRIS-000461

*HARRIS*

**Employee Comments:**

No comments

L3HARRIS-000462

# FILED UNDER SEAL:

Doctor's Note

# EXHIBIT "T"

ImanageDB:5863634.1

# FILED UNDER SEAL:

Doctor's Note

# EXHIBIT "U"

**From:** "West, Ross W CTR (USA)" <ross.west.ctr@navy.mil>

**To:** "Arnold, Amanda" <Amanda.Arnold@L3Harris.com>, "Kreider, Jay" <Jay.Kreider@L3Harris.com>

**Cc:** "Broyles, Julie (Contractor)" <Julie.Broyles@L3Harris.com>, "Apo, Jasmine" <Jasmine.Apo@L3Harris.com>

**Subject:** FW: Gasoline Inquiry

**Date:** Wed, 11 Dec 2019 23:11:17 +0000

**Importance:** Normal

**Attachments:** TAYLOR_INQUIRY_INTO_GASOLINE_THEFT.docx; MFR_--_TAYLOR_INTERVIEW_WITH_LEE.docx; STATEMENT_--_MARTIN.docx; STATEMENT_--_FUJITA.docx; STATEMENT_--_HESAPENE.docx; STATEMENT_--_CASTRO.docx; STATEMENT_--_IGNE.docx

---

Jay / Amanda:

I received a call right from the NAVSUP SCO after the BOD Meeting regarding an anonymous report from a Manu Kai individual to the Navy HOT Line and PMRF Commanding Officer. I told the SCO I would look into the issue once I returned from Orlando, FL. As it turns out, we guessed the individual was Preston Lee based upon a recent disciplinary action against him. The Navy has confirmed he was the accuser. I asked Scott Taylor to conduct a formal inquiry based upon his 30+ years of military investigative experience and told PMRF of my intent to do so.

Attached is his report which has been shared with the PMRF Technical Director, NAVSUP SCO and PMRF XO. I also requested a formal investigation to be conducted by the NCIS. Due to the recent two active shooter events, many personnel are raising concerns about Preston Lee's stability. Preston himself has openly told his co-workers that he has been diagnosed with PTSD and has had other issues. Those concerns were addressed by HR in a confidential manner in the past, but I believe we need to elevate it concerns to a corporate level based upon the findings Scott presented. Apparently the situation with Preston Lee's stability is deteriorating.

R,

Ross W. West
Program Manager
Manu Kai, LLC
O: 808-335-4298
C: 703-635-9878
ross.west.ctr@navy .mil
rwest@alakaina.com

**From:** West, Ross W CTR (USA)
**Sent:** Wednesday, December 11, 2019 12:58 PM
**To:** Moore, Judith L CIV NAVSUP, 7020 <judith.moore1@navy.mil>; Kay, Robert T, Civ, PMRF, N02-Technical Director <robert.t.kay@navy.mil>
**Subject:** FW: Gasoline Inquiry

Judith / Bob:

Attached are the findings from Manu Kai's formal inquiry into the alleged fuel theft.

**EXHIBIT V**

BLUF:  The alleged incident seems to be from the 2007-2010 timeframe and there is not collaborating evidence to prove the theft occurred or to dis-prove the allegation.  Several items have come to light:

1.  There seems to be a motive of retaliation associated with the allegations.
2.  Individuals have raised significant concerns with the mental health of the accuser.
3.  The VLN ProKee system in use to monitor fuel usage has significant gaps with regards to accountability to fuel dispensing and usage.

Manu Kai is continuing to investigate how the VLN ProKee system might be enhanced to close the accountability loopholes and we are working with our Corporate HR/Legal department to determine what employment action can be taken regarding the mental health concerns of the accuser.

R,


Ross W. West
Program Manager
Manu Kai, LLC
O: 808-335-4298
C: 703-635-9878
ross.west.ctr@navy .mil
rwest@alakaina.com



From: Taylor, Stuart S CTR USN PMRF BARS HI (USA) <stuart.s.taylor.ctr@navy.mil>
Sent: Wednesday, December 11, 2019 11:36 AM
To: West, Ross W CTR (USA) <ross.west.ctr@navy.mil>
Cc: Broyles, Julie A CTR USN (USA) <julie.broyles.ctr@navy.mil>; Apo, Jasmine C CTR (USA) <jasmine.apo.ctr@navy.mil>
Subject: Gasoline Inquiry

Ross,

Please see attached inquiry as requested.  I would consider this a draft, but I am in possession of all signed documents.

Scott

**Scott Taylor**
Manager, Security & Emergency Services
Manu Kai, LLC
PMRF, Barking Sands
Office:  335-4119
Email:  stuart.s.taylor.ctr@navy.mil

TO:  Ross West, Program Manager

FROM:  Scott Taylor, Inquiry Officer and SES Manager

SUBJECT:  Gasoline Theft Inquiry

On Monday, 9 Dec 19, I was appointed by Ross West as an Inquiry Officer to investigate the following allegation:  that Sean Igne, a Manu Kai Lead Painter, systematically stole gasoline from the MOGAS Station every Tuesday and Thursday for the last 12 years by pumping gasoline into his personal gas can.

Methodology:  after obtaining background information from Facilities Maintenance Supervisor Rod Martin, I decided on the following course of action:

- Conduct personal interviews with and obtain written statements from Preston Lee (painter, complainant), Rod Martin (supervisor), Guy Fujita (arresting gear mechanic), Gilbert Castro (painter), David Hesapene (painter), and Sean Igne (lead painter).
- Review fuel records from Manu Kai Supply

Findings:

- That Preston Lee maintained the truthfulness of his initial allegation but narrowed the timeframe in which he personally observed the theft by Sean Igne to 2007-2010.  He volunteered to take a polygraph, if offered.
- That gasoline usage records do not exist for the period 2007-2010 for the vehicle in question.
- That gasoline usage in the Paint Shop includes the permanent use of two 5-gallon gas cans for which there is no separate VIL Key, separate from the vehicle.  These cans are used to supply gas to the power washer and blower.
- That the Paint Shop gasoline cans are frequently not secured at the end of the workday, but left in the bed of the truck.
- That Manu Kai's gasoline accountability system has significant weaknesses.
- That the three witnesses whom Preston provided to corroborate his story – Guy Fujita, Gilbert Castro, and David Hesapene – all denied ever observing Sean Igne steal gas but all acknowledged that Preston Lee had told them about this theft several times over the last few years.
- That Sean Igne denied the allegation and volunteered to take a polygraph, if offered.
- That Preston Lee has serious psychological issues, to include anger management and low self-esteem, and has demonstrated a pattern of violent behavior.
- That severe friction has existed for several years between Preston Lee and his co-workers and supervisor that has led to an exceptionally hostile work environment.
- That Rodney Martin addressed this allegation immediately upon learning of it on 18 Nov 19, except that he never approached Sean Igne with the issue.

- That Preston Lee is likely the source of the government's complaint since he voluntarily told me that he reported the theft to the Navy Hotline and the PMRF Commander.  I want to make clear that I did not ask him if he filed an anonymous complaint – he provided me this information without any prompt from me.

Conclusions:

- That using the low level of proof normally associated with an administrative inquiry – preponderance of the evidence (51%) -- there is insufficient evidence to support theft of gasoline by Sean Igne.  There is no documentary evidence; there is no corroborating testimony; revenge is the clear motive for making the allegation; the complainant modified his initial story; and Sean Igne has a higher level of credibility than his accuser.
- That it cannot be determined with 100% certainty whether gas was stolen, and to what degree, due to insufficient records, elapsed time, and an inadequate accountability system at the Manu Kai and departmental levels.
- That Preston Lee is an employee who needs professional psychological assistance.
- That, if Preston Lee returns to his assigned position at the end of his medical leave, it is likely that the hostile work environment will further deteriorate into violence.

Recommendations:

- That a polygraph be offered to Sean Igne if a higher level of proof is desired.  He has volunteered to take one from a certified examiner.  It is standard practice to offer to the accused first before offering to anyone else.  Polygraphy is not permitted in legal proceedings, but it is permissible to use polygraph for administrative decisions.
- That a comprehensive review of gas accountability be conducted to arrive at solutions designed to improve it.
- That HR address Preston Lee's obvious mental instability.
- That Preston Lee not be reassigned to his current position to reduce the possibility of violence.

ATTACHMENTS:
Memorandum for Record – Taylor Interview with Preston Lee
Statement of Rodney Martin
Statement of Guy Fujita
Statement of David Hesapene
Statement of Gilbert Castro
Statement of Sean Igne

SCOTT TAYLOR
11 DEC 19

## MEMORANDUM FOR RECORD – TAYLOR INTERVIEW WITH PRESTON LEE ON 9 DEC 19

Given that Preston Lee is currently on medical leave, I called him on his cell 635-0164 to determine if he would talk to me in an unpaid status. He readily agreed to talk after I explained to him that Ross West had appointed me as an inquiry officer to look into the allegation that Sean Igne systematically stole gas from the MOGAS station for personal use. The following is a summarized version of our conversation with Q = Taylor and A = Lee.

Q: What is your Manu Kai job?

A: Painter

Q: What is your relationship with Sean Igne?

A: He is my Lead.

Q: How would you describe your relationship with Mr. Igne?

A: I hate him, and I'm glad that someone has finally taken this seriously. I have contacted the Navy Hotline, the base commander, and it appears to be just a big cover-up.

Q: Did you make an allegation during an 18 Nov 19 counselling session with Julie Broyles and Rodney Martin that Sean Igne has been stealing MOGAS for about 12 years?

A: Yes I did.

Q: Could you be more specific?

A: I personally observed Sean Igne put MOGAS into his personal gas can every Tuesday and Thursday during the period 2007-2010, and I suspect that he's been doing it since then to the present. I rode with him in the Manu Kai truck during that time (2007-10) and personally saw him do it. He would take a personal 5-gallon gas can from his personal truck and place it in the Manu Kai truck. Sometime during the day, he would fill the personal can at the MOGAS station, and then put it back in his personal vehicle at the end of the day. He stopped doing it in 2010 because I told him that he needed to stop this or I would turn him in. You can check the fuel records and they will show this. Rodney Martin just wants to cover this up.

Q: Why did this occur on Tuesdays and Thursdays?

A: I don't know, maybe to just spread out the amounts.

Q: Why are you just now reporting this in 2019?

A: Because he just turned me in, so I will turn him in.

Q: Are there any other personnel who may have witnessed this theft?

A:  Gilbert Castro and Guy Fujita for sure; David Hesapene knows too but he may not talk
because Igne is his partner.

Q:  If offered, would you be willing to take a polygraph from a certified examiner?

A:  Damn right.

Q:  Is there anything else that you'd like to add to this statement?

A:  Just that I am telling the truth, and I would take a polygraph today if you wanted me to.

TAYLOR:  My conversation with Preston lasted about 45 minutes.  During this conversation, he
talked in a rage with excessive profanity throughout.  He was not disrespectful to me, but I was
shocked by his degree of anger, given that he was about three weeks removed from his 18 Nov
19 counselling.

END OF STATEMENT

SCOTT TAYLOR
INQUIRY OFFICER
9 DEC 19

**STATEMENT OF RODNEY MARTIN ON 10 DEC 19**

I voluntarily provide this statement to Scott Taylor, who is conducting an inquiry into an allegation that Sean Igne systematically stole gas from the MOGAS station for personal use.

Q = Taylor and A = Martin

Q:  Do you agree to the statement above?

A:  Yes.

Q:  What is your job?

A:  Facilities Maintenance Supervisor.

Q:  What was your job during 2007-2010?

A:  Same.

Q:  Do you know Sean Igne?

A:  Yes.

Q:  What is your relationship with Sean Igne?

A:  I am his supervisor.

Q:  When did you first become aware of this allegation again Sean?

A:  On Nov 18 during a counselling session in the Manu Kai Conference Room involving Preston Lee.  Julie Broyles was present as well.  Preston said that he wanted to report that Sean Igne has been stealing gasoline from the Company for years, every Tuesday and Thursday, and that he has witnesses, and he named the witnesses.

Q:  What was your response to Preston?

A:  I told him that I would follow up on his allegation, to include talking with the witnesses, but that the focus right now was to address the counselling incident of 6 Nov 19.

Q:  What were the results of the follow-up into the allegation?

A:  Immediately after the counselling, I began an informal inquiry.  David Hesapene, Gilbert Castro, and Guy Fujita told me that they had never seen Sean do this but that Preston Lee had told them that this was going on.  I sent an email to Julie Broyles on 19 Nov 19 that outlines this information.

Q:  Have you ever observed Sean Igne pump gas at the MOGAS station since 2007?

A:  I have seen him pumping gas but not into a fuel can or personal container.

Q:  What color are the fuel cans that the Paint Shop uses?

A:  I am not sure but I am only aware of red metal 5-gallon cans being used in Public Works, because it is stock issue.

Q:  Why does the Paint Shop use gas cans?

A:  They use straight gas for the pressure washer and mixed oil-gas for the blower, so there should be more than one can for the shop.

Q:  Do you know about much gas they might go through in a week for this use?

A:  I have no idea.

Q:  Based on the physical layout of the PW compound during 2007-2010, how risky would it be for a painter to steal gas as alleged?

A:  Pretty risky because there was a lot of pedestrian traffic in the area, and there is a camera on top of Crash Fire.

Q:  Based on what you know, how likely is it that Sean Igne systematically stole gasoline over a number of years?

A:  I find it hard to believe.  Sean is very responsible.  Unfortunately, he could not get along with Preston.

Q:  Is there anything else that you'd like to add to or delete from this statement?

A:  I do have concern about Preston's mental state.  He once told me a story where he became violent with a man on the street who looked at him strangely.  His behavior has been boisterous and loud and defensive at work.  I have concern that he might harm himself or others without some type of intervention.

END OF STATEMENT


RODNEY MARTIN
10 DEC 19

**STATEMENT OF GUY FUJITA ON 10 DEC 19**

I voluntarily provide this statement to Scott Taylor, who is conducting an inquiry into an allegation that Sean Igne systematically stole gas from the MOGAS station for personal use.

Q = Taylor and A = Fujita

Q:  Do you agree to the statement above?

A:  Yes.

Q:  What is your job?

A:  Arresting Gear mechanic.

Q:  What was your job during 2007-2010?

A:  Fire Lieutenant.

Q:  Do you know Sean Igne?

A:  Yes.

Q:  What is your relationship with Sean Igne?

A:  Just a friend, never worked with him.

Q:  Have you ever observed Sean Igne pump gas at the MOGAS station since 2007?

A:  I have seen him numerous times pumping gas at the MOGAS station with his co-worker, maybe Preston Lee or someone else I can't remember.

Q:  During the times that you observed him pump gas, did you ever see him pump gas into a personal 5-gallon gas can?

A:  No, just the red Manu Kai gas can.

Q:  Has anyone ever approached you about this issue before today?

A:  Rod Martin about two weeks, and I told him the same thing.

Q:  Why would anyone say that you have personal knowledge about Sean misusing the gas?

A:  Just hearsay.

Q:  Has Preston Lee ever shared knowledge about this misuse with you?

A:  Yes, about 7 or 8 times from 2006 on, and then it died down.  The thing that I remember is that Preston said that Sean was pumping gas into his personal gas can.

Q:  Is there anything else that you'd like to add to or delete from this statement?

A:  I have not seen Sean do this, and I don't work with him.

END OF STATEMENT


GUY FUJITA
10 DEC 19

**STATEMENT OF DAVID HESAPENE ON 10 DEC 19**

I voluntarily provide this statement to Scott Taylor, who is conducting an inquiry into an allegation that Sean Igne systematically stole gas from the MOGAS station for personal use.

Q = Taylor and A = Hesapene

Q: Do you agree to the statement above?

A: Yes.

Q: What is your job?

A: Painter.

Q: What was your job during 2007-2010?

A: I was in Grounds Department on this contract.

Q: Do you know Sean Igne?

A: Yes.

Q: What is your relationship with Sean Igne?

A: He is my Lead, and we were school classmates, and he's my friend.

Q: Have you ever observed Sean Igne pump gas at the MOGAS station since 2007?

