No. 22-15288

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

---

PRESTON LEE,

Plaintiff-Appellant

v.

L3HARRIS TECHNOLOGIES, INC.

Defendant-Appellee

---

On Appeal from the United States District Court
District of Hawaii Civil No. 1:20-00489 (LEK/KJM)
(Honorable Leslie E. Kobayashi)

---

**REPLY BRIEF**

---

FUJIWARA AND ROSENBAUM, LLLC

JOSEPH T. ROSENBAUM          9205
ELIZABETH JUBIN FUJIWARA     3558
Alakea Corporate Tower
1100 Alakea St. 20th Fl. Ste. B
Honolulu, Hawaii 96813
Telephone: (808) 203-5436

Attorney for Plaintiff-Appellant
PRESTON LEE

# **TABLE OF CONTENTS**

<u>Page</u>

STATEMENT OF FACTS....................................................................1

ARGUMENT.................................................................... 11

THE DISTRICT COURT ERRED IN GRANTING L3's MOTION FOR
SUMMARY JUDGMENT …….….….….….….….…………….…...11

THE DISTRICT COURT CORRECTLY FOUND THAT MR. LEE WAS AN
EMPLOYEE WITH A DISABILITY AND COULD PERFORM HIS
ESSENTIAL JOB FUNCTIONS…….….….….….….….….….….12

THE DISTRICT COURT CORRECTLY RULED THAT THERE WERE
GENUINE ISSUES OF MATERIAL FACT AS TO WHETHER MR. LEE
WAS TERMINATED BECAUSE OF HIS PTSD…………….….……...14

THE DISTRICT COURT RULED THAT L3 MET ITS BURDEN TO
PROFFER A NON-DISCRIMINATORY REASON FOR
MR. LEE'S TERMINATION…….….….….….….….….….….….18

THE DISTRICT COURT ERRED IN FINDING THAT MR. LEE HAD NOT
RAISED A GENUINE ISSUE OF MATERIAL FACT AS TO THE REASON
FOR HIS TERMINATION BEING A PRETEXT……….….……….19

THE DISTRICT COURT ERRED IN HOLDING THERE WAS NO
GENUINE ISSUE OF MATERIAL FACT AS TO PRETEXT………….20

THE DISTRICT COURT ERRED IN GRANTING SUMMARY
JUDGMENT AS TO THE HAWAI'I WHISTLEBLOWER
 PROTECTION ACT CLAIM…….….….….….….….….….…..24

CONCLUSION........................................................ ….25

STATEMENT OF RELATED CASES................................. 26

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME
LIMITATION…….….….….….….….….….….….……27

i

CERTIFICATE OF SERVICE………………………………………..………28

# TABLE OF AUTHORITIES

<u>CASES</u>                                                    <u>Page</u>

*Borkowski v. Valley Central Sch. Dist.*, 63 F.3d 131, 143 (2d Cir. 1995)….15

*Dumas v. New United Motor Mfg., Inc.*,
305 F. App'x 445, 448 (9th Cir. 2008)…………..…………..…………..…..19

*Humphrey v. Mem'l Hosps. Ass'n*,
239 F.3d 1128, 1139—40 (9th Cir. 2001)…….…………...…………..……15

*Kimbro v. Atlantic Richfield Co.*,
889 F.2d 869 (9th Cir. 1989)………..…………………..…………..………15

*Mayo v. PCC Structurals, Inc.*,
795 F.3d 941 (9th Cir. 2015)……..……………………..…………...…..…13

*Murray v. Mayo Clinic*,
934 F.3d 1101, 1105 (9th Cir. 2019)
*cert denied*, 140 S. Ct. 2720 (2020)…………..…………………..……...18-19

*Ogunleye v. Arizona*,
66 F. Supp. 2d 1104, 1108 (D. Ariz. 1999)……………..…………..……18

*Reaves v. Nexstar Broad., Inc.*,
327 F. Supp. 3d 1352, 1365-1368 (D. Or. 2018)………..…………...…..13

*Rezentes v. Sears, Roebuck & Co.*,
729 F. Supp. 2d 1197, 1205 (D. Hawai`i 2010)…………..……...…..19

*Unt v. Aerospace Corp.*,
765 F.2d 1440, 1446 (9th Cir. 1985)…….……..……..……..……..18

## STATEMENT OF FACTS

In his Memorandum in Opposition to L3's Motion for Summary Judgment filed on October 22, 2021[Docket No. 88, 2-ER-066-090], Mr. Lee provided, *inter alia*, the following facts:

Mr. Lee is a fifty-seven (57) year old a combat veteran who served our country in the United States Navy from 1982-1992. *See* Declaration of Preston Lee ("Lee Decl.") [Docket No. 61-5, 2-ER-119] at ¶ 4 attached to Mr. Lee's Concise Statement of Facts ("CSF"). [Docket No. 61, 2-ER-091-096] Mr. Lee served two tours in the Persian Gulf in the late 1980's/early 1990's and has PTSD as a result since 1991. [Docket No. 61-5, 2-ER-119-120] at ¶¶ 5-11. Mr. Lee never knew what PTSD was until he was informed of what it is by his doctor in or about 2016-2017 when he spoke about his PTSD symptoms with his VA doctor. [Docket No. 61-5, 2-ER-120 at ¶ 12.] Mr. Lee was formally diagnosed with PTSD by at least one of his doctor in or about 2017 or 2018. *Id*. at ¶ 13.