A: Yes, he and I have been partners since Jan 19, and he has put gas in the Manu Kai vehicle and the Manu Kai 5-gallon gas cans, one for straight gas (pressure washer) and one for mixed gas (blower).  The cans go in a locked locker once a job is finished.

Q: During the times that you observed him pump gas, did you ever see him pump gas into a personal 5-gallon gas can?

A: No, just the red Manu Kai metal gas cans.  Plus, I am the one who normally pumps the gas.

Q: Has anyone ever approached you about this issue before today?

A: Rod Martin about two weeks, and I told him the same thing.

Q: Why would anyone say that you have personal knowledge about Sean misusing the gas?

A: I do not know why.  I just know Preston and Sean do not get along, and that Preston will not take orders from him.

Q: Has Preston Lee ever shared knowledge about this misuse with you?

A: Yes, a couple of times recently when he got mad at Sean.

Q: How much gas might you use in a week for each type?

A: Probably never more than two cans of straight gas and no more than one can for the mixed gas.

Q: Is there anything else that you'd like to add to or delete from this statement?

A: I have a real concern that Preston will hurt himself or others.

END OF STATEMENT

DAVID HESAPENE
10 DEC 19

**STATEMENT OF GILBERT CASTRO ON 10 DEC 19**

I voluntarily provide this statement to Scott Taylor, who is conducting an inquiry into an allegation that Sean Igne systematically stole gas from the MOGAS station for personal use.

Q = Taylor and A = Castro

Q:  Do you agree to the statement above?

A:  Yes.

Q:  What is your job?

A:  Painter.

Q:  What was your job during 2007-2010?

A:  Painter.

Q:  Do you know Sean Igne?

A:  Yes.

Q:  What is your relationship with Sean Igne?

A:  He is my Lead, and he's my friend.

Q:  Have you ever observed Sean Igne pump gas at the MOGAS station since 2007?

A:  Yes, many times over the years into the Manu Kai vehicle and the Manu Kai 5-gallon gas cans, one for straight gas (pressure washer) and one for mixed gas (blower).  The cans go in a locked locker once a job is finished.

Q:  During the times that you observed him pump gas, did you ever see him pump gas into a personal 5-gallon gas can?

A:  No, just the red Manu Kai metal gas cans.

Q:  Has anyone ever approached you about this issue before today?

A:  Rod Martin after his meeting with Preston, and I told him the same thing.

Q:  Why would anyone say that you have personal knowledge about Sean misusing the gas?

A:  I do not know why – maybe because I have been here for a long time.

Q:  Has Preston Lee ever shared knowledge about this misuse with you?

A:  Yes, about five times recently.  During 2007-2010, he mainly complained about other things.

Q: How much gas might you use in a week for each type?

A: Probably never more than two cans of straight gas and no more than one can for the mixed gas.

Q: Is there anything else that you'd like to add to or delete from this statement?

A: I think that leadership must better define Preston's role when he comes back to work.

END OF STATEMENT

GILBERT CASTRO
10 DEC 19

**STATEMENT OF SEAN IGNE ON 11 DEC 19**

I voluntarily provide this statement to Scott Taylor, who is conducting an inquiry into an allegation that I systematically stole gas from the MOGAS station for personal use.

Q = Taylor and A = Igne

Q: Do you agree to the statement above?

A: Yes.

Q: Do you desire Union representation at this session?

A: No, I don't need one.

Q: What is your job?

A: Lead Painter.

Q: What was your job during 2007-2010?

A: The same as Lead Painter.

Q: Do you know Preston Lee?

A: Yes.

Q: What is your relationship with Preston Lee?

A: I am his Lead in the Paint Shop, and we do not socialize.

Q: Have you ever pumped gas at the MOGAS station since 2007?

A: Yes, of course.

Q: Have you ever since 2007 pumped gas into your personal gas can at the MOGAS Station?

A: Never.

Q: Have you ever pumped gas into the Manu Kai gas cans as a matter of work?

A: Yes, we use up to 2 cans (10 gallons) a week of straight gasoline for the pressure washer, and we also use a mixed oil-gas can for the blower, which uses less.

Q: Right now, who is your partner in the truck?

A: David Hesapene.

Q: During 2007-2010, who was your partner in the truck?

A: I can't remember the exact years, but both Gilbert Castro and Preston Lee have been partners since 2007.

Q: Do you know of anyone who has misused gasoline from the MOGAS Station for personal use?

A: No, but we have had gasoline stolen from the back of our truck at times, and so we now lock the cans up in a locker at the end of a project.

Q: Do you have a personal gasoline can at home?

A: I have five plastic red gas cans, three of which are 5-gallon, one is 1 ½, and another gallon can for oil-gas mixture.

Q: What color and material are the Manu Kai gas cans at work?

A: Both are red, metal, and 5-gallon.

Q: Has anyone ever approached you about this issue before today?

A: No.

Q: Has Preston Lee ever accused you of stealing gasoline?

A: Yes.  A couple of times during the last two years, usually when he is mad at me for telling him what to do as the Lead.

Q: What is your work relationship with Preston Lee?

A: We don't get along from the get-go.  He is very negative and does not want to be told what to do.  He even gets mad at Rodney.

Q: Do you feel that Preston could be a harm to you, your family, others, or himself?

A: Definitely.  He is a big guy, and he gets mad over nothing.

Q: If offered, would you take a polygraph from a certified examiner to validate your position?

A: Yes.

Q: Is there anything else that you'd like to add to or delete from this statement?

A: No.

END OF STATEMENT

SEAN IGNE

11 DEC 19

| **MANU KAI** | **Standard Operating Procedure (SOP)** | |
|---|---|---|
| **Program — Pacific Missile Range Facility (PMRF), Barking Sands** | | |
| Subject: **Contract Employee Identification Lanyard and Badge** | No.: HR-025 | Page: 1 of 4 |
| | Effective: **01 October 2018** | |
| | Cancels: 01 March 2017 | |

| Affects: Manu Kai Personnel, PMRF Barking Sands | |
|---|---|
| Reviewed By:            2/12/2019<br><br>**X** Julie Broyles<br>_____<br>Julie Broyles<br>Human Resource Manager<br>Signed by: BROYLES.JULIE.A.1396160605 | Approved By:            4/26/2019<br><br>**X** Ross W. West<br>_____<br>Ross West<br>Program Manager<br>Signed by: WEST.ROSS.WADE.1202266459 |

★ This document is considered Manu Kai LLC proprietary information, produced, or distributed with exclusive rights to Manu Kai LLC, and does not contain ITAR-controlled technical data, as defined by 22 CFR 120.10. This document may also be reviewed by Manu Kai LLC employees, including the employees of the Manu Kai LLC joint venture member companies, Ke'aki and Harris Corporation, or subcontractors with previously authorized viewing privileges via their subcontract. Distribution to non-US citizens is prohibited without prior written approval from an authorized export official representing Manu Kai LLC. By viewing, printing, or possessing this document, you agree to protect this document as Manu Kai LLC proprietary information and not to disclose or duplicate any data contained herein. Civil and Criminal penalties may be enforced for unauthorized usage and/or disclosure.

The U.S. Government has rights to this work pursuant to Contract #N00604-18-D-4003.

**★ This procedure should be considered completely revised, in both format and content. Therefore, no individual change markings are indicated herein.**

**1.0 PURPOSE.** The purpose of this policy is to issue specific guidelines for the issuance of employees' identification badges, proper handling and to establish a means of appropriately identifying Manu Kai personnel when interacting with Government personnel, personnel from other Contractors in the work area and the general public in work areas located at Barking Sands, Makaha Ridge, Mauna Kapu, Port Allen, Kokee Park Facility, Ford Island and new or future locations within the PMRF contract.

**2.0 SCOPE**

2.1 This SOP is applicable to all Manu Kai personnel.

2.2 This SOP is not applicable to personnel in Fire Department and Security Services Department that are required to wear company issued/authorized Manu Kai uniforms.

2.3 Marine Department personnel and Manu Kai personnel assigned to MATSS when deployed at sea will not be required to wear Manu Kai lanyard and badge.

**3.0 REFERENCES**

3.1 SOP HR-012 Manu Kai Dress Code and Professional Appearance

3.2 Form HR-046 Manu Kai Dress Code and Professional Appearance

**Uncontrolled When Printed— May Not Be Current**      Use/disclosure of data contained on this sheet is subject to the restrictions on the first page of this SOP.      **COMPANY PROPRIETARY**

ER 406

| MANU KAI | Standard Operating Procedure (SOP) |
|---|---|
| Program — Pacific Missile Range Facility (PMRF), Barking Sands | |

| Subject:<br>**Contract Employee Identification Lanyard and Badge** | No.: HR-025 | Page: 2 of 4 |
| | Effective: **01 October 2018** | |
| | Cancels: 01 March 2017 | |

3.3        Form HR-045  Dress Code/Professional Appearance, Contract ID Badge/Lanyard Acknowledgment and compliance Form.

3.4        HRP 004        Ke'aki Technologies, LLC Dress Code

3.5        PWS 2.7.4        Employee Appearance

**4.0        DEFINITIONS.**

4.1        Employee.        For the purpose of this policy, employees shall refer to full-time, part-time, casual, temporary, CAT-3 and on-call employees.

4.2        Identification Badge.  An official Manu Kai contract identification (I.D.) for employees who are required to wear at all times.  This includes a Manu Kai lanyard and badge.

4.3        Identification Badge Holder.  All Manu Kai employees who are required to comply with this SOP.

4.4        Non-Badge Holder.  Employees who wear company issued and authorized uniform such as all First Responders (i.e. Security Officers and Crash Fire), Marine Department personnel and Manu Kai personnel (i.e. IT Dept., Optics and Measurement Systems) assigned to MATSS when deployed at sea.

4.5        PWS.  Performance Work Statement.

**5.0        RESPONSIBILITIES.**

5.1        The Human Resources Manager is responsible for the administration of this SOP.

5.2        The Program Manager is responsible for managing this SOP and has the ultimate authority in resolving any dispute.

5.3        Human Resource Department will provide additional or replacement badges and/or lanyards to Leads, Supervisors or Managers.  A completed and signed copy of Form HR-045 must be submitted prior to releasing lanyards and/or badges.

5.3.1        Human Resource Department will provide all new employees with a copy of this policy, Manu Kai identification lanyard and badge.

5.4        Managers and/or Supervisors are responsible for enforcing this SOP and ensure all employees comply with requirements of this policy.  This includes counseling employees who are not wearing the Manu Kai identification lanyard and badge.

**Uncontrolled When Printed— May Not Be Current**        Use/disclosure of data contained on this sheet is subject to the restrictions on the first page of this SOP.        **COMPANY PROPRIETARY**

| MANU KAI | | Standard Operating Procedure (SOP) |
| --- | --- | --- |
| Program — Pacific Missile Range Facility (PMRF), Barking Sands | | |
| Subject: **Contract Employee Identification Lanyard and Badge** | No.: HR-025 | Page: 3 of 4 |
| | Effective: **01 October 2018** | |
| | Cancels: 01 March 2017 | |

5.4.1        Managers and/or Supervisors are responsible to request for additional or replacement lanyards and/or badges.  A completed copy of Form HR-045 must be submitted to HR prior to stock replenishment.

5.4.2        In an event that an employee forgets their identification lanyard and/or badge at home, the employees' Supervisor and/or Manager must be notified at the start of the work shift. The Supervisor and/or Manager will issue a temporary lanyard and/or badge for the employee. Employee must return the lanyard and/or badge at the end of the shift, prior to leaving the premises.

5.4.3        Manu Kai Managers, Supervisors and Leads will be responsible to ensure all Manu Kai employees are in compliance with this contractual requirement.

5.5          Identification Badge Holder.

5.5.1        All employees are expected to fully comply with all provisions of this policy. Employees who frequently and intentionally disregard this policy or are found to be in violation of this policy may be subject to disciplinary action.

5.5.2        Do not leave lanyard and badge on dash of the vehicle or other locations where it can be exposed to extreme temperatures.

5.5.3        Do not fold, bend, mutilated or allow your badge to get wet.

5.5.4        Do not lend your identification lanyard and/or badge to anyone.

5.5.5        Do not leave your identification lanyard and badge unattended.

5.5.6        Do not tape your Manu Kai lanyard or badge.

**6.0          PROCEDURES**

6.1          All employees required to wear identification lanyard and badge at Manu Kai work areas during official capacity.

6.2          Manu Kai identification lanyards and badges are to be prominently worn so the badge is visible to others.

6.3          Any task, action, event or operation that the Manu Kai employee deems is unsafe to wear/display the Manu Kai identification lanyard and badge; the Manu Kai employee should then remove or place the identification lanyard and badge under their shirt, blouse, jacket, coverall, etc.  Once the task, action, event or operation in question has ended, the employee must immediately place the identification lanyard and badge around their neck to be properly display at all other times.  If the Manu Kai identification lanyard and badge jeopardize your safety, act accordingly, when the risk no longer exists than you must be PWS/SOP compliant.

**Uncontrolled When Printed— May Not Be Current**          Use/disclosure of data contained on this sheet is subject to the restrictions on the first page of this SOP.          **COMPANY PROPRIETARY**

ER 408

| MANU KAI | Standard Operating Procedure (SOP) | |
|---|---|---|
| **Program — Pacific Missile Range Facility (PMRF), Barking Sands** | | |
| Subject: **Contract Employee Identification Lanyard and Badge** | No.: HR-025 | Page: 4 of 4 |
| | Effective: **01 October 2018** | |
| | Cancels: 01 March 2017 | |

6.4      The identification lanyard and badge is to be worn around the neck, between the shoulders and waist.  The Manu Kai badge placed in a plastic sleeve must be visible and placed in front of other badges.

6.5      The identification lanyard must be worn with the company issued badge. The badge shall not be defaced, altered with pins, stickers, decals, etc.  Badge shall not be laminated, copied or distributed to other Manu Kai personnel.

6.6      Employees may use several lanyards that hold CAC, Security Badge, ESH PRIDE badge, etc.  However, the Manu Kai Identification lanyard and badge must be visible at all times.

6.7      Employee who chooses to use one lanyard must select the Manu Kai lanyard. Employee may change the lanyard clip to hold the Manu Kai badge along with other badges (i.e. CAC, Security Badge, etc.).  The manufacturer provided clip attached to the Manu Kai lanyard is not durable to secure all badges at once.

6.8      The identification lanyard and badge is a standardized dress code.  Any changes or modifications to the lanyard and/or badge must be approved by Program Manager.

6.9      The lanyard and badge may be used only by the individual to whom it was issued.  Employees may not "loan" their identification lanyard and badge to anyone for any reason.

6.10      Employees shall surrender Manu Kai identification lanyard and badge to their Supervisor and/or Manager upon termination, retirement, beginning an extended leave of absence of 30-days or more, or when requested.

6.11      Damaged, lost, stolen or misplaced identification lanyard and/or badge are to be immediately reported to employee's Supervisor and/or Manager.  A replacement lanyard and badge will be issued as necessary and a record of lost lanyard and badge noted.