Mr. Lee was hired on or about March 20, 1994 to work on the Flight Line at the time ITT Industries ("ITT") was the main contractor for the United States Navy at Barking Sands on Kaua'i. *Id*. at ¶ 14. Mr. Lee worked on the Flight Line as a helicopter inspector. *Id*. at ¶ 15. Mr. Lee was promoted during the time he worked for ITT. *Id*. at ¶ 16. Mr. Lee had PTSD the whole time he worked at Barking Sands on the Flight Line for ITT and he never once got into any physical altercations in

the workplace and never made any threats against anyone in the workplace. *Id.* at ¶ 17. He never had any performance issues related to his ability to perform his job duties. *Id.* at ¶ 18. In November 2006, Mr. Lee became a painter. *Id.* at ¶ 19.

L3 Harris Technologies, Inc. ("L3") took over the United States Navy contract Mr. Lee worked under from ITT at Barking Sands in or about 2015. *Id.* at ¶ 20. Mr. Lee held the position of painter. [Docket No. 61-5, 2-ER-121 at ¶ 21.] The entire time he worked for L3 Mr. Lee had PTSD, he just hadn't been officially diagnosed yet. *Id.* at ¶ 22.

Mr. Lee submitted documentation to the VA in 2017 and 2018 requesting disability benefits related to his PTSD diagnosis that occurred around the same time. Part of the documentation to the VA reflected Mr. Lee's private thoughts and feelings related to his PTSD that he conveyed to his physicians. L3 did not have any of this documentation prior to Mr. Lee's termination. *Id.* at ¶ 23.

In February 2019, Mr. Lee received 100% VA disability benefits due to his PTSD. *Id.* at ¶ 24. At the time the VA approved his 100% disability benefits, the VA knew he was employed at L3 and there is nothing that forbids a military veteran from receiving 100% VA benefits for PTSD and/or other injuries to continue to work in the private sector. *Id.* at ¶ 25. L3 became aware of Mr. Lee's PTSD disability via L3 Lead Sean Igne in or about February 2019 after Mr. Lee informed Mr. Igne Mr. Lee received 100% VA benefits based on his PTSD.

[Docket No. 61-5, 2-ER-122 at ¶ 26.] Mr. Lee worked on a day-to-day basis side-by-side alongside Mr. Igne, Gilbert Castro and David Hesapene at the paint shop for L3. *Id.* at ¶ 27. Mr. Lee did not work with L3 employee Mark Vegas on a day-to-day basis as he was not in the paint shop. He was a rigger not a painter. *Id.* at ¶ 28.

Since disclosing his PTSD in the workplace, Mr. Lee was harassed and unfairly disciplined. *Id.* at ¶ 29. Sean Igne told L3's human resources that he was afraid to work with Mr. Lee because of Mr. Lee's PTSD. *Id.* at ¶ 30. In or about February 2019, Mr. Igne asked Mr. Lee why he didn't just retire because he got his 100% VA benefits for PTSD. *Id.* at ¶ 31. Mr. Lee told Mr. Igne it was none of his business. *Id.* at ¶ 32.

Mr. Igne wrote a letter to L3 to falsely portray Mr. Lee in a negative light as a violent person in the workplace that was a threat to him and Mr. Lee's coworkers. Mr. Igne knew this was false. Mr. Igne has been proven to be a liar and a thief of government gas and has falsified his timecards at work. He is simply a liar and a cheat. [Docket No. 61-5, 2-ER-123 at ¶ 35 and Ex A [Docket No. 61-2, 2-ER-099-109] at pg. 37 lns 10-14, pg 39 ln 11-25, pg. 49 ln 5-25 to pg 50-51, pg 52 ln 19 to pg 54 ln 17.

Mr. Lee had PTSD since 1991 and worked at Barking Sands since 1994 and for L3 since 2015 and Mr. Lee never did anything violent in the workplace and he

never threatened or physically harmed anyone. [Docket No. 61-5, 2-ER-123 at ¶ 36]. Although PTSD does result in irritability and other negative emotions, part of having this disability is Mr. Lee learning to deal with it and maintain his mental wellbeing through learning coping mechanisms and to not let situations enflame his PTSD. *Id*. at ¶ 37. Through his efforts to keep his PTSD in check, Mr. Lee has always kept it together at work and he has never been violent with anyone at the workplace and he would never. He told L3 the same. *Id*. at ¶ 38. Mr. Lee conveyed this to L3's human resources', Julie Broyles, when they asked him about it. Mr. Lee confirmed that he did not want to hurt his coworkers or in any way be violent in the workplace. *Id*. at ¶ 39. Mr. Lee has never once been in a physical altercation in the workplace and he has never physically threatened anyone in the workplace. [Docket No. 61-5, 2-ER-124 at ¶ 40].

Working at Barking Sands is and has always been a workplace for blue collar workers and many veterans. It is quite common for the employees to be cursing in the workplace and at each other. *Id*. at ¶ 41; Ex A [Docket No. 61-2, 2-ER-099-109] pg 59 ln 5 to pg 60 ln 9. Every day that he worked at L3 Mr. Lee's coworkers were cursing in the workplace. Lee Decl. [Docket No. 61-5, 2-ER-118-141] at ¶ 42. Mr. Lee's former manager/supervisor Rod Martin himself would curse in the workplace. Mr. Lee personally heard Mr. Martin curse more than five (5) times. *Id*. at ¶ 43. Mr. Igne himself would also curse in the workplace. Mr. Lee

4

has heard Mr. Igne curse at least twice a day when he worked with Mr. Igne. Mr. Lee worked with Mr. Igne for fourteen (14) years. *Id.* at ¶ 44. Rod Martin likely heard Mr. Igne curse in the workplace as it was so common. *Id.* at ¶ 45. Mr. Lee tried to remain professional in the workplace. *Id.* at ¶ 46. Mr. Lee's professional conduct is reflected in that he never had a poor performance review and, in 2019, he received from L3 an award for 25 years of dedicated service. *Id.* at ¶ 47. Mr. Lee worked at Barking Sands for 26 years and never was he violent. he might have been loud and might have cursed, but this was commonplace in this blue collar and veteran-filled workplace. [Docket No. 61-5, 2-ER-125 at ¶ 49].