6.12      Employee must complete and sign Form HR-045, prior to replacement.

— End of SOP —

**Uncontrolled When Printed— May Not Be Current**      Use/disclosure of data contained on this sheet is subject to the restrictions on the first page of this SOP.      **COMPANY PROPRIETARY**

ER 409

# FILED UNDER SEAL:

Employment Policy 1

# EXHIBIT "X"

# FILED UNDER SEAL:

Employment Policy 2

# EXHIBIT "Y"

# FILED UNDER SEAL:

Medical Evaluation

# EXHIBIT "Z"

# FILED UNDER SEAL:

Medical Letter

# EXHIBIT "AA"

|  |  |
|---|---|
| 1 | IN THE UNITED STATES DISTRICT COURT |
| 2 | FOR THE DISTRICT OF HAWAII |

```
 3
    PRESTON LEE,                        )   Civil No.
 4                                      )   20-00489 LEK-KJM
             Plaintiff,                 )   (Other Civil Action)
 5                                      )
        vs.                             )
 6                                      )
    L3HARRIS TECHNOLOGIES, INC.;        )
 7  JOHN DOES 1-10; JANE DOES           )
    1-10; DOE CORPORATIONS 1-10;        )
 8  DOE PARTNERSHIPS 1-10; DOE          )
    UNINCORPORATED ORGANIZATIONS        )
 9  1-10; and DOE GOVERNMENTAL          )
    AGENCIES 1-10,                      )
10                                      )   (Pages 1 - 74)
             Defendants.               )
11  _____)

12

13

14            DEPOSITION OF GILBERT CASTRO

15     taken on behalf of Defendants, commencing at

16  8:59 a.m., Wednesday, September 22, 2021, pursuant to

17  Notice.

18

19

20

21

22

23

24  Reported by:      JESSICA AKITA, RPR
                      Certified Shorthand Reporter
25                    Hawaii License No. 461
```

**EXHIBIT BB**

Case: 22-15288, 07/06/2022, ID: 12487394, DktEntry: 11-4, Page 72 of 136
Case 1:20-cv-00489-LEK-KJM   Document 50-33   Filed 09/29/21   Page 2 of 31   PageID #: 562

2

```
 1   APPEARANCES:

 2
       FOR THE PLAINTIFF, PRESTON LEE:
 3
             Fujiwara and Rosenbaum, LLLC
 4           BY:  JOSEPH T. ROSENBAUM, ESQ.
             Alakea Corporate Tower
 5           1100 Alakea Street, Floor 20, Suite B
             Honolulu, Hawaii  96813
 6           808-203-5436
             jtr@frlawhi.com
 7

 8
       FOR THE DEFENDANT, L3HARRIS TECHNOLOGIES, INC.:
 9
             Cades Schutte LLP
10           BY:  AMANDA M. JONES, ESQ.
             Cades Schutte Building
11           1000 Bishop Street, Floor 12
             Honolulu, Hawaii  96813
12           808-521-9232
             ajones@cades.com
13

14
       Also Present:
15
             PRESTON LEE
16

17

18

19

20

21

22

23

24

25
```

Case: 22-15288, 07/06/2022, ID: 12487394, DktEntry: 11-4, Page 73 of 136
Case 1:20-cv-00489-LEK-KJM  Document 50-33  Filed 09/29/21  Page 3 of 31  PageID #:
563

3

```
 1                        I N D E X

 2    DEPOSITION OF:                                 Page

 3    GILBERT CASTRO

 4        EXAMINATION BY MS. JONES:                    4

 5        EXAMINATION BY MR. ROSENBAUM:               59

 6


 7                     E X H I B I T S

 8    Marked      Description                         Page

 9    Exhibit 1   Subpoena To Testify At A             9
                  Deposition in a Civil Action
10                (3 pages)

11    Exhibit 2   Incident Concerning Preston Lee     16
                  and Sean Igne (2 pages)
12
      Exhibit 3   Statement of Gilbert Castro         33
13                (2 pages)

14    Exhibit 4   Statement of Gilbert Castro         40
                  (1 page)
15
      Exhibit 5   Declaration of Gilbert Castro       42
16                (3 pages)

17

18              INFORMATION REQUESTED

19                     (None.)

20

21       QUESTIONS INSTRUCTED NOT TO ANSWER

22                     (None.)

23

24

25
```

```
 1                        LIHUE, HAWAII;

 2           WEDNESDAY, SEPTEMBER 22, 2021; 8:59 A.M.

 3                         *  *  *  *  *

 4                       GILBERT CASTRO,

 5           having been first duly sworn, was examined

 6                     and testified as follows:

 7                        EXAMINATION

 8    BY MS. JONES:

 9        Q.    Good morning.

10        A.    Good morning.

11        Q.    My name is Amanda Jones.   I represent

12    L3Harris Technologies.

13              Can you please state your full name?

14        A.    Gilbert P. Castro.

15        Q.    Okay.  And where are you currently employed?

16        A.    Right now it's Kupono.   It's an umbrella

17    company with Amentum.   It's called Koa Lani.

18        Q.    And previously, were you employed by Ke'aki

19    Technologies?

20        A.    Yes.  Yes.

21        Q.    Just a couple of things.

22        A.    Uh-huh.

23        Q.    So the court reporter today is taking down

24    all of my questions and then everything that you say.

25        A.    Okay.
```

1    put?

2                    COURT REPORTER:  Exhibit 1.

3                    MS. JONES:  Oh.  Numbers are fine.

4                    (Exhibit 2 was marked.)

5    BY MS. JONES:

6         Q.    Mr. Castro, the court reporter has handed you

7    what's been marked Exhibit 2 to your deposition, and if

8    you can take a look at this document.  It's two pages.

9    Just review it and let me know when you're finished

10   reviewing it; okay?

11        A.    Some stuffs is correct.  Some stuffs is kind

12   of -- it's not how it happened.

13        Q.    Okay.  Let me ask you some questions about

14   this.  So you --

15        A.    Yeah.

16        Q.    -- you reviewed Exhibit 2?

17        A.    Yes.

18        Q.    Okay.  Do you recognize this document?

19        A.    This document is a whole incident that

20   happened.  That's how everything got started right here.

21        Q.    Okay.  But just taking this piece by piece.

22   First, I just want to know if you recognize the document

23   itself?

24        A.    Yes.

25        Q.    Okay.  And is -- if you look at the second

```
 1   page of the document, is that your signature there?

 2        A.   Yes.

 3        Q.   Okay.  And did you also handwrite in the date

 4   next to your signature?

 5        A.   Yes.

 6        Q.   Okay.  And is this a statement that you gave

 7   to Rodney Martin?

 8        A.   Yes.

 9        Q.   So, after you signed this document, you

10   handed it in to Mr. Martin?

11        A.   Yes.

12        Q.   And who is Rodney Martin?

13        A.   He was our former supervisor.

14        Q.   Okay.

15        A.   The super.

16        Q.   So he was the supervisor for both you and

17   Preston Lee?

18        A.   Yes.

19        Q.   He was in charge of the paint shop?

20        A.   Yes.

21        Q.   Okay.  And was he also in charge of other

22   areas, if you know?

23        A.   Oh.  Yeah.

24        Q.   Is that a "yes"?

25        A.   Yes.
```

 1    Q.    Okay.  And prior to doing the statement which

 2  is Exhibit 2, did Mr. Martin ask you some questions

 3  about what had happened the previous day?

 4    A.    Concerning this incident?

 5    Q.    Yeah.  Did -- did Mr. Martin ask you some

 6  questions about the incident that had happened the

 7  previous afternoon between Preston Lee and Sean Igne?

 8    A.    He asked me but was more for what was said.

 9    Q.    Mr. Martin was asking you what was said

10  between Mr. Lee and Mr. Igne?

11    A.    Yes.

12    Q.    Okay.

13    A.    As a witness.

14    Q.    Right.

15        So Mr. Martin wanted -- was asking you what

16  happened between the two of them?

17    A.    Mr. Martin had bring me in to accommodate

18  what else had happened after this incident.  Yes.  But

19  not before.  I don't know why he brought me in before.

20    Q.    No, no, no.  I'm not asking before.

21        There's an incident between Sean Igne and

22  Preston Lee that you talk about in your statement,

23  Exhibit 2.

24    A.    Okay.

25    Q.    Is that right?

```
 1        A.    Yes.

 2        Q.    Okay.   After that incident, Mr. Martin called

 3   you in to ask you questions about what happened --

 4        A.    Yes.

 5        Q.    -- is that correct?

 6        A.    Yes.

 7        Q.    And after asking you questions, the statement

 8   that is Exhibit 2 was prepared?

 9        A.    Uh-huh.

10        Q.    Is that a "yes"?

11        A.    Yes.

12        Q.    Sorry.   You just have to say "yes" or "no"

13   instead of uh-huh --

14        A.    Oh.   Okay.

15        Q.    -- or huh-uh.

16        A.    Right.

17        Q.    It's hard to take down.

18        A.    Okay.

19        Q.    And when Mr. Martin was questioning you about

20   what happened between Sean Igne and Preston Lee, were

21   you truthful with Mr. Martin?

22        A.    Yes.

23        Q.    So in the second and third paragraphs of

24   Exhibit 2, you reference a Safety Inspector named

25   Kathleen Lambrix; do you see that?
```

```
 1        A.    Yes.

 2        Q.    You see it, the second and third paragraphs?

 3        A.    Yeah.  Right here.

 4        Q.    Okay.  So I just want to ask you some

 5   questions about Ms. Lambrix; okay?

 6        A.    Uh-huh.  Yes.

 7        Q.    So, as I understand it, Kathleen Lambrix was

 8   -- was the Safety Inspector for the Navy; is that right?

 9        A.    Yes.  I didn't even know her until she came

10   introduce herself.

11        Q.    Okay.  And it looks like, according to your

12   statement, that you talked to her on November 5th, 2019;

13   does that seem right to you?

14        A.    Yes.

15        Q.    And is it correct that she came up to you

16   after seeing you on a roof not wearing fall protection?

17        A.    Yes.  I was -- I was on a lean-to.

18        Q.    On a what?

19        A.    Lean-to, you know, like a roof.

20        Q.    Okay.

21        A.    A small little roof.  I walked up on top of

22   there but didn't have my fall protection, thinking that

23   I would do things fast, you know, just pressure wash

24   things fast, then I can come down.  But before I could

25   do it, she kind of caught me -- driving by.
```

1      Q.     And so she came up to you and -- and talked

2   to you about not wearing fall protection?

3      A.     Yeah.  She told me to get down and -- and she

4   introduced herself and told me, "You know you're in the

5   wrong?"

6              I go, "Yes.  I'm wrong."

7              So they kind of explained, then the safety

8   guy, this guy was a -- what is -- this -- our safety --

9   he's not a manager.  He's an assistant -- assistant

10  safety member.  He came over, but they all came and kind

11  of conducted a -- a whole safety issue over here.  And,

12  yes, I was wrong about not wearing safety equipment and

13  pressure washing without -- I had my rain gear, but I

14  didn't have my safety harness and ropes to hold me up.

15     Q.     Okay.  So they had a discussion with you

16  about, "Hey, you've got to wear appropriate protective

17  equipment while you're working"?

18     A.     Yes.

19     Q.     And did Ms. Lambrix also ask you about

20  Preston Lee?

21     A.     No.  The whole -- the whole incident at that

22  point was just -- focuses on me --

23     Q.     Okay.

24     A.     -- not wearing safety.

25     Q.     Can you look at the third paragraph of

```
 1    Exhibit 2, please?

 2         A.    Uh-huh.

 3         Q.    It begins with, "She asked me to come down."

 4               You see that paragraph?

 5         A.    "She asked me if the guy pressure washing,"

 6    yeah.  Yes.

 7         Q.    Okay.  So it says here in the middle of this

 8    paragraph, "She asked me if the guy pressure washing the

 9    walls in shorts," in parentheses, "(Preston) worked with

10    me and I said yes."

11               Do you see that?

12         A.    Okay.  Yeah.

13         Q.    You see that sentence?

14         A.    Yes.

15         Q.    Okay.  In looking back at that sentence --

16         A.    Uh-huh.

17         Q.    -- does it refresh your recollection that

18    Ms. Lambrix asked you about Preston?

19         A.    She asked me, "Who else is working here?"

20               And I told, "My -- my friend Preston."  Yes.

21         Q.    Okay.  And was Preston wearing shorts at the

22    time?

23         A.    He was wearing shorts, but he didn't ask

24    me -- she didn't ask me why -- why is he wearing shorts.

25    Wasn't one -- one issue.
```

```
 1        Q.     And do I understand that Ms. Lambrix also

 2   said to you, "I'm going to be watching you," during this

 3   conversation?

 4        A.     Well, she said that after the whole incident.

 5   When she walked away, she said, "I'll be watching you

 6   guys."

 7               Safety.  Yeah.

 8        Q.     Okay.  And you kind of made a gesture where

 9   she -- with your -- with your two fingers from her eyes

10   out towards you; is that right?

11        A.     Yes.

12        Q.     Okay.  Did you tell Preston about the

13   conversation that you had with Ms. Lambrix?

14        A.     Yes.

15        Q.     And did anyone issue any written disciplinary

16   action to you regarding what Ms. Lambrix observed and

17   talked to you about?

18        A.     No written notice to where we was doing

19   wrong, just -- we had personal conversation to take care

20   this safety issue.

21        Q.     And did you inform anybody else, any of your,

22   you know, supervisors or lead man about the conversation

23   that Ms. Lambrix had with you?

24        A.     Yes.  I -- I had to talk to Sean after work

25   -- not after.  Before we -- you know, before work --
```

1    work was done and explained to him what had happened.

2         Q.    And you told him that Ms. Lambrix had

3    observed you not wearing fall protection and talked to

4    you about it?

5         A.    Yes.

6         Q.    And did you tell Sean Igne that Ms. Lambrix

7    has indicated that she'd be watching you guys?

8         A.    Yes.

9         Q.    And what did Sean Igne say, if you recall?

10        A.    Well, he kind of told me, "You have to wear

11   your safety gear."

12             It's our judgment, yeah?  It's our call.  And

13   the call wasn't right when I didn't use my safety gear,

14   of course.

15        Q.    So the day after the conversation that you

16   had with Ms. Lambrix, you and Preston Lee were pressure

17   washing; is that correct?

18        A.    Yes.

19        Q.    And when you were pressure washing that day,

20   were you wearing rain gear?

21        A.    Yes.

22        Q.    And was -- does that include long pants?

23        A.    Yes.

24        Q.    And was Preston Lee wearing shorts while

25   pressure washing that day?

1    A.    That -- the following day?

2    Q.    **Yes.**

3    A.    He was wearing shorts, but he just got

4  started to start up, put gas, and start up the machine

5  to warm things up.  Yes.  He -- he wasn't wearing rain

6  gear at that time in the morning.  Yeah.

7    Q.    **Okay.  And as I understand it, Sean Igne**

8  **arrived on the scene while you and Preston were pressure**

9  **washing; is that correct?**

10   A.    Yes.

11   Q.    **And Mr. Igne was trying to get Preston's**

12 **attention over the sound of the pressure washer?**

13   A.    Yes.

14   Q.    **Is the pressure washer pretty loud?**

15   A.    It's real loud.

16   Q.    **Okay.  It's like a gasoline power piece of**

17 **equipment?**

18   A.    Yes.

19   Q.    **And did you understand that Sean Igne was**

20 **trying to signal to Mr. Lee to put on pants?**

21   A.    He was trying to yell at him prior to him

22 getting his attention where he could have just shut the

23 thing off and kind of like wave him in, you know?  But

24 he kept yelling.

25   Q.    **And he was yelling --**

1      A.    Over --

2      Q.    -- to put on pants?

3      A.    Yes.  Well, he wasn't yelling to put on

4    pants.  He was just getting his attention.

5      Q.    He was yelling his name?

6      A.    Yes.

7      Q.    And was he signaling to indicate what he was

8    trying to get his attention for like to -- motioning to

9    put on his pants?

10      A.    He was just yelling.

11            By the time Preston looked back, then he saw

12    him kind of waving his hands and telling -- kept telling

13    him to -- it's hard to talk when the machine is so loud,

14    yeah?  So turn off the machine, you know, so.  Yeah.  He

15    was -- he was yelling for his attention.

16      Q.    Okay.  And then at that point did you go to

17    the truck and get the rain pants?

18      A.    I -- I -- I knew already, so I had the rain

19    gear for -- when -- as Preston was walking up, then Sean

20    kind of explained to him, you know, you got to wear your

21    safety gear.  He's the lead man, yeah.  But you don't

22    have to yell at your team members when you -- you

23    yourself as the lead man can just shut the machine down

24    and talk to him, you know?  I knew already, so I just

25    walked over to the van and handed Mr. Lee his rain gear.

1    "Hey, put this on.  Please put this on so we can keep

2    pressure washing."

3         But Sean was kind of upset, but I would get

4    upset too.  I would get upset because I would be yelling

5    -- he was yelling at me, yeah -- yelling at Mr. Lee, not

6    getting his attention so fast.

7    **Q.   Did you think it was inappropriate for Sean**

8    **Igne to tell Mr. Lee to put on pants?**

9         A.    It's not a -- it wasn't appropriate -- I

10   mean, it was appropriate to him to put on the pants, but

11   not kind of like making a big whole incident where

12   everybody's just walking around you.  He could have just

13   make -- turn off that machine and kind of cool

14   everything down and kind of -- how he pursues things is

15   differently, you know?