In or about March 2019, Mr. Lee was told by his supervisor, Rodney Martin, to go to the human resources ("HR") at 9:00 a.m. *Id.* at ¶ 50. Mr. Lee did as instructed and met with Julie Broyles head of L3 HR in Hawai'i and Jasmine Apo an L3 HR representative. *Id.* at ¶ 51. At the meeting, Ms. Broyles confirmed she was aware of Mr. Lee's PTSD. *Id.* at ¶ 52. Ms. Boynes began to ask Mr. Lee a series of questions listed below related to his PTSD as Ms. Apo took notes. *Id.* at ¶ 53.

Ms. Broyles stated because of Mr. Lee's PTSD they had to ask him some questions. *Id.* at ¶ 54. Ms. Broyles asked, amongst other questions: Do you want to hurt your coworkers? Mr. Lee answered, "No." Do you want to hurt yourself? Mr. Lee answered, "No." Do you want to kill your coworkers? Mr. Lee answered

"No." Do you want to kill yourself? Mr. Lee answered, "No." Do you have an

anger problem? Mr. Lee answered, "No." Do you want to kill people when you get

angry? Mr. Lee answered, "No." Do you need anger management classes? Mr. Lee

answered, "No." Do you need a psychiatrist? Mr. Lee answered, "No." Do you

have a drug problem? Mr. Lee answered, "No." Do you have an alcohol problem?

Mr. Lee answered, "No." [Docket No. 61-5, 2-ER-126 at ¶ 57]. Mr. Lee asked

them if they were trying to fire him and Ms. Broyles and Ms. Apo said they were

there to help him. *Id.* at ¶ 58. Ms. Broyles asked Mr. Lee if he needed any

accommodation. *Id.* at ¶ 59. Mr. Lee responded, "No" as he had been functioning

in the workplace up to that point for twenty-five (25) years without

accommodation and without any violence or any other threatening conduct. *Id.* at ¶

60. Mr. Lee had been able to perform his job duties as a painter for years without

anyone calling his ability to do his job functions into question. Mr. Lee saw no

reason for an accommodation. Nothing had changed. *Id.* at ¶ 61.

 After he was called in and interviewed by HR, Mr. Lee spoke with L3's Bill

Nordmeier, the operator for grounds department, who informed Mr. Lee that Mr.

Nordmeier also had just received 100% VA disability for his back. [Docket No.

61-5, 2-ER-127 at ¶ 64.] Mr. Nordmeier was still working at L3s although he has

100% VA disability. *Id.* at ¶ 65. Due to the way Mr. Lee was questioned by HR

after getting his 100% disability from the federal government, Mr. Nordmeier told

Mr. Lee he went to L3 HR to inform them that he also got his 100% VA disability. *Id.* at ¶ 66. Mr. Nordmeier told Mr. Lee he went to L3 HR and disclosed that he had received 100% disability from the federal government and wanted to disclose it to L3. *Id.* at ¶ 67. Mr. Nordmeier told Mr. Lee that HR at L3 told Mr. Nordmeier that he doesn't need to disclose it and that he shouldn't talk about his disability at work as it was personal. *Id.* at ¶ 68.

On or about November 15, 2019, Mr. Lee's coworker Gilbert Castro was verbally warned by the safety lady at Barking Sands for not wearing protective gear. [Docket No. 61-5, 2-ER-127-129 at ¶ 70]. After lunch on the same date, Mr. Igne yelled at Mr. Lee to put on pants which he immediately complied with. [Docket No. 61-5, 2-ER-128 at ¶ 71]. Mr. Lee was power washing at that time and was wearing shorts because he was soaking wet. *Id.* at ¶ 72. Mr. Lee was wearing steel toed rubber boots. *Id.* at ¶ 73. At that time, Mr. Igne was also wearing shorts and tennis shoes. *Id.* at ¶ 74. Mr. Igne wore shorts and tennis shoes every day at work. *Id.* at ¶ 75. On the same date, Mr. Lee told Mr. Igne, "Tomorrow if I have to wear long pants, you have to wear long pants. If I have to wear steel toe shoes you have to wear steel toe shoes. What is good for one is good for all. So come tomorrow morning have your PPE or else." *Id.* at ¶ 78. Mr. Igne said, "Or else what, you going turn me in?" [Docket No. 61-5, 2-ER-128-129 at ¶ 79]. Mr. Lee respond, "Yeah" [Docket No. 61-5, 2-ER-129 at ¶ 80]. Mr. Igne: "Well, fuck you"

7

*Id.* at ¶ 81. Mr. Lee responds: "Well, fuck you too." *Id.* at ¶ 82. Mr. Igne and Mr. Lee exchanged a couple more "fuck yous" and Mr. Lee realized it was wrong and walked away. *Id.* at ¶ 83. Mr. Lee never physically threatened Mr. Igne. *Id.* at ¶ 84. Mr. Igne claims that when they spoke Mr. Lee's hands were "fisted and his chest was popped out." This is completely false. Mr. Lee was in no way physically threatening Mr. Igne. *Id.* at ¶ 85.