16   **Q.   So, if I understand correctly, you think it**

17   **was appropriate for Sean Igne to tell Preston to wear**

18   **pants, but you didn't think that the way he went about**

19   **doing it was the best way; is that right?**

20        A.    Yes.  Yes.  Yes.

21   **Q.   Now, at the end of the workday, that same**

22   **workday --**

23        A.    Uh-huh.

24   **Q.   -- I understand there was a incident in the**

25   **office; is that correct, between Preston and Sean?**

1        A.   Yes.

2        Q.   And in Exhibit 2, in the last paragraph on

3   the first page, the third line says, "I heard Preston

4   yelling at Sean in an angry tone about why he had to

5   wear long pants while Sean was working in short pants.

6   And if he, Preston, was going to have to wear long

7   pants, then Sean better be wearing long pants the next

8   day."

9             You see that?

10       A.   Yes.

11       Q.   Does that sentence accurately reflect what

12   you heard in the office that day?

13       A.   Exactly.

14       Q.   Now, the statement also says that you heard

15   Preston swearing at Sean.

16            Is it correct that Preston was swearing at

17   Sean that afternoon?

18       A.   He said some words of swearing.  Yes.

19       Q.   Like what, the "F" word?

20       A.   "F" word and, you know, he was just very

21   upset.

22       Q.   Was -- did you think that Preston's conduct

23   towards Sean in the office was appropriate?

24       A.   Well, two guys was going at it.  So if one

25   swear, the other one going swear.  So two guys was just

1   going off at each other.

2        Q.   Okay.

3        A.   Had start with, you know, just the build up,

4   yeah, during the day of him coming to him that morning

5   kind of, you know, winding him up for the finale at the

6   end like this --

7        Q.   Okay.

8        A.   -- so.

9        Q.   So in your statement that's Exhibit 2, you

10  don't say anything about Sean swearing at Preston.   I

11  don't see that anywhere in this statement.

12            Do you see that anywhere?

13       A.   No.  But two guys was swearing at each other

14  in -- because I was on the other side listening because

15  I was doing my time card.  Yeah.  So two guys

16  automatically going -- was swearing at each other.

17       Q.   And why is it that you didn't say anything in

18  your statement about Sean swearing during this incident?

19       A.   They never ask me to put if Sean was

20  swearing.

21       Q.   Who never asked you?

22       A.   Rod Martin when they asked me to give a

23  statement.

24       Q.   Okay.  Why did you not put something in here

25  about that before you signed it if that was what

1  happened?

2       A.    I just told you what I heard, you know, and I

3  cannot give all the details, you know?  I'm not one

4  police officer, so I don't know.  I just listened.  I

5  heard him swearing.  I heard Sean swearing and that's

6  it.  I mean, if I missed them, I missed them.  I didn't

7  -- I didn't put it in.  But they didn't ask me to ask if

8  Sean was swearing.  I just heard Preston.

9       Q.    Did -- did Mr. Martin ask you what happened

10  that afternoon?

11       A.    Yeah.

12       Q.    Okay.  And did you give him a full accounting

13  of what happened?

14       A.    Yeah.  A rough -- rough thing, what had

15  happened.

16       Q.    Did you ever amend this statement that you

17  gave to Mr. Martin?

18       A.    No.  I never amend anything.  I go back and

19  check it or rephrase things.

20       Q.    Did you ever tell him, oh, hey, I missed

21  something in my statement that wasn't included?

22       A.    I never really thought about telling in

23  detail what had happened because having one argument is

24  normal, you know?  We -- we get arguments all the time.

25  And he swore.  I swore.  What you expect?  Everybody's

1  so -- so hyped up already, and I cannot catch every

2  detail what that person said, what that person said.  So

3  I'm -- I'm not -- I'm not perfect in telling who was

4  innocent in the whole thing, you know?

5      Q.  **This incident on November 6, 2019, was that**

6  **the first time you heard Preston yell at somebody at**

7  **work?**

8      A.  He yells at me.  I yell back, but it was just

9  to make the day as -- as comfortable as possible for me,

10 yeah?  But it's all work-related.  But for other people,

11 not really.  I don't -- if -- if he probably yells at

12 people, it's not around me, you know, just to, you know,

13 say "Hi, bye," you know, but that's it.  Not violently,

14 yeah, with anybody.

15     Q.  **Okay.  Earlier, I think you said that**

16 **Exhibit 2 was not exactly what happened?**

17     A.  Uh-huh.

18     Q.  **When you first read Exhibit 2, you said,**

19 **"Some of this was correct and some of this is not what**

20 **happened"; is that -- is that correct?**

21     A.  Yes.

22     Q.  **Okay.  So what -- what is it that is not**

23 **correct about this statement?**

24     A.  (Reading) That guy Jose Felix -- Felix Jose

25 wasn't in the picture over here.  Only -- only Kathleen

```
 1    Lambrix that was in the whole -- whole, you know, kind

 2    of -- having one personal explanation for -- for what I

 3    was getting in trouble for.  We didn't have Felix Jose

 4    in -- in this paragraph, or just only Kathleen Lambrix.

 5        Q.    Okay.  I'm sorry.  I don't see where it says

 6    Felix Jose here.

 7        A.    Yeah.  That's why when I -- I read it, you

 8    know, they only had Kathleen's name.

 9                MR. ROSENBAUM:  He's saying that that was

10    left out and --

11                THE DEPONENT:  Yeah.  They left out Felix

12    Jose, the safety -- one of our safety members in -- in

13    our supply.

14    BY MS. JONES:

15        Q.    Okay.  So you're saying in paragraph 2 --

16        A.    Uh-huh.

17        Q.    -- of Exhibit 2 --

18        A.    Yes.

19        Q.    -- you just didn't include that this guy

20    Felix Jose was also present during this discussion?

21        A.    Yes.

22        Q.    Is there anything else that is not accurate

23    about Exhibit 2?

24        A.    No.  Everything is pretty -- pretty updated.

25    Just wasn't right where I didn't see Felix's name inside
```

```
 1   that included the whole conversation.

 2        Q.    Okay.  Now, I understand that you were later

 3   interviewed by a man named Scott Taylor --

 4        A.    Uh-huh.

 5        Q.    -- for an investigation that he was doing to

 6   an allegation that Sean Igne was stealing gasoline.

 7        A.    Uh-huh.

 8        Q.    Do you recall that interview?

 9        A.    Yes.

10        Q.    Did you know Mr. Taylor prior to that

11   interview?

12        A.    Not really.  He's around, but I don't know

13   him personally.

14        Q.    Okay.  You knew who he was?

15        A.    Yes.

16        Q.    And did you respond truthfully to

17   Mr. Taylor's questions?

18        A.    Yes.

19                  (Exhibit 3 was marked.)

20   BY MS. JONES:

21        Q.    The court reporter has handed you what's been

22   marked as Exhibit 3 to your deposition.  If you can take

23   a look at that document, two pages, and let me know when

24   you're ready.

25        A.    Yes.
```

```
 1                     (Exhibit 4 was marked.)

 2   BY MS. JONES:

 3        Q.     The court reporter has just handed you what's

 4   been marked as Exhibit 4 --

 5        A.     Uh-huh.

 6        Q.     -- to your deposition.  Please take a look at

 7   this document and let me know when you're ready.

 8        A.     Okay.  I'm ready.

 9        Q.     Okay.  Do you recognize this document?

10        A.     This came from --

11        Q.     It's just a yes or no question --

12        A.     Yes.

13        Q.     -- do you recognize it?

14        A.     Yes.  I recognize it.

15        Q.     Okay.  And is that your signature at the

16   bottom?

17        A.     Yes.

18        Q.     Okay.  And is that your handwriting right

19   above it with the date?

20        A.     Yes.

21        Q.     And what about the handwriting up at the top

22   in paragraphs one, two, and three; is that yours?

23        A.     Yes.

24        Q.     And L3Harris received this document from the

25   union.
```

```
 1        A.    Okay.

 2        Q.    And you've got a shirt on today that says,

 3    "IBEW1260."

 4        A.    Right.

 5        Q.    Is that the union that you belong to?

 6        A.    Yes.

 7        Q.    Okay.  How long have you been a union member?

 8        A.    Since '95.

 9        Q.    Since you started out at the base?

10        A.    Yes.

11        Q.    And is this a document that the union typed

12    up for you?

13        A.    They typed it up.  Yes.

14        Q.    Yeah.  You didn't type this document; right?

15        A.    No.  I haven't -- yeah.  I wouldn't type this

16    thing out.

17        Q.    Yeah.  So who at the union typed this out, if

18    you know?

19        A.    I don't know anybody from the union that --

20    that actually typed this thing up.

21        Q.    You don't remember who -- who typed this up?

22        A.    No.

23        Q.    Do you -- do you remember who gave it to you?

24        A.    No.  No.

25        Q.    Did you review this document before you
```

1  signed it?

2      A.   I signed it.  Yeah.  I reviewed them.  I

3  signed it.

4      Q.   And did you agree with the statement in this

5  document at the time that you signed it?

6      A.   I agreed it -- or I agreed with it and this

7  is just one -- like a aggression, yeah, towards Sean,

8  yeah, about how Preston was treating Sean or anybody

9  else.  So I just signed it.  I mean, they tell me sign

10 them, I sign them.  I mean, I signed it.

11     Q.   Did the union tell you what they were going

12 to do with this document?

13     A.   They was going to -- I don't know, just hold

14 them, I guess, evidence.  Yeah.  Towards the -- I guess

15 the whole incident -- so this -- this was 11/16/20.

16              MR. ROSENBAUM:  January 16, '20.

17              THE DEPONENT:  Oh.  January.

18          Yeah.  This -- I think this -- with the whole

19 incident that was coming up and whatnot, they gave me

20 this to sign, and I signed.

21              (Exhibit 5 was marked.)

22 BY MS. JONES:

23     Q.   Okay.  Okay.  The court reporter just handed

24 you what's been marked Exhibit 5 to your deposition.

25     A.   Yes.

```
1                        C E R T I F I C A T E

2    STATE OF HAWAII              )
                                  )   SS.
3    CITY AND COUNTY OF KAUAI     )
     _____  )

4

5         I, JESSICA AKITA, Certified Shorthand Reporter
     No. 461, RPR, do hereby certify:
6         That on Wednesday, September 22, 2021,
     at 8:59 a.m., appeared before me GILBERT CASTRO, the
7    deponent whose testimony is contained herein; that prior
     to being examined, the deponent was by me duly sworn or
8    affirmed; that the proceedings were taken in machine
     shorthand by me and was thereafter reduced to
9    typewriting under my supervision; that the foregoing
     represents, to the best of my ability, a correct
10   transcript of the proceedings had at that time;
          That pursuant to Rule 30(e) of the Hawai'i Rules
11   of Civil Procedure, a request for an opportunity to
     review and make changes to the transcript:
12
               ___   Was made by the deponent or a party (and/or
13                   their attorney) prior to the completion of
                     the deposition.
14
               ___   Was not made by the deponent or a party
15                   (and/or their attorney) prior to the
                     completion of the deposition.
16
               _X_  Was waived.
17

18        I further certify that I am not of counsel or
     attorney for any of the parties to this case, nor in any
19   way interested in the outcome hereof, and that I am not
     related to any of the parties hereto.
20
          Dated this 28th day of September, 2021.
21

22                        _____
                          JESSICA AKITA, RPR
23                        Certified Shorthand Reporter
                          in and for the State of Hawai'i
24                        License No. 461

25
```

To:   Rodney Martin

Date:  11/7/19

Subject: Incident Concerning Preston Lee and Sean Igne

I'm going to give you some background information that had a play in what happened between Preston Lee and Sean Igne at approximately 1545 hours on Wednesday, 11/6/19.

On 11/5/19, I was pressure washing the roof of BS 358 and Preston was pressure washing the walls when a NAVFAC Safety Inspector, Kathleen Lambrix, who is in charge of overseeing the safety of the NOVA project at Makaha Ridge was walking by BS 358 and saw me on the roof without fall protection gear on.

She asked me to come down and told me that even though the roof was flat I still need to have life lines strung across the roof and my fall protection gear on. I apologized and told her that I would comply. We talked in general about PPE and how important it was to wear it. She asked me if the guy pressure washing the walls in shorts (Preston) worked with me and I said yes. The only other thing she said to me before leaving was with her two fingers pointing at my eyes, "I'm going to be watching you".

At the end of the day I told my Lead, Sean Igne who was working on another job site that day, what had happened to me and what the Safety Inspector talked to me about and that I was sorry.

The next day, 11/6/19, Preston and I returned to BS 358 to continue pressure washing the walls of the building. Preston was on washing the north wall on the building and I had I was at our work van getting some gear out of it when I heard a horn blowing. Sean Igne and David Hesapene had arrived on site at approximately 1215 – 1230 hours to start working on painting the roof. He was trying to get Preston's attention but because the gas powered pressure washer was so loud he had walked to within 5' or so of Preston and yelled over the noise of the pressure washer "put on your pants" meaning put on your rain gear. Sean was motioning with his hands from his waist down to his ankles while he was trying to convey the message to Preston over the loud noise of the pressure washer. Preston looked at Sean and I, knowing that Sean wanted Preston to wear his rain gear because of the PPE discussion I had with the Safety inspector, even though she didn't actually day anything about it, wanted to be proactive, so I grabbed Preston's rain gear out of the van and walked over and gave it to him, Preston but his rain gear on and went back to pressure washing without incident. Sean and David grabbed all of the fall protection gear, set it up on the roof and started working on painting the roof without incident.

At the end of the day when we got back to the shop and were working on entering our timecard information into the Kiosk computer in the Antenna Riggers office which is on the other side of the partition wall from the our Paint shop office in the same building, I heard Preston yelling at Sean in an angry tone about why he had to wear long pants while Sean was working in short pants and if he, Preston was going to have to wear long pants then Sean better be wearing long pants the next day. I heard Preston swearing and Sean and Sean say something like "why you going to turn me in" but could



EXHIBIT
2
9·22·21

ER 440

L3HARRIS-000471

not hear all the details that were being said because I was in another room and the office door was
closed. I could tell that Preston was very angry and was very loud.


Gilbert Castro

11 - 7-19

NOV  8 2019

L3HARRIS-000472

EXHIBIT F p.8

## STATEMENT OF GILBERT CASTRO ON 10 DEC 19

I voluntarily provide this statement to Scott Taylor, who is conducting an inquiry into an allegation that Sean Igne systematically stole gas from the MOGAS station for personal use.

Q = Taylor and A = Castro

Q:  Do you agree to the statement above?

A:  Yes.

Q:  What is your job?

A:  Painter.

Q:  What was your job during 2007-2010?

A:  Painter.

Q:  Do you know Sean Igne?

A:  Yes.

Q:  What is your relationship with Sean Igne?

A:  He is my Lead, and he's my friend.

Q:  Have you ever observed Sean Igne pump gas at the MOGAS station since 2007?

A:  Yes, many times over the years into the Manu Kai vehicle and the Manu Kai 5-gallon gas cans, one for straight gas (pressure washer) and one for mixed gas (blower).  The cans go in a locked locker once a job is finished.

Q:  During the times that you observed him pump gas, did you ever see him pump gas into a personal 5-gallon gas can?

A:  No, just the red Manu Kai metal gas cans.

Q:  Has anyone ever approached you about this issue before today?

A:  Rod Martin after his meeting with Preston, and I told him the same thing.

Q:  Why would anyone say that you have personal knowledge about Sean misusing the gas?

A:  I do not know why — maybe because I have been here for a long time.

Q:  Has Preston Lee ever shared knowledge about this misuse with you?

A:  Yes, about five times recently.  During 2007-2010, he mainly complained about other things.



L3HARRIS-000503

EXHIBIT F pg 8A

Q: How much gas might you use in a week for each type?

A: Probably never more than two cans of straight gas and no more than one can for the mixed gas.

Q: Is there anything else that you'd like to add to or delete from this statement?

A: I think that leadership must better define Preston's role when he comes back to work.