The following workday, Mr. Lee was called into Mr. Martin's office regarding a letter/note that Mr. Igne wrote to human resources/management regarding the previous day's confrontation with Mr. Lee. *Id.* at ¶ 86. Mr. Martin asked Mr. Lee a series of questioned that indicated Mr. Igne had given Mr. Martin false information. [Docket No. 61-5, 2-ER-129-130 at ¶¶ 87-95]. Mr. Martin said he was going to investigate Mr. Lee and this alleged incident. [Docket No. 61-5, 2-ER-130 at ¶ 97].

Previously in or about October 2017, Mr. Igne lied to Mr. Martin and stated Mr. Lee walked up to Mr. Igne with clenched fists acted like he was going to attack Mr. Igne and falsely alleged Mr. Lee said he was going to kick Mr. Igne's ass after work. *Id.* at ¶ 98. This was proven to be a lie by the two witnesses present. *Id.* at ¶ 99. In his November 2019 letter to L3 regarding him being afraid of Mr. Lee, Mr. Igne cites to the incident on October 24, 2017. The truth of that incident is that Mr. Igne falsely claimed that Mr. Lee had again clenched his fists and

popped out his chest like he wanted to fight. [Docket No. 61-5, 2-ER-130 at ¶ 100].
This incident was investigated by L3 and David Hesapene, who was a direct
witness told the truth. David Hesapene reported that Mr. Lee never had clenched
fist and a popped-out chest and never said he wanted to fight Mr. Igne. Declaration
of David Hesapene [Docket No. 61-11, 2-ER-154-156 at ¶ 6]. Mr. Igne was again
lying. The investigation, done by Rodney Martin, came back that Mr. Lee did
nothing wrong. Lee Decl. [Docket No. 61-5, 2-ER-130 at ¶ 100].

On November 18, 2019, Mr. Lee had a meeting with human recourses and
Mr. Martin regarding the confrontation with Mr. Igne. [Docket No. 61-5, 2-ER-131
at ¶ 102]. Mr. Lee was told he was being written up for breaking the code of
conduct for telling Mr. Igne fuck you. *Id*. at ¶ 102. During this meeting, Mr. Lee
reported that Mr. Igne had been stealing gas from the government for his personal
truck. The theft of the gasoline was confirmed by Gilbert Castro. Ex A [Docket
No. 61-2, 2-ER-099-109] at pg. 37 lns 10-14, pg 39 ln 11-25, pg. 49 ln 5-25 to pg
50-51. Mr. Lee then said he had to immediately take stress leave and that he could
not work under these conditions as he felt he was being single out now that he was
officially diagnosed with PTSD and those at the workplace knew about his
diagnosis. [Docket No. 61-5, 2-ER-132. at ¶ 111].

Mr. Lee went to see his doctor that very day to be placed on stress leave
which was effective November 21, 2019. *Id*. at ¶¶112-113.

On December 5, 2019, Ross West, the L3 project manager called Mr. Lee and requested Mr. Lee's CAC card and secret clearance card. The CAC and secret clearance cards are national security sensitive. Mr. Lee received security clearance training every year. L3 employees are supposed to give the CAC card and secret clearance card to security not to Mr. West. *Id.* at ¶ 114. Mr. Lee was directed by Mr. West to give his CAC card and secret clearance card to Mr. West and if he wasn't there then give it to his secretary. *Id.* at ¶ 115. Mr. Lee objected and said that was not proper as the CAC card and the secret clearance card were national security related items that need to be secure at all times. *Id.* at ¶ 116. Following Mr. West's directive, Mr. Lee brought the CAC card and secret clearance card on December 6, 2020 to Mr. West's office, Mr. West was not there so the card was left with Mr. West's secretary. [Docket No. 61-5, 2-ER-133 at ¶¶ 118-119]. This was a clear national security violation as Mr. Lee should have been directed to provide the CAC card and secret clearance card to the L3 security to safeguard those security sensitive items. *Id.* at ¶ 120. There were other L3 employees including Melissa Castillo and William "Bill" Milke, who were on stress leave that did not have their CAC cards and clearance cards removed by L3. They did not have PTSD. *Id.* at ¶ 121.

On or about April 1, 2020, Mr. Lee's doctor, Dr. Williamson, released him to return to work. *Id.* at ¶ 122. Mr. Lee was told to stay home and he would be paid

his full wages. *Id.* at ¶ 123. Mr. Lee was never notified by L3 that they felt he was a threat to return to the workplace or was he given a chance to provide his side of the story. Mr. Lee was never called by L3 to determine if he was a threat to return to the workplace. Mr. Lee was never interviewed, his psychologists/psychiatrist were not interviewed, he had no chance to refute any of L3's feelings that he was a threat to return to the workplace. L3 never did any investigation into whether Mr. Lee was a threat to the workplace in 2020 that included Mr. Lee or any doctor's or family on his behalf that would verify he was not a threat to the workplace. Mr. Lee's twenty-six (26) years working at Barking Sands, while he had PTSD, with no violence in the workplace is evidence that he was not a threat to the workplace or his coworkers. [Docket No. 61-5, 2-ER-132-133 at ¶ 124].

On June 22, 2020, Mr. Lee was issued his termination letter that does not indicate why he was terminated, and he was never told why he was terminated. [Docket No. 61-5, 2-ER-132 at ¶ 127-128].