END OF STATEMENT

GILBERT CASTRO
10 DEC 19

L3HARRIS-000504

### Statement of Gilbert Castro

1. My name is Gilbert Castro, and I have been a (Harris/Keaki/Kupono) employee at PMRF as a Sr. Painter since *1995* . *June*

2. I know and have worked with Sean Igne since *June 1985*

3. I know and have worked with Preston Lee since *June 2006*

4. I have read Sean's statement dated November 6, 2019 (attached) and witnessed and agree that Preston's aggressive and hostile behavior is unprofessional, threatening, and adversely affects my ability work with and around Preston.

5. Preston's aggressive and hostile behavior at work creates a hostile work environment for me, Sean and others who work with Preston.

6. I am very uncomfortable working with Preston, and, at times have been concerned about my personal safety at work. I am also concerned about the safety of others, including Sean and Rodney Martin, our supervisor.

7. I believe that Preston's aggressive and hostile behavior creates an unsafe, hostile work environment.

8. The Company is responsible for investigating this unsafe, hostile work environment, and, is also responsible for addressing and correcting the gaps and issues that exist, including:

   a. Evaluate Preston for workplace violence and harassment in an independent medical exam
   b. Evaluate the risk of harm to me and my co-workers
   c. Address the risk of harm, if such exists.

Dated: *1/16/20*

Gilbert Castro



L3HARRIS-000510

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                FOR THE DISTRICT OF HAWAII

 3    _____ )
      PRESTON LEE,                     )   Civil No.
 4                                     )   20-00489 LEK-KJM
                  Plaintiff,           )   (Other Civil Action)
 5                                     )
            vs.                        )
 6                                     )
      L3HARRIS TECHNOLOGIES, INC.;     )
 7    JOHN DOES 1-10; JANE DOES        )
      1-10; DOE CORPORATIONS 1-10;     )
 8    DOE PARTNERSHIPS 1-10; DOE       )
      UNINCORPORATED ORGANIZATIONS     )
 9    1-10; and DOE GOVERNMENTAL       )
      AGENCIES 1-10,                   )
10                                     )   (Pages 1 - 48)
                  Defendants.          )
11    _____ )

12

13

14              DEPOSITION OF DAVID HESAPENE

15      taken on behalf of Defendants, taken at the Law

16    Office of Cades & Schutte, 3135 Akahi Street, Suite A,

17    Lihue, Hawaii 96766, commencing at 10:53 a.m.,

18    Wednesday, September 22, 2021, pursuant to Notice.

19

20

21

22

23

24    Reported by:    JESSICA AKITA, RPR
                      Certified Shorthand Reporter
25                    Hawaii License No. 461
```

EXHIBIT CC
ER 445

```
 1   APPEARANCES:

 2
       FOR THE PLAINTIFF, PRESTON LEE:
 3
             Fujiwara & Rosenbaum, LLLC
 4           BY:  JOSEPH T. ROSENBAUM, ESQ.
             Alakea Corporate Tower
 5           1100 Alakea Street, Fl. 20, Suite B
             Honolulu, Hawaii  96813
 6           808-203-5436
             jtr@frlawhi.com
 7

 8
       FOR THE DEFENDANTS, L3HARRIS TECHNOLOGIES, INC.:
 9
             Cades Schutte LLP
10           BY:  AMANDA M. JONES, ESQ.
             Cades Schutte Building
11           1000 Bishop Street, Floor 12
             Honolulu, Hawaii  96813
12           808-521-9232
             ajones@cades.com
13

14
       Also Present:
15
             PRESTON LEE
16

17

18

19

20

21

22

23

24

25
```

1                          I N D E X

2   DEPOSITION OF:                                    Page

3   DAVID HESAPENE

4       EXAMINATION BY MS. JONES:                       4

5       EXAMINATION BY MR. ROSENBAUM:                   37

6       EXAMINATION BY MS. JONES:                       45

7

8                     E X H I B I T S

9   Marked      Description                            Page

10   Exhibit 1   Subpoena To Testify At A                8
                Deposition In A Civil Action
11               (3 pages)

12   Exhibit 2   Declaration of David Hesapene          10
                (3 pages)
13
     Exhibit 3   Incident Concerning Preston Lee        26
14               and Sean Igne (1 page)

15   Exhibit 4   Statement of David Hesapene on 10      31
                DEC 19 (2 pages)
16
     Exhibit 5   Statement of David Hesapene           33
17               (1 page)

18

19              INFORMATION REQUESTED

20                     (None.)

21

22

23          QUESTIONS INSTRUCTED NOT TO ANSWER

24                     (None.)

25

1          LIHUE, HAWAII;

2     WEDNESDAY, SEPTEMBER 22, 2021; 10:53 A.M.

3               *  *  *  *  *

4          DAVID HESAPENE,

5     having been first duly sworn, was examined

6          and testified as follows:

7          EXAMINATION

8  BY MS. JONES:

9     Q.   Okay.  Good morning.

10    A.   Good morning.

11    Q.   My name is Amanda Jones, and I represent

12  L3Harris Technologies.

13         Can you please state your full name?

14    A.   David G. Hesapene.

15    Q.   Can you spell your last name for us?

16    A.   H-e-s-a-p-e-n-e.

17    Q.   P-a-n-e?

18    A.   P-e-n-e.

19    Q.   And you understand that this is a federal

20  court proceeding that we're involved with right now, so

21  the testimony that you're giving is under oath and

22  penalty of perjury; do you understand that?

23    A.   Yes.

24    Q.   Is there -- are you under the influence of

25  any drugs, alcohol, medication that would impair your

```
1    already upset because he stay yelling at me.  And, you
2    know, I said, "Maybe you should talk to him."
3              Told Rodney that he should talk to him
4    because we just came back to the job site the next day.
5         Q.   Okay.  So you talked to Rodney Martin?
6         A.   Yes.
7         Q.   And did Rodney Martin ask you what happened
8    the day before?
9         A.   No.  I just told him -- I just told him that
10   what had happened that day and was about Preston
11   pressure washing.  That's about it.  I didn't go give
12   him details, you know, because he was asking what had
13   happened.  I said, "Preston was pressure washing without
14   pants and he -- the next day is when he was venting to
15   me."
16        Q.   And you told that to Rodney Martin?
17        A.   Yes.
18                  (Exhibit 3 was marked.)
19   BY MS. JONES:
20        Q.   Okay.  The court reporter has handed you
21   what's been marked Exhibit 3 to your deposition.  Take a
22   look at this document and let me know when you're ready.
23        A.   Okay.
24        Q.   Do you recognize Exhibit 3?
25        A.   Yes.
```

```
 1        Q.    Okay.  Is that your signature at the bottom?

 2        A.    Yes.

 3        Q.    And did you handwrite the date under your

 4   name?

 5        A.    The date?  Yeah.

 6        Q.    Okay.

 7        A.    I think my supervisor had -- Rodney Martin

 8   made the statement.  We just have to give -- we just

 9   tell him what had happened and he typed it up.

10        Q.    Okay.  So you talked to Mr. Martin about what

11   happened.  He typed up Exhibit 3, and then you reviewed

12   and signed it?

13        A.    Yes.

14        Q.    And then did -- after you signed it, did you

15   give this document to Mr. Martin?

16        A.    Give it back to him.  Yeah.

17        Q.    Okay.  And who is Mr. Martin?

18        A.    My supervisor.

19        Q.    He was in charge of the paint shop?

20        A.    Yes.

21        Q.    And when you talked to Mr. Martin about what

22   happened, were you honest with him?

23        A.    Yeah.

24        Q.    You told him truthfully what happened?

25        A.    Yes.
```

1      Q.     And did you -- were you truthful in this

2  statement that is contained in Exhibit 3?

3      A.     Yes.  Whatever I remembered what was going on

4  pretty much the day of this pressure washing thing and

5  then the next day.  It's pretty much whatever I gave, I

6  was trying to give him a report.

7      Q.     You think your -- your memory of what

8  occurred was better when you signed the statement that's

9  Exhibit 3 than it is today?

10      A.     Yes.  I get too much things in my head.

11      Q.     Yeah.  I hear you.  It was almost two years

12  ago.

13              So in the last paragraph of Exhibit 3, the

14  second sentence states, "Preston just walked up to me

15  and started ranting, 'I don't care if I going to lose my

16  job.  I'm just going to punch Sean through his face.'"

17              Do you see that?

18      A.     Yes.

19      Q.     Is that what Preston said to you?

20      A.     Yes, because he was angry from the day before

21  already.

22      Q.     And -- sorry.  Go ahead.

23      A.     No, then he apologized to me and just tell me

24  he sorry he had to do that, but he just wanted for vent

25  because, you know, this stuff had happened.

```
 1        Q.    It -- it also says at the end of this
 2   paragraph, "His face was full of sweat from his anger,
 3   and he wiped it away and said, 'F,' space, space, space,
 4   'Rod, F,' space, space, space, 'Sean.  Nobody can touch
 5   me, not Rod, not Sean or HR.'"
 6             Do you see that?
 7        A.    Yes.
 8        Q.    Okay.  Now, in the statement, we have this "F
 9   space, space, space."
10        A.    Okay.
11        Q.    Can you tell me exactly what it is that he
12   said?  You may have been sort of being polite here and
13   not using the word.  But what is it that Preston
14   actually said that day?
15        A.    He had that attitude like fuck everybody.  He
16   just was angry -- angry because all this stuff was just
17   frickin happening.
18        Q.    Okay.  So he said, "Fuck Rod"?
19        A.    Yeah.
20        Q.    And Preston also said, "Fuck Sean"?
21        A.    Yes.
22        Q.    And he said -- did he say "nobody can touch
23   me"?
24        A.    Oh.  I didn't -- I don't remember saying
25   that.
```

```
 1        Q.    You don't remember that part?

 2        A.    No.

 3        Q.    So in this statement -- actually, scratch

 4   that.  That's okay.  Move on.

 5              Do you remember being interviewed by a man

 6   named Scott Taylor concerning an allegation about Sean

 7   Igne stealing gasoline?

 8        A.    Yeah.

 9        Q.    And when -- did you know who Scott Taylor

10   was?

11        A.    He was replacing the general manager at the

12   time.  The general manager wasn't here.  So I think he

13   was taking his place.  That's the way I thought -- I

14   thought -- I seen it.

15        Q.    Okay.  So by "general manager," are you

16   referring to Ross West?

17        A.    Yes.

18        Q.    Did -- but did you know Scott Taylor prior to

19   this interview that he did?

20        A.    No, because the only -- the only way I knew

21   Scott Taylor because he was the one that gave us the

22   blue badge.  He the one do the security clearance.

23        Q.    Okay.  So you had seen him before about

24   giving you a badge?

25        A.    Yeah.  He the one used to do our clearance
```

```
 1   papers.  He was the one who used to help us.

 2       Q.    Okay.  So you knew him but didn't know him

 3   very well?

 4       A.    No, not personally.

 5       Q.    Okay.  And did Mr. Taylor ask you some

 6   questions as part of this investigation he was doing?

 7       A.    I -- I no remember.  I know he was taking one

 8   statement.  I forget details he was asking me.

 9       Q.    Okay.  Let me show you a document, maybe that

10   will help.

11       A.    Okay.

12              (Exhibit 4 was marked.)

13   BY MS. JONES:

14       Q.    Okay.  The court reporter has just handed you

15   what's been marked Exhibit 4.  If you can take a look at

16   the document and let me know when you're ready.

17       A.    Okay.

18       Q.    Okay.  So is your signature on the second

19   page of Exhibit 4?

20       A.    Yes.

21       Q.    And did Mr. Taylor type up this document

22   for -- for you?

23       A.    Yes.

24       Q.    And did you review it before you signed it?

25       A.    Yes.
```

```
 1        Q.    And when Mr. Taylor was asking you these

 2   questions about the allegation about Sean stealing

 3   gasoline --

 4        A.    Uh-huh.

 5        Q.    -- were you truthful with Mr. Taylor?

 6        A.    Yes.

 7        Q.    And did you see anything in this Exhibit 4

 8   that is not accurate?

 9        A.    Well, he -- when Scott Taylor -- he -- he was

10   asking me questions with everyone, yeah?  So whatever I

11   could think what was going on, I answer them.  But the

12   thing is, you know, we -- we -- we don't -- I don't used

13   to put gas -- everybody used to put gas in the cans.

14   And I don't know.  You know, I never did -- we always

15   used to throw them in the truck.  You know, we take them

16   with us, the gas.  So, you know, I the one probably the

17   one filling up the can and I never noticed the thing was

18   gone, but.