## **ARGUMENT**

## **THE DISTRICT COURT ERRED IN GRANTING L3's MOTION FOR SUMMARY JUDGMENT**

The key argument made by Plaintiff in this Appeal is that, in relation to his federal and state disability discrimination claims and his whistleblower retaliation claim under Hawai'i law, the District Court erred in finding that there were no genuine issues of material fact as to whether the reason given for Plaintiff's termination

11

was a pretext. As the District Court found for Mr. Lee in regards to the *prima facie* elements of the rest of his claims discussed below, the District Court's finding that the reason given for Mr. Lee's termination was not pretextual is the key factual and legal decision made by the District Court resulting in the granting of L3 Motion for Summary Judgment as to the claims disputed below. Order Granting Defendant's Motion for Summary Judgment. ("Order"). [Docket No. 82, 1-ER-003-044].

## The District Court Correctly Found That Mr. Lee Was an Employee with a Disability and Could Perform His Essential Job Functions

As the District Court noted, it was undisputed that Mr. Lee was disabled individual within the meaning of the ADA. [Docket No. 82, 1-ER-022]. The District Court also correctly ruled that Mr. Lee raised genuine issues of matter fact as to whether he was a qualified individual who could perform the essential functions of his job. [Docket No. 82, 1-ER-022-025]. L3 argues in its Answering Brief at pg. 30 that Mr. Lee is not a "qualified individual" with a disability. District Court correctly rejected this argument because "L3Harris only raises concerns with Lee's ability to appropriately handle stress and not interact with coworkers" and that there is "[n]o other evidence that Lee cannot perform the essential functions of his job has been provided." 1-ER-025 (MSJ Order at 23). A genuine issue of material fact exists as to Plaintiff's ability to handle stress to perform his job as it is disputed whether Plaintiff's "threat" to punch Mr. Igne was credible and because this one alleged singular event was not as severe

as the conduct in *Mayo*. 1-ER-024-25 (MSJ Order at 22-23). *Mayo v. PCC Structurals, Inc.*, 795 F.3d 941 (9th Cir. 2015) held that while an employee can *be qualified despite adverse reactions to stress*, he is not qualified when that stress leads him to threaten to kill his co-workers in chilling detail and on multiple occasions (here, at least five times)). (This vastly disproportionate reaction demonstrated that Mayo could not perform an "essential function" of his job, and was not a "qualified individual."). *Mayo*, 795 F.3d at 944; see also id. at 945 ("Mayo's credible, detailed, and unwavering plan to kill his supervisors more than adequately demonstrated that he lacked the ability to appropriately handle stress and interact with others"). ... The *Mayo* court, addressing the narrowness of its holding, expressly wrote that "[w]e emphasize that we only address the extreme facts before us in this case: an employee who makes serious and credible threats of violence toward his co-workers." Id. at 945 n.4. Contrary to L3's assertion, absent a credible threat of violence to a coworker or supervisor, facts showing that an employee may have adverse reactions to stress are not enough to conclude, as a matter of law, that the employee cannot perform the essential functions of the job. *See Reaves v. Nexstar Broad., Inc.*, 327 F. Supp. 3d 1352, 1365-1368 (D. Or. 2018). L3's argument overlooks *Mayo's* limited holding. While *Mayo* noted that an "essential function of almost every job is the ability to appropriately handle stress and interact with others," the court did not hold that every employee who has

13

difficulty handling stress cannot, as a matter of law, establish a prima facie case of disability discrimination. *Id.* at 1368. The facts of *Mayo* warranted a finding as a matter of law, but were much more extreme and starkly different than the facts in the Instant Matter. It is undisputed that Mr. Lee, in his decades of work at L3 and its predecessor, never was in any physical confrontation in the workplace. Based on the instant facts, it is disputed if Mr. Lee even made a credible threat of violence in the workplace.

The District Court also correctly ruled that Mr. Lee was not estopped from claiming he is a qualified individual based on his VA disability benefits filing and award of benefits. [Docket No. 82, 1-ER-025-028]. The District Court rejected L3's estoppel argument because the District Court concluded Mr. Lee's ADA claim did not genuinely conflict with his successful VA benefits application. 1-ER-027-28 (MSJ Order at 25-26). The District Court held that the findings in Mr. Lee's PTSD evaluation did not necessarily preclude Mr. Lee from performing the essential functions of his job, the VA disability decision "did not address Lee's ability to work," and Lee did not make such a claim in his disability application. *Id.* Again, Mr. Lee never physically threatened or harmed anyone in the workplace in his decades of service.

**The District Court Correctly Ruled that There Were Genuine Issues of Material Fact as to Whether Mr. Lee Was Terminated Because of His PTSD.**

The Order at 1-ER-029-031 states:

14

"[A]n ADA discrimination plaintiff bringing a claim under 42 U.S.C. § 12112 must show that the adverse employment action would not have occurred **but for** the disability." *Murray v. Mayo Clinic*, 934 F.3d 1101, 1105 (9th Cir. 2019) (emphasis added), *cert denied*, 140 S. Ct. 2720 (2020). "For purposes of the ADA, with a few exceptions, conduct resulting from a disability is considered to be part of the disability, rather than a separate basis for termination."[1] *Humphrey v. Mem'l Hosps. Ass'n*, 239 F.3d 1128, 1139—40 (9th Cir. 2001) (footnote and citation omitted).