19        Q.    Okay.  So you -- at the time Mr. Taylor was

20   questioning you, you answered the question to the best

21   of your ability at that --

22        A.    Yes.

23        Q.    -- time?

24        A.    Yes.

25        Q.    And you were honest as you could with
```

33

1    Mr. Taylor at the time?

2        A.    Yes.

3        Q.    And at the time that Mr. Taylor interviewed

4    you, did you have any information that Sean was stealing

5    gasoline?

6        A.    No.  I never see him personally take the can

7    and put them -- you know, take them.  You know, we

8    always had a can in our truck when we got to pressure

9    wash and all that.

10       Q.    And so did -- at any time did you report to

11   Mr. Taylor that Sean Igne was stealing gasoline?

12       A.    No.

13       Q.    Is that a "no"?

14       A.    No.

15       Q.    And did Mr. Taylor tell you he was taking

16   your statement here for the investigation that he was

17   doing?

18       A.    Yes.

19               (Exhibit 5 was marked.)

20   BY MS. JONES:

21       Q.    The court reporter has just handed you what

22   has been marked as Exhibit 5 to your deposition.  Take a

23   look at that document and let me know when you're ready.

24       A.    Okay.

25       Q.    David, is that your signature on Exhibit 5?

1      Q.    And did Mr. Lee's wife also make a complaint

2   about you in the past?

3      A.    Yeah -- well, had a few of them they turned

4   me in to corporate one time.

5      Q.    And Mr. Lee's wife was one of them?

6      A.    And two -- three other guys.

7              MS. JONES:  I don't have any further

8   questions at this time, but Mr. Rosenbaum may have some

9   questions.

10                     EXAMINATION

11  BY MR. ROSENBAUM:

12     Q.    Yeah, just a couple.

13             Can you look at Exhibit 4?  Look at the

14  second page.  Looks like the last question you were

15  asked -- that's reflected in this document -- "Is there

16  anything else that you would like to add to or delete

17  from this statement?"

18             And it says your answer was, "I have a real

19  concern that Preston will hurt himself or others."

20             Did you ever say that?

21     A.    Well, when -- I used to -- I was always

22  working with him.  When he get angry, you know, he

23  always -- you know, he's mad.

24     Q.    And did you -- did you state this that you

25  thought Preston would hurt himself or others?

C E R T I F I C A T E

STATE OF HAWAII          )
                         )   SS.
COUNTY OF KAUAI          )
_____)


        I, JESSICA AKITA, Certified Shorthand Reporter
No. 461, RPR, do hereby certify:
        That on Wednesday, September 22, 2021,
at 10:53 a.m., appeared before me DAVID HESAPENE, the
deponent whose testimony is contained herein; that prior
to being examined, the deponent was by me duly sworn or
affirmed; that the proceedings were taken in machine
shorthand by me and was thereafter reduced to
typewriting under my supervision; that the foregoing
represents, to the best of my ability, a correct
transcript of the proceedings had at that time;
        That pursuant to Rule 30(e) of the Hawai'i Rules
of Civil Procedure, a request for an opportunity to
review and make changes to the transcript:

        ____ Was made by the deponent or a party (and/or
             their attorney) prior to the completion of
             the deposition.

        ____ Was _not_ made by the deponent or a party
             (and/or their attorney) prior to the
             completion of the deposition.

        _X_ Was waived.


        I further certify that I am not of counsel or
attorney for any of the parties to this case, nor in any
way interested in the outcome hereof, and that I am not
related to any of the parties hereto.

        Dated this _29th_ day of _September_, 2021.


                              _____
                              JESSICA AKITA, RPR
                              Certified Shorthand Reporter
                              in and for the State of Hawai'i
                              License No. 461

To:    Rodney Martin

Date:   11/7/19

Subject: Incident Concerning Preston Lee and Sean Igne

On 11/6/19 my Lead, Sean Igne and I returned to BS 1111 to finish the exterior painting of that beach
cottage and after lunch we went to BS 358 to join Preston Lee and Gilbert Castro in painting that
building. We got there close to 1230 and pulled up along the north side of the building where Preston
was pressure washing the wall.

As we pulled up on the lawn, Sean blew his horn a few times to get Preston's attention but he couldn't
hear because the pressure washer and the water hitting the wall must have been too loud. Sean and I
got out of the truck and he started walking over towards Preston. When he got close enough to not get
sprayed with water bouncing back off the wall, he yelled out to Preston "put your pants on" while
motioning with his hands from his waist to his legs to show he was talking about covering your legs.
Preston turned around and just looked at Sean without saying anything. Gilbert overheard what was
going on and since he was at the van that he and Preston work out of, he grabbed Preston's rain gear
and brought over to him. Preston put the gear on and went back to pressure washing while Sean and I
hauled the fall protection gear up on to the roof and got going with painting the roof.

At the end of the day when we got back to the shop I went into the Riggers office to enter my time into
the company computer with Gilbert and Mark. It was around 1545 hours when and we heard Preston
going off, yelling at Sean about why he had to wear long pants while Sean was working in short pants
and tennis shoes. He told Sean that he better be wearing long pants the next day. Preston was swearing
the F word at Sean and Sean yelled back in defense "why you going to turn me in, I just told you to put
PPE on". I couldn't hear everything that was being said clearly but will say that Preston was extremely
loud and angry and not acting in a civil manner.,

On the morning of 11/7/19 after arriving at BS 358 to continue painting the roof, Gilbert, Preston and I
were on the north side of the building where we kept our gear overnight. Preston just walked up to me
and started ranting "I don't care if I going to lose my job, I just going to punch Sean through his face". I
told him "I thought you guys settled this years ago but I guess not". His face was full of sweat from his
anger and he wiped it away and said "F _ _ _ Rod , F _ _ _ Sean, nobody can touch me, not Rod, not Sean
or HR".

David Hesapene

*(signature)* David Hesapen

11/7/19

EXHIBIT
3
9·22·21

L3HARRIS-000470

EXHIBIT F 7

**STATEMENT OF DAVID HESAPENE ON 10 DEC 19**

I voluntarily provide this statement to Scott Taylor, who is conducting an inquiry into an allegation that Sean Igne systematically stole gas from the MOGAS station for personal use.

Q = Taylor and A = Hesapene

Q: Do you agree to the statement above?

A: Yes.

Q: What is your job?

A: Painter.

Q: What was your job during 2007-2010?

A: I was in Grounds Department on this contract.

Q: Do you know Sean Igne?

A: Yes.

Q: What is your relationship with Sean Igne?

A: He is my Lead, and we were school classmates, and he's my friend.

Q: Have you ever observed Sean Igne pump gas at the MOGAS station since 2007?

A: Yes, he and I have been partners since Jan 19, and he has put gas in the Manu Kai vehicle and the Manu Kai 5-gallon gas cans, one for straight gas (pressure washer) and one for mixed gas (blower). The cans go in a locked locker once a job is finished.

Q: During the times that you observed him pump gas, did you ever see him pump gas into a personal 5-gallon gas can?

A: No, just the red Manu Kai metal gas cans. Plus, I am the one who normally pumps the gas.

Q: Has anyone ever approached you about this issue before today?

A: Rod Martin about two weeks, and I told him the same thing.

Q: Why would anyone say that you have personal knowledge about Sean misusing the gas?

A: I do not know why. I just know Preston and Sean do not get along, and that Preston will not take orders from him.

Q: Has Preston Lee ever shared knowledge about this misuse with you?

A: Yes, a couple of times recently when he got mad at Sean.



L3HARRIS-000501

Q: How much gas might you use in a week for each type?

A: Probably never more than two cans of straight gas and no more than one can for the mixed gas.

Q: Is there anything else that you'd like to add to or delete from this statement?

A: I have a real concern that Preston will hurt himself or others.

END OF STATEMENT

DAVID HESAPENE
10 DEC 19

L3HARRIS-000502

FUJIWARA AND ROSENBAUM, LLLC

ELIZABETH JUBIN FUJIWARA 3558
JOSEPH T. ROSENBAUM 9205
1100 Alakea St., 20th Fl., Ste B
Honolulu, Hawaii 96813
Telephone: 808-203-5436

Attorneys for Plaintiff
PRESTON LEE

## IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| PRESTON LEE,<br><br>     Plaintiff,<br><br>  vs.<br><br>L3HARRIS TECHNOLOGIES, INC.;<br>JOHN DOES 1-10; JANE DOES 1-10;<br>DOE CORPORATIONS 1-10; DOE<br>PARTNERSHIPS 1-10; DOE<br>UNINCORPORATED<br>ORGANIZATIONS<br>1-10; and DOE GOVERNMENTAL<br>AGENCIES 1-10,<br><br>     Defendants. | ) CIVIL NO. 20-00489 LEK-KJM<br>) (Other Civil Action)<br>)<br>) **PLAINTIFF'S NOTICE OF**<br>) **APPEAL TO THE UNITED**<br>) **STATES COURT OF APPEALS**<br>) **FOR THE NINTH CIRCUIT**<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) Action Filed: November 13, 2020<br>) Judge: Hon. Leslie E. Kobayashi<br>) |

## PLAINTIFF'S NOTICE OF APPEAL TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

Plaintiff PRESTON LEE hereby appeals to the United States Court of

1

Appeals for the Ninth Circuit from this Court's January 31, 2022 Order (Doc. 82)

Granting Defendant L3HARRIS TECHNOLOGIES, INC.'s Motion for Summary

Judgment (attached hereto) and the Court's January 31, 2022 Judgment in a Civil

Case (Doc. 83) (attached hereto) in favor of Defendant L3HARRIS

TECHNOLOGIES, INC.

      DATED:   Honolulu, Hawaii; February 25, 2022.

          /s/ Joseph T. Rosenbaum
          JOSEPH T. ROSENBAUM
          Attorney for Plaintiff Preston Lee

# U.S. District Court
## District of Hawaii (Hawaii)
## CIVIL DOCKET FOR CASE #: 1:20-cv-00489-LEK-KJM

Lee v. L3Harris Technologies, Inc.
Assigned to: JUDGE LESLIE E. KOBAYASHI
Referred to: MAGISTRATE JUDGE KENNETH J. MANSFIELD
Case in other court: Ninth Circuit Court of Appeals, 22-15288
Cause: 28:451 Employment Discrimination

Date Filed: 11/13/2020
Date Terminated: 01/31/2022
Jury Demand: Plaintiff
Nature of Suit: 445 Civil Rights: Americans with Disabilities - Employment
Jurisdiction: Federal Question

**Plaintiff**

**Preston Lee**                    represented by    **Elizabeth Jubin Fujiwara**
Fujiwara and Rosenbaum, LLLC
1100 Alakea St. 20th Fl. Suite B
Honolulu, HI 96813
808-203-5436
Email: elizabeth@hawaii-adr.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joseph T. Rosenbaum**
Fujiwara and Rosenbaum, LLLC
1100 Alakea St., 20th Fl., Ste B
Honolulu, HI 96813
808-203-5436
Email: jtr@frlawhi.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**L3Harris Technologies, Inc.**      represented by    **Amanda M. Jones**
Cades Schutte LLP
Cades Schutte Building
1000 Bishop Street 12th Flr
Honolulu, HI 96813
Email: ajones@cades.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael Raymond Soon Fah**
Cades Schutte LLP

Cades Schutte Building
1000 Bishop Street 12th Flr
Honolulu, HI 96813
808-521-9200
Fax: 808-521-9210
Email: msoonfah@cades.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**John Does 1-10**

**Defendant**

**Jane Does 1-10**

**Defendant**

**Doe Corporations 1-10**

**Defendant**

**Doe Partnerships 1-10**

**Defendant**

**Doe Unincorporated
Organizations 1-10**

**Defendant**

**Doe Governmental Agencies 1-10**

| Date Filed | # | Docket Text |
|---|---|---|
| 11/13/2020 | 1 | COMPLAINT *and Demand for Jury Trial* against L3Harris Technologies, Inc., filed by Preston Lee. (0975-2447911 $ 400.00) (Rosenbaum, Joseph) Modified on 11/13/2020 (emt, ). (Entered: 11/13/2020) |
| 11/13/2020 | 2 | NOTICE of Case Assignment: Please reflect Civil case number CV 20-00489 LEK-KJM on all further pleadings. (emt, ) (Entered: 11/13/2020) |
| 11/13/2020 | 3 | Order Setting Rule 16 Scheduling Conference is set for 09:30AM on 1/11/2021 before MAGISTRATE JUDGE KENNETH J. MANSFIELD - Signed by CHIEF JUDGE J. MICHAEL SEABRIGHT on 11/13/2020. (Attachments: # 1 Memo from Clerk Re: Corporate Disclosure Statements) |
| | | **ATTACH THE SCHEDULING ORDER TO THE INITIATING DOCUMENT (COMPLAINT/NOTICE OF REMOVAL). THE SCHEDULING ORDER AND MEMO RE: CORPORATE DISCLOSURES MUST BE SERVED WITH THE** |

| | | |
|---|---|---|
| | | **DOCUMENT.**<br>(emt, ) (Entered: 11/13/2020) |
| 11/13/2020 | 4 | CIVIL Waiver of Service Packet ~ Notice to Parties Regarding Service Pursuant to Rule 4 of the Federal Rules of Civil Procedure. (Attachments: # 1 AO 398 Notice of Lawsuit and Request to Waive Service of Summons, # 2 AO 399 Waiver of Service of Summons)(emt, ) (Entered: 11/13/2020) |
| 11/19/2020 | 5 | Summons (Proposed) (Rosenbaum, Joseph) (Entered: 11/19/2020) |
| 11/23/2020 | 6 | Summons Issued as to L3Harris Technologies, Inc. (emt, ) (Entered: 11/23/2020) |
| 11/24/2020 | 7 | ACKNOWLEDGEMENT OF SERVICE Executed *L3Harris Technologies, Inc. served on 11/24/2020* Acknowledgement filed by Preston Lee. (Rosenbaum, Joseph) Modified on 11/27/2020 (emt, ). (Entered: 11/24/2020) |
| 12/15/2020 | 8 | ANSWER to 1 Complaint *DEFENDANT L3HARRIS TECHNOLOGIES, INC.'S ANSWER TO COMPLAINT, FILED NOVEMBER 13, 2020* by L3Harris Technologies, Inc.. (Attachments: # 1 Certificate of Service)(Jones, Amanda) (Entered: 12/15/2020) |
| 12/15/2020 | 9 | Corporate Disclosure Statement by L3Harris Technologies, Inc.. (Attachments: # 1 Certificate of Service)(Jones, Amanda) (Entered: 12/15/2020) |
| 12/22/2020 | 10 | REPORT of Planning Meeting *(Joint)*. (Rosenbaum, Joseph) (Entered: 12/22/2020) |
| 01/04/2021 | 11 | *Plaintiff's* Scheduling Conference Statement *Certificate of Service*. (Rosenbaum, Joseph) Modified on 1/7/2021 (emt, ). (Entered: 01/04/2021) |