In *Humphrey*, the Ninth Circuit stated:

> The link between the disability and termination is particularly strong where it is the employer's failure to reasonably accommodate a known disability that leads to discharge for performance inadequacies resulting from that disability. *See Borkowski v. Valley Central Sch. Dist.*, 63 F.3d 131, 143 (2d Cir. 1995). *In Kimbro [v. Atlantic Richfield Co.*, 889 F.2d 869 (9th Cir. 1989)], for example, we found that there was a sufficient causal connection between the employee's disability and termination where the employee was discharged for excessive absenteeism caused by migraine-related absences. *See Kimbro*, 889 F.2d at 875. Similarly, Humphrey has presented sufficient evidence to create a triable issue of fact as to whether her attendance problems were caused by [obsessive compulsive disorder ("OCD")]. In sum, a jury could reasonably

---

[12] The exceptions to this general rule are when an employee is discharged for misconduct caused by alcoholism or illegal drug-use, or for "egregious and criminal conduct." See Humphrey, 239 F.3d at 1139 n.18 (citation and quotation marks omitted).

15

> find the requisite causal link between a disability of OCD and
> Humphrey's absenteeism and conclude that MHA fired
> Humphrey because of her disability.

Id. at 1140.

Here, L3 was aware of Lee's PTSD diagnosis, as evidenced by the 3/13/19 Meeting. See, e.g., Stewart Decl. ¶ 4. [Docket No. 82, 1-ER-030]. According to Lee, the human resource representatives present at the meeting asked Lee many questions relating to his PTSD diagnosis, including if he wanted to hurt himself or others, if he had anger problems, if he needed anger management classes, if he needed a psychiatrist, and if he needed any accommodations. Lee states he answered "no" to all those questions. [Lee Decl. ¶¶ 57—60.] [Docket No. 82, 1-ER-030]. Although Lee answered the questions in the negative, a jury could reasonably conclude that L3's questions to Lee about his PTSD show that it was aware of the possible symptoms or stereotypes associated with PTSD. [Docket No. 82, 1-ER-030]. The District Court noted that L3 received Dr. Bianchi's February 2020 psychological report about Lee, which highlighted some of Lee's PTSD symptoms. [Haen Decl. at ¶ 9; L3Harris Sealed CSOF, Exh. Z at PageID #: 893.] [Docket No. 82, 1-ER-030]. The District Court found that the evidence, when viewed in the light most favorable to Lee, suggests that L3 had reason to believe Lee's conduct was associated with his PTSD. [Docket No. 82, 1-ER-030].

The District Court also correctly stated that, "Viewing the evidence in the light most favorable to Lee, a rational trier of fact could find that, although L3Harris terminated Lee's employment because of his conduct surrounding the incident, his conduct was caused by his PTSD. *Cf. Gambini v. Total Renal Care, Inc.*, 486 F.3d 1087, 1094 (9th Cir. 2007) ("[T]he jury was entitled to infer reasonably that [the plaintiff's] 'violent outburst' . . . was a consequence of her bipolar disorder, which the law protects as part and parcel of her disability."). Put differently, but for Lee's conduct, which could reasonably have been caused by his PTSD, Lee's employment would not have been terminated. [Docket No. 82, 1-ER-031]. Accordingly, the District Court ruled that there was a genuine issue of material fact as to whether Mr. Lee's employment was terminated because of his PTSD. Summary judgment as to this issue was therefore inappropriate.[2] [Docket No. 82, 1-ER-031-032].

---

[2] L3Harris's sole argument against finding that Lee's employment was terminated because of his PTSD is that Lee was terminated more than a year after L3Harris learned about his PTSD. [Mem. in Supp. of Motion at 21 (citing *Manatt v. Bank of Am.*, 339 F.3d 792, 802 (9th Cir. 2003) (nine months too long to infer causation)).] L3Harris relies on *O'Brien v. R.C. Willey Home Furnishings*, 748 F. App'x 721, 723 (9th Cir. 2018), where the Ninth Circuit held that "causation may be inferred from timing alone where an employee is terminated shortly after his employer discovers that he is disabled." Although Lee may not benefit from the inference of causation because he not terminated shortly after L3Harris found out about his PTSD, that does not mean L3 is entitled to a ruling on summary judgment that Lee cannot establish causation.

**The District Court Ruled That L3 Met its Burden to Proffer a Non-Discriminatory Reason for Mr. Lee's Termination**

The District Court ruled that L3 provided a legitimate, non-discriminatory reason for Mr. Lee's termination in that Mr. Lee disrupted the workplace as L3 provided that:

> The final decision to terminate Mr. Lee's employment was based on several factors. First, Mr. Lee's comments to Dr. Bianchi regarding instigating a fight or argument with others for no reason raised concerns about employee safety and disruption to the workplace. His statements suggested that he had not learned from the warning he received in November 2019. Second, Keaki would not allow Mr. Lee access to the base unless L3Harris could guarantee that he would not be a danger to himself or others. Combined with the concerns described above that prompted the initial discussion to terminate Mr. Lee's employment in January 2020, I once again recommended that L3Harris terminate Plaintiff's employment . . . .

[Docket No. 82, 1-ER-033].

The District Court ruled that disruption in the workplace can serve as a legitimate, non-discriminatory reason for an adverse employment action. *Citing Unt v. Aerospace Corp.*, 765 F.2d 1440, 1446 (9th Cir. 1985) (stating termination for disrupting work environment can be a legitimate, nondiscriminatory basis); *Ogunleye v. Arizona*, 66 F. Supp. 2d 1104, 1108 (D. Ariz. 1999) (stating the plaintiff's disruptive presence was a legitimate, nondiscriminatory reason for not renewing her contract). [Docket No. 82, 1-ER-034].

As noted by the District Court, there were inconsistent statements made by Hesapene and Castro, two key witnesses supporting L3 proffer reason for Mr.

Lee's termination, in their written statements submitted to L3 as compared with their deposition testimony pertaining to whether Mr. Lee created a hostile workplace. [Docket No. 82, 1-ER-034]. Nevertheless, the District Court found that L3Harris had sufficient reason to believe, at the time of its review, that Lee's conduct was disruptive to the workplace.