| 01/04/2021 | 12 | EO: The 3 Rule 16 Scheduling Conference set for 01/11/2021 at 9:30 a.m. before MAGISTRATE JUDGE KENNETH J. MANSFIELD will be held via telephone.<br><br>In accordance with the United States District Court for the District of Hawaii's latest Temporary General Order Regarding District of Hawaii Response to COVID-19 Emergency and the Order Authorizing the Use of Telephonic and Video Hearings, due to the ongoing COVID-19 pandemic and public health emergency, including the anticipated long term need to maintain certain social distancing and other measures intended to protect the public, court employees, and counsel from being exposed to the COVID-19 virus, while at the same time regulating civil matters in a manner consistent with equity and fairness, the hearing will be held telephonically. Parties are to participate via telephone through our AT&T Service. Call-in information for this conference is below. Parties must |

| | | |
|---|---|---|
| | | connect to the conference at least five (5) minutes prior to the scheduled start time of the hearing. |
| | | Dial in number is 1-877-848-7030<br>Access Code is 2123668 |
| | | (MAGISTRATE JUDGE KENNETH J. MANSFIELD)(bbb) (Entered: 01/04/2021) |
| 01/04/2021 | 13 | Scheduling Conference Statement *DEFENDANT L3HARRIS TECHNOLOGIES, INC.'S SCHEDULING CONFERENCE STATEMENT;*. (Attachments: # 1 Certificate of Service)(Jones, Amanda) (Entered: 01/04/2021) |
| 01/05/2021 | 14 | *Plaintiff's First Amended* Scheduling Conference Statement . (Rosenbaum, Joseph) Modified on 1/7/2021 (emt, ). (Entered: 01/05/2021) |
| 01/11/2021 | 15 | EP: TELEPHONIC RULE 16 SCHEDULING CONFERENCE hearing not held.<br><br>Discussion held.<br><br>Telephonic Rule 16 Scheduling Conference is continued to February 12, 2021 at 9:00 a.m. before Magistrate Judge Kenneth J. Mansfield.<br><br>In accordance with the United States District Court for the District of Hawaii's latest Temporary General Order Regarding District of Hawaii Response to COVID-19 Emergency and the Order Authorizing the Use of Telephonic and Video Hearings, due to the ongoing COVID-19 pandemic and public health emergency, including the anticipated long term need to maintain certain social distancing and other measures intended to protect the public, court employees, and counsel from being exposed to the COVID-19 virus, while at the same time regulating civil matters in a manner consistent with equity and fairness, the hearing will be held telephonically. Parties are to participate via telephone through our AT&T Service. Call-in information for this conference is below. Parties must connect to the conference at least five (5) minutes prior to the scheduled start time of the hearing.<br><br>Dial in number is 1-877-848-7030<br>Access Code is 2123668<br><br>(AT&T Service / 9:27 - 9:35) (MAGISTRATE JUDGE KENNETH J. MANSFIELD)(bbb) (Entered: 01/12/2021) |
| 01/19/2021 | 16 | INITIAL DISCLOSURE by Preston Lee. (Rosenbaum, Joseph) (Entered: 01/19/2021) |

| 01/19/2021 | 17 | CERTIFICATE OF SERVICE by L3Harris Technologies, Inc. *CERTIFICATE OF SERVICE [RE: DEFENDANT L3HARRIS TECHNOLOGIES, INC.'S INITIAL DISCLOSURES, DATED JANUARY 19, 2021]* (Jones, Amanda) (Entered: 01/19/2021) |
| 02/09/2021 | 18 | STIPULATION *STIPULATION REGARDING AMENDMENT OF THE COMPLAINT AND DISMISSAL OF THE SECOND LAWSUIT* by L3Harris Technologies, Inc.. (Attachments: # 1 Exhibit A)(Jones, Amanda) (Entered: 02/09/2021) |
| 02/11/2021 | | ADVISORY ENTRY. **Submission of Proposed Orders** - Please be advised that Document 18 Stipulation Regarding Amendment of the Complaint and Dismissal of the Second Lawsuit, filed by L3Harris Technologies, Inc., requires the court's approval. If the filing party has not already done so, please email the document in Microsoft Word format to the applicable chambers' email address. See **Section 10.4 - Emailing of Proposed Orders and Stipulations to Chambers**, of the CM/ECF Procedures Guide for additional instructions and a list of judge's email addresses. (emt, ) (Entered: 02/11/2021) |
| 02/11/2021 | 19 | STIPULATION REGARDING AMENDMENT OF THE COMPLAINT AND DISMISSAL OF THE SECOND LAWSUIT; ORDER - Signed by JUDGE LESLIE E. KOBAYASHI on 2/11/2021. (Attachments: # 1 Exhibit A)(emt, ) (Entered: 02/11/2021) |
| 02/11/2021 | 20 | **First AMENDED COMPLAINT** ; *Demand for Jury Trial* against L3Harris Technologies, Inc., filed by Preston Lee. (Attachments: # 1 Certificate of Service)(Rosenbaum, Joseph) Modified on 2/16/2021 (emt, ). (Entered: 02/11/2021) |
| 02/12/2021 | 21 | EP: RULE 16 SCHEDULING CONFERENCE hearing held. Dates given. Court to prepare Scheduling Order.<br><br>Jury Selection/Trial is set for 02/28/2022 at 9:00 a.m. in Aha Nonoi before JUDGE LESLIE E. KOBAYASHI. Final Pretrial Conference is set for 01/18/2022 at 9:45 a.m. via telephone before MAGISTRATE JUDGE KENNETH J. MANSFIELD. Early Settlement Conference is set for 04/22/2021 at 10:00 a.m. by Video Tele-Conference (VTC) before MAGISTRATE JUDGE KENNETH J. MANSFIELD. Settlement Conference #2 is set for 11/17/2021 at 10:00 a.m. via Video Tele-Conference (VTC) before MAGISTRATE JUDGE KENNETH J. MANSFIELD. Dispositive Motions filed by 09/29/2021. Discovery due by 12/30/2021.<br><br>Due to the uncertainty of the ongoing pandemic and to minimize traffic into the Courthouse, at this time, hard copies of any settlement conference statements need not be delivered to the Clerk's Office. Instead, parties are |

| | | |
|---|---|---|
| | | to submit their confidential settlement statements via email to mansfield_orders@hid.uscourts.gov.<br><br>The Courtroom Manager will be sending out a separate email providing counsel detailed instructions regarding Settlement Conferences Video Tele-Conference (VTC) access prior to the conference date.<br><br>Until further notice, all other hearings before Magistrate Judge Kenneth J. Mansfield, parties are to participate via telephone through our AT&T Service. Call-in information for this conference is below. Parties must connect to the conference at least five (5) minutes prior to the scheduled start time of the hearing.<br><br>Dial in number is 1-877-848-7030<br>Access Code is 2123668<br><br>(AT&T Service / 5:58 - 9:06) (MAGISTRATE JUDGE KENNETH J. MANSFIELD)(bbb) (Entered: 02/12/2021) |
| 02/12/2021 | 22 | RULE 16 SCHEDULING ORDER. Signed by MAGISTRATE JUDGE KENNETH J. MANSFIELD on February 12, 2021. (bbb) (Entered: 02/12/2021) |
| 02/17/2021 | 23 | NOTICE of Appearance by Michael Raymond Soon Fah on behalf of L3Harris Technologies, Inc. on behalf of L3Harris Technologies, Inc.. (Soon Fah, Michael) (Entered: 02/17/2021) |
| 03/03/2021 | 24 | ANSWER to 20 Amended Complaint *DEFENDANT L3HARRIS TECHNOLOGIES, INC.'S ANSWER TO FIRST AMENDED COMPLAINT, FILED FEBRUARY 11, 2021* by L3Harris Technologies, Inc.. (Attachments: # 1 Certificate of Service)(Jones, Amanda) (Entered: 03/03/2021) |
| 03/09/2021 | 25 | NOTICE by L3Harris Technologies, Inc. *DEFENDANT L3HARRIS TECHNOLOGIES, INC.'S NOTICE OF TAKING DEPOSITION UPON WRITTEN INTERROGATORIES* L3Harris Technologies, Inc.. (Attachments: # 1 Exhibit A, # 2 Certificate of Service)(Soon Fah, Michael) (Entered: 03/09/2021) |
| 03/10/2021 | | ADVISORY ENTRY. **Discovery**-Please be advised that Document 25 Notice of Taking Deposition Upon Written Interrogatories filed by L3Harris Technologies, Inc. was filed prematurely in this case. Discovery request and responses must not be filed until they are used in the proceeding or the court. The filing party may refer to Fed.R.Civ.P.5(d) governing the filing procedures for the filing of discovery. A certificate of service may be filed to indicate that discovery has been exchanged. (emt, ) (Entered: 03/10/2021) |

| 03/10/2021 | 26 | CERTIFICATE OF SERVICE by L3Harris Technologies, Inc. *[RE: DEFENDANT L3HARRIS TECHNOLOGIES, INC'S NOTICE OF TAKING DEPOSITON UPON WRITTEN INTERROGATORIES RE: CUSTODIAN RECORDS FOR DEPARTMENT OF VETERANS AFFAIRS, DATED MARCH 10, 2021]* (Soon Fah, Michael) (Entered: 03/10/2021) |
|---|---|---|
| 03/12/2021 | 27 | CERTIFICATE OF SERVICE by Preston Lee (Rosenbaum, Joseph) (Entered: 03/12/2021) |
| 03/18/2021 | 28 | Return of Service on Subpoena To Testify at a Deposition on Custodian of Records for Department of Veterans Affairs was served on March 12, 2021 (Soon Fah, Michael) (Entered: 03/18/2021) |
| 04/12/2021 | 29 | CERTIFICATE OF SERVICE by L3Harris Technologies, Inc. *[RE: DEFENDANT L3HARRIS TECHNOLOGIES, INC.'S RESPONSE TO PLAINTIFF'S FIRST REQUEST FOR PRODUCTION OF DOCUMENTS, DATED MARCH 12, 2021, DATED APRIL 12, 2021]* (Jones, Amanda) (Entered: 04/12/2021) |
| 04/22/2021 | 30 | EP: EARLY SETTLEMENT CONFERENCE held. The Court met with the parties. Settlement discussions held. No settlement reached at this time. Further discussions on call. (Video Tele-Conference (VTC) - no record 10:00 - 10:30) (MAGISTRATE JUDGE KENNETH J. MANSFIELD)(bbb) (Entered: 04/23/2021) |
| 04/27/2021 | 31 | CERTIFICATE OF SERVICE by L3Harris Technologies, Inc. *[RE: DEFENDANT L3HARRIS TECHNOLOGIES, INC.'S NOTICE OF TAKING DEPOSITION UPON WRITTEN INTERROGATORIES RE: CUSTODIAN OF RECORDS FOR HAWAII PACIFIC HEALTH - KAUAI MEDICAL CLINIC, DATED APRIL 27, 2021]* (Jones, Amanda) (Entered: 04/27/2021) |
| 04/30/2021 | 32 | CERTIFICATE OF SERVICE by L3Harris Technologies, Inc. *RE: DEFENDANT L3HARRIS TECHNOLOGIES, INC.'S FIRST REQUEST FOR ANSWERS TO INTERROGATORIES TO PLAINTIFF PRESTON LEE, DATED APRIL 30, 2021* (Soon Fah, Michael) (Entered: 04/30/2021) |
| 04/30/2021 | 33 | CERTIFICATE OF SERVICE by L3Harris Technologies, Inc. *RE: DEFENDANT L3HARRIS TECHNOLOGIES, INC.'S FIRST REQUEST FOR PRODUCTION OF DOCUMENTS TO PLAINTIFF PRESTON LEE, DATED APRIL 30, 2021* (Soon Fah, Michael) (Entered: 04/30/2021) |
| 05/05/2021 | 34 | Return of Service on Subpoena CUSTODIAN OF RECORDS, HAWAII PACIFIC HEALTH - KAUAI MEDICAL CLINIC was served on May 3, 2021 (Jones, Amanda) (Entered: 05/05/2021) |

| 05/07/2021 | 35 | CERTIFICATE OF SERVICE by L3Harris Technologies, Inc. *CERTIFICATE OF SERVICE [RE: DEFENDANT L3HARRIS TECHNOLOGIES, INC.'S NOTICE OF TAKING VIDEO RECORDED DEPOSITION UPON ORAL EXAMINATION, DATED MAY 7, 2021 (Deponent: Preston Lee)]* (Jones, Amanda) (Entered: 05/07/2021) |
| 06/10/2021 | 36 | CERTIFICATE OF SERVICE by Preston Lee (Rosenbaum, Joseph) (Entered: 06/10/2021) |
| 06/10/2021 | 37 | CERTIFICATE OF SERVICE by Preston Lee (Rosenbaum, Joseph) (Entered: 06/10/2021) |
| 06/23/2021 | 38 | STIPULATED PROTECTIVE ORDER; (EXHIBIT A) - Signed by MAGISTRATE JUDGE KENNETH J. MANSFIELD on 6/22/2021. (emt, ) (Entered: 06/23/2021) |
| 08/02/2021 | 39 | CERTIFICATE OF SERVICE by Preston Lee (Rosenbaum, Joseph) (Entered: 08/02/2021) |
| 08/02/2021 | 40 | ~~CERTIFICATE OF SERVICE~~ Subpoena Returned Executed as to ESARO on 8/2/2021 by Preston Lee (Rosenbaum, Joseph) Modified on 8/3/2021 (emt, ). (Entered: 08/02/2021) |
| 09/07/2021 | 41 | SUPPLEMENT by Preston Lee *Amended Initial Disclosure; Certificate of Service.* (Rosenbaum, Joseph) (Entered: 09/07/2021) |
| 09/08/2021 | 42 | CERTIFICATE OF SERVICE by L3Harris Technologies, Inc. *[RE: DEFENDANT L3HARRIS TECHNOLOGIES, INC.'S NOTICE OF TAKING DEPOSITION UPON ORAL EXAMINATION AND SUPBOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS, DATED SEPTEMBER 8, 2021 (Deponent: David Hesapene)]* (Jones, Amanda) (Entered: 09/08/2021) |
| 09/08/2021 | 43 | CERTIFICATE OF SERVICE by L3Harris Technologies, Inc. *[RE: DEFENDANT L3HARRIS TECHNOLOGIES, INC.'S NOTICE OF TAKING DEPOSITION UPON ORAL EXAMINATION AND SUPBOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS, DATED SEPTEMBER 8, 2021 (Deponent: Gilbert Castro)]* (Jones, Amanda) (Entered: 09/08/2021) |
| 09/08/2021 | 44 | CERTIFICATE OF SERVICE by L3Harris Technologies, Inc. *[RE: DEFENDANT L3HARRIS TECHNOLOGIES, INC.'S NOTICE OF TAKING DEPOSITION UPON ORAL EXAMINATION AND SUPBOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS, DATED SEPTEMBER 8, 2021 (Deponent: Mark Vegas)]* (Jones, Amanda) (Entered: 09/08/2021) |

| 09/15/2021 | 45 | Return of Service on Subpoena DAVID HESAPENE was served on September 10, 2021 (Attachments: # 1 Exhibit A)(Jones, Amanda) (Entered: 09/15/2021) |
|---|---|---|
| 09/15/2021 | 46 | Return of Service on Subpoena GILBERT CASTRO was served on September 10, 2021 (Attachments: # 1 Exhibit A)(Jones, Amanda) (Entered: 09/15/2021) |
| 09/20/2021 | 47 | Return of Service on Subpoena MARK VEGAS was served on September 18, 2021 (Attachments: # 1 Exhibit A)(Jones, Amanda) (Entered: 09/20/2021) |
| 09/29/2021 | 48 | EX PARTE Motion *DEFENDANT L3HARRIS TECHNOLOGIES, INC.'S EX PARTE MOTION TO FILE UNDER SEAL PORTIONS OF L3HARRIS TECHNOLOGIES, INC.'S MOTION FOR SUMMARY JUDGMENT ON ALL CLAIMS AND EXHIBITS B, D-I, J, K,,T, U, X, Y, Z, AND AA TO THE MOTION; DECLARATION OF MICHAEL R. SOON FAH; EXHIBIT A; CERTIFICATE OF SERVICE* Michael Raymond Soon Fah appearing for Defendant L3Harris Technologies, Inc. (Attachments: # 1 Declaration of Michael R. Soon Fah , # 2 Exhibit A , # 3 Certificate of Service)(Soon Fah, Michael) Modified on 9/30/2021 (eta). (Entered: 09/29/2021) |
| 09/29/2021 | 49 | MOTION for Summary Judgment *DEFENDANT L3HARRIS TECHNOLOGIES, INC.'S MOTION FOR SUMMARY JUDGMENT ON ALL CLAIMS* Amanda M. Jones appearing for Defendant L3Harris Technologies, Inc. (Attachments: # 1 Memorandum, # 2 Certificate of Service Certificate of Compliance, # 3 Appendix APPENDIX 1, # 4 Appendix APPENDIX 2, # 5 Appendix APPENDIX 3, # 6 Appendix APPENDIX 4, # 7 Appendix APPENDIX 5, # 8 Certificate of Service)(Jones, Amanda) (Entered: 09/29/2021) |
| 09/29/2021 | 50 | CONCISE STATEMENT in Support re 49 MOTION for Summary Judgment *DEFENDANT L3HARRIS TECHNOLOGIES, INC.'S MOTION FOR SUMMARY JUDGMENT ON ALL CLAIMS DEFENDANT L3HARRIS TECHNOLOGIES, INC.'S SEPARATE AND CONCISE STATEMENT OF MATERIAL FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT* filed by L3Harris Technologies, Inc.. (Attachments: # 1 Declaration DECLARATION OF AMANDA JONES, # 2 Declaration DECLARATION OF LINDSAY HAEN, # 3 Declaration DECLARATION OF DANIELLE STEWART, # 4 Declaration DECLARATION OF RODNEY MARTIN, # 5 Declaration DECLARATION JOHN KREIDER, # 6 Exhibit EXHIBIT A, # 7 Exhibit EXHIBIT B, # 8 Exhibit EXHIBIT C, # 9 Exhibit EXHIBIT D, # 10 Exhibit EXHIBIT E, # 11 Exhibit EXHIBIT F, # 12 Exhibit EXHIBIT G, # 13 Exhibit EXHIBIT H, # 14 Exhibit EXHIBIT I, # 15 Exhibit EXHIBIT J, # 16 Exhibit EXHIBIT K, # 17 Exhibit EXHIBIT L, # 18 Exhibit EXHIBIT M, # 19 Exhibit EXHIBIT N, |

| | | |
|---|---|---|
| | | # 20 Exhibit EXHIBIT O, # 21 Exhibit EXHIBIT P, # 22 Exhibit EXHIBIT Q, # 23 Exhibit EXHIBIT R, # 24 Exhibit EXHIBIT S, # 25 Exhibit EXHIBIT T, # 26 Exhibit EXHIBIT U, # 27 Exhibit EXHIBIT V, # 28 Exhibit EXHIBIT W, # 29 Exhibit EXHIBIT X, # 30 Exhibit EXHIBIT Y, # 31 Exhibit EXHIBIT Z, # 32 Exhibit EXHIBIT AA, # 33 Exhibit EXHIBIT BB, # 34 Exhibit EXHIBIT CC, # 35 Certificate of Service CERTIFICATE OF COMPLIANCE, # 36 Certificate of Service)(Jones, Amanda) (Entered: 09/29/2021) |