The District Court also ruled that Mr. Lee was alleged to have violated L3Harris's policies. [Docket No. 82, 1-ER-034-035]. Violation of company policies and procedures can also be a legitimate, nondiscriminatory reason for termination. *See, e.g.*, *Dumas v. New United Motor Mfg., Inc.*, 305 F. App'x 445, 448 (9th Cir. 2008); *Rezentes v. Sears, Roebuck & Co.*, 729 F. Supp. 2d 1197, 1205 (D. Hawai`i 2010). [Docket No. 82, 1-ER-035]. As such, the District Court ruled that L3 had met its burden in providing legitimate, nondiscriminatory reasons for terminating Lee's employment.

Both of the key reasons for Mr. Lee's termination, as cited by the District Court, were based on the November 6, 2019 incident with Mr. Igne.

**The District Court Erred in Finding That Mr. Lee Had Not Raised a Genuine Issue of Material Fact as to the Reason for His Termination Being a Pretext**

In its Order the District Court completely ignores some of the most glaring facts that create a genuine issue of fact as to pretext. Mr. Lee did submit sufficient evidence to raise a genuine issue of matter fact as to the perpetual nature of L3

reason for terminating him. This is clear based on the history of adverse treatment related to Mr. Lee's PTSD, Mr. Lee's never getting into any physical confrontations at work after 25 years of service and the fact that his coworker Sean Igne, a man without PTSD, had initiated the disruption in the workplace on more than one occasion in regards to Mr. Lee, including the confrontation that formed the basis for Mr. Lee's termination based on the allegation he disrupted the workplace, yet Mr. Igne was not terminated or even reprimanded.

### THE DISTRICT COURT ERRED IN HOLDING THERE WAS NO GENUINE ISSUE OF MATERIAL FACT AS TO PRETEXT

The District Court relied on evidence from L3 that Mr. Lee was disruptive in the workplace in regards to the November 6, 2019 incident with Sean Igne. [Docket No. 82, 1-ER-034 and 005]. In said incident it was alleged that Mr. Lee accosted Mr. Igne in his office and yelled and swore at Mr. Igne. [Docket No. 82, 1-ER-005]. The District Court incorrectly took facts in the light most favorable to L3. The most crucial being the fact it found Mr. Lee started the incident. [Docket No. 82, 1-ER-037]. ("Lee went into the shop and initiated the discussion with Igne about the power-washing incident."). Mr. Lee did start the discussion, but Mr. Igne started the yelling and cursing. If nothing else, this is a disputed material fact.

The District Court did acknowledge that Mr. Lee submitted evidence that Mr. Igne started yelling and swearing at Mr. Lee first. To wit, the District Court detailed:

"According to Lee, he did not yell at Igne, but he admits he swore at Igne because Igne swore at him first. Lee states he told Igne that, if he had to wear his personal protective equipment ("PPE"), then Igne needed to wear his. Lee then told Igne that, if he did not bring his PPE the following Monday, then he would turn Igne in. According to Lee, it was at this point when Igne swore at Lee and Lee swore back at Igne. [Id. at 39-40.] They exchanged swear words "twice, maybe three times," then Lee walked away. [Id. at 40.] Lee contends in his deposition testimony that he did not yell at Igne. [Id. at 39.] But, in his written statement to Martin the day after the incident, Lee wrote that he yelled at Igne. [Haen Decl., Exh. O ("that's when I started yelling and swearing at him").]"

[Docket No. 82, 1-ER-005].

Mr. Lee argued that Mr. Igne, whose conduct initiated the yelling and swearing (the disruption in the workplace and violation of company policy), was not written up or terminated for his ***identical conduct*** as he did not have PTSD. [Docket No. 61-5 at 2-ER-128-129 at ¶ 78-85 and 2-ER-139 at ¶ 146-147]. When Mr. Lee went to tell Mr. Igne he too had to where his protective gear Mr. Lee was not yelling or swearing at Mr. Igne. [Docket No. 61-5 at 2-ER-128-129 at ¶ 78-85]. Mr. Igne swore at Mr. Lee first. [Docket No. 61-5 at 1-ER-130 at ¶ 102-104]. These facts on their face create a genuine of material fact as to whether Mr. Lee's alleged disruption of the workplace and violation of company policy was a pretext to fire him due to his PTSD and his PTSD related symptoms. Moreover, as Mr. Igne new Mr. Lee had PTSD he could have started yelling at Mr. Lee to bate him, trigger him and cause a response.

Two of the witnesses to the altercation, who could not clearly hear what was being said as they were in a separate room, Mr. Gilbert Castro and Mr. David Hesapene, both changed their story upon being deposed under oath.

Mr. Castro, under oath, which his statement to L3 was not, made clear that Mr. Igne swore and yelled at Mr. Lee and that the management personnel and union rep never asked him about Mr. Igne's conduct during the incident or Mr. Igne's yelling or swearing when management wanted a written statement about the incident from Mr. Castro. [Docket No. 61-2, 2-ER-099-101]. Mr. Castro also testified that yelling and swearing at the L3 workplace were common. [Docket No. 61-2, 2-ER-101 and 107]. This was confirmed by Mr. Lee including cursing by the same managers that held the same against Mr. Lee. [Docket No. 61-5, 2-ER-124 at ¶ 41-45]. Mr. Castro confirmed that Mr. Lee was not a threat to him in the workplace and did not create an unsafe or hostile environment. [Docket No. 61-2, 2-ER-107-111].