| 09/30/2021 | | ADVISORY ENTRY. **No E-Service of Ex Parte Motion** - Please be advised that viewing access to Document 48 EX PARTE Motion *TO FILE UNDER SEAL PORTIONS OF L3HARRIS TECHNOLOGIES, INC.'S MOTION FOR SUMMARY JUDGMENT ON ALL CLAIMS AND EXHIBITS B, D-I, J, K,,T, U, X, Y, Z, AND AA TO THE MOTION filed by L3Harris Technologies, Inc. is restricted to the filing party and the court (filing events from the "Ex Parte" Filings Category, will restrict viewing of the entry to the court and the filing party). The Certificate of Service reflects that service was made electronically through CM/ECF. The filing party may refile the entry as a public document by selecting a filing event from the "motions" category. Alternatively, an amended certificate of service may be filed. (eta) (Entered: 09/30/2021)* |
| 09/30/2021 | 51 | CERTIFICATE OF SERVICE by L3Harris Technologies, Inc. *AMENDED CERTIFICATE OF SERVICE* (Soon Fah, Michael) (Entered: 09/30/2021) |
| 10/01/2021 | 52 | EO: COURT ORDER SETTING BRIEFING SCHEDULE<br><br>On 9/29/2021, Defendant L3Harris Techonologies, Inc. filed Dkt. 49 ; Motion for Summary Judgment on All Claims.<br><br>Court sets the following Motion hearing and briefing schedule: Opposition memorandum due: **10/22/2021**. Reply memorandum due: **10/29/2021**.<br><br>Motion Hearing is set for 11/12/2021 at 09:45 AM in Aha Nonoi before JUDGE LESLIE E. KOBAYASHI.<br><br>All persons entering the court house are REQUIRED TO WEAR A FACE MASK fully covering the nose and mouth while in all public areas of the court house.<br><br>(JUDGE LESLIE E. KOBAYASHI) (afe) (Entered: 10/01/2021) |
| 10/01/2021 | 53 | ORDER GRANTING DEFENDANT L3HARRIS TECHNOLOGIES, INC.'S EX PARTE MOTION TO FILE UNDER SEAL PORTIONS OF L3HARRIS TECHNOLOGIES, INC.'S MOTION FOR SUMMARY |

| | | JUDGMENT ON ALL CLAIMS AND EXHIBITS B, D-I, J, K, T, U, X, Y, Z, AND AA TO THE MOTION re <u>48</u> - Signed by JUDGE LESLIE E. KOBAYASHI on 10/1/2021. L3Harris is hereby granted leave to file (1) an unredacted version of L3Harris Technologies, Inc.'s Motion for Summary Judgment on All Claims and the Memorandum in Support; (2) an unredacted version of the Concise Statement of Material Facts; (3) unredacted versions of Exhibit B and J to the Motion; and (4) Exhibits D-I, K, T, U, X, Y, Z, and AA to the Motion, under seal. (eta) (Entered: 10/01/2021) |
|---|---|---|
| 10/01/2021 | <u>54</u> | **(UNREDACTED)** Defendant L3Harris Technologies, Inc.'s MOTION for Summary Judgment; Memorandum in Support; Certificate of Compliance With Word Limit; Certificate of Service - filed by L3Harris Technologies, Inc. (SEALED) <u>SEALED</u> pursuant to ECF No. <u>53</u> ORDER (eta) (Entered: 10/01/2021) |
| 10/01/2021 | <u>55</u> | **(UNREDACTED)** Defendant L3Harris Technologies, Inc.'s SEPARATE AND CONCISE STATEMENT of Material Facts in Support of Is Motion for Summary Judgment - filed by L3Harris Technologies, Inc. (SEALED) . <u>SEALED</u> pursuant to ECF No. <u>53</u> ORDER. (Attachments: # <u>1</u> Exhibit B (UNREDACTED), # <u>2</u> Exhibit D, # <u>3</u> Exhibit E, # <u>4</u> Exhibit F, # <u>5</u> Exhibit G, # <u>6</u> Exhibit H, # <u>7</u> Exhibit I, # <u>8</u> Exhibit J (UNREDACTED), # <u>9</u> Exhibit K, # <u>10</u> Exhibit T, # <u>11</u> Exhibit U, # <u>12</u> Exhibit X, # <u>13</u> Exhibit Y, # <u>14</u> Exhibit Z, # <u>15</u> Exhibit AA)(eta) (Entered: 10/01/2021) |
| 10/04/2021 | <u>56</u> | CERTIFICATE OF SERVICE by L3Harris Technologies, Inc. *CERTIFICATE OF SERVICE [RE: DISCLOSURE OF TONY HUNSTIGER AS AN EXPERT AND PRODUCTION OF HIS EXPERT REPORT, RESUME, FEE SCHEDULE, AND TESTIMONY LIST]* (Jones, Amanda) (Entered: 10/04/2021) |
| 10/04/2021 | <u>57</u> | CERTIFICATE OF SERVICE by L3Harris Technologies, Inc. *CERTIFICATE OF SERVICE [RE: DEFENDANT L3HARRIS TECHNOLOGIES, INC.'S SUPPLEMENTAL INITIAL DISCLOSURES, DATED OCTOBER 4, 2021]* (Jones, Amanda) (Entered: 10/04/2021) |
| 10/11/2021 | <u>58</u> | Errata re <u>50</u> Concise Statement in Support of Motion,,,,, *ERRATA REGARDING DECLARATION OF DANIELLE STEWART IN SUPPORT OF DEFENDANT L3HARRIS TECHNOLOGIES, INC.'S SEPARATE AND CONCISE STATEMENT OF MATERIAL FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT, FILED SEPTEMBER 29, 2021 [Dkt. 50-3]*;. (Attachments: # <u>1</u> Declaration of Danielle Stewart, # <u>2</u> Certificate of Service)(Jones, Amanda) (Entered: 10/11/2021) |
| 10/19/2021 | 59 | EO: The Court determines that the hearing on Defendant L3Harris Technologies, Inc's. MOTION (Dkt. No. <u>49</u> ) for Summary Judgment on All Claims is not necessary pursuant to Local Rule LR7.1 (c), and hereby |

| | | |
|---|---|---|
| | | VACATES the hearing current set for 11/12/2021. The briefing schedule previously issued on 10/1/2021 (Dkt. No. 52 ) setting the Opposition Memorandum due on 10/22/2021 and the Reply Memorandum due on 10/29/2021 will remain in place. The matter will be taken under advisement thereafter.<br><br>(JUDGE LESLIE E. KOBAYASHI) (afe) (Entered: 10/19/2021) |
| 10/22/2021 | 60 | MEMORANDUM in Opposition re 49 MOTION for Summary Judgment *DEFENDANT L3HARRIS TECHNOLOGIES, INC.'S MOTION FOR SUMMARY JUDGMENT ON ALL CLAIMS* filed by Preston Lee. (Attachments: # 1 Certificate of Service)(Rosenbaum, Joseph) (Entered: 10/22/2021) |
| 10/22/2021 | 61 | CONCISE STATEMENT in Opposition re 49 MOTION for Summary Judgment *DEFENDANT L3HARRIS TECHNOLOGIES, INC.'S MOTION FOR SUMMARY JUDGMENT ON ALL CLAIMS (Document 50 Defs CSF could not be used to link this document as it is filed under seal at this time)* filed by Preston Lee. (Attachments: # 1 Declaration of Joseph T. Rosenbaum, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Declaration of Preston Lee, # 6 Declaration of Jimmy Costales, # 7 Declaration of Josh Burton, # 8 Declaration of Guy Fujita, # 9 Declaration of Michael Young, # 10 Declaration of David Shimogawa, # 11 Declaration of David Hesapene, # 12 Certificate of Compliance, # 13 Certificate of Service)(Rosenbaum, Joseph) (Entered: 10/22/2021) |
| 10/26/2021 | 62 | (Document refiled, see ECF No. 63 ) SUPPLEMENT by Preston Lee *Table of Contents and Authorities*. (Rosenbaum, Joseph) Modified on 10/27/2021 (eta). (Entered: 10/26/2021) |
| 10/27/2021 | | ADVISORY ENTRY. **No Identification of Person Filing Document** - Please be advised that Document 62 Supplement (Table of Contents) filed by Preston Lee, does not include information that identifies the filer. The name, Hawaii bar identification number, address, telephone number, and email address of counsel (or, if pro se, of the party) and the specific identification of each party represented by name and interest in the litigation (e.g., plaintiff, defendant, etc.) shall appear in the upper left corner of the first page of each document presented for filing, see L.R. 10.2 (b). The filing party may resubmit this document, to include an appropriate caption cover page. (eta) (Entered: 10/27/2021) |
| 10/27/2021 | 63 | SUPPLEMENT by Preston Lee *Plaintiff's Table of Contents and Table of Authorities Regarding Doc. 60 Plaintiff's Memorandum in Opposition to Defndant L3Harris Technologies, Inc.'s Motion for Summary Judgment; Certificate of Service* . (Rosenbaum, Joseph) Modified on 10/27/2021 to add linkage to related document, text modified (eta). (Entered: 10/27/2021) |

| 10/27/2021 | 64 | SUPPLEMENT by Preston Lee *Second Amended Initial Disclosures*. (Rosenbaum, Joseph) (Entered: 10/27/2021) |
|---|---|---|
| 10/28/2021 | 65 | EO: This Court has been notified of the parties dispute on discovery issues. As parties have met and conferred and were unable to resolve the dispute, a request expedited discovery assistance has been made.<br><br>Discovery Letter briefs are due no later than 5:00 p.m. on November 2, 2021 and shall be electronically filed on CM/ECF.<br><br>Upon review of the letter briefs, the Court will determine whether this expedited procedure will entail only the submission of letter briefs (consisting of five pages or less of written materials, including exhibits) submitted, or involve both the submission of letter briefs and a discovery conference or hearing.<br><br>(MAGISTRATE JUDGE KENNETH J. MANSFIELD)(bbb) (Entered: 10/28/2021) |
| 10/29/2021 | 66 | Defendant L3Harris Technologies, Inc.'s REPLY Memorandum in Support of 49 MOTION for Summary Judgment *on All Claims* filed by L3Harris Technologies, Inc.. (Attachments: # 1 Certificate of Word Count, # 2 Certificate of Service)(Soon Fah, Michael) Modified on 11/1/2021 (eta). (Entered: 10/29/2021) |
| 11/02/2021 | 67 | Letter Brief Regarding Discovery Issue *addressed to Magistrate Judge Kenneth J. Mansfield from Joseph T. Rosenbaum, Esq., dated November 2, 2021* . (Rosenbaum, Joseph) Modified on 11/3/2021 (eta). (Entered: 11/02/2021) |
| 11/02/2021 | 68 | Letter Brief addressed to Magistrate Judge Kenneth J. Mansfield from Amanda M. Jones, Esq., dated November 2, 2021. *Lee v.. L3Harris Technologies, Inc*. (Jones, Amanda) Modified on 11/3/2021 (eta). (Entered: 11/02/2021) |
| 11/09/2021 | 69 | EO: Due to a conflict in the Courts schedule, the Settlement Conference previously set for 11/17/2021 IS ADVANCED TO 11/16/2021 at 1:30 p.m. by Video Tele-Conference (VTC) before MAGISTRATE JUDGE KENNETH J. MANSFIELD. Confidential Settlement Conference Statements remain due by 11/10/201. One double sided hard copy of the Settlement Conference Statements from each party shall be delivered to the Clerk's Office followed by an electronic version to be emailed to mansfield_orders@hid.uscourts.gov.<br><br>The Courtroom Manager will be sending out a separate email providing counsel detailed instructions regarding Settlement Conferences Video Tele-Conference (VTC) access prior to the conference date. |

| | | |
|---|---|---|
| | | (MAGISTRATE JUDGE KENNETH J. MANSFIELD)(bbb) (Entered: 11/09/2021) |
| 11/10/2021 | 70 | ORDER ON LOCAL RULE 37.1 DISCOVERY DISPUTE 67 , 68 - Signed by MAGISTRATE JUDGE KENNETH J. MANSFIELD on 11/10/2021. (eta) (Entered: 11/10/2021) |
| 11/16/2021 | 71 | EP: FURTHER SETTLEMENT CONFERENCE held on 11/16/2021. The Court met with the parties. Settlement discussions held. No settlement reached at this time. Parties may contact Magistrate Judge Kenneth J. Mansfield's courtroom Manager, Bernie Aurio at (808) 541-1298 or by email at bbb@hid.uscourts.gov, if they so wish further assistance in settlement with the Court. (Video Tele-Conference (VTC) - no record 1:30 - 2:35) (MAGISTRATE JUDGE KENNETH J. MANSFIELD)(bbb) (Entered: 11/17/2021) |
| 11/23/2021 | 72 | CERTIFICATE OF SERVICE by Preston Lee (Rosenbaum, Joseph) (Entered: 11/23/2021) |
| 11/23/2021 | 73 | Third Amended Initial Disclosures ~~SUPPLEMENT~~ by Preston Lee . (Rosenbaum, Joseph) Modified on 11/23/2021 (eta). (Entered: 11/23/2021) |
| 11/24/2021 | 74 | CERTIFICATE OF SERVICE by Preston Lee (Rosenbaum, Joseph) (Entered: 11/24/2021) |
| 12/01/2021 | 75 | CERTIFICATE OF SERVICE by Preston Lee (Rosenbaum, Joseph) (Entered: 12/01/2021) |
| 12/06/2021 | 76 | Return of Service on Subpoena Sean Igne was served on 11/26/21 (Rosenbaum, Joseph) (Entered: 12/06/2021) |
| 12/08/2021 | 77 | Return of Service on Subpoena Julie Broyles was served on 11/29/21 (Rosenbaum, Joseph) (Entered: 12/08/2021) |
| 12/08/2021 | 78 | Return of Service on Subpoena Scott Taylor was served on 11/29/21 (Rosenbaum, Joseph) (Entered: 12/08/2021) |
| 12/08/2021 | 79 | Return of Service on Subpoena Petere Bianchi was served on 11/29/21 (Rosenbaum, Joseph) (Entered: 12/08/2021) |
| 01/11/2022 | 80 | EO: Pursuant to the Temporary General Order issued by Chief Judge Seabright on 12/27/2021 suspending all jury trials until 3/1/2022, the Final Pretrial Conference set for 1/18/2022 is VACATED and will be reset when a new trial date is set. (JUDGE LESLIE E. KOBAYASHI)(afe) (Entered: 01/11/2022) |

| | | |
|---|---|---|
| 01/20/2022 | 81 | EO: ORDER DIRECTING PARTIES TO MEET AND CONFER, AND TO CONTACT MAGISTRATE JUDGE FOR TRIAL RE-SETTING<br><br>On January 11, 2022, pursuant to the Temporary General Orer issued by Chief Judge Seabright on December 27, 2021, this Court vacated the final pretrial conference and trial date in this matter, [dkt. no. 80,] and therefore DIRECTS the parties to meet and confer regarding a new trial date, and to contact the magistrate judge for a conference to reset the trial date as well as any trial-related deadlines.<br><br>IT IS SO ORDERED.<br><br>(JUDGE LESLIE E. KOBAYASHI)(afe) (Entered: 01/20/2022) |
| 01/31/2022 | 82 | ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT re 49 - Signed by JUDGE LESLIE E. KOBAYASHI on 1/31/2022.<br>On the basis of the foregoing, L3Harris's Motion for Summary Judgment on All Claims, filed September 29, 2021, is HEREBY GRANTED, and summary judgment is granted in favor of L3Harris as to all of Lee's claims. The Clerk's Office is directed to enter final judgment and close the case immediately.<br>(eta) (Entered: 01/31/2022) |
| 01/31/2022 | 83 | CLERK'S JUDGMENT entered on 1/31/2022 pursuant to ECF No. 82 ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT. (eta) (Entered: 01/31/2022) |
| 02/25/2022 | 84 | NOTICE OF APPEAL as to 83 Clerk's Judgment, 82 Order on Motion for Summary Judgment, by Preston Lee. USCA NO. 22-15288 Filing fee $ 505, receipt number AHIDC-2647533. Appeal Record due by 3/28/2022. (Attachments: # 1 Exhibit Order Appealed From, # 2 Exhibit Judgment Appealed From, # 3 Representation Statement, # 4 Certificate of Service)(Rosenbaum, Joseph) Modified on 3/2/2022 (eta). (Entered: 02/25/2022) |
| 02/28/2022 | 85 | USCA Case Number 22-15288 for 84 Notice of Appeal, filed by Preston Lee. (eta) (Entered: 03/02/2022) |
| 02/28/2022 | 86 | USCA TIME SCHEDULE ORDER as to 84 Notice of Appeal, filed by Preston Lee, USCA NO. 22-15288. (eta) (Entered: 03/02/2022) |
| 03/02/2022 | 87 | **Attorney Appeal Packet** re 84 Notice of Appeal, filed by Preston Lee, USCA NO. 22-15288. (Attachments: # 1 Notice of Appeal, # 2 Instructions for Civil Appeals, # 3 Additional Instructions for Transcript Designation and Ordering Form, # 4 Letter Re: Court Reporters, # 5 Transcript Designation and Ordering Form, # 6 Docket Sheet)(eta) (Entered: 03/02/2022) |

| 03/08/2022 | 88 | NOTICE by Preston Lee *PLAINTIFFS NOTICE THAT NO TRANSCRIPTS WILL BE ORDERED REGARDING PLAINTIFFS APPEAL TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT; CERTIFICATE OF SERVICE* Preston Lee. (Rosenbaum, Joseph) (Entered: 03/08/2022) |