Mr. Hesapene, during his deposition under oath, also essentially recanted his key written statements, taken by management, that L3 submitted in its defense. Mr. Hesapene made clear during his deposition that he did not hear Mr. Lee threatening, yelling or swearing at Mr. Igne. [Docket No. 61-3, 2-ER-110-111]. Mr. Hesapene testified that Mr. Lee was not a threat to the workplace. [Docket No. 61-3, 2-ER-113-114]. To any allegation that Mr. Lee said he wanted to punch

Mr. Igne through his face, Mr. Hesapene testified that Mr. Lee was just venting and not serious. [Docket No. 61-3, 2-ER-115]. Mr. Lee did not admit he said this and submitted that he does not recall saying this during his deposition [Docket No. 61-5 at 1-ER-139 at ¶ 148].

Looking at Mr. Castro and Mr. Hesapene's deposition testimony attached to Mr. Lee's Memorandum in Opposition you can see that L3 management and its union put words in these witnesses mouths, misstated their testimony and then had them sign such manufactured statements. [Docket No. 61-2 and 61-3, 2-ER-99-115]. This practice was clearly coercive coming from their management and further evidence of pretext.

On the date of the November 6, 2019, incident Mr. Lee had already been approached and yelled at by Mr. Igne. [Docket No. 61-5 at 2-ER-128 at ¶ 71-75]. Moreover, Mr. Lee submitted evidence that Mr. Igne had previously falsified nearly the exact claims against Mr. Lee for yelling and being aggressive with Mr. Igne that were determined to be false. [Docket No. 61-5, 2-ER-130-131 at ¶ 100] and [Docket No. 61-11, 2-ER-155 at ¶ 6]. Moreover, Mr. Lee was already written up for this incident and that should have been the end of any discipline. Instead, he was fired months later after being on leave from the workplace and being cleared by his doctor to return.

Mr. Lee never once had a physical altercation in the workplace. [Docket No. 61-5, 2-ER-124 at ¶ 40]. Prior to the November 6, 2019 incident, Mr. Lee had never been written up for being disruptive in the workplace. [Docket No. 61-5, 2-ER-139 at ¶ 145].

Mr. Lee submitted the declaration of six (6) of his coworkers (Jimmy Costales, Josh Burton, Guy Fujita, Michael Young, David Shimogawa, David Hesapene) all confirming Mr. Lee was not a threat, disruptive or intimidating in the workplace as alleged. [Docket No. 61-6 to 61-11, 2-ER-142-156].

## The District Court Erred In Granting Summary Judgment as to the Hawai'i Whistleblower Protection Act Claim

As recognized by the District Court, Mr. Lee submitted that the protected activities he engaged in were: (1) reporting to Martin and L3Harris that Igne stole gasoline; and (2) objecting to the violation of the law related to his security clearance card. [Docket N0. 82, 1-ER-042].

The District Court wrote, "Lee reported Igne's alleged gasoline thefts during Martin's investigation of the incident between Lee and Igne in November 2019. Although the decision to terminate Lee's employment was made approximately two months after Lee reported Igne's alleged thefts, an inference of causation based on proximity in time is not enough. Lee was already being investigated for misconduct before he reported the gasoline thefts." [Docket No. 82, 1-ER-042]. The District Court ignored the fact that Mr. Lee, for the second

24

time reported the theft of gas on November 6, 2019. Mr. Lee initially reported the theft of gasoline on April 9, 2019, before the November 6, 2019 incident. [Docket No. 61-5, 2-ER-127 at ¶ 69].

The District Court did find that the timing between the whistleblowing and termination supported a finding of causation, but found Mr. Lee provided nothing more as to causation. [Docket No. 82, 1-ER-042]. This is incorrect. Mr. Lee relied on the same facts in support of his wrongful termination claim under disability law to support the fact that his termination was pretextual, thereby creating a genuine issue of material fact as to causation under the HWPA. [Docket No. 60, 2-ER-090].

## <u>CONCLUSION</u>

Considering the facts submitted by Mr. Lee a reasonable juror could find that Mr. Lee was terminated due to his disability and/or for whistleblowing. The District Court erred in granting summary judgment as the District Court ignored key facts and/or took the facts in the light most favorable to L3.

DATED: Honolulu, Hawaii, October 27, 2022.

/s/ Joseph T. Rosenbaum
JOSEPH T. ROSENBAUM
Attorney for Plaintiff-Appellant
Preston Lee

## <u>STATEMENT OF RELATED CASES</u>

Plaintiff-Appellant Preston Lee is not aware of any other related cases with similar facts to this appeal.

DATED: Honolulu, Hawaii, October 27, 2022.

/s/ Joseph T. Rosenbaum
JOSEPH T. ROSENBAUM
Attorney for Plaintiff-Appellant
Preston Lee

## CERTIFICATE OF COMPLIANCE WITH
## TYPE-VOLUME LIMITATION

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

This brief contains 6,670 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), or

DATED: Honolulu, Hawaii, October 27, 2022.

/s/ Joseph T. Rosenbaum
JOSEPH T. ROSENBAUM
Attorney for Plaintiff-Appellant
Preston Lee

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## 9ᵀᴴ Circuit Case No. 22-15288

---

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on October 27, 2022.

I hereby certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system as follows:

> AMANDA M. JONES
> *ajones@cades.com*
> Attorney for Defendant/Appellee L3Harris Technologies, Inc.

DATED: Honolulu, Hawaii, October 27, 2022.

> /s/ Joseph T. Rosenbaum
> JOSEPH T. ROSENBAUM
> Attorney for Plaintiff-Appellant
> Preston Lee